Anoush Hakimi (SBN 228858)
anoush@handslawgroup.com
Peter Shahriari (SBN 237074)
peter@handslawgroup.com
Laura Steven (SBN 332168)
laura@handslawgroup.com
Kyle Wilson (SBN 323888)
kyle@handslawgroup.com
**THE LAW OFFICE OF HAKIMI & SHAHRIARI**
1800 Vine Street
Los Angeles, CA 90028
Telephone: (888) 635-2250
Facsimile: (213) 402-2170

Attorneys for Plaintiff,
**JAMES SHAYLER**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| James Shayler, an individual,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>HB MAT PROPERTIES, a California limited liability company; FUSION SUSHI, a business of unknown form; and DOES 1-10,<br><br>　　　　Defendants. | Case No.:  2:20-cv-11107-FMO-GJS<br><br>Hon. Fernando M. Olguin<br><br>**JOINT EVIDENTIARY APPENDIX ISO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (VOL. 2)** |

EVIDENTIARY APPENDIX ISO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# Table of Contents

Declaration of James Shayler......................................................................1

Declaration of Dr. McCloy .......................................................................14

Declaration of John Battista.......................................................................22
Declaration of Anoush Hakimi ..................................................................32
Declaration of Marc Friedlander................................................................36

Exhibit 1 ...................................................................................................41

Exhibit 2 ...................................................................................................46

Exhibit 3 ...................................................................................................48

Exhibit 4 ...................................................................................................53

Exhibit 5 ...................................................................................................56

Exhibit 6 ...................................................................................................60

Exhibit 7 ...................................................................................................63

Exhibit 8 ...................................................................................................68

Exhibit 9 ...................................................................................................71

Exhibit 10 .................................................................................................75

Exhibit 11 .................................................................................................77

Exhibit 12 .................................................................................................79

Exhibit 13 ...............................................................................................221

Exhibit 14 ...............................................................................................224

Exhibit 15 ...............................................................................................244

Exhibit 16 ...............................................................................................246

Exhibit 17 ...............................................................................................248

Exhibit 18 ...............................................................................................250

Exhibit 19 ...............................................................................................252

Exhibit 20 ...............................................................................................254

Exhibit 21 ...............................................................................................256

Exhibit 22 ...............................................................................................258

Exhibit 23 ...............................................................................................260

Exhibit 24 ..................................................................................................262

Exhibit 25 ..................................................................................................264

Exhibit 26 ..................................................................................................266

Exhibit 27 ..................................................................................................268

Exhibit 28 ..................................................................................................270

Exhibit 29 ..................................................................................................272

Exhibit 30 ..................................................................................................274

Exhibit 31 ..................................................................................................276

Exhibit 32 ..................................................................................................278

Declaration Of James S. Link                                              285

Exhibit 33, Deposition of James Shayler                                   288

Exhibit 34, Civil Rights Complaint                                        437

Exhibit 35, Lumbar Spine Medical Source Statement                         528

Exhibit 36, Photo of Stairs at CPAP store                                 533

Exhibit 37, Stills from July 14, 2021                                     535

Exhibit 38, Declaration of James Shayler, dated 7/16/2021                 574

Exhibit 39, Still from April 2, 2021 in CPAP store                        598

Exhibit 40, Still from April 2, 2021 outside CPAP store                   600

Exhibit 41, Still from July 16, 2019 video outside                        602

Exhibit 42, Still from July 16, 2019 video inside                         604

Exhibit 43, Declaration of James Shayler, dated 3/17/21                   606

Exhibit 44, Still from July 16, 2019 video going inside                   618

Exhibit 45, Declaration of James Shayler, dated 6/10/21                   620

Exhibit 46, Video: RPReplay_Final1622081366                               629

Exhibit 47, Video: RPReplay_Final1622084437                               629

Exhibit 48, Video: July 2021 Checking access aisle                        629

Exhibit 49, Video: July 2021 video getting drink

1   James S. Link (SBN 94280)
2   Counselor & Advocate At Law
    215 N. Marengo, 3rd Floor
3   Pasadena, CA 91101
4   (626)793-9570
    (626)628-1925 (fax)
5   james.s.link@att.net

6   Attorney for Defendant HB Mat Properties, A California Limited Liability Company
7

8              IN THE UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA

10  | James Shayler, | Case No.: 2:20-cv-11107-FMO-GJS |
11  | | |
12  | Plaintiff, | **Declaration Of James S. Link In Opposition To Motion For Summary Judgment** |
    | v. | |
13  | | |
14  | HB Mat Properties, a California limited liability company, et al., | |
15  | | |
16  | Defendants. | |

17      James S. Link declares:

18      1.      I am an attorney licensed to practice law in the state of California since

19  1980 and admitted to practice in the United States District Court for the Central

20  District of California since 1981.  I am counsel of record for defendant HB Mat

21  Properties.

22      2.      Exhibit 33 is a true and correct copy of the deposition of plaintiff James

23  Shayler, which I took on October 13, 2021.

24      3.      Exhibit 34 is a true and correct copy of Exhibit 2 to the deposition of

25  plaintiff James Shayler.

26      4.      Exhibit 35 is a true and correct copy of Exhibit 4 to the deposition of

27  plaintiff James Shayler.

28      5.      Exhibit 36 is a true and correct copy of Exhibit 10 to the deposition of

                                    1
**Declaration Of James S. Link In Opposition To Motion For Summary Judgment**

1  plaintiff James Shayler.

2       6.    Exhibit 37 is a true and correct copy of Exhibit 16 to the deposition of

3  plaintiff James Shayler.

4       7.    Exhibit 38 is a true and correct copy of Exhibit 5 to the deposition of

5  plaintiff James Shayler.

6       8.    Exhibit 39 is a true and correct copy of Exhibit 8 to the deposition of

7  plaintiff James Shayler.

8       9.    Exhibit 40 is a true and correct copy of Exhibit 9 to the deposition of

9  plaintiff James Shayler.

10       10.    Exhibit 41 is a true and correct copy of Exhibit 11 to the deposition of

11  plaintiff James Shayler.

12       11.    Exhibit 42 is a true and correct copy of Exhibit 14 to the deposition of

13  plaintiff James Shayler.

14       12.    Exhibit 43 is a true and correct copy of Exhibit 6 to the deposition of

15  plaintiff James Shayler.

16       13.    Exhibit 44 is a true and correct copy of Exhibit 13 to the deposition of

17  plaintiff James Shayler.

18       14.    Exhibit 45 is a true and correct copy of Exhibit 7 to the deposition of

19  plaintiff James Shayler.

20       15.    Exhibit 46 is a true and correct copy of the video entitled

21  RPReplay_Final1622081366.mov that was shown to plaintiff James Shayler at his

22  deposition.  He identified himself as the person shown in the video.

23       16.    Exhibit 47 is a true and correct copy of the video entitled

24  RPReplay_Final1622084437.mov that was shown to plaintiff James Shayler at his

25  deposition.  He identified himself as the person shown in the video.

26       17.    Exhibit 48 is a true and correct copy of the video entitled July 2021

27  Checking access aisle.mp4 that was shown to plaintiff James Shayler at his

28  deposition.  He identified himself as the person shown in the video.

2

**Declaration Of James S. Link In Opposition To Motion For Summary Judgment**

18.     Exhibit 49 is a true and correct copy of the video entitled RPReplay_Final1622081366.mov that was shown to plaintiff James Shayler at his deposition.  He identified himself as the person shown in the video.

19.     By September 1, 2021, I had sent to counsel for plaintiff the videos showing plaintiff walking without a cane, walking on stairs, using his right hand, stooping, and bending.  When I met with counsel for plaintiff to meet and confer for this motion, I specifically discussed the fact that the evidence presented in the videos raised questions of fact precluding summary judgment.

20.     On October 13, 2021, I took the deposition of plaintiff. I showed him stills from the videos as well as the videos showing him walking without a cane, walking on stairs, using his right hand, stooping and bending.  Despite the obvious challenge to Shayler's credibility from the videos, plaintiff counsel have proceeded with the filing of this motion. They have done so despite the fact they were aware plaintiff perjured himself in declarations, which also discredits his testimony.

21.     I have spent 30 hours in the preparation of the opposing portions of the joint motion for summary judgment.  My hourly rate is $500.  Defendant seeks $15,000 for having to oppose this motion that has been brought in bad faith to multiply the proceedings in this case.

I declare under penalty of perjury under the laws of the United States of America and the state of California that the foregoing is true and correct.

Date: November 5, 2021

James S. Link

3

**Declaration Of James S. Link In Opposition To Motion For Summary Judgment**

# Exhibit 33



# Transcript of **James Shayler**

Wednesday, October 13, 2021

**James Shayler v. HB Mat Propeties**

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 107945

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

 4        JAMES SHAYLER,

 5                          Plaintiff,

 6             vs.                               Case No.
                                                2:20-cv-11107-FMO-
 7        HB MAT PROPERTIES, a California        GJS
          limited liability company; and
 8        DOES 1-10,

 9                          Defendants.
          _____

10

11

12

13                      REMOTE DEPOSITION OF

14                         JAMES SHAYLER

15                       October 13, 2021

16                          9:55 a.m.

17

18

19

20

21

22

23

24

25             JAY W. HARBIDGE, CSR No. 4090
```

Trustpoint.One  Alderson        www.trustpoint.one        800.FOR.DEPO
                                286
                          www.aldersonreporting.com        (800.367.3376)

```
 1              REMOTE APPEARANCES OF COUNSEL:

 2

 3    For Plaintiff:

 4              LAW OFFICE OF HAKIMI AND SHAHRIARI

 5              PETER SHAHRIARI, ESQ.

 6              1800 Vine Street

 7              Los Angeles, California  90028

 8              888 635 2250

 9              213 402 2170 Fax

10

11    For Defendants:

12              LAW OFFICE OF JAMES S. LINK

13              JAMES S. LINK, ESQ.

14              215 N. Marengo, 3rd Floor

15              Pasadena, California  91101

16              626 793 9570

17              626 628 1925  Fax

18              James.S.Link@att.net

19

20

21

22

23

24

25
```

Trustpoint.One   Alderson   www.trustpoint.one
287
www.aldersonreporting.com

800.FOR.DEPO
(800.367.3376)

```
 1                    INDEX TO EXAMINATION

 2    WITNESS:  JAMES SHAYLER

 3    EXAMINATION                                      PAGE

 4    BY MR. LINK                                         5

 5

 6                    INDEX TO EXHIBITS

 7     MARKED              DESCRIPTION               PAGE

 8    Exhibit 1      Photograph                         7

 9    Exhibit 2      Civil Rights Complaint, Shayler

10                   versus Onglao                      14

11    Exhibit 3      Complaint, Shayler versus

12                   Narcotics Task Force, Sheriff

13                   Department                         25

14    Exhibit 4      Document captioned Lumbar Spine

15                   Medical Source Statement, Beverly

16                   Hospital, James Shayler            32

17    Exhibit 5      Declaration of James Shayler in

18                   Support of Plaintiff's Motion for

19                   Summary Judgment, Shayler versus

20                   1310 PCH LLC                       34

21    Exhibit 6      Declaration of James Shayler in

22                   Support of Plaintiff's Motion for

23                   Summary Judgment, Shayler versus

24                   Yacoub                             48

25
```

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
288
800.FOR.DEPO
(800.367.3376)

```
 1                    INDEX TO EXHIBITS

 2   Exhibit 7        Declaration of James Shayler in

 3                    Support of Plaintiff's Opposition

 4                    to Defendant's Motion to Dismiss

 5                    for Lack of Jurisdiction Pursuant

 6                    to FRCP Rule 12(B)(1) and (H)(3),

 7                    Shayler versus HB Mat Properties      50

 8   Exhibit 8        Video still, April 2, 2021,

 9                    1:16:42 p.m.                          57

10   Exhibit 9        Video still, April 2, 2021,

11                    1:17:41 p.m.                          58

12   Exhibit 10       Video still                           59

13   Exhibit 11       Video still, 7-16-19, 14:37:00        60

14   Exhibit 12       Video Still, 7-16-19, 14:37:30        62

15   Exhibit 13       Video still, 7-16-19, 14:37:53        63

16   Exhibit 14       Video still, 7-16-19, 14:39:01        64

17   Exhibit 15       Video still, 7-16-19, 14:38:54        69

18   Exhibit 16       Series of photographs                 74

19   Exhibit 17       Document captioned Shayler Cases      121

20               QUESTION INSTRUCTED NOT TO ANSWER

21                    PAGE          LINE

22                     91            8
                      107            2
23                    120            1
                      129            4
24                    129            4

25
```

```
 1                REMOTE PROCEEDINGS

 2              OCTOBER 13, 2021, 9:55 A.M.

 3

 4                    JAMES SHAYLER,

 5              having been first duly sworn,

 6           was examined and testified as follows:

 7

 8                     EXAMINATION

 9    BY MR. LINK:

10        Q.     Mr. Shayler, can you please state and spell

11    your full name for the record.

12        A.     My name is James Shayler, that's J-a-m-e-s

13    and then S-h-a-y-l-e-r.

14        Q.     Mr. Shayler, have you ever had your

15    deposition taken before?

16        A.     Yes.

17        Q.     All right.  How long ago?

18        A.     Maybe a year ago.

19        Q.     Okay.  I'm not going to repeat all of what

20    you may have heard about what a deposition is, but I

21    just wanted to make sure that we have a few ground rules

22    in place.  I will do my best not to interrupt your

23    response.  Please try not to interrupt my question.

24    It's not so much a matter of me; it's a matter of the

25    court reporter being able to get a clean record.
```

 1              Do you understand that?

 2      A.      I'm aware of that, yes, sir.

 3      Q.      Thank you.  The other thing is, in

 4  conversation we tend to nod other heads, shake our heads

 5  and say "uh-huh" or "huh-uh."  Those responses are not

 6  easily discernible for the court reporter in the record.

 7              Do you understand that?

 8      A.      I do.

 9      Q.      So I need you to say "yes" or "no."  And if I

10  badger you by saying, "Was that a yes or was that a no,"

11  I'm just trying to get a clear record.

12              Do you understand that?

13      A.      I do.

14      Q.      Okay.  Lastly, you further understand that

15  you have been given the oath to testify under penalty of

16  perjury, correct?

17      A.      Yes.

18              Come on in.  Excuse me one second.  Okay?  I

19  have a delivery of my medications.  Just wait one

20  second, sir.

21      Q.      Okay.

22              (Brief pause.)

23              THE WITNESS:  Okay, I'm back.  Sorry about

24  that.  I tried to get that dropped but I couldn't.

25  BY MR. LINK:

1        Q.      No worries.  Okay.  Mr. Shayler, we're

2    supposed to be able to show exhibits in this deposition

3    by Zoom.  I'm going to try to load up an exhibit to show

4    you and there will be a number of them.  Bear with me a

5    moment.

6            Mr. Shayler, you should see on screen, I

7    think, a photograph of someone holding a package of

8    money.  Do you see that?

9        A.      Yes.

10       Q.      Okay.  Mr. Shayler, is that you?

11       A.      Yes, that's me.

12       Q.      How long ago was that picture taken?

13       A.      Fifteen years ago.

14           MR. LINK:  I would like to mark this

15   photograph as Exhibit 1 to the deposition.  It is, as I

16   said earlier, a photograph of Mr. Shayler holding a

17   package of money.

18           (Exhibit 1 marked)

19   BY MR. LINK:

20       Q.      Mr. Shayler, do you recall why this

21   photograph was taken?

22           MR. SHAHRIARI:  Objection, calls for

23   speculation, lacks foundation, vague and ambiguous and

24   is not calculated to lead to admissible evidence.

25           MR. LINK:  Are you instructing him not to

```
 1   answer?

 2              MR. SHAHRIARI:  I didn't say that.

 3              MR. LINK:  Okay.  I just wanted to make sure.

 4   BY MR. LINK:

 5       Q.    Mr. Shayler, that means you can answer the

 6   question.  And the question was, subject to the

 7   objections, do you recall why this photograph was taken?

 8       A.    Yes, I do.

 9       Q.    Why --

10       A.    The photograph was taken when my brother got

11   some money into his check cashing business, and I had

12   never seen a hundred thousand dollars before.

13       Q.    What is your brother's name?

14              MR. SHAHRIARI:  Objection, not calculated to

15   lead to admissible evidence, invasion of privacy,

16   constitution privacy.  That's all.

17   BY MR. LINK:

18       Q.    Mr. Shayler, what is your brother's name?

19       A.    Guy Shayler.

20       Q.    Was that Guy, G-u-y?

21       A.    Guy, G-u-y.

22       Q.    Where was the check cashing business located?

23              MR. SHAHRIARI:  Objection, vague and

24   ambiguous, lacks foundation, invades Constitutional

25   privacy, vague and ambiguous, beyond the scope of this
```

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
293
800.FOR.DEPO
(800.367.3376)

1   case, not calculated to lead to the discovery of

2   admissible evidence.

3   BY MR. LINK:

4       Q.      Where was the check cash business located?

5       A.      In Westwood, California.

6               MR. SHAHRIARI:  Same objections.

7   BY MR. LINK:

8       Q.      Did you work for the check cashing business?

9               MR. SHAHRIARI:  Objection, vague and

10  ambiguous, "work for," lacks foundation, unduly

11  burdensome.  Hold on, hold on, James.  And Mr. Link, I'm

12  not finished with my objection.  Please allow me to

13  finish my objections before you interject with a new

14  question.  Please give me a moment.

15              It's also vague and ambiguous, it's also not

16  calculated to lead to the discovery of addible evidence

17  and beyond the scope of this case, invasion of privacy.

18  BY MR. LINK:

19      Q.      Mr. Shayler, were you employed by or worked

20  for the check cashing business?

21      A.      No.

22      Q.      What was the name of --

23              MR. SHAHRIARI:  Objection, beyond the scope

24  of this case, not calculated to lead to the discovery of

25  admissible evidence, lacks foundation, incomplete

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
294
800.FOR.DEPO
(800.367.3376)

 1   hypothetical, calls for speculation, incomplete

 2   hypothetical.

 3   BY MR. LINK:

 4       Q.     Mr. Shayler, what was the name of the check

 5   cashing business?

 6       A.      Westwood Check Cashing.

 7              MR. SHAHRIARI:  Objection.

 8   BY MR. LINK:

 9       Q.     Does Guy Shayler still own and operate the

10   Westwood Check Cashing business?

11              MR. SHAHRIARI:  Objection, compound question,

12   calls for speculation, calls for legal reasoning and a

13   conclusion, lacks foundation, beyond the scope of this

14   lawsuit, not calculated to lead to the discovery of

15   admissible evidence and invasion of privacy.

16   BY MR. LINK:

17       Q.     You may answer the question.

18       A.     Yes, he still does.

19       Q.     Thank you.  Mr. Shayler, you are a convicted

20   felon, correct?

21              MR. SHAHRIARI:  Objection, invades privacy,

22   Constitutional privacy rights, beyond the scope of this

23   case, not calculated to lead to the discovery of

24   admissible evidence, unduly burdensome, lacks

25   foundation, calls for a legal conclusion, assumes facts

1    not in evidence -- excuse me.  Strike that last

2    objection.

3    BY MR. LINK:

4        Q.      You may answer the question.

5        A.      Yes.

6        Q.      What were you convicted of?

7                MR. SHAHRIARI:  Objection, calls for legal

8    reasoning and conclusion, lacks foundation, vague and

9    ambiguous, beyond the scope of this lawsuit, invades

10   Constitutional privacy rights, not calculated to lead to

11   the discovery of admissible evidence.

12               MR. LINK:  You know, Mr. Shahriari, when this

13   deposition is shown to the judge he is not going to be

14   happy with these objections.  The question was --

15               MR. SHAHRIARI:  Mr. Link, I want to address

16   what you just said.  Why is the judge not going to be

17   happy?  Are you intending to send this to the judge

18   because I'm making objections?

19               MR. LINK:  I might, I might.

20               MR. SHAHRIARI:  Yes, it's obvious that's what

21   you're planning on doing.

22   BY MR. LINK:

23       Q.      What was your conviction of?

24       A.      Driving without owner's consent.

25               MR. SHAHRIARI:  Objection, invades

Trustpoint.One  |  Alderson

www.trustpoint.one
www.aldersonreporting.com

296

800.FOR.DEPO
(800.367.3376)

1    Constitutional privacy rights.

2              Go ahead, James.

3    BY MR. LINK:

4        Q.    I missed the first part.  Something without

5    owner's consent; is that correct?

6        A.    Driving.

7              MR. SHAHRIARI:  Same objection.

8    BY MR. LINK:

9        Q.    For the crime of driving without owner's

10   consent you served time in the California Men's Colony

11   in San Luis Obispo, correct?

12       A.    That's correct.

13             MR. SHAHRIARI:  Objection, invades privacy,

14   beyond the scope of this lawsuit, not calculated to lead

15   to the discovery of admissible evidence, vague and

16   ambiguous, also calls for a legal conclusion.

17             Go ahead, James.

18   BY MR. LINK:

19       Q.    How long was your term?

20             MR. SHAHRIARI:  Objection, calls for a legal

21   reasoning and conclusion, calls for expert opinion, also

22   calls for speculation, beyond the scope of this lawsuit,

23   not calculated to lead to the discovery of admissible

24   evidence, violates Mr. Shayler's Constitutional privacy

25   rights.

Trustpoint.One   Alderson.

www.trustpoint.one
www.aldersonreporting.com

297

800.FOR.DEPO
(800.367.3376)

1           You can answer, James, if you understand.

2    Also vague and ambiguous.

3           THE WITNESS:   I'd have to guess, but I think

4    it was three years.

5    BY MR. LINK:

6       Q.     What were you driving without the owner's

7    consent?

8           MR. SHAHRIARI:  Objection, vague and

9    ambiguous, lacks foundation, beyond the scope of this

10   lawsuit, not calculated to lead to the discovery of

11   admissible evidence, invasion of privacy.

12   BY MR. LINK:

13      Q.     You may answer.

14      A.     A car.

15      Q.     Did you get into an accident with the car?

16      A.     No.

17          MR. SHAHRIARI:  Objection, vague and

18   ambiguous.

19   BY MR. LINK:

20      Q.     Okay.  I would like to show you --

21      A.     Can I say something for the record?

22          MR. LINK:  Your counsel is free to ask a

23   question after I'm done if you'd like to fill in --

24          THE WITNESS:  That was 25 years ago.  Let's

25   put that on the record.

```
 1                    MR. SHAHRIARI:  James, he's not asking any

 2    questions.  Wait for his questions, James.

 3                    THE WITNESS:  Did you ask it, Counselor?

 4                    MR. SHAHRIARI:  James, let him ask his

 5    questions.  Wait until he asks a question.

 6    BY MR. LINK:

 7        Q.    Mr. Shayler, I'm hopefully -- let's stop

 8    sharing.

 9                    On screen should be a Civil Rights Complaint

10    pursuant to 42 USC Section 1983, with the name James

11    Shayler versus Dr. Onglao, O-n-g-l-a-o.

12                    Do you see that on screen?

13        A.    Yes, I do.

14                    MR. SHAHRIARI:  Objection, the document

15    speaks for itself.

16                    MR. LINK:  I'm going to mark this Civil

17    Rights Complaint as Exhibit 2.

18                    (Exhibit 2 marked)

19    BY MR. LINK:

20        Q.    Mr. Shayler, I'm going to ask that you look

21    at the second page -- I'm sorry, the third page, which I

22    should be scrolling up to, and ask that you just look,

23    read to yourself the portion that looks like it's

24    paragraph 1 and paragraph 2.

25        A.    It says 1 and 2; is that correct?
```

Trustpoint.One   Alderson.        www.trustpoint.one          800.FOR.DEPO
                                   www.aldersonreporting.com          (800.367.3376)
                                          299

1        Q.      It says 1, "Defendant Dr. Onglao resides,"

2   and then, you know, read down from there.

3        A.      "Dr. Onglao resides at West Medical Clinic,

4   California Men's Colony, PO Box 1803, San Luis Obispo."

5              Did you want me the finish it?

6        Q.      No.  I just wanted you to read it to yourself

7   so that I could ask some questions relative to this.

8              Have you had a chance to review that?

9        A.      Yes.

10       Q.      Okay.  What was Dr. Onglao's actions under

11   color of state law that in any way harmed you?

12              MR. SHAHRIARI:  Objection, calls for a legal

13   reasoning and conclusion, vague and ambiguous,

14   unintelligible and confusing, lacks foundation, calls

15   for speculation, invades Constitutional privacy rights.

16   And I'm going to object to -- on the basis of medical

17   privilege to the extent any medical information is

18   beyond the scope of this lawsuit, although our client

19   has put his medical background at issue by filing this

20   case, but only to the extent that it is relative to his

21   disabilities.

22              James, you can answer if you understand the

23   question, please.

24              THE WITNESS:  I believe this doctor was the

25   one that injured me on my right elbow and he waited a

1   year to do the surgery.   And by the time he did the

2   surgery, my hand had atrophied and I had little use or

3   no use of my right hand.   I could be wrong but I believe

4   that was it.

5   BY MR. LINK:

6       Q.      Now, if you go -- I'm going to scroll up to

7   the top of the page.   Apparently the case was filed on

8   12/18/2006.

9       A.      Uh-huh.

10      Q.      Were you in prison for the crime of driving a

11  vehicle without the owner's consent in December 2006?

12          MR. SHAHRIARI:   Objection, beyond the scope

13  of this case, invades Constitutional privacy rights,

14  unintelligible and confusing, unduly burdensome, calls

15  for legal reasoning and a conclusion.

16  BY MR. LINK:

17      Q.      You can answer the question.

18      A.      I was in an outside yard, yes.

19      Q.      What does an outside yard mean?

20      A.      That means you're not confined to the prison,

21  you work outside the prison.

22      Q.      Got it.   Mr. Shayler, I'm only seeing about

23  half of your face.   Can you --

24      A.      Okay, yes.

25      Q.      -- adjust your video?

1        A.      Yes, there you go.

2        Q.      Thank you, sir.

3                Now, moving on to page 4, it says some words

4    to the effect that you had hepatitis C and the doctors

5    did not provide interferon treatment for you.

6                MR. SHAHRIARI:  Objection, invades

7    Constitutional privacy rights, invades physician-patient

8    privilege to the extent you're asking about any medical

9    information that is beyond the scope of his disabilities

10   and impairments, vague and ambiguous.

11   BY MR. LINK:

12       Q.      You may answer the question.

13               MR. SHAHRIARI:  I'm sorry -- go ahead.

14               THE WITNESS:  Yes, that was for not treating

15   me for hepatitis C at stage 2.

16   BY MR. LINK:

17       Q.      And now I know I'm asking for stuff going

18   back a long time, so I just wanted to refresh your

19   recollection.

20               Did Dr. Onglao also perform surgery on your

21   right elbow?

22       A.      No, he did not, no.

23       Q.      Okay.  Who performed surgery on your right

24   elbow?

25               MR. SHAHRIARI:  Objection, beyond the scope

Trustpoint.One | Alderson.        www.trustpoint.one              800.FOR.DEPO
                                          502
                                  www.aldersonreporting.com          (800.367.3376)

```
 1   of this case, beyond -- excuse me, vague and ambiguous

 2   as to time, lacks foundation.

 3            MR. LINK:  I would have to inquire, then, is

 4   Mr. Shayler withdrawing his claim that he has disability

 5   in his right arm in this litigation?

 6            MR. SHAHRIARI:  Are you asking me a question,

 7   Mr. Link?

 8            MR. LINK:  Yes, because that's the --

 9            MR. SHAHRIARI:  This is not my deposition.

10   This is not my deposition.  Please continue to ask the

11   witness questions.

12   BY MR. LINK:

13      Q.    Mr. Shayler, are you going to waive your

14   claim that you have disabilities --

15      A.    No, I'm not.

16            MR. SHAHRIARI:  Objection -- Mr. Link, I need

17   to finish my objection because this is inappropriate for

18   you to be asking the witness on whether he's waiving

19   claims and not one of his attorneys.  We object on the

20   basis the question is vague and ambiguous,

21   unintelligible and confusing, calls for speculation,

22   unreasonable.

23            Go ahead, please.

24            THE WITNESS:  No, I'm not sure who did the

25   surgery.
```

```
 1   BY MR. LINK:

 2        Q.      How long ago was that surgery?

 3        A.      25 years ago.

 4        Q.      Where did you have the surgery, in what town?

 5               MR. SHAHRIARI:  Objection, vague and

 6   ambiguous -- objection, vague and ambiguous,

 7   unintelligible and confusing, lacks foundation, beyond

 8   the scope of this case, invades Mr. Shayler's privacy

 9   rights.

10   BY MR. LINK:

11        Q.      You may answer.

12        A.      I had it in San Luis Obispo Prison.

13        Q.      You were in San Luis Obispo Prison in 2006,

14   correct?

15               MR. SHAHRIARI:  Objection, beyond the scope

16   of this lawsuit, invades Mr. Shayler's Constitutional

17   privacy rights, vague and ambiguous, calls for a legal

18   conclusion, is not calculated to lead to the discovery

19   of admissible evidence, unduly burdensome.

20               MR. LINK:  Mr. Shahriari, I offer to you a

21   proposal, that each and every one of my questions is

22   subject to your ongoing objections on privacy,

23   irrelevance, burdensome and oppressive, vague,

24   ambiguous.  Whatever other objections you have made, I

25   will deem to have them made to every single question I
```

1   ask from here forward in this deposition.

2           Will you agree to that?

3           MR. SHAHRIARI:  Mr. Link, that's

4   inappropriate and that's completely unacceptable.  We

5   need to make our objections appropriate to the question

6   you're asking, and for you to just have a blanket

7   statement whereby you accept every objection and you

8   expect the opposing counsel to not make any further

9   objections I don't think is appropriate and I don't

10  think is something that we would be comfortable agreeing

11  to.

12          So I propose that you continue with the

13  deposition so we not waste time.

14  BY MR. LINK:

15     Q.     Mr. Shayler, on page 7 of the exhibit that

16  I'm showing to you, it has the names Dr. Perry,

17  P-e-r-r-y, Dr. Mission, M-i-s-s-i-o-n, and Dr. Greenman,

18  G-r-e-e-n-m-a-n.

19          Do you see that?

20     A.     Yes, I do.

21     Q.     Does that refresh your recollection as to

22  which doctor may have performed the surgery on your

23  elbow?

24          MR. SHAHRIARI:  Objection, calls for medical

25  testimony, legal reasoning and conclusion, vague and

Trustpoint.One   Alderson.         www.trustpoint.one              800.FOR.DEPO
                                    www.aldersonreporting.com          (800.367.3376)
                                            505

 1   ambiguous, also beyond the scope of this lawsuit, not

 2   calculated to lead to the discovery of admissible

 3   evidence, invades Mr. Shayler's privacy rights.

 4   BY MR. LINK:

 5        Q.      You may answer the question.

 6        A.      Yes, I do.

 7        Q.      Which doctor was it?

 8        A.      Dr. Perry.

 9        Q.      Thank you.  During your prison sentence --

10   strike that.  Let me start over.

11              During the service of your prison sentence

12   when did the elbow surgery take place?

13              MR. SHAHRIARI:  Objection, vague and

14   ambiguous, "service," calls for a legal reasoning and

15   conclusion, calls also for speculation, vague and

16   ambiguous, unintelligible and confusing, beyond the

17   scope of this lawsuit, not calculated to lead to the

18   discovery of admissible evidence and invades

19   Mr. Shayler's right to privacy.

20   BY MR. LINK:

21        Q.      Do you understand the question, Mr. Shayler?

22        A.      I'd have to guess.  I can't answer that.

23        Q.      Can you give me an estimate, one year, two

24   years, three years, whatever?

25              MR. SHAHRIARI:  Objection, asked and

```
 1   answered.  He said he would have to guess.

 2               MR. LINK:  I'm entitled to an estimate.

 3   BY MR. LINK:

 4       Q.    Do you have an estimate for me?

 5               MR. SHAHRIARI:  Mr. Shayler, if you have an

 6   estimate --

 7               THE WITNESS:  Okay.  25 years.

 8   BY MR. LINK:

 9       Q.    Mr. Shayler, 2006 was 15 years ago.  Did you

10   serve ten years in state prison?

11               MR. SHAHRIARI:  Objection, beyond the scope

12   of this lawsuit, not calculated to lead to the discovery

13   of admissible evidence, invades Mr. Shayler's right to

14   privacy, vague and ambiguous, asked and answered.

15               THE WITNESS:  You asked me to guess.  That

16   was my best guess, best recollection.

17   BY MR. LINK:

18       Q.    I'm trying to refresh your recollection here,

19   Mr. Shayler.  You were in prison 15 years ago in 2006,

20   correct?

21               MR. SHAHRIARI:  Objection, beyond the scope

22   of this lawsuit, invasion of Mr. Shayler's privacy and

23   what this has to do with his disability claim.  It is

24   also vague and ambiguous, calls for a legal reasoning

25   and conclusion and is oppressive.
```

Trustpoint.One | Alderson        www.trustpoint.one                  800.FOR.DEPO
                                 507
                          www.aldersonreporting.com                  (800.367.3376)

1    BY MR. LINK:

2          Q.      You may answer the question.

3          A.      Please repeat it.

4                  Mr. Harbidge, can you read that back, please.

5              (Record read)

6                  MR. SHAHRIARI:   Same objections.

7                  THE WITNESS:   That's correct.

8    BY MR. LINK:

9          Q.      So ten years before that you had the surgery

10   in prison, correct?

11                 MR. SHAHRIARI:   Objection, vague and

12   ambiguous, "in prison," unintelligible, confusing,

13   beyond the scope of this lawsuit, invades Mr. Shayler's

14   privacy rights, calls for expert opinion.

15   BY MR. LINK:

16         Q.      You may answer.

17         A.      Can you repeat the question again, please.

18                 MR. LINK:   Mr. Harbidge, can you read that

19   back again, please, just the question.

20             (Record read)

21                 MR. SHAHRIARI:   Same objections.

22                 THE WITNESS:   It's 15 years ago, not 25 years

23   ago.

24   BY MR. LINK:

25         Q.      Did they give you a diagnosis on your elbow

1   before they did the surgery?

2             MR. SHAHRIARI:  Objection, vague and

3   ambiguous.  Who is "they"?  It also calls for medical

4   testimony as to what the diagnosis is, vague and

5   ambiguous, unintelligible and confusing, lacks

6   foundation, is beyond the scope of this case, invades

7   Mr. Shayler's Constitutional privacy rights and calls

8   for expert testimony.

9   BY MR. LINK:

10       Q.     You may answer the question.

11       A.     Okay.  They said I had shattered my elbow and

12   had destroyed my -- had pinched my ulnar nerve.

13       Q.     Thank you.  Mr. Shayler, I'm going to show

14   you, and it should be on screen, a Complaint filed

15   February -- excuse me, filed December 6, 2018 in a case

16   called James Shayler versus Narcotics Task Force,

17   Sheriff Department.

18             Do you see that?

19             MR. SHAHRIARI:  Objection.  I'm going to

20   object to the introduction of this document.  It's

21   beyond the scope of this lawsuit and it invades

22   Mr. Shayler's Constitutional privacy rights.  It's not

23   calculated to lead to the discovery of admissible

24   evidence regarding any of his claims.

25             Go ahead.

```
 1   BY MR. LINK:

 2       Q.      The question was, do you see it on screen?

 3       A.      Yes, I see it on screen.

 4       Q.      And if I -- you know, I got lost in the

 5   objection.  If I'm repeating myself, sorry.

 6               I'm going to mark this Complaint as Exhibit

 7   3, that is, the Complaint in Shayler versus Narcotics

 8   Task Force.

 9               (Exhibit 3 marked)

10   BY MR. LINK:

11       Q.      Mr. Shayler, I'm not going to put into the

12   record your entire address, but it shows -- the

13   Complaint shows an address in Culver City.

14               Was that your address in December 2018?

15       A.      Yes.

16               MR. SHAHRIARI:  Objection, the document

17   speaks for itself, invades Mr. Shayler's Constitutional

18   privacy rights, beyond the subject matter of this case.

19   BY MR. LINK:

20       Q.      Does that remain your address in Culver City

21   today?

22               MR. SHAHRIARI:  Objection, vague and

23   ambiguous, "remain," unintelligible and confusing.

24   BY MR. LINK:

25       Q.      You may answer.
```

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1          A.          Yes, yes.

2              Q.          Just to be clear, you've lived continuously

3      from December 2018 to the present time at the Culver

4      City address, correct?

5                  MR. SHAHRIARI:   Objection, vague and

6      ambiguous, "at."   It also lacks foundation, beyond the

7      scope of this case, invades his privacy rights.

8                  You can answer.

9                  THE WITNESS:   Yes.

10     BY MR. LINK:

11         Q.      Mr. Shayler, did you prepare this Complaint?

12         A.      Yes.

13                 MR. SHAHRIARI:   Objection, vague and

14     ambiguous, "prepare."

15     BY MR. LINK:

16         Q.      Mr. Shayler, do you understand the word

17     "prepare"?

18         A.      Yes.

19         Q.      What do you understand the word "prepare" to

20     mean?

21                 MR. SHAHRIARI:   Objection, compound question,

22     asked and answered, vague and ambiguous, beyond the

23     scope of this case.   You're asking him definitions of

24     questions.

25                 But you can answer.

```
 1                    THE WITNESS:  If I made this Complaint.

 2   BY MR. LINK:

 3       Q.      Now, I'm scrolling to the last page, page 3,

 4   and there's a paragraph there on page 3 which follows

 5   the words "Description of Reasons For Liability."  Do

 6   you see that paragraph?

 7       A.      Say the question again.

 8       Q.      There's a paragraph on page 3 under the words

 9   "Description of Reasons For Liability."  Do you see that

10   paragraph?

11       A.      Yes.

12       Q.      Did you make that paragraph?

13              MR. SHAHRIARI:  Objection, vague as to the

14   term "make," vague and ambiguous, beyond the scope of

15   this case, invades Mr. Shayler's Constitutional privacy

16   rights, not calculated to lead to the discovery of

17   admissible evidence, calls for -- strike that last one.

18              Please answer.

19              THE WITNESS:  Yes.

20   BY MR. LINK:

21       Q.      So did you type this paragraph into this

22   Complaint?

23       A.      Yes.

24              MR. SHAHRIARI:  Objection, vague and

25   ambiguous, the word "into," beyond the scope of this
```

 1  case, not calculated to lead to the discovery of

 2  admissible evidence, invasion of Mr. Shayler's privacy

 3  rights.

 4  BY MR. LINK:

 5      Q.     Are the words that you typed there in that

 6  paragraph true and correct?

 7             MR. SHAHRIARI:  Objection, vague and

 8  ambiguous, unintelligible and confusing, compound

 9  question, beyond the scope of this case, invades

10  Mr. Shayler's privacy rights.

11  BY MR. LINK:

12      Q.     You may answer.

13      A.     I'm not going to answer that.  You're

14  jeopardizing my life by talking about this.

15      Q.     Why am I jeopardizing your life talking about

16  this, Mr. Shayler?

17      A.     If you read what it says, then you would

18  know.

19      Q.     I have read what it says many times, and

20  nothing there shows to me that I'm endangering your life

21  by talking about a document that is easily obtained from

22  court records.

23             Please explain to me how I'm jeopardizing

24  your life.

25             MR. SHAHRIARI:  Objection, calls for a

Trustpoint.One | Alderson

www.trustpoint.one
www.aldersonreporting.com

313

800.FOR.DEPO
(800.367.3376)

1   narrative, vague and ambiguous, asked and answered,

2   unintelligible and confusing, repetitious because he

3   already responded, lacks foundation, invasion of

4   Mr. Shayler's privacy rights and far beyond the scope of

5   this lawsuit which has nothing to do with these claims.

6   BY MR. LINK:

7        Q.      You may answer.

8        A.      Because the gentleman that was arrested has

9   killed people before.

10       Q.      You're saying the gentleman that was arrested

11  because of your work for the Narcotics Task Force has

12  killed people before; is that correct?

13       A.      Right.

14              MR. SHAHRIARI:   Objection, asked and

15  answered, beyond the scope of this lawsuit, not

16  calculated to lead to the discovery of admissible

17  evidence, invades Mr. Shayler's privacy rights.  It also

18  calls for -- excuse me, strike that last one.

19  BY MR. LINK:

20       Q.      In the paragraph it says, "They stated," I

21  think you meant started, "following me around trying to

22  get me off drugs."

23              Do you see that?

24              MR. SHAHRIARI:   Objection, the document

25  speaks for itself.  He's read this paragraph, he said.

 1   It also is beyond the scope of this lawsuit, not

 2   calculated to lead to the discovery of admissible

 3   evidence, it invades Mr. Shayler's privacy rights, it is

 4   vague and ambiguous and unduly burdensome.

 5   BY MR. LINK:

 6       Q.      The question is, do you see what I read?

 7       A.      Yes.

 8       Q.      Which drugs were you using?

 9              MR. SHAHRIARI:  Objection, invades

10   Mr. Shayler's privacy rights, has nothing to do with

11   this lawsuit, which is about disability violations at

12   the property, it is vague and ambiguous, lacks

13   foundation, it is unduly burdensome and harassing.

14   BY MR. LINK:

15       Q.      You may answer the question.

16       A.      I was not using any drugs.

17       Q.      Why were you used by the Narcotics Task Force

18   to buy two kilos of cocaine?

19              MR. SHAHRIARI:  Objection, it is far beyond

20   the scope of this lawsuit, invades Mr. Shayler's privacy

21   rights.

22              Mr. Shayler, I'm going to instruct you not to

23   answer anything related to any potential criminal

24   implications that have nothing to do with this case.

25              It also calls for opinion testimony as to why

Trustpoint.One  Alderson.        www.trustpoint.one              800.FOR.DEPO
                                          313
                                www.aldersonreporting.com           (800.367.3376)

```
 1   he -- why certain things were done by a law enforcement

 2   agency.  It is unduly burdensome and lacks foundation.

 3   It is harassing and oppressive.

 4           MR. LINK:  You're instructing him not to

 5   answer?

 6           MR. SHAHRIARI:  No.

 7           Mr. Shayler, if you think you can answer the

 8   question, answer it.

 9           THE WITNESS:  I'm not going to answer it.

10   BY MR. LINK:

11       Q.    Why is that?

12           MR. SHAHRIARI:  Objection, same objections,

13   and asked and answered.

14   BY MR. LINK:

15       Q.    Why are you not going to --

16           MR. SHAHRIARI:  Objection, asked and

17   answered, oppressive.  We just went through this.  It's

18   unduly burdensome.

19           MR. LINK:  He said he's not going to answer a

20   specific question.  I'm asking him why he's not going to

21   answer.  He's not given me an answer.

22           MR. SHAHRIARI:  Mr. Link, we've already been

23   through this.  On the basis of an ongoing criminal

24   matter that has nothing to do with this case, to that

25   extent and to the extent that he may be -- I'm going to
```

```
 1   let James answer to the extent he can.

 2              James, answer the question to the extent that

 3   you're able to, please.

 4              THE WITNESS:  As I said, I'm not going to

 5   answer due to the problems that happened down in San

 6   Diego.  I'm just not going to answer.  Okay?  I'm not

 7   going to answer.

 8              MR. SHAHRIARI:  What is the question right

 9   now, what is the question pending?

10              MR. LINK:  I'm going to move on.  I think

11   he's tried to answer my question.

12   BY MR. LINK:

13       Q.    Let me try to show you another document.

14              Mr. Shayler, I have put up on screen --

15   hopefully you can see -- a document headed Lumbar Spine

16   Medical Source Statement, Beverly Hospital, James

17   Shayler.  I'm going to mark this document as Exhibit 4.

18              (Exhibit 4 marked)

19   BY MR. LINK:

20       Q.    Mr. Shayler, are you seeing this document on

21   the screen?

22       A.    Yes, I am.  I see it.

23       Q.    Thank you.  Have you seen this document

24   before?

25       A.    Yes, I have.
```

1      Q.      When was the last time you saw this document?

2      A.      I don't know.  Maybe a year ago.

3      Q.      Now I'm scrolling down to page 3.  It's page

4      3 of the .pdf.  I'm going to go ahead and read the

5      portion that I'm looking at.

6              "How often can your patient perform the

7      following activities:  Twist, never; stoop (bend),

8      never; climb ladders, never; climb stairs, never."

9              At the time this medical report was made,

10     were all of those statements true?

11             MR. SHAHRIARI:  Objection, compound question,

12     unintelligible and confusing, calls for a medical

13     conclusion and reasoning.

14             You can answer if you understand, James.

15             THE WITNESS:  Yes.

16     BY MR. LINK:

17     Q.      Thank you.  The report is dated February 11,

18     2020.  Do you see that on page 4?

19             MR. SHAHRIARI:  Objection, the document

20     speaks for itself.

21             THE WITNESS:  Yes, I see it.

22     BY MR. LINK:

23     Q.      Okay.  Did you have an appointment with Dr.

24     Ananian, A-n-a-n-i-a-n, on February 11, 2020?

25     A.      I believe I did.

 1        Q.        Okay, thank you.  Mr. Shayler, I'm going to

 2     hopefully show you on screen a Declaration in a case

 3     called James Shayler versus 1310 PCH LLC.

 4                  Do you see that on screen?

 5        A.        Yes, I do.

 6                  MR. LINK:  Okay.  I'm going to mark this

 7     declaration as Exhibit 5, please.

 8                  (Exhibit 5 marked)

 9     BY MR. LINK:

10        Q.        Mr. Shayler, I'm going to scroll down to

11     paragraph four on page 3 where it says, "I use a cane

12     daily to help me walk."

13                  For how long have you used a cane daily to

14     help you walk?

15                  MR. SHAHRIARI: Objection, vague and

16     ambiguous, "for how long."  It's also a compound

17     question, unintelligible and confusing.  It calls for

18     expert medical opinion also.  Excuse me, strike that

19     last objection.

20                  James, do you understand the question?

21                  THE WITNESS:  Yes.

22     BY MR. LINK:

23        Q.     Can you answer it, please.

24        A.        You're going to have to repeat that question

25     one more time, Counselor.

1        Q.        For how long have you been using a cane daily

2   to help you walk?

3        A.        Roughly --

4                  MR. SHAHRIARI:  Same objections.

5                  THE WITNESS:  Roughly since 2019, of November

6   2019 or December of 2019, roughly right after that.

7   BY MR. LINK:

8        Q.        Thank you.

9                  The next sentence says, "When my pain is

10   especially bad, I use a walker instead."

11                 How often, since you -- well, how often do

12   you use a walker instead of your cane?

13                 MR. SHAHRIARI:  Objection, vague and

14   ambiguous, unintelligible and confusing.  It's hard for

15   me to understand.  Beyond the scope of -- excuse me.

16   That's all.

17                 THE WITNESS:  Was the question is how often

18   do I use a walker; is that correct?

19   BY MR. LINK:

20        Q.        How often do you use a walker instead of your

21   cane?  Can you give me an estimate.

22                 MR. SHAHRIARI:  Same objections.

23   BY MR. LINK:

24        Q.        Is it ten percent of the time that you're

25   moving around?  Is it 15 percent?  Is it, "I use the

Trustpoint.One  Alderson.

www.trustpoint.one
www.aldersonreporting.com

520

800.FOR.DEPO
(800.367.3376)

1   walker 20 days in a month and the cane ten days in a

2   month," if you have an estimate?

3              MR. SHAHRIARI:  Objection, unintelligible and

4   confusing, vague and ambiguous.

5              THE WITNESS:  I would say I use a walker

6   probably 40 percent of the time, between 30 and 40

7   percent, depending on how bad my sciatic nerve is on my

8   left leg.  If it's giving out that day, then I use a

9   walker if it gives out.

10  BY MR. LINK:

11      Q.     Got it.  For how long have you been using a

12  walker?

13             MR. SHAHRIARI:  Objection, "for how long,"

14  vague and ambiguous, unintelligible.

15             MR. LINK:  Really?

16             MR. SHAHRIARI:  I'm sorry, Mr. Link.  Did you

17  say something?

18             MR. LINK:  I said "really?"

19  BY MR. LINK:

20      Q.     Go ahead, Mr. Shayler if you can answer it.

21      A.     Roughly right after December of 20 -- or not

22  '20, '19, right after 2019.  Excuse me.

23      Q.     Did something happen in 2019 to caused you to

24  use a walker?

25      A.     Yes.

Trustpoint.One | Alderson.

www.trustpoint.one
www.aldersonreporting.com

321

800.FOR.DEPO
(800.367.3376)

 1                MR. SHAHRIARI:  Objection, vague and

 2    ambiguous as to the phrase "something happen."

 3    BY MR. LINK:

 4        Q.    What was that?

 5                MR. SHAHRIARI:  Objection, vague and

 6    ambiguous as to the term "something happen," calls for a

 7    medical opinion, calls for a narrative, also calls for

 8    medical speculation as to the exact cause.

 9                THE WITNESS:  I was involved in an accident.

10    BY MR. LINK:

11        Q.    What type of accident?

12                MR. SHAHRIARI:  Same objections.

13                THE WITNESS:  A T-bone at high speed.

14    BY MR. LINK:

15        Q.    It was an automobile accident involving a

16    T-bone?

17        A.    Right, correct.

18        Q.    Okay.  Which side of the car was struck by

19    the T-boning vehicle?

20                MR. SHAHRIARI:  Objection, vague and

21    ambiguous, "which side of the car," unintelligible and

22    confusing.

23    BY MR. LINK:

24        Q.    Okay.  Let me get more specific.

25                MR. SHAHRIARI:  Calls for an expert opinion.

Trustpoint.One | Alderson.          www.trustpoint.one          800.FOR.DEPO
                                    522
                              www.aldersonreporting.com          (800.367.3376)

```
 1   BY MR. LINK:

 2       Q.      Let's break it down.

 3               Mr. Shayler, was your vehicle T-boned in the

 4   accident?

 5       A.      No.

 6       Q.      You T-boned some other vehicle in the

 7   accident, correct?

 8               MR. SHAHRIARI:  Objection, calls for legal or

 9   expert opinion or testimony, unduly burdensome, lacks

10   foundation, vague and ambiguous.

11               You can answer if you understand.

12               THE WITNESS:  Yes.

13   BY MR. LINK:

14       Q.      Did the airbag deploy?

15               MR. SHAHRIARI:  Objection, vague and

16   ambiguous, -- which airbags -- unintelligible and

17   confusing, calls for expert testimony as to what

18   "deployed" means.

19   BY MR. LINK:

20       Q.      Mr. Shayler, did the airbag go off in your

21   car when you T-boned the other vehicle?

22       A.      No, it did not.

23               MR. SHAHRIARI: Same objection.

24   BY MR. LINK:

25       Q.      What was the make and model of the vehicle
```

Trustpoint.One  Alderson.

www.trustpoint.one
www.aldersonreporting.com

523

800.FOR.DEPO
(800.367.3376)

1       you were driving when you T-boned the other vehicle?

2           A.      A 2019 Volkswagen Tiguan.

3           Q.      Was that vehicle declared a total loss as a

4       result of the T-bone accident?

5                   MR. SHAHRIARI:  Objection, vague and

6       ambiguous, calls for expert opinion, lacks foundation.

7                   THE WITNESS:  $17,000 in damage.  They fixed

8       it.  I couldn't believe it.

9       BY MR. LINK:

10          Q.      Okay.  Do you still operate today that

11      Volkswagen Tiguan vehicle?

12                  MR. SHAHRIARI:  Objection, vague and

13      ambiguous, unintelligible and confusing, lacks

14      foundation.

15                  THE WITNESS:  Yes.

16      BY MR. LINK:

17          Q.      Looking at paragraph five in the declaration

18      it says:

19                  "I have very limited use of one arm and hand

20          as a result of an injury on the job as a firefighter

21          years ago."

22                  Which firefighting organization were you

23      hired years ago?

24          A.      CAL FIRE.

25                  MR. SHAHRIARI:  Objection, vague and

1    ambiguous as to which year, calls for -- go ahead.

2             I'm sorry, Mr. Link?

3    BY MR. LINK:

4        Q.     When were you hired by CAL FIRE?

5        A.     2004.

6        Q.     For how long did you work with CAL FIRE?

7             MR. SHAHRIARI:  Objection, vague and

8    ambiguous as to the term "work with," calls for -- I'm

9    sorry, Mr. Link?

10             MR. LINK:  Nothing.

11             MR. SHAHRIARI:  I thought you heard you say

12   something.

13             Go ahead, answer if you understand.

14             THE WITNESS:  About two years.

15   BY MR. LINK:

16       Q.     In what city did you work for CAL FIRE?

17             MR. SHAHRIARI:  Objection, vague and

18   ambiguous, also beyond the scope of this lawsuit,

19   unintelligible and confusing.

20             THE WITNESS:  San Luis Obispo.

21   BY MR. LINK:

22       Q.     Were you a firefighter and also an inmate in

23   San Luis Obispo at the same time?

24             MR. SHAHRIARI:  Objection, compound question,

25   beyond the scope of this lawsuit, not calculated to lead

Trustpoint.One | Alderson.
www.trustpoint.one
525
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
1    to the discovery of admissible evidence, vague and

2    ambiguous, unintelligible and confusing, lacks

3    foundation.

4              THE WITNESS:  Yes.

5              MR. SHAHRIARI:  Assumes facts not in

6    evidence.

7    BY MR. LINK:

8        Q.    Have you ever worked as a firefighter for any

9    other public entity or organization?

10             MR. SHAHRIARI:  Objection, compound question,

11   vague and ambiguous, calls for expert -- excuse me --

12   assumes facts not in evidence, irrelevant, not

13   calculated to lead to the discovery of admissible

14   evidence?

15             THE WITNESS:  No.

16   BY MR. LINK:

17       Q.    How were you injured?

18             MR. SHAHRIARI:  Objection, vague and

19   ambiguous, also calls for expert medical testimony and

20   opinion.

21             THE WITNESS:  Can you repeat the question

22   again.

23   BY MR. LINK:

24       Q.    How were you injured as a firefighter on the

25   job years ago?
```

1        A.      I fell off a truck that was moving, a fire

2    truck.

3        Q.      The next sentence in paragraph five that

4    should be on the screen says, "I cannot put pressure on

5    my left arm or hand."

6             Do you see that?

7        A.      Which paragraph?

8        Q.      Same paragraph, five:  "I cannot put much

9    pressure on my left arm or hand."

10            Do you see that?

11       A.      Yes.  That should say my right arm or hand,

12   not my left.

13       Q.      Okay.  Now, paragraph five also mentions the

14   car accident.  How did the car accident further

15   deteriorate your back condition?

16            MR. SHAHRIARI:  Objection, calls for expert

17   medical opinion, vague and ambiguous, unintelligible and

18   confusing, lacks foundation, calls for speculation.

19            THE WITNESS:  It has affected my cervical

20   spine and my lumbar spine.  I didn't have a pinched

21   sciatic nerve before that, and since that accident I

22   have a pinched sciatic nerve.

23   BY MR. LINK:

24       Q.      And the accident was in 2018, correct?

25       A.      2019.

Trustpoint.One | Alderson.      www.trustpoint.one
                                www.aldersonreporting.com

800.FOR.DEPO
(800.367.3376)

1        Q.       Okay.  Do you remember which month in 2019?

2        A.       December, I believe.

3        Q.       Did a doctor diagnose you with a pinched

4    sciatic nerve after the accident?

5        A.       Yes.

6        Q.       Which doctor was that?

7        A.       Three different doctors, Dr. Yashar, a

8    neurosurgeon; and a neurological center,

9    Dr. O-k-h-o-b-a-t.

10       Q.       Can you also spell "Yashar."  That will help

11   the court reporter, please.

12       A.       Yashar, Y-a-s-h-a-r.

13       Q.       Thank you.  Did you bring a lawsuit as a

14   result of the auto accident?

15               MR. SHAHRIARI:  Objection, vague and

16   ambiguous as to the term "you bring."

17   BY MR. LINK:

18       Q.       You can answer.

19               MR. SHAHRIARI:  Lacks foundation, beyond the

20   scope of this lawsuit, not calculated to lead to the

21   discovery of admissible evidence, invades Mr. Shayler's

22   privacy rights.

23               THE WITNESS:  Yes.

24   BY MR. LINK:

25       Q.       Who was the defendant in that lawsuit?

```
 1              MR. SHAHRIARI:  Objection, calls for a legal

 2   conclusion, also expert legal testimony.  It is beyond

 3   the scope of this lawsuit, invades Mr. Shayler's privacy

 4   rights, not calculated to lead to the discovery of

 5   admissible evidence.

 6              THE WITNESS:  I don't know.  I'm not sure who

 7   the defendant is.

 8   BY MR. LINK:

 9       Q.    Who was your attorney in that case?

10              MR. SHAHRIARI:  Objection, invades

11   Mr. Shayler's privacy rights.  It's beyond the scope of

12   this lawsuit, not calculated to lead to the discovery of

13   admissible evidence, lacks foundation.

14              THE WITNESS:  I'm not going to answer that

15   question.

16              MR. SHAHRIARI:  James, you have to answer his

17   questions, all of them, unless you're instructed not to.

18              THE WITNESS:  No, I don't.

19              MR. SHAHRIARI:  Yes, you do.

20              THE WITNESS:  Okay.  I have to go get his

21   card.

22              MR. SHAHRIARI:  James, James, if you

23   remember.  You don't have to get up.  If you remember,

24   give the answer.

25              THE WITNESS:  Jacob Armani, Jacob Armani.
```

Trustpoint.One   Alderson.

www.trustpoint.one
www.aldersonreporting.com

529

800.FOR.DEPO
(800.367.3376)

 1   BY MR. LINK:

 2       Q.      Thank you.  Scrolling down to paragraph

 3   seven, it says:

 4               "A true and correct copy of the Lumbar Spine

 5       Medical Source Statement I received from Beverly

 6       Hospital in connection with my evaluation by

 7       Dr. Charles Ananian on February 11, 2020 and

 8       redacted to remove irrelevant private information,

 9       is filed concurrently herewith as Exhibit 1."

10               Is Exhibit 1 to this declaration what we were

11   looking at as Exhibit 4, the Lumbar Spine Source

12   Statement?  Is that the same thing?

13               MR. SHAHRIARI:  Objection, calls for legal

14   reasoning and expert opinion testimony.  He's not an

15   attorney.  It also is vague and ambiguous and a compound

16   question, lacks foundation.

17               James, if you understand, answer.

18               THE WITNESS:  You're going to have to repeat

19   that again one more time, Counsel.

20   BY MR. LINK:

21       Q.      Exhibit 1 to your declaration that we've been

22   looking at, is that the same as Exhibit 4 that I showed

23   to you earlier in the deposition?

24       A.      I believe it is.

25               MR. SHAHRIARI:  Objection, it calls for an

1   expert opinion, calls for speculation, unintelligible

2   and confusing, vague and ambiguous.

3   BY MR. LINK:

4       Q.      The declaration that we're looking at was

5   dated July 13, 2021, and bears a signature of James

6   Shayler on page 11.

7               Do you see that?

8               MR. SHAHRIARI:  Objection, the document

9   speaks for itself.

10              THE WITNESS:  Yes.

11  BY MR. LINK:

12      Q.      Is that your signature, Mr. Shayler?

13      A.      Yes.

14      Q.      Do you recall reviewing this declaration in

15  July of 2020 -- I'm sorry, excuse me, I misspoke.

16              Do you recall reviewing this declaration in

17  July of 2021?

18      A.      No, I don't recall.

19      Q.      Would you normally have read the declaration

20  prior to signing it, Mr. Shayler?

21              MR. SHAHRIARI:  Objection, vague and

22  ambiguous, "normally," also beyond the scope of this

23  case, vague and ambiguous, unintelligible and confusing

24  lacks foundation.

25              THE WITNESS:  Yes.

```
 1   BY MR. LINK:

 2        Q.     Scrolling back up to page 3 in paragraph

 3   seven, it says:

 4             "The information in the Lumbar Spine Medical

 5        Source Statement is accurate and reflects

 6        Dr. Ananian's observations and notes during his

 7        visit."

 8             Is that statement true?

 9             MR. SHAHRIARI:  Objection, the document

10   speaks for itself, calls for a narrative, vague and

11   ambiguous.

12             James, answer if you understand, please.

13             THE WITNESS:  I guess it's true, yeah, yes.

14   I mean, I don't remember that far back, is what I'm

15   saying.

16   BY MR. LINK:

17        Q.     "The information in the Lumbar Spine Medical

18   Source Statement is accurate and reflects Dr. Ananian's

19   observations and notes during the visit."

20             Is that statement made in your declaration on

21   July 13, 2021 accurate?

22        A.     Yes.

23             MR. SHAHRIARI:  Objection, asked and

24   answered, repetitious.

25   BY MR. LINK:
```

Trustpoint.One   Alderson.   www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1        Q.       I'll show you another document.   Hopefully

2    you're seeing -- I got a strange message, but hopefully

3    you're seeing the Declaration of James Shayler in

4    Support of Plaintiff's Motion For Summary Judgment in

5    the case of Shayler versus Yacoub, Y-a-c-o-u-b.

6                Are you seeing that, Mr. Shayler?

7        A.       Yes.

8                MR. LINK:  Thank you.  I'm going to have this

9    declaration marked as Exhibit 6.

10               (Exhibit 6 marked)

11   BY MR. LINK:

12       Q.       This declaration, Mr. Shayler, is dated --

13   pardon me, it takes a bit to get there -- March 17,

14   2021, and bears a DocuSign signature on page 11.

15               Do you see that?

16       A.       Yes, I do.

17       Q.       Is that signature your DocuSign authorized

18   signature?

19       A.       Yes, it is.

20       Q.       Thank you.  Paragraph four we've already

21   really discussed in your last -- in the declaration that

22   we looked at, Exhibit 5, "I use a cane daily to help me

23   walk."  I think you've explained all that in paragraph

24   five.

25               It also says, "I cannot put much pressure on

Trustpoint.One | Alderson.

www.trustpoint.one
www.aldersonreporting.com

333

800.FOR.DEPO
(800.367.3376)

1   my left arm or hand and my left hand is atrophied."

2        A.      That's right.

3        Q.      It is your right hand.  So your left hand is

4   not atrophied, correct?

5        A.      No, correct.

6        Q.      The surgery that you had was on your right

7   elbow, correct?

8        A.      Correct.

9        Q.      Have you ever had surgery on your left hand

10   or elbow?

11        A.      No.

12        Q.      I'll show you another -- pardon me a moment.

13   If you need to take a five-minute break, I need to find

14   the next exhibit.  For some reason it's not in my

15   exhibit folder.  Wait a minute.  I did find it, but the

16   offer still stands.  If you need to take a five-minute

17   break, we can do that now if you'd like.

18        A.      Okay.

19              MR. LINK:  Okay.

20            (Brief recess.)

21   BY MR. LINK:

22        Q.      Mr. Shayler, I'm going to show you a

23   declaration that was filed in this case, Shayler versus

24   HB Mat Properties.  It is dated June 9, 2021.  I'm going

25   to ask that this declaration be marked as Exhibit 7.

```
 1                    (Exhibit 7 marked)

 2   BY MR. LINK:

 3        Q.      Looking at page 11 of this declaration,

 4   Mr. Shayler, is that your signature?

 5        A.      Yes.

 6        Q.      Do you remember reading and reviewing this

 7   declaration, Mr. Shayler?

 8                MR. SHAHRIARI:  Objection, compound question,

 9   vague and ambiguous.

10                THE WITNESS:  No, I don't remember reviewing

11   that.

12   BY MR. LINK:

13        Q.      Mr. Shayler, in paragraph five it notes that

14   your right hand and arm -- or your right hand is

15   atrophied and that you can't put much pressure on your

16   right hand and arm.

17                This is the correct statement of your

18   disability from the accident and surgery that you had as

19   a firefighter, correct?

20        A.      Correct.

21                MR. SHAHRIARI:  Objection, vague and

22   ambiguous, unintelligible and confusing.  The document

23   speaks for itself, compound.  It's a complex question,

24   incomplete and improper hypothetical.

25                If you understand, you can answer, James.  I
```

```
 1    think you already did.

 2             THE WITNESS:  That is correct.

 3    BY MR. LINK:

 4       Q.    Do you have any understanding or reason why

 5    the declaration that is Exhibit 5 and the declaration

 6    that is Exhibit 6 would say left hand and arm instead of

 7    right hand and arm?

 8             MR. SHAHRIARI:  Objection, calls for

 9    speculation, compound question, vague and ambiguous.

10             THE WITNESS:  Can repeat that question.

11    BY MR. LINK:

12       Q.    Do you have any reason or understanding as to

13    why the declarations that we looked at, Exhibits 5 and

14    6, wrongly stated that you had issues with your left

15    hand and left arm?

16             MR. SHAHRIARI:  Objection, unintelligible and

17    confusing, vague and ambiguous, lacks foundation,

18    misstates, mischaracterizes earlier testimony, calls for

19    speculation.

20             THE WITNESS:  Looks like a typo.

21    BY MR. LINK:

22       Q.    Other than it being just a typo, do you have

23    any understanding as to why that typo was made?

24             MR. SHAHRIARI:  Objection, asked and

25    answered, repetitious, vague and ambiguous, assumes
```

Trustpoint.One  Alderson.
www.trustpoint.one
www.aldersonreporting.com
536
800.FOR.DEPO
(800.367.3376)

 1   facts not in evidence, mischaracterizes earlier

 2   testimony, lacks foundation, calls for speculation.

 3          THE WITNESS:  No, I don't.

 4   BY MR. LINK:

 5      Q.    Moving on to paragraph seven, it says, "I

 6   have --" it's on page 4 of Exhibit 7, it says:

 7          "I have two friends who live in Hermosa Beach

 8      near Fusion Sushi, and I enjoy traveling to visit

 9      them, spending time with them at the beach and going

10      to eat in the neighborhood."

11          Please give me the names of the two friends.

12          MR. SHAHRIARI:  Objection, invades privacy

13   rights, beyond the scope of this case, not calculated to

14   lead to the discovery of admissible evidence regarding

15   his disabilities, compound question.

16          Go ahead.  Vague and ambiguous.

17          THE WITNESS:  Yes, one is Rick Rowe; the

18   other is Matt Wright.

19   BY MR. LINK:

20      Q.    Please spell "Rowe."

21      A.    R-o-w-e.

22      Q.    Please spell "Wright."

23      A.    R-i-g-h-t.

24      Q.    No W?

25      A.    Oh, W, W-r-i-g-h-t.  Excuse me.

```
 1       Q.       How often do you visit Rick Rowe in Hermosa

 2  Beach?

 3                MR. SHAHRIARI:  Objection, vague and

 4  ambiguous as to the term "how often," assumes facts not

 5  in evidence, lacks foundation, it's beyond the scope of

 6  this lawsuit, not calculated to lead to the discovery of

 7  admissible evidence and invades privacy rights.

 8                THE WITNESS:  Oh, I'd have to guess on that,

 9  but maybe once a month.

10  BY MR. LINK:

11       Q.       When did you start visiting Rick Rowe in

12  Hermosa Beach?

13                MR. SHAHRIARI:  Objection, vague and

14  ambiguous, "when did you start visiting."  It assumes

15  facts not in evidence, lacks foundation.

16                THE WITNESS:  I'd say probably early part of

17  2019.

18  BY MR. LINK:

19       Q.       How often per month do you visit Matt Wright?

20                MR. SHAHRIARI:  Objection, vague and

21  ambiguous, assumes facts not in evidence, lacks

22  foundation.

23                THE WITNESS:  Maybe every two months.

24  BY MR. LINK:

25       Q.       When did you start visiting Matt Wright in
```

Trustpoint.One | Alderson

www.trustpoint.one
www.aldersonreporting.com
538

800.FOR.DEPO
(800.367.3376)

```
 1    Hermosa Beach?

 2              MR. SHAHRIARI:  Objection, vague and

 3    ambiguous, "when did you start visiting," unintelligible

 4    and confusing, lacks foundation, calls for speculation

 5    as to time -- excuse me.  Strike that last objection.

 6              James, go ahead and answer.

 7              THE WITNESS:  Probably the late part of 2018.

 8    BY MR. LINK:

 9        Q.    Have you ever been to Fusion Sushi with Rick

10    Rowe?

11              MR. SHAHRIARI:  Objection, vague and

12    ambiguous as to the term "been to," calls for -- excuse

13    me?  I'm sorry, Mr. Link.  Did you say something?

14              MR. LINK:  No.

15              THE WITNESS:  No.

16    BY MR. LINK:

17        Q.    Have you ever been to Fusion Sushi with Matt

18    Wright?

19              MR. SHAHRIARI:  Same objections.

20              THE WITNESS:  No.

21    BY MR. LINK:

22        Q.    Paragraph eight says:

23              "I visited Fusion Sushi with one of my

24        friends to enjoy sushi, but I had trouble accessing

25        the property as I described below."
```

Trustpoint.One   Alderson.          www.trustpoint.one          800.FOR.DEPO
                                     559
                              www.aldersonreporting.com          (800.367.3376)

1              Who was the friend that you visited Fusion

2   Sushi with?

3        A.     I think when I was down there, I never had

4   anybody with me.  I stopped there and bought food and

5   then would go over to see them.

6        Q.     Paragraph eight says, "I had visited Fusion

7   Sushi with one of my friends."

8              Is that an untrue statement?

9              MR. SHAHRIARI:  Objection, asked and

10   answered, vague and ambiguous, mischaracterizes

11   testimony.

12              THE WITNESS:  I believe it was just worded

13   wrong.  It should have said, "I stopped down there

14   before I visited my friends."

15   BY MR. LINK:

16        Q.     How far is Hermosa Beach from Fusion Sushi?

17              MR. SHAHRIARI:  Objection, calls for legal --

18   excuse me.  Strike that objection.  If he knows, he can

19   answer.

20              THE WITNESS:  I mean, it's in Hermosa Beach.

21   I guess about two miles, a mile and a half down to the

22   beach from there, Pacific Coast Highway.

23   BY MR. LINK:

24        Q.     How many times have you bought foods from

25   Fusion Sushi?

1       A.       I think the Complaint says three times.

2       Q.       So each time you visited Fusion Sushi as

3    alleged in the Complaint you bought food, correct?

4       A.       Correct.

5       Q.       Do you remember what kind of sushi you

6    bought?

7                Sorry about that.  I didn't turn off all the

8    noise makers.  Sorry.

9                MR. SHAHRIARI:  Can we have the question

10   again, please.

11   BY MR. LINK:

12      Q.       Do you remember the types of sushi that you

13   bought from Fusion Sushi?

14      A.       Yes, I do.

15      Q.       Okay.  What are the names?

16               MR. SHAHRIARI:  Objection, assumes facts not

17   in evidence, lacks foundation, vague and ambiguous,

18   assumes facts not in evidence.

19               THE WITNESS:  On which date, sir?

20   BY MR. LINK:

21      Q.       On all dates.

22      A.       Oh, on all dates?

23               MR. SHAHRIARI:  Objection, compound question,

24   vague and ambiguous, lacks foundation, assumes facts not

25   in evidence.

1              THE WITNESS:   On March 20th I bought a spicy

2    tuna roll and a salmon roll.   On February 10th I bought

3    teriyaki chicken.   On September 3rd I bought, again,

4    spicy tuna and a salmon roll.

5    BY MR. LINK:

6        Q.     Okay.  Do you have the receipts for those

7    purchases?

8        A.     No, I don't.

9        Q.     I'd like to show you a still from a video

10   dated April 2, 2021.

11              I'm going to mark that as Exhibit 8.

12              (Exhibit 8 marked)

13   BY MR. LINK:

14       Q.     Are you seeing that still on screen,

15   Mr. Shayler?

16       A.     Yes.

17       Q.     Is that you in the video, Mr. Shayler?

18              MR. SHAHRIARI:  Objection, vague and

19   ambiguous, unintelligible and confusing.

20              THE WITNESS:  Yes, that is me, that's

21   correct.

22   BY MR. LINK:

23       Q.     Mr. Shayler, I'm going to try to share

24   another still from a video.  It's also dated April 2,

25   2021.  I'm going to mark this as Exhibit 9.  I guess

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
542
800.FOR.DEPO
(800.367.3376)

 1      I'll distinguish it by saying that the time on this

 2      still is 1:17:41 p.m.

 3                  (Exhibit 9 marked)

 4      BY MR. LINK:

 5          Q.      Are you seeing this still on the screen?

 6          A.      Yes.

 7          Q.      Mr. Shayler, is that you down there on the

 8      sidewalk?

 9          A.      Yes.  I'm hunched over, yes.  I'm having

10      problems walking.

11          Q.      Do you remember the location of these two

12      stills that I've showed you?

13                  MR. SHAHRIARI:  Objection, vague and

14      ambiguous, unintelligible and confusing, lacks

15      foundation.

16                  THE WITNESS:  What was the question?

17      BY MR. LINK:

18          Q.      Do you remember what the location was for

19      these -- that's shown in these two stills, Exhibits 8

20      and 9?

21                  MR. SHAHRIARI:  Objection, vague and

22      ambiguous, unintelligible and confusing.

23                  THE WITNESS:  Yes, I know where the place is

24      at, uh-huh.

25      BY MR. LINK:

1      Q.      What place is it?

2      A.      I think there's a gym in back and that's a

3   CPAP store, I believe.

4      Q.      Do you use a CPAP machine, Mr. Shayler?

5      A.      I do not.  My brother --

6      Q.      I'm sorry.  I talked over you.  I'm sorry.

7   Finish your answer.

8      A.      I do not.  My brother does.

9      Q.      Have you ever been diagnosed as needing a

10   CPAP machine?

11      A.      No.

12      Q.      Mr. Shayler I'm going to show you a

13   photograph of the CPAP store.  I'm going to mark this as

14   Exhibit 10.

15              (Exhibit 10 marked)

16   BY MR. LINK:

17      Q.      Do you recognize the CPAP store shown in this

18   photograph to be the CPAP store that you visited?

19      A.      I believe so.

20      Q.      Mr. Shayler, did you walk down the steps that

21   are shown in the photograph to get to the sidewalk after

22   leaving the CPAP store?

23              MR. SHAHRIARI:  Objection, vague as to time,

24   unintelligible and confusing, vague and ambiguous as to

25   "walk down," also lacks foundation.

Trustpoint.One | Alderson

www.trustpoint.one
www.aldersonreporting.com

544

800.FOR.DEPO
(800.367.3376)

```
 1              THE WITNESS:  Yes, I remember it because I

 2    had problems going down that.  I have to be real

 3    careful.

 4    BY MR. LINK:

 5         Q.    How were you being very careful?

 6         A.    Well, I thought I was going to fall.  I

 7    thought I had to reach over and use the -- that railing

 8    right there.

 9         Q.    Okay.  Did you use the railing?

10         A.    I'm not sure.  I don't know if I lost my

11    balance or not, but I almost fell.  I should have had my

12    cane.  I don't know.  Is that me right there?  I'm not

13    sure.

14         Q.    No, that's not you.

15         A.    Yes, I don't think that's me.  I'm almost

16    sure I had to hold on to that rail and use it.

17         Q.    Okay.  Mr. Shayler, hopefully on screen is a

18    photograph -- I think I can make it a little smaller so

19    it appears on screen -- dated June 16, 2019, time,

20    14:37.

21              Do you see that on screen?

22         A.    Yes, I do.

23              MR. LINK:  I'm going to mark this photograph

24    as Exhibit 11.

25              (Exhibit 11 marked)
```

 1   BY MR. LINK:

 2        Q.      Mr. Shayler, can you tell if that is you in

 3   the photograph -- actually, a still from a video toward

 4   the upper left side of that still?

 5            MR. SHAHRIARI:  Objection, calls for

 6   speculation, is vague and ambiguous.

 7            But please answer if you can.

 8            THE WITNESS:  Yes, that's me having problems

 9   getting up those steps.

10   BY MR. LINK:

11        Q.      It's kind of difficult to read backwards, but

12   it appears on the door that you are arguably headed to

13   the name Great Care Medical Group.

14            Have you ever been to Great Care Medical

15   Group?

16        A.      Yes.

17        Q.      Where is Great Care Medical Group located?

18            MR. SHAHRIARI:  Objection, calls for

19   speculation as to where they are located, also vague and

20   ambiguous.  Do you mean the headquarters?  Do you mean

21   the location?  It lacks foundation and it's beyond the

22   scope of this case, not calculated to lead to the

23   discovery of admissible evidence.

24            But please answer if you understand, please.

25            THE WITNESS:  Yes.

Trustpoint.One  |  Alderson.        www.trustpoint.one        800.FOR.DEPO
                                    www.aldersonreporting.com        (800.367.3376)
                                            546

1    BY MR. LINK:

2        Q.      Where is it located?

3        A.      Santa Monica.

4        Q.      Do you remember the street address?

5        A.      I don't remember the street address.  It's on

6    Pacific Coast Highway.

7        Q.      So this still is taken from a video at Great

8    Care Medical Group located in Santa Monica, correct?

9        A.      Correct.

10              MR. SHAHRIARI:  Objection -- objection.

11   You're asking him to authenticate a video of yours.  It

12   calls for speculation, calls for expert opinion, and

13   that's it.

14              MR. LINK:  Well, he already answered

15   "correct."

16   BY MR. LINK:

17       Q.      I'm going to show you a still from a video

18   dated July 16, 2019, time of 14 hours, 37 minutes, 30

19   seconds.  I'm going to mark this as Exhibit 12.

20              (Exhibit 12 marked)

21   BY MR. LINK:

22       Q.      Do you see that still on screen, Mr. Shayler?

23       A.      I do.

24       Q.      Okay.  That again is you in the still?

25              MR. SHAHRIARI:  Objection, assumes facts not

 1   in evidence, lacks foundation.

 2            THE WITNESS:   That is me.

 3   BY MR. LINK:

 4      Q.     Mr. Shayler, I'm going to show you, I think,

 5   another still from a video.  This one is dated 7/16/2019

 6   with a time of 14 hours, 37 minutes, 53 seconds.  I'm

 7   going to mark that as Exhibit 13.

 8            (Exhibit 13 marked)

 9   BY MR. LINK:

10      Q.     Are you seeing that on screen?

11      A.     I remember.  That's me, yes.  I was having

12   problems opening that door, but I remember that.  It

13   wasn't an easy door to open.

14      Q.     Mr. Shayler, I see that you're opening the

15   door with your right hand; is that correct?

16      A.     That's correct.  I have limited use of my

17   right hand.  I don't have total use of it.  I have

18   limited use of it.

19      Q.     Is there any reason why you didn't use your

20   left hand instead of your right hand?

21      A.     I try to use my right hand as much as I can.

22   The least I use it, the more atrophy is in it.  If the

23   door is too hard to open, sometimes I have to use my

24   left hand.  It depends on the pressure of the door,

25   opening it.

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
548
800.FOR.DEPO
(800.367.3376)

1        Q.       Mr. Shayler, I'm going to also show you

2    another exhibit, again, a still from a video.   This one

3    is dated July 16, 2019, time:   14 hours, 39 minutes, 1

4    second.

5        A.       Can you enlarge that, please, so I can see?

6        Q.       Yes.   Hold on a second.

7                 I'm going to mark this as Exhibit 14.

8                 (Exhibit 14 marked)

9                 THE WITNESS:   Yes, I can see me.   And I was

10   having problems -- I was limping pretty bad.

11   BY MR. LINK:

12       Q.       Why were you visiting Great Care Medical

13   Group?

14       A.       I had a knee replacement and I was seeing the

15   doctor regarding my knee, just getting a follow-up.

16   There was locking on my knee after the surgery.   I was

17   trying to see if anything was wrong with the surgery.

18       Q.       Did Great Care Medical Group perform the knee

19   surgery?

20       A.       No.

21       Q.       Who performed the knee surgery?

22                MR. SHAHRIARI:   Objection, calls for

23   speculation, vague and ambiguous as to "who performed."

24   Do you mean which member of the staff?

25                THE WITNESS:   Dr. Su.

Trustpoint.One | Alderson.        www.trustpoint.one        800.FOR.DEPO
                         349                                 (800.367.3376)
                         www.aldersonreporting.com

 1   BY MR. LINK:

 2       Q.      Can you spell "Su."

 3       A.      S-u.

 4       Q.      Do you remember Dr. Su's first name?

 5       A.      No.

 6       Q.      Does Dr. Su work for a medical group?

 7               MR. SHAHRIARI:  Objection, calls for

 8   speculation, calls for -- lacks foundation,

 9   unintelligible and confusing.  It's beyond the scope of

10   this lawsuit.

11               THE WITNESS:  He works downtown.  I don't

12   know his address.

13   BY MR. LINK:

14       Q.      Okay.  Do you remember where downtown Dr. Su

15   works?

16       A.      In Chinatown somewhere.

17       Q.      Do you remember the hospital in which the

18   surgery took place?

19               MR. SHAHRIARI:  Objection, lacks foundation,

20   vague and ambiguous.

21               THE WITNESS:  Montebello Hospital.

22   BY MR. LINK:

23       Q.      Was that Montebello or Montecello?

24       A.      Montebello.

25       Q.      Thank you, sir.

Trustpoint.One  Alderson.   www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)
550

1          What is the address, if you recall, for

2     Montebello?

3       A.     I don't recall.

4       Q.     When did the knee surgery take place?

5          MR. SHAHRIARI:  Objection, vague and

6     ambiguous, unintelligible and confusing, lack of

7     foundation, calls for speculation.

8          THE WITNESS:  It was a double knee surgery

9     and it happened, I believe, in 2017, something like

10    that.  I don't remember the year.  I think it was a

11    couple years ago.

12    BY MR. LINK:

13      Q.     The knee surgery, was it in 2017 or could it

14    have been later than that?

15         MR. SHAHRIARI:  Objection, compound question,

16    vague and ambiguous.

17         THE WITNESS:  No, it couldn't have been later

18    than that.

19    BY MR. LINK:

20      Q.     Do you remember the month of the surgery?

21      A.     No.

22      Q.     Did someone drive you to the hospital before

23    the surgery?

24         MR. SHAHRIARI:  Objection, assumes facts not

25    in evidence, vague and ambiguous.

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
 1                    THE WITNESS:  Yes.

 2   BY MR. LINK:

 3        Q.     Who was that?

 4        A.     My brother.

 5        Q.     Is that Guy Shayler?

 6        A.     Yes.

 7        Q.     Since Dr. Su did the knee surgeries why were

 8   you not talking to her about your knees?

 9                    MR. SHAHRIARI:  Objection, lacks foundation,

10   assumes facts not in evidence, vague and ambiguous,

11   "talking to her," unintelligible and confusing,

12   mischaracterizes and misquotes earlier testimony --

13                    MR. LINK:  You know, Mr. Shahriari, that was

14   a bad question.  Let me do a better question.

15   BY MR. LINK:

16        Q.     Why did you go to Great Care Medical Group to

17   check on your knees when Dr. Su did the surgery?

18                    MR. SHAHRIARI:  Objection, vague and

19   ambiguous, lacks foundation, calls for -- excuse me,

20   strike that last objection.

21                    You can answer if you understand the

22   question.

23                    THE WITNESS:  Repeat the question again,

24   Counselor.

25   BY MR. LINK:
```

Trustpoint.One  Alderson.          www.trustpoint.one                    800.FOR.DEPO
                                 532
                              www.aldersonreporting.com              (800.367.3376)

1        Q.     Why did you go to Great Care Medical Group

2   on -- I'll get more specific -- on September 16 to talk

3   about your knees or to go there because of your knees

4   when Dr. Su did the surgery?

5              MR. SHAHRIARI:  Objection, compound question,

6   vague and ambiguous, unintelligible and confusing, lacks

7   foundation.

8              THE WITNESS:  That medical group was my

9   primary care, and I wanted to get Xrays on my knees

10  because something was wrong.  The surgery didn't work.

11  It didn't heal me completely at all.

12  BY MR. LINK:

13       Q.     Did Great Care Medical Group Xray your knees

14  in July of 2019?

15       A.     I believe we did get some -- no, we never did

16  get any Xrays.  I'm not sure why.

17       Q.     Mr. Shayler, it appears to me that you have

18  bottles in your left hand; is that right?

19       A.     Bottles?

20              MR. SHAHRIARI:  Objection, vague and

21  ambiguous, unintelligible and confusing.  The photograph

22  speaks for itself.

23              THE WITNESS:  Oh, in this picture?

24  BY MR. LINK:

25       Q.     Yes.

1        A.      Push it up.  I can't see it.  No, that's not

2    bottles.  That's something I got from him.  It was some

3    gauze and stuff.

4        Q.      When you say "from him," who are you talking

5    about?

6        A.      From my doctor.  He gave me some gauze and

7    stuff for my foot.

8        Q.      So are you returning the gauze to the doctor?

9        A.      No.  He had gave the gauze at the hospital --

10   at the clinic to take home.

11       Q.      Okay.  Moving on, on screen should be a video

12   dated July 16, 2019 with the time of 14 hours, 38

13   minutes, 54 seconds.  I'm going to mark this exhibit

14   as -- or this is really a still -- as Exhibit 15.

15              (Exhibit 15 marked)

16   BY MR. LINK:

17       Q.      Are you seeing that on screen, Mr. Shayler?

18       A.      I believe that's an elevator right there.

19       Q.      Okay.  Is that you at the door?

20       A.      Yes.  Me hunched over, yes.

21       Q.      Okay.  In your hand it appears there are

22   three prescription bottles.  Is that not accurate?

23       A.      That's what those are, yes.  I think they're

24   prescription.  Yes, they are prescriptions.

25       Q.      So after looking at the photograph, does it

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
534
800.FOR.DEPO
(800.367.3376)

1   refresh your recollection that you walked into Great

2   Care Medical Group with three prescription bottles and

3   left with three prescription bottles?

4              MR. SHAHRIARI:  Objection, misstates and

5   mischaracterizes testimony, unintelligible, vague and

6   ambiguous, lacks foundation.

7              But you can answer if you understand, James.

8              THE WITNESS:  I don't know if I walked in

9   there with them or he gave them to me.  I'm not sure.

10  BY MR. LINK:

11       Q.     Do you remember what prescriptions you were

12  taking from Great Care Medical Group?

13             MR. SHAHRIARI:  Objection, vague and

14  ambiguous as to the term "taking."  Do you mean

15  ingesting or taking physically as he's doing here --

16             MR. LINK:  Taking them, Mr. Shahriari.

17             MR. SHAHRIARI:  Let me finish my objection,

18  Mr. Link.  I'm not finished.  Please be patient.  It

19  lacks foundation, incomplete hypothetical, incomplete

20  and improper hypothetical, mischaracterizes and

21  misstates his earlier testimony.

22             THE WITNESS:  Yes, I do.

23  BY MR. LINK:

24       Q.     What were you taking?

25             MR. SHAHRIARI:  Same objections.

 1              THE WITNESS:  OxyContin, muscle relaxers and

 2   Gabapentin.

 3   BY MR. LINK:

 4       Q.     Do you remember the muscle relaxer that you

 5   were taking?

 6              MR. SHAHRIARI:  Objection, vague and

 7   ambiguous, "do you remember," unintelligible and

 8   confusing, vague and ambiguous as to time.

 9              THE WITNESS:  No, I don't remember exactly

10   what kind of muscle relaxer.  Oh, wait, I do.  Hang on

11   one second.  As a matter of fact, I do know.  The muscle

12   relaxer is D-u-l-o-x-e-a-i-n-e (sic).  I believe that's

13   how you spell it.

14   BY MR. LINK:

15       Q.     Okay, thank you.

16       A.     Uh-huh.

17       Q.     How long had you taken OxyContin prior to

18   July 16, 2019?

19              MR. SHAHRIARI:  Objection, vague and

20   ambiguous, lacks foundation, also is beyond the scope of

21   this lawsuit, not calculated to lead to the discovery of

22   admissible evidence, mischaracterizes earlier testimony.

23              James, you can answer.

24              THE WITNESS:  I'm not sure when I started

25   taking OxyContin.  Right before the surgery, about

Trustpoint.One   Alderson.        www.trustpoint.one          800.FOR.DEPO
                                  www.aldersonreporting.com        (800.367.3376)
536

1    probably a year before the surgery I started taking it.

2    BY MR. LINK:

3         Q.     Now, when you say "surgery," are you talking

4    about the knee surgeries or --

5         A.     The double knee surgery, the double knee

6    replacement.  I had to use a walker.  I couldn't walk.

7    I used a walker and they gave me OxyContin for the pain.

8         Q.     When did you start taking the Gabapentin?

9         A.     Oh, boy.  I started taking it somewhere

10   around -- right after the accident, my car accident.

11        Q.     Okay.  When did you start taking the muscle

12   relaxer -- I'm not going to try to pronounce that.

13             MR. SHAHRIARI:  Objection, assumes facts not

14   in evidence, misstates earlier testimony, vague and

15   ambiguous.

16             THE WITNESS:  Probably right when I started

17   seeing this doctor I started to take the muscle relaxer,

18   so probably -- probably 2017, something like that.  I'm

19   not sure.

20   BY MR. LINK:

21        Q.     Now, when you say "this doctor," are you

22   talking about this doctor at Great Care Medical Group?

23        A.     That's correct.

24        Q.     Okay, thank you.

25             From July 16, 2019 to the present have you

```
 1    been taking OxyContin.

 2        A.      No.

 3                MR. SHAHRIARI:  Objection, assumes facts not

 4    in evidence.

 5    BY MR. LINK:

 6        Q.      The answer was no; is that correct?

 7        A.      "No."

 8        Q.      Okay.  After July 16, 2019 for how long did

 9    you take OxyContin?

10                MR. SHAHRIARI:  Objection, assumes facts not

11    in evidence, vague and ambiguous, lacks foundation, also

12    invades his Constitutional privacy rights.  It's beyond

13    the scope of this lawsuit.

14                THE WITNESS:  I took OxyContin for --

15    probably after the surgery for about two years after the

16    surgery and then I weaned myself off it.

17    BY MR. LINK:

18        Q.      When did you wean yourself off OxyContin?

19    Can you give me a month, a year?

20        A.      Probably --

21                THE REPORTER:  Excuse me, Counsel.  The

22    deponent cut out and I didn't get a complete answer.

23    BY MR. LINK:

24        Q.      Mr. Shayler, the court reporter needs you to

25    repeat your answer, please.
```

Trustpoint.One   Alderson.

www.trustpoint.one
www.aldersonreporting.com

338

800.FOR.DEPO
(800.367.3376)

1        A.        Somewhere in the early part of or the late

2    part of 2018.

3        Q.        Have you taken OxyContin since then?

4             MR. SHAHRIARI:  Objection, asked and

5    answered, lacks -- excuse me.  Yes, that's it.

6             THE WITNESS:  No.

7    BY MR. LINK:

8        Q.        Have you taken any other pain medication from

9    the time you weaned yourself from OxyContin to the

10   present?

11       A.        Yes.

12       Q.        What pain medication is that?

13       A.        After the accident, the doctor put me on

14   hydrocodone.

15             MR. SHAHRIARI:  Mr. Link, can we take a

16   five-minute restroom break?

17             MR. LINK:  Yes, that's fine.

18             Off the record, please.

19             (Brief recess.)

20   BY MR. LINK:

21       Q.        Mr. Shayler, on screen should be 38 pages of

22   stills taken from a video dated July 14, 2021.  I'm

23   going to mark these stills as Exhibit 16.

24             (Exhibit 16 marked)

25   BY MR. LINK:

Trustpoint.One  |  Alderson            www.trustpoint.one              800.FOR.DEPO
                                  599
                              www.aldersonreporting.com               (800.367.3376)

1          Q.          Mr. Shayler, we see the back-end of a vehicle

2     in the first page of Exhibit 16.   Does that look like

3     your car?

4                    MR. SHAHRIARI:   Objection, assumes facts not

5     in evidence, lacks foundation, vague and ambiguous.

6                    THE WITNESS:   Yes.

7     BY MR. LINK:

8          Q.          Okay, thank you.   Is that you in the video --

9     excuse me.   Is that you in the still from the video on

10    the first page of Exhibit 16?

11         A.          Yes.

12         Q.          Can you tell me what you're holding in your

13    right hand in that still from the video?

14         A.          I believe that's a slope measure.

15         Q.          Can you tell me what you're holding in your

16    left hand in that still from the video?

17         A.          I believe that's a camera on my phone.   That

18    may be my camera on my phone.

19         Q.          What kind of camera do you have?

20                   MR. SHAHRIARI:   Objection, misstates

21    testimony.   He said it is his telephone.

22                   THE WITNESS:   My phone.

23    BY MR. LINK:

24         Q.          Do you separately have a camera that you use?

25                   MR. SHAHRIARI:   Objection, vague and

```
 1   ambiguous, unintelligible and confusing, "a camera that

 2   you use," irrelevant, not calculated to lead to the

 3   discovery of admissible evidence, mischaracterizes

 4   earlier testimony.

 5              THE WITNESS:  No.

 6   BY MR. LINK:

 7       Q.    When we took the break, I realized that I had

 8   a couple more questions about medications that you're

 9   taking.

10              You were prescribed hydrocodone.  Are you

11   still taking hydrocodone?

12              MR. SHAHRIARI:  Objection, vague and

13   ambiguous.

14              THE WITNESS:  Yes, I take hydrocodone.

15   BY MR. LINK:

16       Q.    Are you still taking Gabapentin?

17              MR. SHAHRIARI:  Objection, vague and

18   ambiguous.

19              THE WITNESS:  Yes.

20   BY MR. LINK:

21       Q.    Are you still taking the muscle relaxer?

22              MR. SHAHRIARI:  Objection, misstates

23   testimony, lacks foundation, vague and ambiguous, not

24   calculated to lead to the discovery of admissible

25   evidence in this case.
```

Trustpoint.One | Alderson.

www.trustpoint.one
www.aldersonreporting.com

581

800.FOR.DEPO
(800.367.3376)

```
 1              THE WITNESS:  Yes.

 2  BY MR. LINK:

 3      Q.     Have you been taking hydrocodone

 4  consistently -- or pardon me.

 5              Have you been taking hydrocodone continuously

 6  from the first time it was prescribed to the present?

 7              MR. SHAHRIARI:  Objection, unintelligible and

 8  confusing, compound question, vague and ambiguous, lacks

 9  foundation, invades Constitutional Privacy rights and

10  not calculated to lead to the discovery of admissible

11  evidence.

12              THE WITNESS:  Yes.

13  BY MR. LINK:

14      Q.     Back to Exhibit 16.  Scrolling to page 2 of

15  that exhibit, is that you, Mr. Shayler?

16              MR. SHAHRIARI:  Objection, vague and

17  ambiguous.

18              THE WITNESS:  I'd have to speculate.  I don't

19  see me face, but I'd have to speculate and say yes.

20              MR. SHAHRIARI:  For the record, there's a

21  black strip across the photograph.  I don't know if that

22  was intentional.

23              MR. LINK:  That's a wire from which the

24  surveillance video -- it's just across it.  It's just

25  across -- it's just a photograph with that wire.
```

Trustpoint.One | Alderson.

www.trustpoint.one
www.aldersonreporting.com

582

800.FOR.DEPO
(800.367.3376)

1   BY MR. LINK:

2       Q.      Mr. Shayler, going to Exhibit 3, can you tell

3   if that's you -- excuse me, page 3 of Exhibit 16, can

4   you tell me if that is you in the still?

5       A.      I'd have to speculate again.  I can't see my

6   face, but it looks like what I was wearing that day.

7       Q.      Okay.  If we go back to the first page, that

8   is you in the photograph and your vehicle in the

9   photograph, correct?

10              MR. SHAHRIARI:  Asked and answered.

11              THE WITNESS:  That's me, my face and my car.

12  BY MR. LINK:

13      Q.      Do you have any reason to believe that the

14  second page of Exhibit 16 does not show you in that

15  still?

16              MR. SHAHRIARI:  Objection, asked and

17  answered.  He said he would have to guess because he

18  cannot see his face, repetitious, calls for speculation.

19              THE WITNESS:  Again, I'd have to guess.  I

20  can't see my face.  If I had to guess, I'd say yes, it

21  is.

22              MR. SHAHRIARI:  James, don't guess.

23  BY MR. LINK:

24      Q.      Page 4 of Exhibit 16, is that you,

25  Mr. Shayler?

```
 1          A.      Yes, that's me.

 2          Q.      Okay.  On the ground, pavement, there appears

 3    to be some sort of device.  Do you know what that device

 4    is?

 5                  MR. SHAHRIARI:  Objection, vague and

 6    ambiguous, asked and answered, repetitious.

 7                  THE WITNESS:  I believe that's a slope

 8    measure.

 9    BY MR. LINK:

10          Q.      Okay.  Do you remember taking a slope

11    measurement of a parking space on July 14, 2021?

12                  MR. SHAHRIARI:  Objection, assumes facts not

13    in evidence, lacks foundation, unintelligible and

14    confusing, vague and ambiguous.

15                  You can answer.

16                  THE WITNESS:  No, I don't.

17    BY MR. LINK:

18          Q.      Do you remember suing Melrose Herman-Frankel,

19    a limited liability company?

20                  MR. SHAHRIARI:  Objection, vague and

21    ambiguous, calls for expert legal opinion, legal

22    reasoning.

23    BY MR. LINK:

24          Q.      I didn't hear an answer.  Did you give an

25    answer?
```

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
584
800.FOR.DEPO
(800.367.3376)

1          A.          Yes, I believe so.

2          Q.          Do you remember going to Melrose Liquor

3     Market?

4                    MR. SHAHRIARI:  Objection, vague and

5     ambiguous, "going to."  It's also vague as to time,

6     lacks foundation, assumes facts not in evidence.

7                    THE WITNESS:  Again, yes, I believe so.

8     BY MR. LINK:

9          Q.          Okay.  Going back to Exhibit 16, page 5,

10    Mr. Shayler, is that you on page 5 of Exhibit 16?

11         A.          I believe so.  Yes, I can see the side of

12    myself, yes.

13         Q.          Can you tell me what you are doing in page 5

14    of Exhibit 16?

15                   MR. SHAHRIARI:  Objection, vague and

16    ambiguous, unintelligible and confusing, lacks

17    foundation.

18                   Please answer, James.

19                   THE WITNESS:  Taking a picture of the slope

20    measurement.

21    BY MR. LINK:

22         Q.          Mr. Shayler, is that you on page 6 of Exhibit

23    16?

24         A.          Yes, I remember my back was hurting when I

25    got in that position, so I remember that, yes.

 1          Q.      Mr. Shayler, is that you on page 7 of Exhibit

 2     16?

 3          A.      Yes, I believe so.

 4                  MR. SHAHRIARI:  Objection, asked and

 5     answered.

 6     BY MR. LINK:

 7          Q.      Mr. Shayler, is that you on page 8 of Exhibit

 8     16?

 9          A.      Yes.

10          Q.      Mr. Shayler, is that you on page 9 of Exhibit

11     16?

12          A.      That's -- I believe that's the same picture

13     that we just went over.

14                  MR. SHAHRIARI:  Mr. Link, we keep seeing the

15     same picture.  I don't know if you're scrolling or not.

16     BY MR. LINK:

17          Q.      Are you talking about -- I'm putting up page

18     6 of Exhibit 16.  Are you seeing a photograph where the

19     measuring tool is not yet on the ground?

20          A.      Yes.

21          Q.      Okay.  So if we scroll back to page 9, is

22     this a different picture than what we've seen before?

23                  MR. SHAHRIARI:  Objection, vague and

24     ambiguous, unintelligible and confusing, calls for

25     expert opinion, calls for speculation.

Trustpoint.One   Alderson.          www.trustpoint.one          800.FOR.DEPO
                                    www.aldersonreporting.com          (800.367.3376)
                                           586

 1                    THE WITNESS:  No, it looks like the same

 2      picture.

 3      BY MR. LINK:

 4          Q.      Which picture is this the same one of?

 5                    MR. SHAHRIARI:  Objection, vague and

 6      ambiguous, unintelligible, confusing, repetitious,

 7      cumulative.

 8                    Mr. Link, I have to finish my objection.

 9      Please allow me to finish my objection.  It's asked and

10      answered.

11      BY MR. LINK:

12          Q.      So you're saying that page 9 is the same as

13      page 7, correct?

14                    MR. SHAHRIARI:  We can only see one at a

15      time, Mr. Link.  How are we supposed to compare?

16      BY MR. LINK:

17          Q.      He's the one who made the comparison.

18                    MR. SHAHRIARI:  We are looking at Exhibit 7.

19      If you want him to --

20                    MR. LINK:  Exhibit 16, page 7.

21      BY MR. LINK:

22          Q.      You're looking at page 7 of Exhibit 16.

23                    MR. SHAHRIARI:  That's all we see.

24                    MR. LINK:  Let me scroll down to page 9.

25      BY MR. LINK:

 1       Q.      Are you seeing page 9 now?

 2       A.      They look the same to me.

 3       Q.      All right.  Do you remember taking slope

 4  measurements from two different locations on the

 5  pavement on July 16 -- excuse me, July 14, 2021?

 6            MR. SHAHRIARI:  Objection, compound question,

 7  vague and ambiguous, unintelligible and confusing,

 8  assumes facts not in evidence, lacks foundation.

 9            THE WITNESS:  Yes.

10  BY MR. LINK:

11       Q.      How many measurements did you take on July

12  14th, 2021?

13            MR. SHAHRIARI:  Objection, vague and

14  ambiguous as to "how many measurements," unintelligible

15  and confusing, lacks foundation.

16            THE WITNESS:  I believe two.

17  BY MR. LINK:

18       Q.      Page 10 of Exhibit 16, Mr. Shayler, it

19  appears that you're standing up and working with

20  something with both hands.  Do you see that?

21            MR. SHAHRIARI:  Objection, assumes facts not

22  in evidence, vague and ambiguous.

23            THE WITNESS:  I have to use two hands.  I

24  don't want to drop my phone.

25  BY MR. LINK:

1      Q.      So that is you on page 10 of Exhibit 16,

2   correct?

3      A.      Yes.  I have to use two hands because I can

4   drop my phone.

5      Q.      Page 11 of Exhibit 16, is that you,

6   Mr. Shayler?

7              MR. SHAHRIARI:  Objection, vague and

8   ambiguous.  There appear to be multiple people in this

9   photograph.  It's unintelligible and confusing, also not

10   calculated to lead to the discovery of admissible

11   evidence.

12              THE WITNESS:  Yes, that's me limping.

13   BY MR. LINK:

14      Q.      Do you see anybody else in that photograph,

15   Mr. Shayler?

16      A.      I see a truck behind me.  I don't know if

17   anybody is in there or not.  It's hard to tell.

18      Q.      Mr. Shayler, I'm going to move to page 13 of

19   Exhibit 16.  Is that you in the still from the video?

20      A.      That's me having trouble going up that step

21   all hunched over, yes.

22      Q.      Looking at page 14 of Exhibit 16, is that

23   you, Mr. Shayler, coming in the door of the Melrose

24   Liquor Market?

25              MR. SHAHRIARI:  Objection, assumes facts not

Trustpoint.One  Alderson

www.trustpoint.one
www.aldersonreporting.com

569

800.FOR.DEPO
(800.367.3376)

1    in evidence, lacks foundation, vague and ambiguous.

2              THE WITNESS:  Yes.  I can tell from my face I

3    was in a lot of pain, yes.

4    BY MR. LINK:

5         Q.     Page 15 of Exhibit 16, is that you,

6    Mr. Shayler?

7         A.     That's me hunched over using my left hand.

8         Q.     Page 16 of Exhibit 16, is that you,

9    Mr. Shayler?

10        A.     I can't see my face.  I've got to speculate

11   and say I think so.

12             MR. SHAHRIARI:  James, don't speculate.

13   BY MR. LINK:

14        Q.     Page 17 of Exhibit 16, is that you,

15   Mr. Shayler?

16        A.     That's me with a bottle in my left hand,

17   hunched over.

18        Q.     Is that your right hand, Mr. Shayler?

19        A.     I don't believe so.  I think that's my left.

20   I could be wrong, though.

21             MR. SHAHRIARI:  Objection, vague and

22   ambiguous.  Which hand are we talking about as to hands?

23   BY MR. LINK:

24        Q.     Mr. Shayler, do you remember getting a bottle

25   from the refrigerator case at Melrose Liquor Market on

Trustpoint.One | Alderson.

www.trustpoint.one
www.aldersonreporting.com

376

800.FOR.DEPO
(800.367.3376)

1    July 14th, 2021?

2         A.     No.

3         Q.     Going to page 18 of Exhibit 16, is that you,

4    Mr. Shayler?

5         A.     That's me hunched over using both hands doing

6    something.

7         Q.     Exhibit 16, page 19, is that you,

8    Mr. Shayler, using both hands looking like it's maybe

9    dealing with a bag of coins?

10             MR. SHAHRIARI:  Objection, assumes facts not

11   in evidence, lacks foundation, unintelligible and

12   confusing, compound question, vague and ambiguous, calls

13   for speculation.  He's got to speculate whether it's him

14   when he can't see his face.

15             THE WITNESS:  It looks like me using both

16   hands.  I can't -- I have to use both hands.  I can't --

17   it's hard for me to lift small things with this damaged

18   hand.

19   BY MR. LINK:

20        Q.     Mr. Shayler, do you wear a gold ring on your

21   right index finger?

22             MR. SHAHRIARI:  Objection, vague and

23   ambiguous, vague as to time, also lacks foundation,

24   beyond the scope of this case, not calculated to lead to

25   the discovery of admissible evidence.

```
 1                    THE WITNESS:  Yes.

 2   BY MR. LINK:

 3        Q.     On July 14, 2021 do you believe you were

 4   wearing a gold ring on your right index finger?

 5        A.     Yes, and I had a watch on my left.

 6                    MR. SHAHRIARI:  Same objection.

 7                    THE WITNESS:  It looks like a ring on my

 8   right and then my watch on my left, using both hands,

 9   yes.

10   BY MR. LINK:

11        Q.     Going to page 24 of Exhibit 16, is that you,

12   Mr. Shayler?

13        A.     Are you sure you don't want to talk about the

14   atrophy?  You can see it in my hands.

15                    MR. SHAHRIARI:  James, just answer the

16   question he's asking you.

17                    THE WITNESS:  Yes.

18   BY MR. LINK:

19        Q.     Going to page 25 of Exhibit 16, is that you,

20   Mr. Shayler?

21        A.     That's me.

22        Q.     Mr. Shayler, looking at page 26 of Exhibit

23   16, it appears that you have something in your left

24   hand.  Do you know what that is?

25                    MR. SHAHRIARI:  Objection, lacks foundation,
```

Trustpoint.One | Alderson.

www.trustpoint.one
www.aldersonreporting.com

372

800.FOR.DEPO
(800.367.3376)

 1   assumes facts not in evidence, vague and ambiguous,

 2   unintelligible and confusing, misleading.

 3              THE WITNESS:  I can't remember what that is.

 4   BY MR. LINK:

 5       Q.    That's all I wanted to know.

 6              In your right hand you have the bottle that

 7   you purchased at the Melrose Liquor Market, correct?

 8       A.    That looks about right, yes.

 9       Q.    Thank you.  Mr. Shayler, scrolling to page 28

10   of Exhibit 16, is that you in the photograph?

11       A.    Yes.

12       Q.    Do you know what you were doing at the time

13   this still was taken on July 14, 2019?

14              MR. SHAHRIARI:  Objection, vague and

15   ambiguous, "what you were doing," unintelligible and

16   confusing, lacks foundation, assumes facts not in

17   evidence, is beyond the scope of this lawsuit, not

18   calculated to lead to the discovery of admissible

19   evidence.

20              THE WITNESS:  Again, I believe I'm talking on

21   my phone and I believe I'm using both hands, again.

22   BY MR. LINK:

23       Q.    Who were you talking to?

24       A.    I don't remember.

25       Q.    Going to page 29 of Exhibit 16, is that you,

1    Mr. Shayler?

2         A.    I believe it is.  Yes, it is.

3         Q.    Going to page 30 of Exhibit 16, is that you,

4    Mr. Shayler?

5         A.    Yes, I can see I'm in a lot of pain and I'm

6    talking, again, on my phone.

7         Q.    Could you have been taking photographs,

8    Mr. Shayler, and not talking on the phone?

9              MR. SHAHRIARI:  Objection, misstates

10   testimony, assumes facts not in evidence, vague and

11   ambiguous, asked and answered, argumentative.

12             THE WITNESS:  I'm not sure.  I believe I was

13   talking on the phone.

14   BY MR. LINK:

15        Q.    Page 31 of Exhibit 16, is that you,

16   Mr. Shayler?

17        A.    Yes.

18        Q.    Mr. Shayler, what is that in your left hand

19   in the photograph at page 31?

20             MR. SHAHRIARI:  Objection, assumes facts not

21   in evidence, unintelligible and confusing, vague and

22   ambiguous.

23             MR. LINK:  You're right; it's the right hand.

24   If I said left hand, I was wrong.

25             MR. SHAHRIARI:  James, do you understand his

Trustpoint.One | Alderson.

www.trustpoint.one
www.aldersonreporting.com

364

800.FOR.DEPO
(800.367.3376)

 1   question?

 2           THE WITNESS:  Yes, I'm not sure what that is.

 3   That could be the -- that could be the measuring thing,

 4   the ruler.  I'm not sure what that is.  I can't tell.

 5   You'd have to enlarge it.

 6   BY MR. LINK:

 7       Q.      Page 32 of Exhibit 16, is that you,

 8   Mr. Shayler?

 9       A.      Yes, that is me.

10       Q.      Okay.  Page 34 of Exhibit 16, is that you,

11   Mr. Shayler?

12       A.      That's me.

13       Q.      Page 37 of Exhibit 16, Mr. Shayler, shows

14   what appears to be a level.  Do you see that?

15       A.      I see it.

16       Q.      Do you own that level?

17           MR. SHAHRIARI:  Objection, assumes facts not

18   in evidence, lacks foundation, vague and ambiguous, also

19   vague as to time, not calculated to lead to the

20   discovery of admissible evidence.

21           THE WITNESS:  Yes, I do own that.

22   BY MR. LINK:

23       Q.      For how long have you owned that level?

24       A.      I couldn't tell you exactly.  Maybe a year.

25       Q.      Did you own any level prior to purchasing

1    this level?

2              MR. SHAHRIARI:  Objection, vague and

3    ambiguous as to what exactly a level is, unintelligible

4    and confusing, beyond the scope this lawsuit, also vague

5    as to -- also beyond the scope of time in this case.

6              THE WITNESS:  No, I didn't.

7    BY MR. LINK:

8       Q.     Did anyone recommend the purchase of the

9    level to you?

10             MR. SHAHRIARI:  I'm going to object and

11   instruct Mr. Shayler not to answer to the extent it

12   calls for any instructions provided to him by his

13   attorney.

14             MR. LINK:  The answer calls for a yes or no,

15   so he wouldn't be revealing who recommended it in the

16   answer to this question.

17             THE WITNESS:  The answer is no.

18   BY MR. LINK:

19      Q.     I'm trying to pull up another exhibit here.

20   And I don't know that I'm going to be successful.  Let's

21   see.

22             Mr. Shayler, on screen should be a video

23   taken July 2019.  I'm not going to be able to add this

24   as an exhibit, but I would ask as we're watching this

25   video if that's you approaching the door in the video.

Trustpoint.One  Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1                    MR. SHAHRIARI:  Objection, vague and

2     ambiguous -- James, let me get my objection in.

3                    THE WITNESS:  Okay.

4                    MR. SHAHRIARI:  Objection, vague and

5     ambiguous, unintelligible and confusing, assumes facts

6     not in evidence, compound question, asked and answered.

7                    THE WITNESS:  That's me limping, hurting

8     quite badly.

9     BY MR. LINK:

10         Q.       Let me start it again, Mr. Shayler, from the

11    beginning.  Is that you limping up to Great Care Medical

12    Group?

13         A.       Yes, that is me.

14         Q.       Do you remember what you may have been doing

15    off screen during this video?

16         A.       Not at all.

17                    MR. SHAHRIARI:  Objection, vague and

18    ambiguous as to what you were doing -- James, you've got

19    to let me finish my objection, James.

20                    Objection, vague and ambiguous,

21    unintelligible and confusing, lacks foundation, assumes

22    facts not in evidence.

23                    THE WITNESS:  I believe I was going to see

24    the doctor.

25    BY MR. LINK:

Trustpoint.One   Alderson.

www.trustpoint.one
www.aldersonreporting.com
597

800.FOR.DEPO
(800.367.3376)

```
 1        Q.      Mr. Shayler, you're off screen now.  I'm
 2   looking at your fan.
 3        A.      Oh, sorry about that.  I was trying to look
 4   at that picture so I could see it.  Okay.
 5        Q.      Mr. Shayler, as we're looking at the video,
 6   you were apparently reading something.  Do you remember
 7   what you were reading?
 8              MR. SHAHRIARI:  Objection, assumes facts not
 9   in evidence, lacks foundation, compound question,
10   unintelligible and confusing, not calculated to lead to
11   the discovery of admissible evidence in this case,
12   assumes facts not in evidence.
13              THE WITNESS:  No, I don't remember what I was
14   reading.
15   BY MR. LINK:
16        Q.      I'll back this up just a tiny bit,
17   Mr. Shayler.  You opened the door with your right hand
18   in the video.  Did you have of any issues opening that
19   door?
20              MR. SHAHRIARI:  Objection, vague and
21   ambiguous, "did you have any issues," assumes facts not
22   in evidence, mischaracterizes, repetitious, calls --
23   excuse me -- that's all.
24              James, answer if you understand, please.
25              THE WITNESS:  No, I didn't have problems with
```

1   that door.   The pressure on that door was real light.

2   BY MR. LINK:

3        Q.       Okay.   We're done with that video.   Bear with

4   me.   I've never done this before.   That's not going to

5   work.   Never done videos before.

6             Mr. Shayler, I should have up on screen a

7   video showing -- I don't know if you'd call it the

8   lobby, but it says "Second Foyer" on the video itself.

9   I'm going to play it and ask if you -- if that's you in

10   the video.

11             MR. SHAHRIARI:   Objection, vague and

12   ambiguous, unintelligible and confusing, lacks

13   foundation, repetitious and compound question.

14             But James, if you understand Mr. Link's

15   question, please go ahead and answer.

16             THE WITNESS:   Yes, that's me.   I had to go up

17   the stairs.   I'm hurting.   The elevator was down for

18   like four months.

19   BY MR. LINK:

20        Q.    How many stairs were there, Mr. Shayler?

21        A.    I couldn't -- I'd have to guess.

22        Q.    More than five?

23             MR. SHAHRIARI:   Objection, asked and

24   answered.   He said he would have to guess.

25   BY MR. LINK:

1        Q.      I'm asking for an estimate.

2               MR. SHAHRIARI:  Same objection, asked and

3       answered.  He said he would have to guess.

4       BY MR. LINK:

5        Q.      Mr. Shayler, do you have an estimate of

6       whether it was more than five?

7        A.      More than five, I would say.

8        Q.      Do you have an estimate whether it was more

9       than ten?

10       A.      I'd say right about ten.

11       Q.      Mr. Shayler, did you ever to walk up a full

12      flight of stairs to the next floor?

13              MR. SHAHRIARI:  Objection, vague and

14      ambiguous as to the term "full flight of stairs,"

15      assumes facts not in evidence, lacks foundation.

16              THE WITNESS:  Yes.  And that's why I was

17      limping so bad.  I'm in a lot of pain.

18      BY MR. LINK:

19       Q.      Mr. Shayler, we just saw you open the door to

20      exit the Great Care Medical Group.  Did you have any

21      problem opening that door?

22              MR. SHAHRIARI:  Objection, assumes facts not

23      in evidence, mischaracterizes testimony --

24              MR. LINK:  Really, Mr. Shahriari?

25              MR. SHAHRIARI:  Mr. Link, I'm not finished

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
580
800.FOR.DEPO
(800.367.3376)

1   making my objection.  Please allow me to finish my

2   objection so it's on the record appropriately.

3           It also calls for a narrative and is a

4   compound question.

5           Can we have the question read back again,

6   please.

7           (Record read)

8   BY MR. LINK:

9       Q.     I'm going to ask a different question.

10          Mr. Shayler, I just showed you this video.

11   When you finished the stairs, you walked across the

12   lobby, correct?

13      A.     I limped across the lobby.

14      Q.     Okay.  You limped across the lobby in great

15   pain, correct?

16      A.     Correct.

17      Q.     Okay.  You had just gotten your OxyContin in

18   order to relieve the pain, correct?

19          MR. SHAHRIARI:  Objection, misstates

20   testimony, assumes facts not in evidence, calls for a

21   medical conclusion, also is unintelligible and

22   confusing, unduly burdensome, lacks foundation.

23          THE WITNESS:  I'm not sure which business

24   this is, so I don't know if I -- if I got any OxyContin

25   that day from him.

```
 1    BY MR. LINK:

 2        Q.     Okay.  So you walked across the lobby --

 3    excuse me -- you limped across the lobby in great pain,

 4    grabbed the door handle and opened the door.

 5               Did you have any pain opening that door?

 6        A.     I did not have any pain opening that door.

 7        Q.     Did you have any discomfort opening that

 8    door?

 9        A.     I had --

10               MR. SHAHRIARI:  Objection, vague and

11    ambiguous.

12               Go ahead, James.

13               MR. LINK:  I didn't hear the answer.

14               THE WITNESS:  I had discomfort opening that

15    door, yes.

16    BY MR. LINK:

17        Q.     Did you have any difficulty opening that

18    door?

19        A.     The pressure on that door was such that I did

20    not have problems opening that door.

21        Q.     What discomfort did you have opening that

22    door?

23        A.     When I opened that door, my muscles in my

24    arms hurt.

25        Q.     Forearm muscles or upper arm muscles?
```

```
 1        A.       Forearm muscles.

 2        Q.       Mr. Shayler, are you participating in any

 3   physical therapy for your right arm?

 4            MR. SHAHRIARI:  Objection, vague and

 5   ambiguous as to the term "participating."  It's also

 6   vague as to time, lacks foundation, compound question.

 7            THE WITNESS:  I have had many sessions of

 8   physical therapy for that arm.

 9   BY MR. LINK:

10        Q.       When did you start physical therapy for that

11   right arm?

12            MR. SHAHRIARI:  Objection, vague as to the

13   term "when, when did you start," also a compound

14   question.

15            THE WITNESS:  Roughly 12 years ago, 15 years

16   ago.  Probably less than 15 years ago.  It was probably

17   about 12 years ago.

18   BY MR. LINK:

19        Q.       How many physical therapy sessions have you

20   had in the last 12 years?

21            MR. SHAHRIARI:  Objection, vague and

22   ambiguous.  Are you talking about the previous injury or

23   are you talking about as to other parts of his body or

24   also --

25            MR. LINK:  We're talking about his right arm.
```

Trustpoint.One | Alderson.

www.trustpoint.one
www.aldersonreporting.com

583

800.FOR.DEPO
(800.367.3376)

```
 1                THE WITNESS:  I probably had 20 sessions.

 2   BY MR. LINK:

 3        Q.      When was the last session of physical therapy

 4   that you had on your right arm?

 5                THE WITNESS:  Probably 12 years ago.

 6   BY MR. LINK:

 7        Q.      I'm going to try to show you another video.

 8   You should be seeing a video dated April 2, 2021 with a

 9   timestamp of 1:15:57.  Do you see that?

10        A.      We've seen -- we've gone over this video,

11   yes.

12        Q.      Are you hearing the sound from the video,

13   Mr. Shayler?

14                MR. SHAHRIARI:  Objection, vague and

15   ambiguous as to "hearing the sound."  Do you mean can he

16   understand the sounds or do you mean are any sounds

17   audible?

18                James, please answer the question.

19                THE WITNESS:  I hear the sound.

20   BY MR. LINK:

21        Q.      Can you make out what was said?

22        A.      Well, that's me limping real good.

23                No, I can't make out what's said.

24        Q.      Why did you ask for a business card,

25   Mr. Shayler?
```

1              MR. SHAHRIARI:  Objection, assumes facts not

2     in evidence, lacks foundation.  He didn't say he asked

3     for a business card.

4     BY MR. LINK:

5         Q.    Why did you say the words, "Do you have a

6     business card," Mr. Shayler?

7              MR. SHAHRIARI:  Again, objection, compound

8     question, unintelligible and confusing, assumes facts

9     not in evidence, lacks foundation.

10             THE WITNESS:  I got that for my brother.  He

11    asked me to go up there and get it.

12    BY MR. LINK:

13        Q.    Where does your brother live?

14             MR. SHAHRIARI:  Objection, invasion of

15    privacy rights, beyond the scope of this lawsuit, not

16    calculated to lead to the discovery of admissible

17    evidence, lacks foundation.

18             THE WITNESS:  He owns Hollywood Check Cashing

19    two blocks away.

20    BY MR. LINK:

21        Q.    Where does he live, Mr. Shayler?

22        A.    La Canada Flintridge.

23             Hey, my battery is getting low.  I've got to

24    get my -- move it over there.  I've got to move.

25             MR. SHAHRIARI:  Can we take a brief

 1   five-minute break so he can get to a battery charger?

 2          (Brief recess.)

 3   BY MR. LINK:

 4      Q.    And again, I may or may not be able to get

 5   this accomplished.  Okay, here we go.  Hopefully -- I

 6   don't know.  You probably didn't see that.  Let me go

 7   back.

 8          Mr. Shayler, was that you limping in great

 9   pain down the sidewalk after leaving the CPAP store?

10   I'll show it again.

11          Yes?  No?

12          MR. SHAHRIARI:  Did you hear the question,

13   James?

14   BY MR. LINK:

15      Q.    We're not hearing you, Mr. Shayler.  You need

16   to turn the microphone on.

17          MR. SHAHRIARI:  James -- he's having

18   technical problems.  Let me call him and see if I can

19   get him unmuted.  Excuse me.  Let me call him and see if

20   I can help him.

21          MR. LINK:  Let's go off the record.

22          (Brief recess.)

23   BY MR. LINK:

24      Q.    Mr. Shayler, up on the screen you should see

25   a video with a timestamp 1:17:46, April 2, 2021.  Do you

```
 1    see that?

 2                Mr. Shayler, is that you in the video?

 3                MR. SHAHRIARI:  James, can you hear us?

 4                (Brief pause.)

 5    BY MR. LINK:

 6        Q.     Mr. Shayler, you should be seeing a video

 7    dated April 2, 2021 with a timestamp of 1:17:40.  Do you

 8    see it up on the screen?

 9        A.     Yes.

10        Q.     Okay.  Is that you limping on the sidewalk?

11        A.     Yes.

12        Q.     Okay.  I think you should be seeing a video

13    or the start of a video that shows a truck and what

14    appears to be your Tiguan coming into view.  Do you see

15    that?

16        A.     Yes.

17        Q.     And that is your vehicle parked in the

18    Accessible Parking space, correct?

19        A.     Correct.

20        Q.     Okay.  Here we go.  Mr. Shayler, that is you

21    that we're seeing in the video placing the level on the

22    ground, correct?

23        A.     Yes.

24                MR. SHAHRIARI:  Objection, assumes facts not

25    in evidence.
```

```
 1   BY MR. LINK:

 2       Q.     Mr. Shayler, the video seems to confirm what

 3   you testified earlier, that you took two measurements

 4   with the level, correct?

 5              MR. SHAHRIARI:  Objection, assumes facts not

 6   in evidence, misstates testimony, lack of foundation,

 7   vague and ambiguous, two measurements.

 8              THE WITNESS:  I'm not sure if I took two or

 9   not.  I know I took one, but --

10   BY MR. LINK:

11       Q.     Okay.  Mr. Shayler, as you were walking away

12   from your car into the market, were you taking

13   photographs?

14              MR. SHAHRIARI:  Objection, lack of

15   foundation, vague and ambiguous, unintelligible and

16   confusing, assumes facts not in evidence.

17              THE WITNESS:  I can't say for sure, but I may

18   have.

19   BY MR. LINK:

20       Q.     Mr. Shayler, you should see on screen a video

21   of you by the refrigerator case.  Do you see that?

22              MR. SHAHRIARI:  Objection, vague and

23   ambiguous, unintelligible and confusing, "by the

24   refrigerator case," assumes facts not in evidence, lacks

25   foundation.
```

1               THE WITNESS:   I see me walking around doing

2       something back there, looking for something.   I'm not

3       sure.

4    BY MR. LINK:

5        Q.     Mr. Shayler, looking at this video, does it

6    refresh your recollection what you were looking for when

7    you were back there at the refrigerator case?  Was it

8    something specific?

9               MR. SHAHRIARI:  Objection, compound question.

10              Go ahead, James.

11              THE WITNESS:  It looks like I was looking for

12   something to drink.

13   BY MR. LINK:

14       Q.     Do you remember what you chose?

15       A.     No, I don't.  Probably that ice tea.

16       Q.     Mr. Shayler, the video shows you taking

17   something out of your pocket, correct?

18              MR. SHAHRIARI:  Objection, assumes facts not

19   in evidence, lacks foundation.

20              THE WITNESS:  I'm using two hands for

21   something.  I'm not sure what it is, maybe counting

22   change out or money.  I don't know.

23   BY MR. LINK:

24       Q.     Was it a bag --

25       A.     Something to pay for the ice tea.

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
589
800.FOR.DEPO
(800.367.3376)

1        Q.      Do you have a bag of coins in your pocket?

2               MR. SHAHRIARI:  Objection, vague and

3    ambiguous.  Are you asking now or then?

4               MR. LINK:  Based on the video that we're

5    watching, Mr. Shahriari.

6               THE WITNESS:  It looks like I was giving him

7    some coins.

8    BY MR. LINK:

9        Q.      Okay.  Mr. Shayler, you were given a receipt

10   by the cashier.  Do you see that?

11       A.      Yes.

12       Q.      Do you have that receipt?

13       A.      I don't think so.  I may have or I may not.

14   I don't think I have that receipt.

15       Q.      Mr. Shayler you visited my client's property

16   three times, correct?

17       A.      Yes.

18       Q.      Once in March of 2019, correct?

19       A.      Right.

20       Q.      Do you remember the specific day?

21       A.      Yes.  Hang on one second.

22               What day?

23       Q.      Yes, the specific day in March of 2019.

24       A.      March of 2019.  In March of 2019, it was on

25   the 20th of March.

1        Q.       Were you using a cane or walker that day?

2        A.       That day I was using a cane.

3        Q.       Mr. Shayler, you're looking at some piece of

4   paper or papers.   What is that?

5        A.       Those are notes that I took for this -- for

6   your deposition so I know what I'm talking about.

7        Q.       How did you determine the specific date that

8   you were at my client's property in March of 2019?

9        A.       That's the day I went.   That's the day I

10  went.

11       Q.       The reason why I ask the question is the

12  Complaint only alleged month and day -- excuse me, the

13  month and year.   How did you know what day it was?

14                MR. SHAHRIARI:   Objection, asked and

15  answered, unintelligible and confusing, vague and

16  ambiguous, a compound question, assumes facts not in

17  evidence.

18                But James, if you understand, please answer.

19                THE WITNESS:   I believe once we decided to

20  file a lawsuit I wrote everything down, the days that I

21  went and what I bought.

22  BY MR. LINK:

23       Q.       Where did you write those down?

24       A.       In Culver City, California.

25       Q.       Okay.  Do you keep a diary of where you go?

```
 1        A.       Sometimes.

 2        Q.       Do you write it down on a calendar or a

 3   calendar book?  What do you write it down on?

 4                 MR. SHAHRIARI:  I'm going to object on the

 5   basis of attorney work product.  To the extent that he

 6   was directed by his attorneys to create documents, he

 7   should not be discussing them.  I'm going to instruct

 8   him not to answer any questions related to notes that he

 9   took at the direction of his attorney or anything he did

10   at the direction of his attorneys.  I'm going to be very

11   stern on this.

12                 James, you are not to answer any questions

13   regarding notes you took at the direction of your

14   attorneys.  That is attorney work product and

15   attorney-client privileged.

16                 MR. LINK:  Actually, it's not, Mr. Shahriari,

17   because it can't be work product because he's not an

18   attorney.  And what he creates and gives to you isn't

19   necessarily attorney-client privileged.

20                 MR. SHAHRIARI:  I'm instructing him not to

21   answer any questions regarding what he was told to

22   prepare at the direction of his attorneys.  That is in

23   fact attorney work product, and you know that, Mr. Link.

24                 MR. LINK:  Mr. Shahriari, I have been very

25   patient in allowing you to create your record.
```

Trustpoint.One   Alderson.        www.trustpoint.one          800.FOR.DEPO
                                    592
                              www.aldersonreporting.com        (800.367.3376)

1                    MR. SHAHRIARI:  Thank you.  Thanks for your

2       patience.

3                    MR. LINK:  But you're not allowing me to

4       prepare my record.  It is not attorney work product --

5                    MR. SHAHRIARI:  Okay.  We disagree.  Move on.

6                    MR. LINK:  Am I going to get to finish?

7                    MR. SHAHRIARI:  Please.  Take as much time as

8       you like.

9                    MR. LINK:  It is likely not attorney-client

10      privileged, either.  So we'll deal with that later as

11      necessary.

12                   THE WITNESS:  I'm a paralegal.  Does that

13      matter?

14                   MR. SHAHRIARI:  James, wait until his

15      questions are asked and answer his questions.  Okay?

16                   THE WITNESS:  Okay.

17      BY MR. LINK:

18          Q.    Did you drive yourself to my client's

19      property on March 20, 2019?

20          A.    Yes.

21          Q.    Did you park in the Accessible Parking space

22      at my client's property in -- on March 19, 2019?

23          A.    Yes.

24          Q.    When you park in Accessible Parking spaces,

25      do you park in the access aisle or the actual parking

Trustpoint.One   Alderson.
www.trustpoint.one
593
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

```
 1   space?

 2            MR. SHAHRIARI:  Objection, vague and

 3   ambiguous, unintelligible and confusing.  Are you asking

 4   about every single time he parks in an accessible space?

 5            MR. LINK:  Yes, yes, I am.

 6            MR. SHAHRIARI:  Okay.  So it calls for a

 7   narrative and it calls for -- excuse me.  It's vague and

 8   ambiguous.  It's not specific as to time.  Are you

 9   asking him about events that occurred before this

10   lawsuit and before the statutory period?  I'd like to

11   narrow that down.

12            James, do you understand the question?

13            THE WITNESS:  I park in a disability spot.  I

14   don't park in the access.  That's illegal.

15   BY MR. LINK:

16       Q.    Okay.  And that's a matter of your practice,

17   right?  You don't park in access aisles, correct?

18       A.    No.  I use those to get out and up and

19   around, yes.  I don't in the access.

20       Q.    Was the access aisle for the parking space

21   you parked in at my client's property on the passenger's

22   side or on the driver's side?

23            MR. SHAHRIARI:  Objection, it's a vague and

24   ambiguous question.  It depends on which side he's

25   parked in.  That's a vague and ambiguous question.  It
```

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
594
800.FOR.DEPO
(800.367.3376)

 1   depends on which direction the car is facing, of course,

 2   and lacks foundation and it is unintelligible and

 3   confusing.

 4              THE WITNESS:  It's on the passenger's side.

 5   BY MR. LINK:

 6      Q.     Thank you.  What was the specific date that

 7   you went to my client's property in February 2020?

 8      A.     February 10th.  It was a Monday.

 9      Q.     Did you use a cane or a walker at my client's

10   property on February 10, 2020?

11      A.     I used a cane.

12      Q.     Did you park in the Accessible Parking space

13   at the property?

14      A.     No.

15      Q.     Where did you park?

16      A.     Disability parking.

17      Q.     Okay.  Was the access aisle on the driver's

18   side or the passenger's side where you parked?

19              MR. SHAHRIARI:  Objection, vague and

20   ambiguous, unintelligible and confusing, lacks

21   foundation, assumes -- excuse me.  Strike that last one.

22              James, if you understand, please answer.

23              THE WITNESS:  Passenger.

24   BY MR. LINK:

25      Q.     I didn't really ask the question, but I think

Trustpoint.One | Alderson.          www.trustpoint.one          800.FOR.DEPO
                                    www.aldersonreporting.com    (800.367.3376)
                                         595

1    you answered it impliedly.  You drove yourself to my

2    client's property on February 10, 2020, correct?

3        A.      Yes.

4        Q.      What was the specific date in September 2020

5    that you visited my client's property?

6        A.      September 3rd.  I don't know what day that

7    was, but it was September 3rd.

8        Q.      Did you use a cane or a walker?

9        A.      I used a cane.

10       Q.      Did you drive yourself to the property on

11   September 3, 2020?

12       A.      Yes.

13       Q.      When you parked in the parking space, was

14   there an access aisle on the driver's side or the

15   passenger's side?

16       A.      Passenger's side.

17       Q.      Did you drive the Tiguan to my client's

18   property on March 20, 2019?

19       A.      Yes.

20              MR. SHAHRIARI:  Objection, vague and

21   ambiguous as to "drive to."

22              THE WITNESS:  Yes.

23   BY MR. LINK:

24       Q.      Did you drive the Tiguan to my client's

25   property on February 10, 2020?

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
596
800.FOR.DEPO
(800.367.3376)

```
 1                    MR. SHAHRIARI:  Same objection.

 2                    THE WITNESS:  Yes.

 3   BY MR. LINK:

 4       Q.     Did you drive the Tiguan to my client's

 5   property on September 3, 2020?

 6                    MR. SHAHRIARI:  Same objection.

 7                    THE WITNESS:  Yes.

 8   BY MR. LINK:

 9       Q.     On March 20, 2019, you exited your vehicle on

10   the driver's side, correct?

11                    MR. SHAHRIARI:  Objection, assumes facts not

12   in evidence, lacks foundation.

13                    THE WITNESS:  Yes.

14   BY MR. LINK:

15       Q.     Did you have any difficulty exiting your

16   vehicle on March 20, 2019?

17       A.     Yes.

18       Q.     What was that difficulty?

19       A.     Your cross-slope on your access aisle.

20       Q.     Did that cross-slope on the access aisle

21   cause you any discomfort in exiting your vehicle on

22   March 20, 2019?

23       A.     Again, I almost tripped, it was so steep.

24       Q.     Maybe I'm confused.  I thought you said there

25   was an access aisle on the passenger's side when you
```

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    parked in the parking space on March 20, 2019.

2       A.    That's correct.

3       Q.    Okay.  So when you exited your vehicle on the

4    driver's side, you would not be exiting into an access

5    aisle, correct?

6             MR. SHAHRIARI:  Objection, calls for legal

7    reasoning and conclusion as to what the term "access

8    aisle" means, calls for an expert opinion, also vague

9    and ambiguous, assumes facts not in evidence, lacks

10   foundation, unintelligible and confusing.

11            THE WITNESS:  I had -- I had to go to my

12   passenger door to get my cane, and once I closed my

13   door, you have a cross-slope there that is very steep

14   and I didn't see it and I almost tripped.

15   BY MR. LINK:

16      Q.    On February 10, 2020 you exited your vehicle

17   on the driver's side, correct?

18      A.    Yes.

19      Q.    When you exited the vehicle, did you do the

20   same thing, go around your car to get the cane from the

21   passenger's side?

22      A.    Correct.

23            MR. SHAHRIARI:  Objection, vague and

24   ambiguous, misstates testimony, unintelligible and

25   confusing, "do the same thing," assumes facts not in

Trustpoint.One  Alderson.
www.trustpoint.one
www.aldersonreporting.com
398
800.FOR.DEPO
(800.367.3376)

 1    evidence, lacks foundation.

 2              If you understand the question, please

 3    answer, Mr. Shayler.

 4    BY MR. LINK:

 5         Q.    He said correct.

 6         A.    Correct.

 7         Q.    Mr. Shayler, you said "correct," right?

 8         A.    Correct, correct.

 9         Q.    On September 3, 2020, you would have exited

10    your vehicle on the driver's side, correct?

11         A.    Correct.

12         Q.    Did you then move from the driver's side of

13    the vehicle to the passenger's side to get your cane?

14         A.    Yes, I did.

15              MR. SHAHRIARI:  Objection, misstates

16    testimony, vague and ambiguous.

17              THE WITNESS:  Yes, I did.

18    BY MR. LINK:

19         Q.    Mr. Shayler, you said, "Yes, I did," correct?

20         A.    Yes.

21         Q.    And then your counsel interjected some

22    objections and I think he talked over you.

23              Did you say something else?

24              MR. SHAHRIARI:  No, that's not correct.  I

25    think there was a delay.  I'm making my objection as

1    soon as you're done with your question, Mr. Link, and

2    there must be a delay, which is why the court reporter

3    is also saying that we're talking at the same time.  I'm

4    not interrupting anybody; I'm waiting until nobody is

5    speaking until I speak.  Okay?

6              MR. LINK:  Can we go off the record for a

7    second?

8              MR. SHAHRIARI:  No.

9              MR. LINK:  Then I'm going to put on the

10   record, I heard Mr. Shayler say something while you were

11   objecting, Mr. Shahriari.  I'm trying to give him the

12   opportunity to finish his answer.

13             MR. SHAHRIARI:  Then give him the opportunity

14   instead of bickering back and forth.

15             MR. LINK:  And I did.

16             MR. SHAHRIARI:  Let's go.  Let's continue

17   with the deposition.

18   BY MR. LINK:

19       Q.    Mr. Shayler, what were you going to say?

20       A.    I got my cane and there was a problem opening

21   my door.  There was someone parked in the access aisle

22   that day, and I couldn't get to my cane.  I had to go

23   back around to my passenger door and pull it out.

24   Because you had a "No Parking" -- because you don't have

25   any parking -- "No Parking" in your access aisle,

1    someone was parked in there.  That was September 3rd.

2        Q.      Sorry.  Were you completed?  I'm sorry.

3        A.      Yes, I'm complete.

4        Q.      Okay.  How many times last month, meaning

5    September --

6        A.      Of this year?

7        Q.      This year.  How many times last month did you

8    eat sushi?

9        A.      Probably once.

10        Q.      What was the name of the restaurant?

11              MR. SHAHRIARI:  Objection, assumes facts not

12    in evidence.  He didn't say he went to a restaurant.  It

13    lacks foundation.

14    BY MR. LINK:

15        Q.      Did you eat the sushi last month at

16    somebody's house?

17        A.      No.

18        Q.      Did you eat the sushi at a restaurant last

19    month?

20        A.      I ordered sushi and took it home.

21        Q.      Okay.  So what restaurant did you buy the

22    sushi from?

23        A.      I don't recall the name of the restaurant.

24        Q.      In the last 12 months, how many times have

25    you eaten sushi?

1             MR. SHAHRIARI:  Objection, not calculated to

2    lead to the discovery of admissible evidence.

3             You can answer.

4             THE WITNESS:  Two or three times -- different

5    restaurants.

6    BY MR. LINK:

7        Q.     What's your favorite sushi restaurant?

8        A.     I don't have a favorite sushi restaurant.

9        Q.     Okay.  What are the names of sushi

10   restaurants that you've bought sushi from other than

11   Fusion Sushi?

12            MR. SHAHRIARI:  Objection, beyond the scope

13   of this lawsuit.  Are you asking since his birth?  It

14   lacks foundation, calls for a -- strike that last one.

15            So are you asking, Mr. Link, from the

16   beginning of his birth?

17            MR. LINK:  Absolutely.

18            MR. SHAHRIARI:  Okay.  James, do you

19   understand the question?

20            THE WITNESS:  Yes.  The last time I had sushi

21   in a restaurant I ordered was over in Century City off

22   Sunset Boulevard.

23   BY MR. LINK:

24       Q.     I didn't catch the name.  Did you say "over

25   in"?

1      A.     I'm not sure of the name of the restaurant,

2    but it was in Century City on Sunset, in the mall there.

3      Q.     Prior to that where did you buy sushi?

4            MR. SHAHRIARI:  Objection, assumes facts not

5    in evidence.  He didn't say he bought sushi.  It lacks

6    foundation, also not calculated to lead to the discovery

7    of admissible evidence.

8    BY MR. LINK:

9      Q.     Can you answer that, please, Mr. Shayler.

10     A.     Again, over in -- not Culver City, but over

11   in -- the same place I ordered, the same place.  You

12   have to eat it in.  You can't order it to go there.

13     Q.     Okay.

14     A.     It's off Sunset in Century City.

15     Q.     And you said it was in the mall?

16     A.     In the mall.

17     Q.     What's the name of the mall?

18     A.     Century City Mall.

19     Q.     Prior to that occasion where did you get your

20   sushi?

21           MR. SHAHRIARI:  Objection, vague and

22   ambiguous -- objection, vague and ambiguous as to the

23   term "get your sushi."  It lacks foundation.

24           Go ahead and answer, please.

25           THE WITNESS:  I'm not sure where all I bought

```
 1   sushi.  I can't remember.

 2   BY MR. LINK:

 3       Q.       Okay.  Did you have any difficulty getting

 4   into Fusion Sushi on March 20, 2019?

 5       A.       Yes, I did.

 6       Q.       What was the difficulty?

 7       A.       You have a two-inch lift in the entrance and

 8   I almost tripped over it and fell.  I caught my balance

 9   just in time.

10       Q.       Did you suffer any pain as a result of that

11   visit on March 20, 2019?

12       A.       Yes, I did.

13       Q.       What pain?

14       A.       Pain in my right foot and my left foot too on

15   that lift.

16       Q.       On February 10, 2020, did you have any

17   difficulty entering Fusion Sushi?

18       A.       Yes, I did.

19       Q.       And what difficulty was that?

20       A.       Your doormat was not taped down, and again, I

21   almost fell.

22       Q.       Mr. Shayler, you're looking at something as

23   you're answering that question.  What are you looking

24   at?

25       A.       My notes.
```

Trustpoint.One   Alderson.    www.trustpoint.one
                                         www.aldersonreporting.com
                                                                 494

800.FOR.DEPO
(800.367.3376)

1      Q.      Did you give those notes to your attorney?

2      A.      Yes.

3              MR. SHAHRIARI:  I'm going to object on the

4  basis of any discussions or communications between him

5  and I are attorney-client privileged.  So anything he

6  communicated to me or I communicated to him is

7  attorney-client privileged.

8              I'm instructing my client not to answer

9  regarding any content of notes or anything that were

10  communicated between us.

11  BY MR. LINK:

12      Q.      Mr. Shayler, why did you keep notes on your

13  visit to Fusion Sushi?

14              MR. SHAHRIARI:  Objection, misstates

15  testimony.  He didn't say he kept notes on his visits to

16  Fusion Sushi.  It's asked and answered -- excuse me.

17  Assumes facts not in evidence.

18  BY MR. LINK:

19      Q.      You can answer.

20      A.      I did not take notes when I got sushi there.

21      Q.      You have notes regarding your visits to

22  Fusion Sushi, correct?

23      A.      Yes, I do.

24      Q.      Why did you take those notes?

25      A.      Because you're doing a deposition.

Trustpoint.One | Alderson

www.trustpoint.one
www.aldersonreporting.com

405

800.FOR.DEPO
(800.367.3376)

1      Q.      So when were those notes made?

2      A.      Right after the lawsuit was filed.

3      Q.      All right.  On September 3, 2020, did you

4  have any difficulty entering Fusion Sushi?

5      A.      Yes.  I explained to you that there was a car

6  parked in the access aisle and I couldn't get into my

7  door because you didn't have "No Parking" in the access

8  aisle, so a car was parked in there.

9      Q.      Okay.  Bad question on my part.

10             Did you have any difficulty getting into the

11  restaurant Fusion Sushi on September 3, 2020?

12     A.      Getting inside, no.

13     Q.      Right, thank you.  Hold on.  I'm trying to

14  get up another document.

15             Mr. Shayler, I'm going to show you a document

16  called Shayler Cases.  I'm going to mark that as Exhibit

17  17.

18             (Exhibit 17 marked)

19  BY MR. LINK:

20     Q.      Mr. Shayler, I'd ask that you kind of just

21  take a look at the case list as I scroll through it.

22             You know, on these first five pages or so I

23  see -- oh, it's more than that.  Let me keep going.

24             The first seven pages I see multiple visits

25  listed for the cases having been filed.  Then in a case

Trustpoint.One | Alderson.

www.trustpoint.one
www.aldersonreporting.com

406

800.FOR.DEPO
(800.367.3376)

1    called James Shayler versus Oinkster, LLC, there's only

2    one visit alleged in the Complaint listed on this list.

3              Is there a reason why you stopped going to

4    places on multiple occasions before filing lawsuits?

5              MR. SHAHRIARI:  Objection, misstates his

6    testimony.  He didn't say that.  It mischaracterizes his

7    testimony, vague and ambiguous, unintelligible and

8    confusing, assumes facts not in evidence, lacks

9    foundation and oppressive and it's argumentative.

10             Mr. Shayler, if you understand the

11   question --

12             THE WITNESS:  Yes, there's no particular

13   reason.  It's hard for me to get around, much harder

14   now.

15   BY MR. LINK:

16        Q.    Do you remember Oinkster, LLC?

17             MR. SHAHRIARI:  Objection, vague and

18   ambiguous.  What do you mean, "Do you remember Oinkster,

19   LLC?"  It's unintelligible and confusing.

20             THE WITNESS:  No, I don't.

21   BY MR. LINK:

22        Q.    Oinkster, LLC, is apparently at 2005 Colorado

23   Boulevard, Los Angeles.  Do you spend much time on

24   Colorado Boulevard in Los Angeles?

25             MR. SHAHRIARI:  Objection, vague and

Trustpoint.One  |  Alderson.          www.trustpoint.one          800.FOR.DEPO
                                        407
                                    www.aldersonreporting.com          (800.367.3376)

1   ambiguous as to the term "spend much time."  I don't

2   know what that means.  It's unintelligible and

3   confusing, compound question, assumes facts not in

4   evidence, lacks foundation, also not calculated to lead

5   to the discovery of admissible evidence.

6               THE WITNESS:  Yes, I do.

7   BY MR. LINK:

8       Q.     How often do you go to that area of Colorado

9   Boulevard?

10              MR. SHAHRIARI:  Objection, vague as to "go

11   to."  Do you mean pass by, pass through.  It also lacks

12   foundation.

13              But if you understand, please answer.

14              THE WITNESS:  My brother lives in La Canada

15   Flintridge, which is a few miles away from Pasadena, so

16   I go over there quite a bit.  Sometimes I stay at my

17   brother's house.  That's where I go shopping or I do

18   different things, over in Pasadena.

19   BY MR. LINK:

20       Q.     Mr. Shayler, I'm going to scroll down to the

21   end on this list quite quickly here, hopefully.  The

22   list shows 231 cases filed by you.

23              Do you believe that number to be accurate?

24              MR. SHAHRIARI:  Objection, the document

25   speaks for itself, unintelligible and confusing, also

 1    calls for legal conclusion as to which cases were filed.

 2              Is something funny, Mr. Link?

 3              MR. LINK:  Yes.

 4              MR. SHAHRIARI:  What's funny?  You've been

 5    laughing through the course of this deposition.

 6              MR. LINK:  I find your objections hilarious.

 7              MR. SHAHRIARI:  This is not a laughing

 8    matter, Mr. Link.  This is a very serious civil rights

 9    lawsuit.  I don't think it's funny.

10              What's your question?

11              MR. LINK:  I asked him if the number of 231

12    cases that he's filed is accurate.

13              THE WITNESS:  There's a lot of people

14    breaking the law out there for disabled people.

15    BY MR. LINK:

16      Q.    Nice speech, Mr. Shayler.

17              Is the number 231 cases accurate?

18              MR. SHAHRIARI:  Objection, harassing,

19    argumentative, vague and ambiguous, asked and answered,

20    repetitive and cumulative, also calls for -- go ahead,

21    James.

22              THE WITNESS:  I couldn't tell you.  I don't

23    keep count.

24    BY MR. LINK:

25      Q.    Do you have an estimate for me how many

```
 1   different businesses you have sued, Mr. Shayler?

 2           MR. SHAHRIARI:  Objection, asked and

 3   answered.

 4      A.     No, I don't.

 5      Q.     Is it more than 100 business that you've

 6   sued, Mr. Shayler?

 7           MR. SHAHRIARI:  Objection, asked and

 8   answered.

 9           THE WITNESS:  No.

10   BY MR. LINK:

11      Q.     So you've sued less than 100 businesses; is

12   that correct, Mr. Shayler?

13      A.     More than --

14           MR. SHAHRIARI:  Objection --

15   BY MR. LINK:

16      Q.     Oh, more than.  Have you sued more than 200

17   different businesses?

18           MR. SHAHRIARI:  Objection, calls for legal

19   reasoning as to who the defendant is and whether it is a

20   business or not.  It's also vague and ambiguous,

21   unintelligible and confusing, calls for a narrative,

22   asked and answered, lacks foundation.

23           But you can and the if you understand,

24   Mr. Shayler.

25           THE WITNESS:  I'd say more than 200.
```

Trustpoint.One | Alderson
www.trustpoint.one
www.aldersonreporting.com
446
800.FOR.DEPO
(800.367.3376)

```
 1   BY MR. LINK:

 2       Q.     Mr. Shayler, where have you worked as a

 3   paralegal?

 4              MR. SHAHRIARI:  Objection, vague and

 5   ambiguous as to the term "where," assumes facts not in

 6   evidence -- strike that last objection.

 7              THE WITNESS:  Disability Group Health

 8   Advocates doing disability law.

 9   BY MR. LINK:

10       Q.     What is Disability Help Advocates?

11              MR. SHAHRIARI:  Objection, vague and

12   ambiguous as to the question, what is Disability

13   Advocates, calls for speculation.

14              THE WITNESS:  It's a disability law group.

15   BY MR. LINK:

16       Q.     Okay.  Who are the attorneys at the

17   Disability Law Group?

18              MR. SHAHRIARI:  Objection, calls for

19   speculation, vague and ambiguous as to who are attorneys

20   are, quote-unquote, lacks foundation, assumes facts not

21   in evidence, also not calculated to lead to the

22   discovery of admissible evidence.

23              THE WITNESS:  I'm not sure.  I don't know

24   their names.  They're brothers.

25   BY MR. LINK:
```

1       Q.      Do you still work for that law firm?

2       A.      I can't work.

3       Q.      All right.  When was the last time you worked

4    for that law firm?

5       A.      Seven years ago.

6       Q.      For how long did you work at that law firm?

7       A.      Ten years.

8       Q.      Did that law firm file disability access

9    cases?

10              MR. SHAHRIARI:  Objection, calls for

11   speculation as to what they're doing, assumes facts not

12   in evidence, lacks foundation and is beyond the scope of

13   this case.

14              Are you asking -- or vague as to time.  Also,

15   when are you asking about?  Are you asking about seven

16   years ago or today?

17              MR. LINK:  Well, I don't think he has any

18   understanding of what they're doing now since he hasn't

19   worked with them for seven years.

20   BY MR. LINK:

21      Q.      So during the time that you worked with the

22   law firm, did they file disability access cases?

23      A.      No, they did not.

24      Q.      Okay.  What kind of cases did they file?

25      A.      Social Security.

Trustpoint.One | Alderson.        www.trustpoint.one              800.FOR.DEPO
                                  www.aldersonreporting.com        (800.367.3376)
                                           442

Case 2:20-cv-11107-FMO-GJS   Document 49-3   Filed 11/09/21   Page 137 of 349   Page ID #:1251

```
1        Q.      Are you a licensed paralegal?

2                MR. SHAHRIARI:  Objection, beyond the scope

3    of this lawsuit --

4                THE WITNESS:  Am I --

5                MR. SHAHRIARI:  -- assumes facts not in

6    evidence, lacks foundation.

7                Go ahead, James.

8                THE WITNESS:  Am I licensed with the State

9    Bar?

10   BY MR. LINK:

11       Q.      A paralegal can be licensed.  Are you a

12   licensed paralegal?

13       A.      No.

14               MR. SHAHRIARI:  Same objections.

15   BY MR. LINK:

16       Q.      How much money have you made by filing ADA

17   lawsuits?

18               MR. SHAHRIARI:  Objection, vague and

19   ambiguous, beyond the scope of this lawsuit, invades the

20   financial privacy rights of the deponent, assumes facts

21   not in evidence, lacks foundation, unduly burdensome

22   harassing, insulting.

23               THE WITNESS:  I couldn't tell you.  I don't

24   do it for the money.  I make very little money on these

25   cases.
```

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
443
800.FOR.DEPO
(800.367.3376)

 1            MR. SHAHRIARI:  James, wait for the question.

 2   Okay?

 3   BY MR. LINK:

 4       Q.     Do you have any kind of an estimate for me

 5   how much money you make per case once they are settled?

 6            MR. SHAHRIARI:  Objection.  I'm going to

 7   instruct my client not to answer with regard to any

 8   communications between his attorneys and me.  This is

 9   subject to attorney-client privilege.  I'm going to

10   instruct him not to answer.

11            It is beyond the scope of this lawsuit.  It's

12   also vague and ambiguous, unintelligible and confusing,

13   asked and answered, harassing, and also invades his

14   financial privacy rights.  And, again, I'm going to

15   instruct him not to answer.  It's also compound.

16   BY MR. LINK:

17       Q.     Mr. Shayler, looking at page 21 of Exhibit

18   17, I see you visited, according to the list, ten

19   different businesses that day.  Is there any reason --

20            MR. SHAHRIARI:  Objection, misstates

21   testimony.

22            MR. LINK:  I haven't asked my question yet.

23            MR. SHAHRIARI:  Well, you paused for quite a

24   while so I thought you were done.

25   BY MR. LINK:

 1        Q.       Is there any reason why you needed to go to

 2   ten different businesses that day?

 3              MR. SHAHRIARI:  Objection, misstates

 4   testimony.  He never said he went to ten different

 5   businesses that day.  This is your list.  It's vague and

 6   ambiguous, unintelligible and confusing,

 7   mischaracterizes earlier testimony, misquotes him,

 8   misleading, lacks foundation, incomplete hypothetical,

 9   improper hypothetical, calls for a narrative, assumes

10   facts not in evidence.

11   BY MR. LINK:

12        Q.     You can answer the question.

13              MR. SHAHRIARI:  Do you understand the

14   question?

15              THE WITNESS:  Yes.  I like to shop.  I have a

16   lot of free time.

17              MR. LINK:  I have no further questions.

18              MR. SHAHRIARI:  None here.

19              MR. LINK:  I would -- Mr. Harbidge, does your

20   firm have any difficulty with us stipulating to --

21   you've probably been around long enough to remember the

22   standard stipulation --

23              THE REPORTER:  Counsel, I like to go by code.

24              MR. LINK:  Mr. Shahriari, I hope to be able

25   to get the exhibits out to Mr. Harbidge.  If I've made a

Trustpoint.One | Alderson.          www.trustpoint.one          800.FOR.DEPO
                                    www.aldersonreporting.com          (800.367.3376)
                                             445

1    mistake on any one of them, please let me know.  I tried

2    to keep pretty good notes as to what they are, but stuff

3    happens.  I'm an old dude.  This is all new to me.

4              But in any event, Mr. Shayler, thank you for

5    appearing for your deposition.  We are done for the day,

6    and, you know, again, thank you.

7              THE REPORTER:  Mr. Shahriari, do you want a

8    copy of the transcript?

9              MR. SHAHRIARI: Yes, please.

10             (Deposition concluded at 2:07 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Trustpoint.One   Alderson.
www.trustpoint.one
www.aldersonreporting.com
416
800.FOR.DEPO
(800.367.3376)

1                    C E R T I F I C A T I O N

2

3              I, JAY W. HARBIDGE, a Shorthand Reporter

4      within and for the State of California, do hereby

5      certify:

6              That, JAMES SHAYLER, the witness whose

7      examination is hereinbefore set forth, was first duly

8      sworn by me and that this transcript of said testimony

9      is a true record of the testimony given by said witness.

10             I further certify that I am not related to

11     any of the parties to this action by blood or marriage,

12     and that I am in no way interested in the outcome of

13     this matter.

14             IN WITNESS WHEREOF, I have hereunto set my

15     hand October  27, 2021.

16

17

18

19

20     _____

21     JAY W. HARBIDGE, CSR.

22

23

24

25

Notice Date: 10/25/2021

Deposition Date: 10/13/2021

Deponent: James Shayler

Case Name: James Shayler v. HB Mat Propeties

Page:Line            Now Reads              Should Read

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

_____   _____   _____

Trustpoint.One | Alderson®

www.trustpoint.one
www.aldersonreporting.com

418

800.FOR.DEPO
(800.367.3376)

CERTIFICATE OF DEPONENT

I hereby certify that I have read and examined the

foregoing transcript, and the same is a true and

accurate record of the testimony given by me.

Any additions or corrections that I feel are

necessary, I will attach on a separate sheet of

paper to the original transcript.


_____

Signature of Deponent

I hereby certify that the individual representing

himself/herself to be the above-named individual,

appeared before me this _____ day of _____,

20___, and executed the above certificate in my

presence.


_____

NOTARY PUBLIC IN AND FOR


_____

County Name

MY COMMISSION EXPIRES:

Trustpoint.One   Alderson

www.trustpoint.one
www.aldersonreporting.com

419

800.FOR.DEPO
(800.367.3376)

**WORD INDEX**

**< $ >**
**$17,000** 39:7

**< 1 >**
**1** 3:8 4:23 7:15,
18 14:24, 25 15:1
45:9, 10, 21 64:3
**1:15:57** 99:9
**1:16:42** 4:9
**1:17:40** 102:7
**1:17:41** 4:11 58:2
**1:17:46** 101:25
**10** 4:12 59:14, 15
83:18 84:1 110:10
111:2, 25 113:16
119:16
**100** 125:5, 11
**107** 4:22
**10th** 57:2 110:8
**11** 4:13 33:17, 24
45:7 46:6 48:14
50:3 60:24, 25
84:5
**1-10** 1:8
**12** 4:14 62:19, 20
98:15, 17, 20 99:5
116:24
**12(B)(1** 4:6
**12/18/2006** 16:8
**120** 4:23
**121** 4:19
**129** 4:23, 24
**13** 1:15 4:15 5:2
46:5 47:21 63:7, 8
84:18
**1310** 3:20 34:3
**14** 3:10 4:16
62:18 63:6 64:3, 7,
8 69:12 74:22
79:11 83:5 84:22
87:3 88:13
**14:37** 60:20
**14:37:00** 4:13
**14:37:30** 4:14
**14:37:53** 4:15
**14:38:54** 4:17
**14:39:01** 4:16
**14th** 83:12 86:1
**15** 4:17 22:9, 19
23:22 35:25 69:14,
15 85:5 98:15, 16
**16** 4:18 60:19
62:18 64:3 68:2
69:12 71:18 72:25
73:8 74:23, 24
75:2, 10 77:14
78:3, 14, 24 80:9,
10, 14, 23 81:2, 8,
11, 18 82:20, 22

83:5, 18 84:1, 5, 19,
22 85:5, 8, 14 86:3,
7 87:11, 19, 23
88:10, 25 89:3, 15
90:7, 10, 13
**17** 4:19 48:13
85:14 121:17, 18
129:18
**18** 86:3
**1800** 2:6
**1803** 15:4
**19** 36:22 86:7
108:22
**1925** 2:17
**1983** 14:10

**< 2 >**
**2** 3:9 4:8, 10, 22
14:17, 18, 24, 25
17:15 57:10, 24
77:14 99:8 101:25
102:7
**2:07** 131:10
**2:20-cv-11107-
FMO** 1:6
**20** 36:1, 21, 22
99:1 108:19
111:18 112:9, 16,
22 113:1 119:4, 11
**200** 125:16, 25
**2004** 40:5
**2005** 122:22
**2006** 16:11 19:13
22:9, 19
**2017** 66:9, 13
72:18
**2018** 24:15 25:14
26:3 42:24 54:7
74:2
**2019** 35:5, 6 36:22,
23 39:2 42:25
43:1 53:17 60:19
62:18 64:3 68:14
69:12 71:18 72:25
73:8 88:13 91:23
105:18, 23, 24
106:8 108:19, 22
111:18 112:9, 16,
22 113:1 119:4, 11
**2020** 33:18, 24
45:7 46:15 110:7,
10 111:2, 4, 11, 25
112:5 113:16
114:9 119:16
121:3, 11
**2021** 1:15 4:8, 10
5:2 46:5, 17 47:21
48:14 49:24 57:10,
25 74:22 79:11
83:5, 12 86:1 87:3

99:8 101:25 102:7
132:15
**20th** 57:1 105:25
**21** 129:17
**213** 2:9
**215** 2:14
**2170** 2:9
**2250** 2:8
**231** 123:22 124:11,
17
**24** 87:11
**25** 3:13 13:24
19:3 22:7 23:22
87:19
**26** 87:22
**27** 132:15
**28** 88:9
**29** 88:25

**< 3 >**
**3** 3:11 25:7, 9
27:3, 4, 8 33:3, 4
34:11 47:2 78:2, 3
111:11 112:5
114:9 121:3, 11
**30** 36:6 62:18
89:3
**31** 89:15, 19
**32** 3:16 90:7
**34** 3:20 90:10
**37** 62:18 63:6
90:13
**38** 69:12 74:21
**39** 64:3
**3rd** 2:14 57:3
111:6, 7 116:1

**< 4 >**
**4** 3:14 4:23, 24
17:3 32:17, 18
33:18 45:11, 22
52:6 78:24
**40** 36:6
**402** 2:9
**4090** 1:25
**42** 14:10
**48** 3:24

**< 5 >**
**5** 3:4, 17 34:7, 8
48:22 51:5, 13
80:9, 10, 13
**50** 4:7
**53** 63:6
**54** 69:13
**57** 4:9
**58** 4:11
**59** 4:12

**< 6 >**

**6** 3:21 24:15 48:9,
10 51:6, 14 80:22
81:18
**60** 4:13
**62** 4:14
**626** 2:16, 17
**628** 2:17
**63** 4:15
**635** 2:8
**64** 4:16
**69** 4:17

**< 7 >**
**7** 3:8 4:2 20:15
49:25 50:1 52:6
81:1 82:13, 18, 20,
22
**7/16/2019** 63:5
**7-16-19** 4:13, 14,
15, 16, 17
**74** 4:18
**793** 2:16

**< 8 >**
**8** 4:8, 22 57:11, 12
58:19 81:7
**888** 2:8

**< 9 >**
**9** 4:10 49:24
57:25 58:3, 20
81:10, 21 82:12, 24
83:1
**9:55** 1:16 5:2
**90028** 2:7
**91** 4:22
**91101** 2:15
**9570** 2:16

**< A >**
**a.m** 1:16 5:2
**able** 5:25 7:2
32:3 91:23 101:4
130:24
**Absolutely** 117:17
**accept** 20:7
**access** 108:25
109:14, 17, 19, 20
110:17 111:14
112:19, 20, 25
113:4, 7 115:21, 25
121:6, 7 127:8, 22
**Accessible** 102:18
108:21, 24 109:4
110:12
**accessing** 54:24
**accident** 13:15
37:9, 11, 15 38:4, 7
39:4 42:14, 21, 24
43:4, 14 50:18

72:10 74:13
**accomplished** 101:5
**accurate** 47:5, 18,
21 69:22 123:23
124:12, 17
**action** 132:11
**actions** 15:10
**activities** 33:7
**actual** 108:25
**ADA** 128:16
**add** 91:23
**addible** 9:16
**address** 11:15
25:12, 13, 14, 20
26:4 62:4, 5 65:12
66:1
**adjust** 16:25
**admissible** 7:24
8:15 9:2, 25 10:15,
24 11:11 12:15, 23
13:11 19:19 21:2,
18 22:13 24:23
27:17 28:2 29:16
30:2 41:1, 13
43:21 44:5, 13
52:14 53:7 61:23
71:22 76:3, 24
77:10 84:10 86:25
88:18 90:20 93:11
100:16 117:2
118:7 123:5
126:22
**Advocates** 126:8,
10, 13
**agency** 31:2
**ago** 5:17, 18 7:12,
13 13:24 19:2, 3
22:9, 19 23:22, 23
33:2 39:21, 23
41:25 66:11 98:15,
16, 17 99:5 127:5,
16
**agree** 20:2
**agreeing** 20:10
**ahead** 12:2, 17
17:13 18:23 24:25
33:4 36:20 40:1,
13 52:16 54:6
94:15 97:12
104:10 118:24
124:20 128:7
**airbag** 38:14, 20
**airbags** 38:16
**aisle** 108:25
109:20 110:17
111:14 112:19, 20,
25 113:5, 8 115:21,
25 121:6, 8
**aisles** 109:17
**alleged** 56:3
106:12 122:2

Trustpoint.One   Alderson
www.trustpoint.one
426
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

**allow** 9:12 82:9
96:1
**allowing** 107:25
108:3
**ambiguous** 7:23
8:24, 25 9:10, 15
11:9 12:16 13:2, 9,
18 15:13 17:10
18:1, 20 19:6, 17,
24 21:1, 14, 16
22:14, 24 23:12
24:3, 5 25:23 26:6,
14, 22 27:14, 25
28:8 29:1 30:4, 12
34:16 35:14 36:4,
14 37:2, 6, 21
38:10, 16 39:6, 13
40:1, 8, 18 41:2, 11,
19 42:17 43:16
45:15 46:2, 22, 23
47:11 50:9, 22
51:9, 17, 25 52:16
53:4, 14, 21 54:3,
12 55:10 56:17, 24
57:19 58:14, 22
59:24 61:6, 20
64:23 65:20 66:6,
16, 25 67:10, 19
68:6, 21 70:6, 14
71:7, 8, 20 72:15
73:11 75:5 76:1,
13, 18, 23 77:8, 17
79:6, 14, 21 80:5,
16 81:24 82:6
83:7, 14, 22 84:8
85:1, 22 86:12, 23
88:1, 15 89:11, 22
90:18 91:3 92:2, 5,
18, 20 93:21 94:12
95:14 97:11 98:5,
22 99:15 103:7, 15,
23 105:3 106:16
109:3, 8, 24, 25
110:20 111:21
113:9, 24 114:16
118:22 122:7, 18
123:1 124:19
125:20 126:5, 12,
19 128:19 129:12
130:6
**Ananian** 33:24
45:7
**A-n-a-n-i-a-n** 33:24
**Ananian's** 47:6, 18
**Angeles** 2:7
122:23, 24
**ANSWER** 4:20
8:1, 5 10:17 11:4
13:1, 13 15:22
16:17 17:12 19:11
21:5, 22 23:2, 16

24:10 25:25 26:8,
25 27:18 28:12, 13
29:7 30:15, 23
31:5, 7, 8, 9, 19, 21
32:1, 2, 5, 6, 7, 11
33:14 34:23 36:20
38:11 40:13 43:18
44:14, 16, 24 45:17
47:12 50:25 54:6
55:19 59:7 61:7,
24 67:21 70:7
71:23 73:6, 22, 25
79:15, 24, 25 80:18
87:15 91:11, 14, 16,
17 93:24 94:15
97:13 99:18
106:18 107:8, 12,
21 108:15 110:22
114:3 115:12
117:3 118:9, 24
120:8, 19 123:13
129:7, 10, 15
130:12
**answered** 22:1, 14
26:22 29:1, 15
31:13, 17 47:24
51:25 55:10 62:14
74:5 78:10, 17
79:6 81:5 82:10
89:11 92:6 94:24
95:3 106:15 111:1
120:16 124:19
125:3, 8, 22 129:13
**answering** 119:23
**anybody** 55:4
84:14, 17 115:4
**Apparently** 16:7
93:6 122:22
**appear** 84:8
**APPEARANCES**
2:1
**appearing** 131:5
**appears** 60:19
61:12 68:17 69:21
79:2 83:19 87:23
90:14 102:14
**appointment** 33:23
**approaching** 91:25
**appropriate** 20:5, 9
**appropriately** 96:2
**April** 4:8, 10
57:10, 24 99:8
101:25 102:7
**area** 123:8
**arguably** 61:12
**argumentative**
89:11 122:9
124:19
**arm** 18:5 39:19
42:5, 9, 11 49:1
50:14, 16 51:6, 7,

15 97:25 98:3, 8,
11, 25 99:4
**Armani** 44:25
**arms** 97:24
**arrested** 29:8, 10
**asked** 21:25 22:14,
15 26:22 29:1, 14
31:13, 16 47:23
51:24 55:9 74:4
78:10, 16 79:6
81:4 82:9 89:11
92:6 94:23 95:2
100:2, 11 106:14
108:15 120:16
124:11, 19 125:2, 7,
22 129:13, 22
**asking** 14:1 17:8,
17 18:6, 18 20:6
26:23 31:20 62:11
87:16 95:1 105:3
109:3, 9 117:13, 15
127:14, 15
**asks** 14:5
**assumes** 10:25
41:5, 12 51:25
53:4, 14, 21 56:16,
18, 24 62:25 66:24
67:10 72:13 73:3,
10 75:4 79:12
80:6 83:8, 21
84:25 86:10 88:1,
16 89:10, 20 90:17
92:5, 21 93:8, 12,
21 95:15, 22 96:20
100:1, 8 102:24
103:5, 16, 24
104:18 106:16
110:21 112:11
113:9, 25 116:11
118:4 120:17
122:8 123:3 126:5,
20 127:11 128:5,
20 130:9
**atrophied** 16:2
49:1, 4 50:15
**atrophy** 63:22
87:14
**attorney** 44:9
45:15 91:13 107:5,
9, 14, 18, 23 108:4
120:1
**attorney-client**
107:15, 19 108:9
120:5, 7 129:9
**attorneys** 18:19
107:6, 10, 14, 22
126:16, 19 129:8
**audible** 99:17
**authenticate** 62:11
**authorized** 48:17

**auto** 43:14
**automobile** 37:15
**aware** 6:2

**< B >**
**back** 6:23 17:18
23:4, 19 42:15
47:2, 14 59:2
77:14 78:7 80:9,
24 81:21 93:16
96:5 101:7 104:2,
7 115:14, 23
**back-end** 75:1
**background** 15:19
**backwards** 61:11
**bad** 35:10 36:7
64:10 67:14 95:17
121:9
**badger** 6:10
**badly** 92:8
**bag** 86:9 104:24
105:1
**balance** 60:11
119:8
**Bar** 128:9
**Based** 105:4
**basis** 15:16 18:20
31:23 107:5 120:4
**battery** 100:23
101:1
**Beach** 52:7, 9
53:2, 12 54:1
55:16, 20, 22
**Bear** 7:4 94:3
**bears** 46:5 48:14
**beginning** 92:11
117:16
**believe** 15:24 16:3
33:25 39:8 43:2
45:24 55:12 59:3,
19 66:9 68:15
69:18 71:12 75:14,
17 78:13 79:7
80:1, 7, 11 81:3, 12
83:16 85:19 87:3
88:20, 21 89:2, 12
92:23 106:19
123:23
**bend** 33:7
**best** 5:22 22:16
**better** 67:14
**Beverly** 3:15
32:16 45:5
**beyond** 8:25 9:17,
23 10:13, 22 11:9
12:14, 22 13:9
15:18 16:12 17:9,
25 18:1 19:7, 15
21:1, 16 22:11, 21
23:13 24:6, 21
25:18 26:6, 22

27:14, 25 28:9
29:4, 15 30:1, 19
35:15 40:18, 25
43:19 44:2, 11
46:22 52:13 53:5
61:21 65:9 71:20
73:12 86:24 88:17
91:4, 5 100:15
117:12 127:12
128:2, 19 129:11
**bickering** 115:14
**birth** 117:13, 16
123:16
**bit** 48:13 93:16
123:16
**black** 77:21
**blanket** 20:6
**blocks** 100:19
**blood** 132:11
**body** 98:23
**book** 107:3
**bottle** 85:16, 24
88:6
**bottles** 68:18, 19
69:2, 22 70:2, 3
**bought** 55:4, 24
56:3, 6, 13 57:1, 2,
3 106:21 117:10
118:5, 25
**Boulevard** 117:22
122:23, 24 123:9
**Box** 15:4
**boy** 72:9
**break** 38:2 49:13,
17 74:16 76:7
101:1
**breaking** 124:14
**Brief** 6:22 49:20
74:19 100:25
101:2, 22 102:4
**bring** 43:13, 16
**brother** 8:10 59:5,
8 67:4 100:10, 13
123:14
**brothers** 126:24
**brother's** 8:13, 18
123:17
**burdensome** 9:11
10:24 16:14 19:19,
23 30:4, 13 31:2,
18 38:9 96:22
128:21
**business** 8:11, 22
9:4, 8, 20 10:5, 10
96:23 99:24 100:3,
6 125:5, 20
**businesses** 125:1,
11, 17 129:19
130:2, 5
**buy** 30:18 116:21
118:3

< C >

**CAL** 39:24 40:4, 6, 16
**calculated** 7:24 8:14 9:1, 16, 24 10:14, 23 11:10 12:14, 23 13:10 19:18 21:2, 17 22:12 24:23 27:16 28:1 29:16 30:2 40:25 41:13 43:20 44:4, 12 52:13 53:6 61:22 71:21 76:2, 24 77:10 84:10 86:24 88:18 90:19 93:10 100:16 117:1 118:6 123:4 126:21
**calendar** 107:2, 3
**CALIFORNIA** 1:2, 7 2:7, 15 9:5 12:10 15:4 106:24 132:4
**call** 94:7 101:18, 19
**called** 24:16 34:3 121:16 122:1
**calls** 7:22 10:1, 12, 25 11:7 12:16, 20, 21, 22 15:12, 14 16:14 18:21 19:17 20:24 21:14, 15 22:24 23:14 24:3, 7 27:17 28:25 29:18 30:25 33:12 34:17 37:6, 7, 25 38:8, 17 39:6 40:1, 8 41:11, 19 42:16, 18 44:1 45:13, 25 46:1 47:10 51:8, 18 52:2 54:4, 12 55:17 61:5, 18 62:12 64:22 65:7, 8 66:7 67:19 78:18 79:21 81:24, 25 86:12 91:12, 14 93:22 96:3, 20 109:6, 7 113:6, 8 117:14 124:1, 20 125:18, 21 126:13, 18 127:10 130:9
**camera** 75:17, 18, 19, 24 76:1
**Canada** 100:22 123:14
**cane** 34:11, 13 35:1, 12, 21 36:1 48:22 60:12 106:1, 2 110:9, 11 111:8,

9 113:12, 20 114:13 115:20, 22
**captioned** 3:14 4:19
**car** 13:14, 15 37:18, 21 38:21 42:14 72:10 75:3 78:11 103:12 110:1 113:20 121:5, 8
**card** 44:21 99:24 100:3, 6
**Care** 61:13, 14, 17 62:8 64:12, 18 67:16 68:1, 9, 13 70:2, 12 72:22 92:11 95:20
**careful** 60:3, 5
**Case** 1:6 9:1, 17, 24 10:23 15:20 16:7, 13 18:1 19:8 24:6, 15 25:18 26:7, 23 27:15 28:1, 9 30:24 31:24 34:2 44:9 46:23 48:5 49:23 52:13 61:22 76:25 85:25 86:24 91:5 93:11 103:21, 24 104:7 121:21, 25 127:13 129:5
**Cases** 4:19 121:16, 25 123:22 124:1, 12, 17 127:9, 22, 24 128:25
**cash** 9:4
**cashier** 105:10
**cashing** 8:11, 22 9:8, 20 10:5, 6, 10 100:18
**catch** 117:24
**caught** 119:8
**cause** 37:8 112:21
**caused** 36:23
**center** 43:8
**CENTRAL** 1:2
**Century** 117:21 118:2, 14, 18
**certain** 31:1
**certify** 132:5, 10
**cervical** 42:19
**chance** 15:8
**change** 104:22
**charger** 101:1
**Charles** 45:7
**check** 8:11, 22 9:4, 8, 20 10:4, 6, 10 67:17 100:18
**chicken** 57:3
**Chinatown** 65:16
**chose** 104:14

**City** 25:13, 20 26:4 40:16 106:24 117:21 118:2, 10, 14, 18
**Civil** 3:9 14:9, 16 124:8
**claim** 18:4, 14 22:23
**claims** 18:19 24:24 29:5
**clean** 5:25
**clear** 6:11 26:2
**client** 15:18 120:8 129:7
**client's** 105:15 106:8 108:18, 22 109:21 110:7, 9 111:2, 5, 17, 24 112:4
**climb** 33:8
**Clinic** 15:3 69:10
**closed** 113:12
**Coast** 55:22 62:6
**cocaine** 30:18
**code** 130:23
**coins** 86:9 105:1, 7
**Colony** 12:10 15:4
**color** 15:11
**Colorado** 122:22, 24 123:8
**Come** 6:18
**comfortable** 20:10
**coming** 84:23 102:14
**communicated** 120:6, 10
**communications** 120:4 129:8
**company** 1:7 79:19
**compare** 82:15
**comparison** 82:17
**Complaint** 3:9, 11 14:9, 17 24:14 25:6, 7, 13 26:11 27:1, 22 56:1, 3 106:12 122:2
**complete** 73:22 116:3
**completed** 116:2
**completely** 20:4 68:11
**complex** 50:23
**compound** 10:11 26:21 28:8 33:11 34:16 40:24 41:10 45:15 50:8, 23 51:9 52:15 56:23 66:15 68:5 77:8 83:6 86:12 92:6 93:9 94:13 96:4

98:6, 13 100:7 104:9 106:16 123:3 129:15
**concluded** 131:10
**conclusion** 10:13, 25 11:8 12:16, 21 15:13 16:15 19:18 20:25 21:15 22:25 33:13 44:2 96:21 113:7 124:1
**concurrently** 45:9
**condition** 42:15
**confined** 16:20
**confirm** 103:2
**confused** 112:24
**confusing** 15:14 16:14 18:21 19:7 21:16 23:12 24:5 25:23 28:8 29:2 33:12 34:17 35:14 36:4 37:22 38:17 39:13 40:19 41:2 42:18 46:2, 23 50:22 51:17 54:4 57:19 58:14, 22 59:24 65:9 66:6 67:11 68:6, 21 71:8 76:1 77:8 79:14 80:16 81:24 82:6 83:7, 15 84:9 86:12 88:2, 16 89:21 91:4 92:5, 21 93:10 94:12 96:22 100:8 103:16, 23 106:15 109:3 110:3, 20 113:10, 25 122:8, 19 123:3, 25 125:21 129:12 130:6
**connection** 45:6
**consent** 11:24 12:5, 10 13:7 16:11
**consistently** 77:4
**constitution** 8:16
**Constitutional** 8:24 10:22 11:10 12:1, 24 15:15 16:13 17:7 19:16 24:7, 22 25:17 27:15 73:12 74:7 75:9
**content** 120:9
**continue** 18:10 20:12 115:16
**continuously** 26:2 77:5
**conversation** 6:4
**convicted** 10:19 11:6

**conviction** 11:23
**copy** 45:4 131:8
**correct** 6:16 10:20 12:5, 11, 12 14:25 19:14 22:20 23:7, 10 26:4 28:6 29:12 35:18 37:17 38:7 42:24 45:4 49:4, 5, 7, 8 50:17, 19, 20 51:2 56:3, 4 57:21 62:8, 9, 15 63:15, 16 72:23 73:6 78:9 82:13 84:2 88:7 96:12, 15, 16, 18 102:18, 19, 22 103:4 104:17 105:16, 18 109:17 111:2 112:10 113:2, 5, 17, 22 114:5, 6, 7, 8, 10, 11, 19, 24 120:22 125:12
**COUNSEL** 2:1 13:22 20:8 45:19 73:21 114:21 130:23
**Counselor** 14:3 34:25 67:24
**count** 124:23
**counting** 104:21
**couple** 66:11 76:8
**course** 110:1 124:5
**COURT** 1:1 5:25 6:6 28:22 43:11 73:24 115:2
**CPAP** 59:3, 4, 10, 13, 17, 18, 22 101:9
**create** 107:6, 25
**creates** 107:18
**crime** 12:9 16:10
**criminal** 30:23 31:23
**cross-slope** 112:19, 20 113:13
**CSR** 1:25 132:21
**Culver** 25:13, 20 26:3 106:24 118:10
**cumulative** 82:7 124:20
**cut** 73:22

< D >

**daily** 34:12, 13 35:1 48:22
**damage** 39:7
**damaged** 86:17
**date** 56:19 106:7 110:6 111:4
**dated** 33:17 46:5 48:12 49:24 57:10,

Trustpoint.One    Alderson

www.trustpoint.one
www.aldersonreporting.com

422

800.FOR.DEPO
(800.367.3376)

*24* 60:19 62:*18*
63:5 64:3 69:*12*
74:22 99:8 102:7
**dates** 56:2*1, 22*
**day** 36:8 78:6
96:25 105:2*0, 22,*
*23* 106:*1, 2, 9, 12,*
*13* 111:6 115:22
129:*19* 130:2, *5*
131:*5*
**days** 36:*1* 106:2*0*
**deal** 108:*10*
**dealing** 86:*9*
**December** 16:*11*
24:*15* 25:*14* 26:3
35:6 36:2*1* 43:2
**decided** 106:*19*
**Declaration** 3:*17,*
*21* 4:2 34:2, 7
39:*17* 45:*10, 21*
46:4, *14, 16, 19*
47:2*0* 48:*3, 9, 12,*
*21* 49:23, *25* 50:3,
*7* 51:5
**declarations** 51:*13*
**declared** 39:3
**deem** 19:25
**Defendant** 15:*1*
43:25 44:7 125:*19*
**Defendants** 1:9
2:*11*
**Defendant's** 4:*4*
**definitions** 26:23
**delay** 114:25 115:2
**delivery** 6:*19*
**Department** 3:*13*
24:*17*
**depending** 36:7
**depends** 63:2*4*
109:24 110:*1*
**deploy** 38:*14*
**deployed** 38:*18*
**deponent** 73:22
128:2*0*
**DEPOSITION**
1:*13* 5:*15, 20* 7:2,
*15* 11:*13* 18:9, *10*
20:*1, 13* 45:23
106:6 115:*17*
120:25 124:5
131:5, *10*
**described** 54:25
**DESCRIPTION**
3:7 27:5, 9
**destroyed** 24:*12*
**deteriorate** 42:*15*
**determine** 106:7
**device** 79:3
**diagnose** 43:3
**diagnosed** 59:9

**diagnosis** 23:25
24:*4*
**diary** 106:25
**Diego** 32:6
**different** 43:7
81:22 83:*4* 96:9
117:*4* 123:*18*
125:*1, 17* 129:*19*
130:2, *4*
**difficult** 61:*11*
**difficulty** 97:*17*
112:*15, 18* 119:*3, 6,*
*17, 19* 121:*4, 10*
130:2*0*
**directed** 107:6
**direction** 107:*9, 10,*
*13, 22* 110:*1*
**disabilities** 15:2*1*
17:9 18:*14* 52:*15*
**disability** 18:*4*
22:23 30:*11* 50:*18*
109:*13* 110:*16*
126:7, *8, 10, 12, 14,*
*17* 127:8, 22
**disabled** 124:*14*
**disagree** 108:5
**discernible** 66:*6*
**discomfort** 97:7,
*14, 21* 112:2*1*
**discovery** 9:*1, 16,*
*24* 10:*14, 23* 11:*11*
12:*15, 23* 13:*10*
19:*18* 21:2, *18*
22:*12* 24:23 27:*16*
28:*1* 29:*16* 30:2
41:*1, 13* 43:2*1*
44:*4, 12* 52:*14*
53:6 61:2*3* 71:2*1*
76:3, *24* 77:*10*
84:*10* 86:25 88:*18*
90:2*0* 93:*11*
100:*16* 117:2
118:6 123:*5*
126:22
**discussed** 48:2*1*
**discussing** 107:7
**discussions** 120:*4*
**Dismiss** 4:*4*
**distinguish** 58:*1*
**DISTRICT** 1:*1, 2*
**doctor** 15:2*4*
20:22 21:7 43:*3, 6*
64:*15* 69:6, *8*
72:*17, 21, 22* 74:*13*
92:2*4*
**doctors** 17:*4* 43:7
**Document** 3:*14*
4:*19* 14:*14* 24:2*0*
25:*16* 28:2*1* 29:24
32:*13, 15, 17, 20, 23*
33:*1, 19* 46:8* 47:9

48:*1* 50:22 121:*14,*
*15* 123:24
**documents** 107:6
**DocuSign** 48:*14, 17*
**doing** 11:2*1* 70:*15*
80:*13* 86:5 88:*12,*
*15* 92:*14, 18* 104:*1*
120:25 126:*8*
127:*11, 18*
**dollars** 8:*12*
**door** 61:*12* 63:*12,*
*13, 15, 23, 24* 69:*19*
84:2*3* 91:25 93:*17,*
*19* 94:*1* 95:*19, 21*
97:*4, 5, 6, 8, 15, 18,*
*19, 20, 22, 23*
113:*12, 13* 115:2*1,*
*23* 121:7
**doormat** 119:2*0*
**double** 66:8 72:5
**downtown** 65:*11,*
*14*
**Dr** 14:*11* 15:*1, 3,*
*10* 17:2*0* 20:*16, 17*
21:*8* 33:23 43:*7, 9*
45:*7* 47:6, *18*
64:25 65:*4, 6, 14*
67:*7, 17* 68:*4*
**drink** 104:*12*
**drive** 66:22
108:*18* 111:*10, 17,*
*21, 24* 112:*4*
**driver's** 109:22
110:*17* 111:*14*
112:*10* 113:*4, 17*
114:*10, 12*
**Driving** 11:2*4*
12:6, 9 13:6 16:*10*
39:*1*
**drop** 83:2*4* 84:*4*
**dropped** 6:2*4*
**drove** 111:*1*
**drugs** 29:22 30:8,
*16*
**dude** 131:*3*
**due** 32:5
**D-u-l-o-x-e-a-i-n-e**
71:*12*
**duly** 5:5 132:7

**< E >**
**earlier** 7:*16* 45:23
51:*18* 52:*1* 67:*12*
70:2*1* 71:22 72:*14*
76:*4* 103:*3* 130:7
**early** 53:*16* 74:*1*
**easily** 6:6 28:2*1*
**easy** 63:*13*
**eat** 52:*10* 116:*8,*
*15, 18* 118:*12*

**eaten** 116:25
**effect** 17:*4*
**eight** 54:22 55:6
**either** 108:*10*
**elbow** 15:25 17:2*1,*
*24* 20:23 21:*12*
23:25 24:*11* 49:7,
*10*
**elevator** 69:*18*
94:*17*
**employed** 9:*19*
**endangering** 28:2*0*
**enforcement** 31:*1*
**enjoy** 52:8 54:2*4*
**enlarge** 64:5 90:*5*
**entering** 119:*17*
121:*4*
**entire** 25:*12*
**entitled** 22:2
**entity** 41:9
**entrance** 119:7
**especially** 35:*10*
**ESQ** 2:5, *13*
**estimate** 21:2*3*
22:2, *4, 6* 35:2*1*
36:2 95:*1, 5, 8*
124:25 129:*4*
**evaluation** 45:6
**event** 131:*4*
**events** 109:*9*
**evidence** 7:2*4*
8:*15* 9:2, *16, 25*
10:*15, 24* 11:*1, 11*
12:*15, 24* 13:*11*
19:*19* 21:*3, 18*
22:*13* 24:2*4* 27:*17*
28:2 29:*17* 30:*3*
41:*1, 6, 12, 14*
43:2*1* 44:5, *13*
52:*1, 14* 53:5, *7, 15,*
*21* 56:*17, 18, 25*
61:23 63:*1* 66:25
67:*10* 71:22 72:*14*
73:*4, 11* 75:5 76:*3,*
*25* 77:*11* 79:*13*
80:6 83:*8, 22*
84:*11* 85:*1* 86:*11,*
*25* 88:*1, 17, 19*
89:*10, 21* 90:*18, 20*
92:6, *22* 93:9, *11,*
*12, 22* 95:*15, 23*
96:2*0* 100:2, *9, 17*
102:25 103:6, *16,*
*24* 104:*19* 106:*17*
112:*12* 113:9
114:*1* 116:*12*
117:2 118:5, *7*
120:*17* 122:8
123:*4, 5* 126:6, *21,*
*22* 127:*12* 128:6,

*21* 130:*10*
**exact** 37:8
**exactly** 71:9 90:*24*
91:*3*
**EXAMINATION**
3:*1, 3* 5:8 132:7
**examined** 5:6
**Excuse** 6:*18* 11:*1*
18:*1* 24:*15* 29:*18*
34:*18* 35:*15* 36:22
41:*11* 46:*15* 52:25
54:5, *12* 55:*18*
67:*19* 73:2*1* 74:5
75:9 78:*3* 83:5
93:2*3* 97:*3* 101:*19*
106:*12* 109:7
110:2*1* 120:*16*
**Exhibit** 3:*8, 9, 11,*
*14, 17, 21* 4:*3, 8, 10,*
*12, 13, 14, 15, 16, 17,*
*18, 19* 7:*3, 15, 18*
14:*17, 18* 20:*15*
25:6, *9* 32:*17, 18*
34:7, *8* 45:9, *10, 11,*
*21, 22* 48:*9, 10, 22*
49:*14, 15, 25* 50:*1*
51:5, 6 52:6 57:*11,*
*12, 25* 58:3 59:*14,*
*15* 60:2*4, 25* 62:*19,*
*20* 63:7, *8* 64:2, *7,*
*8* 69:*13, 14, 15*
74:23, *24* 75:2, *10*
77:*14, 15* 78:2, *3,*
*14, 24* 80:9, *10, 14,*
*22* 81:*1, 7, 10, 18*
82:*18, 20, 22* 83:*18*
84:*1, 5, 19, 22* 85:5,
*8, 14* 86:3, *7* 87:*11,*
*19, 22* 88:*10, 25*
89:*3, 15* 90:7, *10,*
*13* 91:*19, 24*
121:*16, 18* 129:*17*
**EXHIBITS** 3:6
4:*1* 7:2 51:*13*
58:*19* 130:25
**exit** 95:2*0*
**exited** 112:9
113:*3, 16, 19* 114:9
**exiting** 112:*15, 21*
113:*4*
**expect** 20:8
**expert** 12:2*1*
23:*14* 24:8 34:*18*
37:25 38:9, *17*
39:6 41:*11, 19*
42:*16* 44:2 45:*14*
46:*1* 62:*12* 79:2*1*
81:25 113:*8*
**explain** 28:23
**explained** 48:23
121:*5*

Trustpoint.One    Alderson.
www.trustpoint.one
www.aldersonreporting.com
423

800.FOR.DEPO
(800.367.3376)

**extent** 15:*17*, *20*
*17*:*8* 31:*25* 32:*1*, *2*
91:*11* 107:*5*

**< F >**
**face** 16:*23* 77:*19*
78:*6*, *11*, *18*, *20*
85:*2*, *10* 86:*14*
**facing** 110:*1*
**fact** 71:*11* 107:*23*
**facts** 10:*25* 41:*5*,
*12* 52:*1* 53:*4*, *15*,
*21* 56:*16*, *18*, *24*
62:*25* 66:*24* 67:*10*
72:*13* 73:*3*, *10*
75:*4* 79:*12* 80:*6*
83:*8*, *21* 84:*25*
86:*10* 88:*1*, *16*
89:*10*, *20* 90:*17*
92:*5*, *22* 93:*8*, *12*,
*21* 95:*15*, *22* 96:*20*
100:*1*, *8* 102:*24*
103:*5*, *16*, *24*
104:*18* 106:*16*
112:*11* 113:*9*, *25*
116:*11* 118:*4*
120:*17* 122:*8*
123:*3* 126:*5*, *20*
127:*11* 128:*5*, *20*
130:*10*
**fall** 60:*6*
**fan** 93:*2*
**far** 29:*4* 30:*19*
47:*14* 55:*16*
**favorite** 117:*7*, *8*
**Fax** 2:*9*, *17*
**February** 24:*15*
33:*17*, *24* 45:*7*
57:*2* 110:*7*, *8*, *10*
111:*2*, *25* 113:*16*
119:*16*
**fell** 42:*1* 60:*11*
119:*8*, *21*
**felon** 10:*20*
**Fifteen** 7:*13*
**file** 106:*20* 127:*8*,
*22*, *24*
**filed** 16:*7* 24:*14*,
*15* 45:*9* 49:*23*
121:*2*, *25* 123:*22*
124:*1*, *12*
**filing** 15:*19* 122:*4*
128:*16*
**fill** 13:*23*
**financial** 128:*20*
129:*14*
**find** 49:*13*, *15*
124:*6*
**fine** 74:*17*
**finger** 86:*21* 87:*4*

**finish** 9:*13* 15:*5*
18:*17* 59:*7* 70:*17*
82:*8*, *9* 92:*19* 96:*1*
108:*6* 115:*12*
**finished** 9:*12*
70:*18* 95:*25* 96:*11*
**FIRE** 39:*24* 40:*4*,
*6*, *16* 42:*1*
**firefighter** 39:*20*
40:*22* 41:*8*, *24*
50:*19*
**firefighting** 39:*22*
**firm** 127:*1*, *4*, *6*, *8*,
*22* 130:*20*
**first** 5:*5* 12:*4*
65:*4* 75:*2*, *10* 77:*6*
78:*7* 121:*22*, *24*
132:*7*
**five** 39:*17* 42:*3*, *8*,
*13* 48:*24* 50:*13*
94:*22* 95:*6*, *7*
121:*22*
**five-minute** 49:*13*,
*16* 74:*16* 101:*1*
**fixed** 39:*7*
**flight** 95:*12*, *14*
**Flintridge** 100:*22*
123:*15*
**Floor** 2:*14* 95:*12*
**folder** 49:*15*
**following** 29:*21*
33:*7*
**follows** 5:*6* 27:*4*
**follow-up** 64:*15*
**food** 55:*4* 56:*3*
**foods** 55:*24*
**foot** 69:*7* 119:*14*
**Force** 3:*12* 24:*16*
25:*8* 29:*11* 30:*17*
**Forearm** 97:*25*
98:*1*
**forth** 115:*14* 132:*7*
**forward** 20:*1*
**foundation** 7:*23*
8:*24* 9:*10*, *25*
10:*13*, *25* 11:*8*
13:*9* 15:*14* 18:*2*
19:*7* 24:*6* 26:*6*
29:*3* 30:*13* 31:*2*
38:*10* 39:*6*, *14*
41:*3* 42:*18* 43:*19*
44:*13* 45:*16* 46:*24*
51:*17* 52:*2* 53:*5*,
*15*, *22* 54:*4* 56:*17*,
*24* 58:*15* 59:*25*
61:*21* 63:*1* 65:*8*,
*19* 66:*7* 67:*9*, *19*
68:*7* 70:*6*, *19*
71:*20* 73:*11* 75:*5*
76:*23* 77:*9* 79:*13*
80:*6*, *17* 83:*8*, *15*

85:*1* 86:*11*, *23*
87:*25* 88:*16* 90:*18*
92:*21* 93:*9* 94:*13*
95:*15* 96:*22* 98:*6*
100:*2*, *9*, *17* 103:*6*,
*15*, *25* 104:*19*
110:*2*, *21* 112:*12*
113:*10* 114:*1*
116:*13* 117:*14*
118:*6*, *23* 122:*9*
123:*4*, *12* 125:*22*
126:*20* 127:*12*
128:*6*, *21* 130:*8*
**four** 34:*11* 48:*20*
94:*18*
**Foyer** 94:*8*
**FRCP** 4:*6*
**free** 13:*22* 130:*16*
**friend** 55:*1*
**friends** 52:*7*, *11*
54:*24* 55:*7*, *14*
**full** 5:*11* 95:*11*, *14*
**funny** 124:*2*, *4*, *9*
**further** 6:*14* 20:*8*
42:*14* 130:*17*
132:*10*
**Fusion** 52:*8* 54:*9*,
*17*, *23* 55:*1*, *6*, *16*,
*25* 56:*2*, *13* 117:*11*
119:*4*, *17* 120:*13*,
*16*, *22* 121:*4*, *11*

**< G >**
**Gabapentin** 71:*2*
72:*8* 76:*16*
**gauze** 69:*3*, *6*, *8*, *9*
**gentleman** 29:*8*, *10*
**getting** 6:*19* 64:*15*
85:*24* 100:*23*
119:*3* 121:*10*, *12*
**give** 9:*14* 21:*23*
23:*25* 35:*21* 44:*24*
52:*11* 73:*19* 79:*24*
115:*11*, *13* 120:*1*
**given** 6:*15* 31:*21*
105:*9* 132:*9*
**gives** 36:*9* 107:*18*
**giving** 36:*8* 105:*6*
**GJS** 1:*7*
**Go** 12:*2*, *17* 16:*6*
17:*1*, *13* 18:*23*
24:*25* 33:*4* 36:*20*
38:*20* 40:*1*, *13*
44:*20* 52:*16* 54:*6*
55:*5* 67:*16* 68:*1*, *3*
78:*7* 94:*15*, *16*
97:*12* 100:*11*
101:*5*, *6*, *21* 102:*20*
104:*10* 106:*25*
113:*11*, *20* 115:*6*,
*16*, *22* 118:*12*, *24*

123:*8*, *10*, *16*, *17*
124:*20* 128:*7*
130:*1*, *23*
**going** 5:*19* 7:*3*
11:*13*, *16* 14:*16*, *20*
15:*16* 16:*6* 17:*17*
18:*13* 24:*13*, *19*
25:*6*, *11* 28:*13*
30:*22* 31:*9*, *15*, *19*,
*20*, *25* 32:*4*, *6*, *7*, *10*,
*17* 33:*4* 34:*1*, *6*, *10*,
*24* 44:*14* 45:*18*
48:*8* 49:*22*, *24*
52:*9* 57:*11*, *23*, *25*
59:*12*, *13* 60:*2*, *6*,
*23* 62:*17*, *19* 63:*4*,
*7* 64:*1*, *7* 69:*13*
72:*12* 74:*23* 78:*2*
80:*2*, *5*, *9* 84:*18*, *20*
86:*3* 87:*11*, *19*
88:*25* 89:*3* 91:*10*,
*20*, *23* 92:*23* 94:*4*,
*9* 96:*9* 99:*7* 107:*4*,
*7*, *10* 108:*6* 115:*9*,
*19* 120:*3* 121:*15*,
*16*, *23* 122:*3*
123:*20* 129:*6*, *9*, *14*
**gold** 86:*20* 87:*4*
**good** 99:*22* 131:*2*
**gotten** 96:*17*
**grabbed** 97:*4*
**Great** 61:*13*, *14*, *17*
62:*7* 64:*12*, *18*
67:*16* 68:*1*, *13*
70:*1*, *12* 72:*22*
92:*11* 95:*20* 96:*14*
97:*3* 101:*8*
**Greenman** 20:*17*
**G-r-e-e-n-m-a-n**
20:*18*
**ground** 5:*21* 79:*2*
81:*19* 102:*22*
**Group** 61:*13*, *15*,
*17* 62:*8* 64:*13*, *18*
65:*6* 67:*16* 68:*1*, *8*,
*13* 70:*2*, *12* 72:*22*
92:*12* 95:*20* 126:*7*,
*14*, *17*
**guess** 13:*3* 21:*22*
22:*1*, *15*, *16* 47:*13*
53:*8* 55:*21* 57:*25*
78:*17*, *19*, *20*, *22*
94:*21*, *24* 95:*3*
**Guy** 8:*19*, *20*, *21*
10:*9* 67:*5*
**G-u-y** 8:*20*, *21*
**gym** 59:*2*

**< H >**
**H)(3** 4:*6*

**HAKIMI** 2:*4*
**half** 16:*23* 55:*21*
**hand** 16:*2*, *3*
39:*19* 42:*5*, *9*, *11*
49:*1*, *3*, *9* 50:*14*, *16*
51:*6*, *7*, *15* 63:*15*,
*17*, *20*, *21*, *24* 68:*18*
69:*21* 75:*13*, *16*
85:*7*, *16*, *18*, *22*
86:*18* 87:*24* 88:*6*
89:*18*, *23*, *24* 93:*17*
132:*15*
**handle** 97:*4*
**hands** 83:*20*, *23*
84:*3* 85:*22* 86:*5*, *8*,
*16* 87:*8*, *14* 88:*21*
104:*20*
**Hang** 71:*10*
105:*21*
**happen** 36:*23*
37:*2*, *6*
**happened** 32:*5*
66:*9*
**happens** 131:*3*
**happy** 11:*14*, *17*
**harassing** 30:*13*
31:*3* 124:*18*
128:*22* 129:*13*
**HARBIDGE** 1:*25*
23:*4*, *18* 130:*19*, *25*
132:*3*, *21*
**hard** 35:*14* 63:*23*
84:*17* 86:*17*
122:*13*
**harder** 122:*13*
**harmed** 111:*5*
**HB** 1:*7* 4:*7* 49:*24*
61:*12*
**headed** 32:*15*
61:*12*
**headquarters** 61:*20*
**heads** 6:*4*
**heal** 68:*11*
**Health** 126:*7*
**hear** 79:*24* 97:*13*
99:*19* 101:*12*
102:*3*
**heard** 5:*20* 40:*11*
115:*10*
**hearing** 99:*12*, *15*
101:*15*
**help** 34:*12*, *14*
35:*2* 43:*10* 48:*22*
101:*20* 126:*10*
**hepatitis** 17:*4*, *15*
**hereinbefore** 132:*7*
**hereunto** 132:*14*
**herewith** 45:*9*
**Herman-Frankel**
79:*18*

Trustpoint.One    Alderson

www.trustpoint.one
www.aldersonreporting.com

148

800.FOR.DEPO
(800.367.3376)

**Hermosa** 52:7
53:1, 12 54:1
55:16, 20
**Hey** 100:23
**high** 37:13
**Highway** 55:22
62:6
**hilarious** 124:6
**hired** 39:23 40:4
**Hold** 9:11 60:16
64:6 121:13
**holding** 7:7, 16
75:12, 15
**Hollywood** 100:18
**home** 69:10
116:20
**hope** 130:24
**hopefully** 14:7
32:15 34:2 48:1, 2
60:17 101:5
123:21
**Hospital** 3:16
32:16 45:6 65:17,
21 66:22 69:9
**hours** 62:18 63:6
64:3 69:12
**house** 116:16
123:17
**huh-uh** 6:5
**hunched** 58:9
69:20 84:21 85:7,
17 86:5
**hundred** 8:12
**hurt** 97:24
**hurting** 80:24
92:7 94:17
**hydrocodone** 74:14
76:10, 11, 14 77:3,
5
**hypothetical** 10:1,
2 50:24 70:19, 20
130:8, 9

**< I >**
**ice** 104:15, 25
**illegal** 109:14
**impairments** 17:10
**implications** 30:24
**impliedly** 111:1
**improper** 50:24
70:20 130:9
**inappropriate**
18:17 20:4
**incomplete** 9:25
10:1 50:24 70:19
130:8
**INDEX** 3:1, 6 4:1
86:21 87:4
**information** 15:17
17:9 45:8 47:4, 17
**ingesting** 70:15

**injured** 15:25
41:17, 24
**injury** 39:20 98:22
**inmate** 40:22
**inquire** 18:3
**inside** 121:12
**instruct** 30:22
91:11 107:7 129:7,
10, 15
**INSTRUCTED**
4:20 44:17
**instructing** 7:25
31:4 107:20 120:8
**instructions** 91:12
**insulting** 128:22
**intending** 11:17
**intentional** 77:22
**interested** 132:12
**interferon** 17:5
**interject** 9:13
**interjected** 114:21
**interrupt** 5:22, 23
**interrupting** 115:4
**introduction** 24:20
**invades** 8:24
10:21 11:9, 25
12:13 15:15 16:13
17:6, 7 19:8, 16
21:3, 18 22:13
23:13 24:6, 21
25:17 26:7 27:15
28:9 29:17 30:3, 9,
20 43:21 44:3, 10
52:12 53:7 73:12
77:9 128:19
129:13
**invasion** 8:15
9:17 10:15 13:11
22:22 28:2 29:3
100:14
**involved** 37:9
**involving** 37:15
**irrelevance** 19:23
**irrelevant** 41:12
45:8 76:2
**issue** 15:19
**issues** 51:14 93:18,
21

**< J >**
**Jacob** 44:25
**JAMES** 1:4, 14
2:12, 13 3:2, 16, 17,
21 4:2 5:4, 12
9:11 12:2, 17 13:1
14:1, 2, 4, 10 15:22
24:16 32:1, 2, 16
33:14 34:3, 20
44:16, 22 45:17
46:5 47:12 48:3
50:25 54:6 70:7

71:23 78:22 80:18
85:12 87:15 89:25
92:2, 18, 19 93:24
94:14 97:12 99:18
101:13, 17 102:3
104:10 106:18
107:12 108:14
109:12 110:22
117:18 122:1
124:21 128:7
129:1 132:6
**J-a-m-e-s** 5:12
**James.S.Link@att.n**
**et** 2:18
**JAY** 1:25 132:3,
21
**jeopardizing** 28:14,
15, 23
**job** 39:20 41:25
**judge** 11:13, 16, 17
**Judgment** 3:19, 23
48:4
**July** 46:5, 15, 17
47:21 62:18 64:3
68:14 69:12 71:18
72:25 73:8 74:22
79:11 83:5, 11
86:1 87:3 88:13
91:23
**June** 49:24 60:19
**Jurisdiction** 4:5

**< K >**
**keep** 81:14 106:25
120:12 121:23
124:23 131:2
**kept** 120:15
**killed** 29:9, 12
**kilos** 30:18
**kind** 56:5 61:11
71:10 75:19
121:20 127:24
129:4
**knee** 64:14, 15, 16,
18, 21 66:4, 8, 13
67:7 72:4, 5
**knees** 67:8, 17
68:3, 9, 13
**know** 11:12 15:2
17:17 25:4 28:18
33:2 44:6 58:23
60:10, 12 65:12
67:13 70:8 71:11
77:21 79:3 81:15
84:16 87:24 88:5,
12 91:20 94:7
96:24 101:6 103:9
104:22 106:6, 13
107:23 111:6
121:22 123:2

126:23 131:1, 6
**knows** 55:18

**< L >**
**La** 100:22 123:14
**Lack** 4:5 66:6
103:6, 14
**lacks** 7:23 8:24
9:10, 25 10:13, 24
11:8 13:9 15:14
18:2 19:7 24:5
26:6 29:3 30:12
31:2 38:9 39:6, 13
41:2 42:18 43:19
44:13 45:16 46:24
51:17 52:2 53:5,
15, 21 54:4 56:17,
24 58:14 59:25
61:21 63:1 65:8,
19 67:9, 19 68:6
70:6, 19 71:20
73:11 74:5 75:5
76:23 77:8 79:13
80:6, 16 83:8, 15
85:1 86:11, 23
87:25 88:16 90:18
92:21 93:9 94:12
95:15 96:22 98:6
100:2, 9, 17 103:24
104:19 110:2, 20
112:12 113:9
114:1 116:13
117:14 118:5, 23
122:8 123:4, 11
125:22 126:20
127:12 128:6, 21
130:8
**ladders** 33:8
**Lastly** 6:14
**late** 54:7 74:1
**laughing** 124:5, 7
**LAW** 2:4, 12
15:11 31:1 124:14
126:8, 14, 17 127:1,
4, 6, 8, 22
**lawsuit** 10:14
11:9 12:14, 22
13:10 15:18 19:16
21:1, 17 22:12, 22
23:13 24:21 29:5,
15 30:1, 11, 20
40:18, 25 43:13, 20,
25 44:3, 12 53:6
65:10 71:21 73:13
88:17 91:4 100:15
106:20 109:10
117:13 121:2
124:9 128:3, 19
129:11
**lawsuits** 122:4
128:17

**lead** 7:24 8:15
9:1, 16, 24 10:14,
23 11:10 12:14, 23
13:10 19:18 21:2,
17 22:12 24:23
27:16 28:1 29:16
30:2 40:25 41:13
43:20 44:4, 12
52:14 53:6 61:22
71:21 76:2, 24
77:10 84:10 86:24
88:18 90:19 93:10
100:16 117:2
118:6 123:4
126:21
**leaving** 59:22
101:9
**left** 36:8 42:5, 9,
12 49:1, 3, 9 51:6,
14, 15 61:4 63:20,
24 68:18 70:3
75:16 85:7, 16, 19
87:5, 8, 23 89:18,
24 119:14
**leg** 36:8
**legal** 10:12, 25
11:7 12:16, 20
15:12 16:15 19:17
20:25 21:14 22:24
38:8 44:1, 2 45:13
55:17 79:21 113:6
124:1 125:18
**level** 90:14, 16, 23,
25 91:1, 3, 9
102:21 103:4
**liability** 1:7 27:5,
9 79:19
**licensed** 128:1, 8,
11, 12
**life** 28:14, 15, 20,
24
**lift** 86:17 119:7, 15
**light** 94:1
**limited** 1:7 39:19
63:16, 18 79:19
**limped** 96:13, 14
97:3
**limping** 64:10
84:12 92:7, 11
95:17 99:22 101:8
102:10
**LINE** 4:21
**LINK** 2:12, 13
3:4 5:9 6:25
7:14, 19, 25 8:3, 4,
17 9:3, 7, 11, 18
10:3, 8, 16 11:3, 12,
15, 19, 22 12:3, 8,
18 13:5, 12, 19, 22
14:6, 16, 19 16:5,
16 17:11, 16 18:3,

Trustpoint.One   Alderson

www.trustpoint.one
www.aldersonreporting.com

425

800.FOR.DEPO
(800.367.3376)

7, 8, 12, 16   19:1, 10,
20   20:3, 14   21:4,
20   22:2, 3, 8, 17
23:1, 8, 15, 18, 24
24:9   25:1, 10, 19,
24   26:10, 15   27:2,
20   28:4, 11   29:6,
19   30:5, 14   31:4,
10, 14, 19, 22   32:10,
12, 19   33:16, 22
34:6, 9, 22   35:7, 19,
23   36:10, 15, 16, 18,
19   37:3, 10, 14, 23
38:1, 13, 19, 24
39:9, 16   40:2, 3, 9,
10, 15, 21   41:7, 16,
23   42:23   43:17, 24
44:8   45:1, 20   46:3,
11   47:1, 16, 25
48:8, 11   49:19, 21
50:2, 12   51:3, 11,
21   52:4, 19   53:10,
18, 24   54:8, 13, 14,
16, 21   55:15, 23
56:11, 20   57:5, 13,
22   58:4, 17, 25
59:16   60:4, 23
61:1, 10   62:1, 14,
16, 21   63:3, 9
64:11   65:1, 13, 22
66:12, 19   67:2, 13,
15, 25   68:12, 24
69:16   70:10, 16, 18,
23   71:3, 14   72:2,
20   73:5, 17, 23
74:7, 15, 17, 20, 25
75:7, 23   76:6, 15,
20   77:2, 13, 23
78:1, 12, 23   79:9,
17, 23   80:8, 21
81:6, 14, 16   82:3, 8,
11, 15, 16, 20, 21, 24,
25   83:10, 17, 25
84:13   85:4, 13, 23
86:19   87:2, 10, 18
88:4, 22   89:14, 23
90:6, 22   91:7, 14,
18   92:9, 25   93:15
94:2, 19, 25   95:4,
18, 24, 25   96:8
97:1, 13, 16   98:9,
18, 25   99:2, 6, 20
100:4, 12, 20   101:3,
14, 21, 23   102:5
103:1, 10, 19   104:4,
13, 23   105:4, 8
106:22   107:16, 23,
24   108:3, 6, 9, 17
109:5, 15   110:5, 24
111:23   112:3, 8, 14
113:15   114:4, 18

115:1, 6, 9, 15, 18
116:14   117:6, 15,
17, 23   118:8   119:2
120:11, 18   121:19
122:15, 21   123:7,
19   124:2, 3, 6, 8, 11,
15, 24   125:10, 15
126:1, 9, 15, 25
127:17, 20   128:10,
15   129:3, 16, 22, 25
130:11, 17, 19, 24
**Link's** 94:14
**Liquor** 80:2   84:24
85:25   88:7
**list** 121:21   122:2
123:21, 22   129:18
130:5
**listed** 121:25   122:2
**litigation** 18:5
**little** 16:2   60:18
128:24
**live** 52:7   100:13,
21
**lived** 26:2
**lives** 123:14
**LLC** 3:20   34:3
122:1, 16, 19, 22
**load** 7:3
**lobby** 94:8   96:12,
13, 14   97:2, 3
**located** 8:22   9:4
61:17, 19   62:2, 8
**location** 58:11, 18
61:21
**locations** 83:4
**locking** 64:16
**long** 5:17   7:12
12:19   17:18   19:2
34:13, 16   35:1
36:11, 13   40:6
71:17   73:8   90:23
127:6   130:21
**look** 14:20, 22
75:2   83:2   93:3
121:21
**looked** 48:22
51:13
**looking** 33:5
39:17   45:11, 22
46:4   50:3   69:25
82:18, 22   84:22
86:8   87:22   93:2, 5
104:2, 5, 6, 11
106:3   119:22, 23
129:17
**looks** 14:23   51:20
78:6   82:1   86:15
87:7   88:8   104:11
105:6
**Los** 2:7   122:23, 24

**loss** 39:3
**lost** 25:4   60:10
**lot** 85:3   89:5
95:17   124:13
130:16
**low** 100:23
**Luis** 12:11   15:4
19:12, 13   40:20, 23
**Lumbar** 3:14
32:15   42:20   45:4,
11   47:4, 17

**< M >**
**machine** 59:4, 10
**makers** 56:8
**making** 11:18
96:1   114:25
**mall** 118:2, 15, 16,
17, 18
**March** 48:13   57:1
105:18, 23, 24, 25
106:8   108:19, 22
111:18   112:9, 16,
22   113:1   119:4, 11
**Marengo** 2:14
**mark** 7:14   14:16
25:6   32:17   34:6
57:11, 25   59:13
60:23   62:19   63:7
64:7   69:13   74:23
121:16
**MARKED** 3:7
7:18   14:18   25:9
32:18   34:8   48:9,
10   49:25   50:1
57:12   58:3   59:15
60:25   62:20   63:8
64:8   69:15   74:24
121:18
**Market** 80:3
84:24   85:25   88:7
103:12
**marriage** 132:11
**MAT** 1:7   4:7
49:24
**Matt** 52:18   53:19,
25   54:17
**matter** 5:24   25:18
31:24   71:11
108:13   109:16
124:8   132:13
**mean** 16:19   26:20
47:14   55:20   61:20
64:24   70:14   99:15,
16   122:18   123:11
**meaning** 116:4
**means** 8:5   16:20
38:18   113:8   123:2
**meant** 29:21
**measure** 75:14
79:8

**measurement**
79:11   80:20
**measurements**
83:4, 11, 14   103:3,
7
**measuring** 81:19
90:3
**Medical** 3:15   15:3,
16, 17, 19   17:8
20:24   24:3   32:16
33:9, 12   34:18
37:7, 8   41:19
42:17   45:5   47:4,
17   61:13, 14, 17
62:8   64:12, 18
65:6   67:16   68:1, 8,
13   70:2, 12   72:22
92:11   95:20   96:21
**medication** 74:8, 12
**medications** 6:19
76:8
**Melrose** 79:18
80:2   84:23   85:25
88:7
**member** 64:24
**Men's** 12:10   15:4
**mentions** 42:13
**message** 48:2
**microphone** 101:16
**mile** 55:21
**miles** 55:21   123:15
**minute** 49:15
**minutes** 62:18
63:6   64:3   69:13
**mischaracterizes**
51:18   52:1   55:10
67:12   70:5, 20
71:22   76:3   93:22
95:23   122:6   130:7
**misleading** 88:2
130:8
**misquotes** 67:12
130:7
**missed** 12:4
**Mission** 20:17
**M-i-s-s-i-o-n** 20:17
**misspoke** 46:15
**misstates** 51:18
70:4, 21   72:14
75:20   76:22   89:9
96:19   103:6
113:24   114:15
120:14   122:5
129:20   130:3
**mistake** 131:1
**model** 38:25
**moment** 7:5   9:14
49:12
**Monday** 110:8

**money** 7:8, 17
8:11   104:22
128:16, 24   129:5
**Monica** 62:3, 8
**Montebello** 65:21,
23, 24   66:2
**Montecello** 65:23
**month** 36:1, 2
43:1   53:9, 19
66:20   73:19
106:12, 13   116:4, 7,
15, 19
**months** 53:23
94:18   116:24
**Motion** 3:18, 22
4:4   48:4
**move** 32:10   84:18
100:24   108:5
114:12
**moving** 17:3
35:25   42:1   52:5
69:11
**multiple** 84:8
121:24   122:4
**muscle** 71:1, 4, 10,
11   72:11, 17   76:21
**muscles** 97:23, 25
98:1

**< N >**
**name** 5:11, 12
8:13, 18   9:22   10:4
14:10   61:13   65:4
116:10, 23   117:24
118:1, 17
**names** 20:16
52:11   56:15   117:9
126:24
**Narcotics** 3:12
24:16   25:7   29:11
30:17
**narrative** 29:1
37:7   47:10   96:3
109:7   125:21
130:9
**narrow** 109:11
**near** 52:8
**necessarily** 107:19
**necessary** 108:11
**need** 6:9   18:16
20:5   49:13, 16
101:15
**needed** 130:1
**needing** 59:9
**needs** 73:24
**neighborhood**
52:10
**nerve** 24:12   36:7
42:21, 22   43:4
**neurological** 43:8
**neurosurgeon** 43:8

Trustpoint.One        Alderson.

www.trustpoint.one
www.aldersonreporting.com

428

800.FOR.DEPO
(800.367.3376)

**never** 8:12 33:7, 8
55:3 68:15 94:4, 5
130:4
**new** 9:13 131:3
**Nice** 124:16
**nod** 6:4
**noise** 56:8
**normally** 46:19, 22
**notes** 47:6, 19
50:13 106:5 107:8,
13 119:25 120:1, 9,
12, 15, 20, 21, 24
121:1 131:2
**November** 35:5
**number** 7:4
123:23 124:11, 17

**< O >**
**oath** 6:15
**Obispo** 12:11
15:4 19:12, 13
40:20, 23
**object** 15:16
18:19 24:20 91:10
107:4 120:3
**objecting** 115:11
**Objection** 7:22
8:14, 23 9:9, 12, 23
10:7, 11, 21 11:2, 7,
25 12:7, 13, 20
13:8, 17 14:14
15:12 16:12 17:6,
25 18:16, 17 19:5,
6, 15 20:7, 24
21:13, 25 22:11, 21
23:11 24:2, 19
25:5, 16, 22 26:5,
13, 21 27:13, 24
28:7, 25 29:14, 24
30:9, 19 31:12, 16
33:11, 19 34:15, 19
35:13 36:3, 13
37:1, 5, 20 38:8, 15,
23 39:5, 12, 25
40:7, 17, 24 41:10,
18 42:16 43:15
44:1, 10 45:13, 25
46:8, 21 47:9, 23
50:8, 21 51:8, 16,
24 52:12 53:3, 13,
20 54:2, 5, 11 55:9,
17, 18 56:16, 23
57:18 58:13, 21
59:23 61:5, 18
62:10, 25 64:22
65:7, 19 66:5, 15,
24 67:9, 18, 20
68:5, 20 70:4, 13,
17 71:6, 19 72:13
73:3, 10 74:4 75:4,
20, 25 76:12, 17, 22

77:7, 16 78:16
79:5, 12, 20 80:4,
15 81:4, 23 82:5, 8,
9 83:6, 13, 21 84:7,
25 85:21 86:10, 22
87:6, 25 88:14
89:9, 20 90:17
91:2 92:1, 2, 4, 17,
19, 20 93:8, 20
94:11, 23 95:2, 13,
22 96:1, 2, 19
97:10 98:4, 12, 21
99:14 100:1, 7, 14
102:24 103:5, 14,
22 104:9, 18 105:2
106:14 109:2, 23
110:19 111:20
112:1, 6, 11 113:6,
23 114:15, 25
116:11 117:1, 12
118:4, 21, 22
120:14 122:5, 17,
25 123:10, 24
124:18 125:2, 7, 14,
18 126:4, 6, 11, 18
127:10 128:2, 18
129:6, 20 130:3
**objections** 8:7 9:6,
13 11:14, 18 19:22,
24 20:5, 9 23:6, 21
31:12 35:4, 22
37:12 54:19 70:25
114:22 124:6
128:14
**observations** 47:6,
19
**obtained** 28:21
**obvious** 11:20
**occasion** 118:19
**occasions** 122:4
**occurred** 109:9
**October** 1:15 5:2
132:15
**offer** 19:20 49:16
**OFFICE** 2:4, 12
**Oh** 52:25 53:8
56:22 68:23 71:10
72:9 93:3 121:23
125:16
**Oinkster** 122:1, 16,
18, 22
**Okay** 5:19 6:14,
18, 21, 23 7:1, 10
8:3 13:20 15:10
16:24 17:23 22:7
24:11 32:6 33:23
34:1, 6 37:18, 24
39:10 42:13 43:1
44:20 49:18, 19
56:15 57:6 60:9,
17 62:24 65:14

69:11, 19, 21 71:15
72:11, 24 73:8
75:8 78:7 79:2, 10
80:9 81:21 90:10
92:3 93:4 94:3
96:14, 17 97:2
101:5 102:10, 12,
20 103:11 105:9
106:25 108:5, 15,
16 109:6, 16
110:17 113:3
115:5 116:4, 21
117:9, 18 118:13
119:3 121:9
126:16 127:24
129:2
**O-k-h-o-b-a-t** 43:9
**old** 131:3
**once** 53:9 105:18
106:19 113:12
116:9 129:5
**Onglao** 3:10
14:11 15:1, 3
17:20
**O-n-g-l-a-o** 14:11
**Onglao's** 15:10
**ongoing** 19:22
31:23
**open** 63:13, 23
95:19
**opened** 93:17
97:4, 23
**opening** 63:12, 14,
25 93:18 95:21
97:5, 6, 7, 14, 17, 20,
21 115:20
**operate** 10:9 39:10
**opinion** 12:21
23:14 30:25 34:18
37:7, 25 38:9 39:6
41:20 42:17 45:14
46:1 62:12 79:21
81:25 113:8
**opportunity**
115:12, 13
**opposing** 20:8
**Opposition** 4:3
**oppressive** 19:23
22:25 31:3, 17
122:9
**order** 96:18
118:12
**ordered** 116:20
117:21 118:11
**organization** 39:22
41:9
**outcome** 132:12
**outside** 16:18, 19,
21
**owned** 90:23

**owner's** 11:24
12:5, 9 13:6 16:11
**owns** 100:18
**OxyContin** 71:1,
17, 25 72:7 73:1, 9,
14, 18 74:3, 9
96:17, 24

**< P >**
**p.m** 4:9, 11 58:2
131:10
**Pacific** 55:22 62:6
**package** 7:7, 17
**PAGE** 3:3, 7 4:21
14:21 16:7 17:3
20:15 27:3, 4, 8
33:3, 18 34:11
46:6 47:2 48:14
50:3 52:6 75:2, 10
77:14 78:3, 7, 14,
24 80:9, 10, 13, 22
81:1, 7, 10, 17, 21
82:12, 13, 20, 22, 24
83:1, 18 84:1, 5, 18,
22 85:5, 8, 14 86:3,
7 87:11, 19, 22
88:9, 25 89:3, 15,
19 90:7, 10, 13
129:17
**pages** 74:21
121:22, 24
**pain** 35:9 72:7
74:8, 12 85:3 89:5
95:17 96:15, 18
97:3, 5, 6 101:9
119:10, 13, 14
**paper** 106:4
**papers** 106:4
**paragraph** 14:24
27:4, 6, 8, 10, 12, 21
28:6 29:20, 25
34:11 39:17 42:3,
7, 8, 13 45:2 47:2
48:20, 23 50:13
52:5 54:22 55:6
**paralegal** 108:12
126:3 128:1, 11, 12
**pardon** 48:13
49:12 77:4
**park** 108:21, 24, 25
109:13, 14, 17
110:12, 15
**parked** 102:17
109:21, 25 110:18
111:13 113:1
115:21 116:1
121:6, 8
**parking** 79:11
102:18 108:21, 24,
25 109:20 110:12,

16 111:13 113:1
115:24, 25 121:7
**parks** 109:4
**part** 12:4 53:16
54:7 74:1, 2 121:9
**participating** 98:2,
5
**particular** 122:12
**parties** 132:11
**parts** 98:23
**Pasadena** 2:15
123:15, 18
**pass** 123:11
**Passenger** 110:23
113:12 115:23
**passenger's** 109:21
110:4, 18 111:15,
16 112:25 113:21
114:13
**patience** 108:2
**patient** 33:6 70:18
107:25
**pause** 6:22 102:4
**paused** 129:23
**pavement** 79:2
83:5
**pay** 104:25
**PCH** 3:20 34:3
**pdf** 33:4
**penalty** 6:15
**pending** 32:9
**people** 29:9, 12
84:8 124:13, 14
**percent** 35:24, 25
36:6, 7
**perform** 17:20
33:6 64:18
**performed** 17:23
20:22 64:21, 23
**period** 109:10
**perjury** 6:16
**Perry** 20:16 21:8
**P-e-r-r-y** 20:17
**PETER** 2:5
**phone** 75:17, 18,
22 83:24 84:4
88:21 89:6, 8, 13
**Photograph** 3:8
7:7, 15, 16, 21 8:7,
10 59:13, 18, 21
60:18, 23 61:3
68:21 69:25 77:21,
25 78:8, 9 81:18
84:9, 14 88:10
89:19
**photographs** 4:18
89:7 103:13
**phrase** 37:2
**physical** 98:3, 8, 10,
19 99:3
**physically** 70:15

Trustpoint.One        Alderson
www.trustpoint.one
www.aldersonreporting.com
427
800.FOR.DEPO
(800.367.3376)

**physician-patient** 17:7

**picture** 7:12 68:23 80:19 81:12, 15, 22 82:2, 4 93:4

**piece** 106:3

**pinched** 24:12 42:20, 22 43:3

**place** 5:22 21:12 58:23 59:1 65:18 66:4 118:11

**places** 122:4

**placing** 102:21

**Plaintiff** 1:5 2:3

**Plaintiff's** 3:18, 22 4:3 48:4

**planning** 11:21

**play** 94:9

**please** 5:10, 23 9:12, 14 15:23 18:10, 23 23:3, 4, 17, 19 27:18 28:23 32:3 34:7, 23 43:11 47:12 52:11, 20, 22 56:10 61:7, 24 64:5 70:18 73:25 74:18 80:18 82:9 93:24 94:15 96:1, 6 99:18 106:18 108:7 110:22 114:2 118:9, 24 123:13 131:1, 9

**PO** 15:4

**pocket** 104:17 105:1

**portion** 14:23 33:5

**position** 80:25

**potential** 30:23

**practice** 109:16

**prepare** 26:11, 14, 17, 19 107:22 108:4

**prescribed** 76:10 77:6

**prescription** 69:22, 24 70:2, 3

**prescriptions** 69:24 70:11

**present** 26:3 72:25 74:10 77:6

**pressure** 42:4, 9 48:25 50:15 63:24 94:1 97:19

**pretty** 64:10 131:2

**previous** 98:22

**primary** 68:9

**prior** 46:20 71:17 90:25 118:3, 19

**prison** 16:10, 20, 21 19:12, 13 21:9,

11 22:10, 19 23:10, 12

**privacy** 8:15, 16, 25 9:17 10:15, 21, 22 11:10 12:1, 13, 24 13:11 15:15 16:13 17:7 19:8, 17, 22 21:3, 19 22:14, 22 23:14 24:7, 22 25:18 26:7 27:15 28:2, 10 29:4, 17 30:3, 10, 20 43:22 44:3, 11 52:12 53:7 73:12 77:9 100:15 128:20 129:14

**private** 45:8

**privilege** 15:17 17:8 129:9

**privileged** 107:15, 19 108:10 120:5, 7

**probably** 36:6 53:16 54:7 72:1, 16, 18 73:15, 20 98:16 99:1, 5 101:6 104:15 116:9 130:21

**problem** 95:21 115:20

**problems** 32:5 58:10 60:2 61:8 63:12 64:10 93:25 97:20 101:18

**PROCEEDINGS** 5:1

**product** 107:5, 14, 17, 23 108:4

**pronounce** 72:12

**PROPERTIES** 1:7 4:7 49:24

**property** 30:12 54:25 105:15 106:8 108:19, 22 109:21 110:7, 10, 13 111:2, 5, 10, 18, 25 112:5

**proposal** 19:21

**propose** 20:12

**provide** 17:5

**provided** 91:12

**public** 41:9

**pull** 91:19 115:23

**purchase** 91:8

**purchased** 88:7

**purchases** 57:7

**purchasing** 90:25

**Pursuant** 4:5 14:10

**Push** 69:1

**put** 13:25 15:19 25:11 32:14 42:4,

8 48:25 50:15 74:13 115:9

**putting** 81:17

**< Q >**

**QUESTION** 4:20 5:23 8:6 9:14 10:11, 17 11:4, 14 13:23 14:5 15:23 16:17 17:12 18:6, 20 19:25 20:5 21:5, 21 23:2, 17, 19 24:10 25:2 26:21 27:7 28:9 30:6, 15 31:8, 20 32:2, 8, 9, 11 33:11 34:17, 20, 24 35:17 40:24 41:10, 21 44:15 45:16 50:8, 23 51:9, 10 52:15 56:9, 23 58:16 66:15 67:14, 22, 23 68:5 77:8 83:6 86:12 87:16 90:1 91:16 92:6 93:9 94:13, 15 96:4, 5, 9 98:6, 14 99:18 100:8 101:12 104:9 106:11, 16 109:12, 24, 25 110:25 114:2 115:1 117:19 119:23 121:9 122:11 123:3 124:10 126:12 129:1, 22 130:12, 14

**questions** 14:2, 5 15:7 18:11 19:21 26:24 44:17 76:8 107:8, 12, 21 108:15 130:17

**quickly** 123:21

**quite** 92:8 123:16, 21 129:23

**quote-unquote** 126:20

**< R >**

**rail** 60:16

**railing** 60:7, 9

**reach** 60:7

**read** 14:23 15:2, 6 23:4, 5, 18, 20 28:17, 19 29:25 30:6 33:4 46:19 61:11 96:5, 7

**reading** 50:6 93:6, 7, 14

**real** 60:2 94:1

99:22

**realized** 76:7

**Really** 36:15, 18 48:21 69:14 95:24 110:25

**reason** 49:14 51:4, 12 63:19 78:13 106:11 122:3, 13 129:19 130:1

**reasoning** 10:12 11:8 12:21 15:13 16:15 20:25 21:14 22:24 33:13 45:14 79:22 113:7 125:19

**Reasons** 27:5, 9

**recall** 7:20 8:7 46:14, 16, 18 66:1, 3 116:23

**receipt** 105:9, 12, 14

**receipts** 57:6

**received** 45:5

**recess** 49:20 74:19 101:2, 22

**recognize** 59:17

**recollection** 17:19 20:21 22:16, 18 70:1 104:6

**recommend** 91:8

**recommended** 91:15

**record** 5:11, 25 6:6, 11 13:21, 25 23:5, 20 25:12 74:18 77:20 96:2, 7 101:21 107:25 108:4 115:6, 10 132:9

**records** 28:22

**redacted** 45:8

**reflects** 47:5, 18

**refresh** 17:18 20:21 22:18 70:1 104:6

**refrigerator** 85:25 103:21, 24 104:7

**regard** 129:7

**regarding** 24:24 52:14 64:15 107:13, 21 120:9, 21

**related** 30:23 107:8 132:10

**relative** 15:7, 20

**relaxer** 71:4, 10, 12 72:12, 17 76:21

**relaxers** 71:1

**relieve** 96:18

**remain** 25:20, 23

**remember** 43:1 44:23 47:14 50:6, 10 56:5, 12 58:11, 18 60:1 62:4, 5 63:11, 12 65:4, 14, 17 66:10, 20 70:11 71:4, 7, 9 79:10, 18 80:2, 24, 25 83:3 85:24 88:3, 24 92:14 93:6, 13 104:14 105:20 119:1 122:16, 18 130:21

**REMOTE** 1:13 2:1 5:1

**remove** 45:8

**repeat** 5:19 23:3, 17 34:24 41:21 45:18 51:10 67:23 73:25

**repeating** 25:5

**repetitious** 29:2 47:24 51:25 78:18 79:6 82:6 93:22 94:13

**repetitive** 124:20

**replacement** 64:14 72:6

**report** 33:9, 17

**reporter** 5:25 6:6 43:11 73:21, 24 115:2 130:23 131:7 132:3

**resides** 15:1, 3

**responded** 29:3

**response** 5:23

**responses** 6:5

**restaurant** 116:10, 12, 18, 21, 23 117:7, 8, 21 118:1 121:11

**restaurants** 117:5, 10

**restroom** 74:16

**result** 39:4, 20 43:14 119:10

**returning** 69:8

**revealing** 91:15

**review** 15:8

**reviewing** 46:14, 16 50:6, 10

**Rick** 52:17 53:1, 11 54:9

**right** 5:17 15:25 16:3 17:21, 23 18:5 21:19 22:13 29:13 32:8 35:6 36:21, 22 37:17 42:11 49:2, 3, 6 50:14, 16 51:7 60:8, 12 63:15, 17, 20, 21 68:18 69:18

428
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

71:25  72:10, 16
75:13  83:3  85:18
86:21  87:4, 8  88:6,
8  89:23  93:17
95:10  98:3, 11, 25
99:4  105:19
109:17  114:7
119:14  121:2, 3, 13
127:3

**R-i-g-h-t** 52:23

**Rights** 3:9  10:22
11:10  12:1, 25
14:9, 17  15:15
16:13  17:7  19:9,
17  21:3  23:14
24:7, 22  25:18
26:7  27:16  28:3,
10  29:4, 17  30:3,
10, 21  43:22  44:4,
11  52:13  53:7
73:12  77:9  100:15
124:8  128:20
129:14

**ring** 86:20  87:4, 7

**roll** 57:2, 4

**Roughly** 35:3, 5, 6
36:21  98:15

**Rowe** 52:17, 20
53:1, 11  54:10

**R-o-w-e** 52:21

**Rule** 4:6

**ruler** 90:4

**rules** 5:21

**< S >**

**salmon** 57:2, 4

**San** 12:11  15:4
19:12, 13  32:5
40:20, 23

**Santa** 62:3, 8

**saw** 33:1  95:19

**saying** 6:10  29:10
47:15  58:1  82:12
115:3

**says** 14:25  15:1
17:3  28:17, 19
29:20  34:11  35:9
39:18  42:4  45:3
47:3  48:25  52:5, 6
54:22  55:6  56:1
94:8

**sciatic** 36:7  42:21,
22  43:4

**scope** 8:25  9:17,
23  10:13, 22  11:9
12:14, 22  13:9
15:18  16:12  17:9,
25  19:8, 15  21:1,
17  22:11, 21  23:13
24:6, 21  26:7, 23
27:14, 25  28:9

29:4, 15  30:1, 20
35:15  40:18, 25
43:20  44:3, 11
46:22  52:13  53:5
61:22  65:9  71:20
73:13  86:24  88:17
91:4, 5  100:15
117:12  127:12
128:2, 19  129:11

**screen** 7:6  14:9,
12  24:14  25:2, 3
32:14, 21  34:2, 4
42:4  57:14  58:5
60:17, 19, 21  62:22
63:10  69:11, 17
74:21  91:22  92:15
93:1  94:6  101:24
102:8  103:20

**scroll** 16:6  34:10
81:21  82:24
121:21  123:20

**scrolling** 14:22
27:3  33:3  45:2
47:2  77:14  81:15
88:9

**second** 6:18, 20
14:21  64:4, 6
71:11  78:14  94:8
105:21  115:7

**seconds** 62:19
63:6  69:13

**Section** 14:10

**Security** 127:25

**see** 7:6, 8  14:12
20:19  24:18  25:2,
3  27:6, 9  29:23
30:6  32:15, 22
33:18, 21  34:4
42:6, 10  46:7
48:15  55:5  60:21
62:22  63:14  64:5,
9, 17  69:1  75:1
77:19  78:5, 18, 20
80:11  82:14, 23
83:20  84:14, 16
85:10  86:14  87:14
89:5  90:14, 15
91:21  92:23  93:4
99:9  101:6, 18, 19,
24  102:1, 8, 14
103:20, 21  104:1
105:10  113:14
121:23, 24  129:18

**seeing** 16:22
32:20  48:2, 3, 6
57:14  58:5  63:10
64:14  69:17  72:17
81:14, 18  83:1
99:8  102:6, 12, 21

**seen** 8:12  32:23

81:22  99:10

**send** 11:17

**sentence** 21:9, 11
35:9  42:3

**separately** 75:24

**September** 57:3
68:2  111:4, 6, 7, 11
112:5  114:9  116:1,
5  121:3, 11

**Series** 4:18

**serious** 124:8

**serve** 22:10

**served** 12:10

**service** 21:11, 14

**session** 99:3

**sessions** 98:7, 19
99:1

**set** 132:7, 14

**settled** 129:5

**seven** 45:3  47:3
52:5  121:24  127:5,
15, 19

**SHAHRIARI** 2:4,
5  7:22  8:2, 14, 23
9:6, 9, 23  10:7, 11,
21  11:7, 12, 15, 20,
25  12:7, 13, 20
13:8, 17  14:1, 4, 14
15:12  16:12  17:6,
13, 25  18:6, 9, 16
19:5, 15, 20  20:3,
24  21:13, 25  22:5,
11, 21  23:6, 11, 21
24:2, 19  25:16, 22
26:5, 13, 21  27:13,
24  28:7, 25  29:14,
24  30:9, 19  31:6,
12, 16, 22  32:8
33:11, 19  34:15
35:4, 13, 22  36:3,
13, 16  37:1, 5, 12,
20, 25  38:8, 15, 23
39:5, 12, 25  40:7,
11, 17, 24  41:5, 10,
18  42:16  43:15, 19
44:1, 10, 16, 19, 22
45:13, 25  46:8, 21
47:9, 23  50:8, 21
51:8, 16, 24  52:12
53:3, 13, 20  54:2,
11, 19  55:9, 17
56:9, 16, 23  57:18
58:13, 21  59:23
61:5, 18  62:10, 25
64:22  65:7, 19
66:5, 15, 24  67:9,
13, 18  68:5, 20
70:4, 13, 16, 17, 25
71:6, 19  72:13
73:3, 10  74:4, 15
75:4, 20, 25  76:12,

17, 22  77:7, 16, 20
78:10, 16, 22  79:5,
12, 20  80:4, 15
81:4, 14, 23  82:5,
14, 18, 23  83:6, 13,
21  84:7, 25  85:12,
21  86:10, 22  87:6,
15, 25  88:14  89:9,
20, 25  90:17  91:2,
10  92:1, 4, 17  93:8,
20  94:11, 23  95:2,
13, 22, 24, 25  96:19
97:10  98:4, 12, 21
99:14  100:1, 7, 14,
25  101:12, 17
102:3, 24  103:5, 14,
22  104:9, 18  105:2,
5  106:14  107:4, 16,
20, 24  108:1, 5, 7,
14  109:2, 6, 23
110:19  111:20
112:1, 6, 11  113:6,
23  114:15, 24
115:8, 11, 13, 16
116:11  117:1, 12,
18  118:4, 21  120:3,
14  122:5, 17, 25
123:10, 24  124:4, 7,
18  125:2, 7, 14, 18
126:4, 11, 18
127:10  128:2, 5, 14,
18  129:1, 6, 20, 23
130:3, 13, 18, 24
131:7, 9

**shake** 6:4

**share** 57:23

**sharing** 14:8

**shattered** 24:11

**SHAYLER** 1:4, 14
3:2, 9, 11, 16, 17, 19,
21, 23  4:2, 7, 19
5:4, 10, 12, 14  7:1,
6, 10, 16, 20  8:5, 18,
19  9:19  10:4, 9, 19
14:7, 11, 20  16:22
18:4, 13  20:15
21:21  22:5, 9, 19
24:13, 16  25:7, 11
26:11, 16  28:16
30:22  31:7  32:14,
17, 20  34:1, 3, 10
36:20  38:3, 20
46:6, 12, 20  48:3, 5,
6, 12  49:22, 23
50:4, 7, 13  57:15,
17, 23  58:7  59:4,
12, 20  60:17  61:2
62:22  63:4, 14
64:1  67:5  68:17
69:17  73:24  74:21
75:1  77:15  78:2,

25  80:10, 22  81:1,
7, 10  83:18  84:6,
15, 18, 23  85:6, 9,
15, 18, 24  86:4, 8,
20  87:12, 20, 22
88:9  89:1, 4, 8, 16,
18  90:8, 11, 13
91:11, 22  92:10
93:1, 5, 17  94:6, 20
95:5, 11, 19  96:10
98:2  99:13, 25
100:6, 21  101:8, 15,
24  102:2, 6, 20
103:2, 11, 20  104:5,
16  105:9, 15  106:3
114:3, 7, 19  115:10,
19  118:9  119:22
120:12  121:15, 16,
20  122:1, 10
123:20  124:16
125:1, 6, 12, 24
126:2  129:17
131:4  132:6

**S-h-a-y-l-e-r** 5:13

**Shayler's** 12:24
19:8, 16  21:3, 19
22:13, 22  23:13
24:7, 22  25:17
27:15  28:2, 10
29:4, 17  30:3, 10,
20  43:21  44:3, 11

**Sheriff** 3:12  24:17

**shop** 130:15

**shopping** 123:17

**Shorthand** 132:3

**show** 7:2, 3  13:20
24:13  32:13  34:2
48:1  49:12, 22
57:9  59:12  62:17
63:4  64:1  78:14
99:7  101:10
121:15

**showed** 45:22
58:12  96:10

**showing** 20:16
94:7

**shown** 11:13
58:19  59:17, 21

**shows** 25:12, 13
28:20  90:13
102:13  104:16
123:22

**sic** 71:12

**side** 37:18, 21
61:4  80:11  109:22,
24  110:4, 18
111:14, 15, 16
112:10, 25  113:4,
17, 21  114:10, 12,
13

sidewalk 58:8
59:21 101:9
102:10
signature 46:5, 12
48:14, 17, 18 50:4
signing 46:20
single 19:25 109:4
sir 6:2, 20 17:2
56:19 65:25
slope 75:14 79:7,
10 80:19 83:3
small 86:17
smaller 60:18
Social 127:25
somebody's 116:16
soon 115:1
Sorry 6:23 14:21
17:13 25:5 36:16
40:2, 9 46:15
54:13 56:7, 8 59:6
93:3 116:2
sort 79:3
sound 99:12, 15, 19
sounds 99:16
Source 3:15 32:16
45:5, 11 47:5, 18
space 79:11
102:18 108:21
109:1, 4, 20 110:12
111:13 113:1
spaces 108:24
speak 115:5
speaking 115:5
speaks 14:15
25:17 29:25 33:20
46:9 47:10 50:23
68:22 123:25
specific 31:20
37:24 68:2 104:8
105:20, 23 106:7
109:8 110:6 111:4
speculate 77:18, 19
78:5 85:10, 12
86:13
speculation 7:23
10:1, 12 12:22
15:15 18:21 21:15
37:8 42:18 46:1
51:9, 19 52:2 54:4
61:6, 19 62:12
64:23 65:8 66:7
78:18 81:25 86:13
126:13, 19 127:11
speech 124:16
speed 37:13
spell 5:10 43:10
52:20, 22 65:2
71:13
spend 122:23
123:1

spending 52:9
spicy 57:1, 4
Spine 3:14 32:15
42:20 45:4, 11
47:4, 17
spot 109:13
staff 64:24
stage 17:15
stairs 33:8 94:17,
20 95:12, 14 96:11
standard 130:22
standing 83:19
stands 49:16
start 21:10 53:11,
14, 25 54:3 72:8,
11 92:10 98:10, 13
102:13
started 29:21
71:24 72:1, 9, 16,
17
state 5:10 15:11
22:10 128:8 132:4
stated 29:20 51:14
Statement 3:15
20:7 32:16 45:5,
12 47:5, 8, 18, 20
50:17 55:8
statements 33:10
STATES 1:1
statutory 109:10
stay 123:16
steep 112:23
113:13
step 84:20
steps 59:20 61:9
stern 107:11
stills 58:12, 19
74:22, 23
stipulating 130:20
stipulation 130:22
stoop 33:7
stop 14:7
stopped 55:4, 13
122:3
store 59:3, 13, 17,
18, 22 101:9
strange 48:2
Street 2:6 62:4, 5
Strike 11:1 21:10
27:17 29:18 34:18
54:5 55:18 67:20
110:21 117:14
126:6
strip 77:21
struck 57:18
stuff 17:17 69:3, 7
131:2
Su 64:25 65:2, 6,
14 67:7, 17 68:4
S-u 65:3

subject 8:6 19:22
25:18 129:9
successful 91:20
sued 125:1, 6, 11,
16
suffer 119:10
suing 79:18
Summary 3:19, 23
48:4
Sunset 117:22
118:2, 14
Support 3:18, 22
4:3 48:4
supposed 7:2
82:15
sure 5:21 8:3
18:24 44:6 60:10,
13, 16 68:16 70:9
71:24 72:19 87:13
89:12 90:2, 4
96:23 103:8, 17
104:3, 21 118:1, 25
126:23
surgeries 67:7
72:4
surgery 16:1, 2
17:20, 23 18:25
19:2, 4 20:22
21:12 23:9 24:1
49:6, 9 50:18
64:16, 17, 19, 21
65:18 66:4, 8, 13,
20, 23 67:17 68:4,
10 71:25 72:1, 3, 5
73:15, 16
surveillance 77:24
Su's 65:4
Sushi 52:8 54:9,
17, 23, 24 55:2, 7,
16, 25 56:2, 5, 12,
13 116:8, 15, 18, 20,
22, 25 117:7, 8, 9,
10, 11, 20 118:3, 5,
20, 23 119:1, 4, 17
120:13, 16, 20, 22
121:4, 11
sworn 5:5 132:8

< T >
take 21:12 49:13,
16 66:4 69:10
72:17 73:9 74:15
76:14 83:11
100:25 108:7
120:20, 24 121:21
taken 5:15 7:12,
21 8:7, 10 62:7
71:17 74:3, 8, 22
88:13 91:23
takes 48:13

talk 68:2 87:13
talked 59:6 114:22
talking 28:14, 15,
21 67:8, 11 69:4
72:3, 22 81:17
85:22 88:20, 23
89:6, 8, 13 98:22,
23, 25 106:6 115:3
taped 119:20
Task 3:12 24:16
25:8 29:11 30:17
T-bone 37:13, 16
39:4
T-boned 38:3, 6,
21 39:1
T-boning 37:19
tea 104:15, 25
technical 101:18
telephone 75:21
tell 61:2 75:12, 15
78:2, 4 80:13
84:17 85:2 90:4,
24 124:22 128:23
ten 22:10 23:9
35:24 36:1 95:9,
10 127:7 129:18
130:2, 4
tend 6:4
teriyaki 57:3
term 12:19 27:14
37:6 40:8 43:16
53:4 54:12 70:14
95:14 98:5, 13
113:7 118:23
123:1 126:5
testified 5:6 103:3
testify 6:15
testimony 20:25
24:4, 8 30:25 38:9,
17 41:19 44:2
45:14 51:18 52:2
55:11 67:12 70:5,
21 71:22 72:14
75:21 76:4, 23
89:10 95:23 96:20
103:6 113:24
114:16 120:15
122:6, 7 129:21
130:4, 7 132:8, 9
Thank 6:3 10:19
17:2 21:9 24:13
32:23 33:17 34:1
35:8 43:13 45:2
48:8, 20 65:25
71:15 72:24 75:8
88:9 108:1 110:6
121:13 131:4, 6
Thanks 108:1
therapy 98:3, 8, 10,
19 99:3

thing 6:3 45:12
90:3 113:20, 25
things 31:1 86:17
123:18
think 7:7 13:3
20:9, 10 29:21
31:7 32:10 48:23
51:1 55:3 56:1
59:2 60:15, 18
63:4 66:10 69:23
85:11, 19 102:12
105:13, 14 110:25
114:22, 25 124:9
127:17
third 14:21
thought 40:11
60:6, 7 112:24
129:24
thousand 8:12
three 13:4 21:24
43:7 56:1 69:22
70:2, 3 105:16
117:4
Tiguan 39:2, 11
102:14 111:17, 24
112:4
time 12:10 16:1
17:18 18:2 20:13
26:3 33:1, 9 34:25
35:24 36:6 40:23
45:19 52:9 54:5
56:2 58:1 59:23
60:19 62:18 63:6
64:3 69:12 71:8
74:9 77:6 80:5
82:15 86:23 88:12
90:19 91:5 98:6
108:7 109:4, 8
115:3 117:20
119:9 122:23
123:1 127:3, 14, 21
130:16
times 28:19 55:24
56:1 105:16 116:4,
7, 24 117:4
timestamp 99:9
101:25 102:7
tiny 93:16
today 25:21 39:10
127:16
told 107:21
tool 81:19
top 16:7
total 39:3 63:17
town 19:4
transcript 131:8
132:8
traveling 52:8
treating 17:14
treatment 17:5

www.trustpoint.one
www.aldersonreporting.com
436
800.FOR.DEPO
(800.367.3376)

Trustpoint.One   Alderson.

tried  6:24  32:11
131:1
tripped  112:23
113:14  119:8
trouble  54:24
84:20
truck  42:1, 2
84:16  102:13
true  28:6  33:10
45:4  47:8, 13
132:9
try  5:23  7:3
32:13  57:23  63:21
72:12  99:7
trying  6:11  22:18
29:21  64:17  91:19
93:3  115:11
121:13
tuna  57:2, 4
turn  56:7  101:16
Twist  33:7
two  21:23  30:18
40:14  52:7, 11
53:23  55:21  58:11,
19  73:15  83:4, 16,
23  84:3  100:19
103:3, 7, 8  104:20
117:4
two-inch  119:7
type  27:21  37:11
typed  28:5
types  56:12
typo  51:20, 22, 23

< U >

uh-huh  6:5  16:9
58:24  71:16
ulnar  24:12
unacceptable  20:4
understand  6:1, 7,
12, 14  13:1  15:22
21:21  26:16, 19
33:14  34:20  35:15
38:11  40:13  45:17
47:12  50:25  61:24
67:21  70:7  89:25
93:24  94:14  99:16
106:18  109:12
110:22  114:2
117:19  122:10
123:13  125:23
130:13
understanding
51:4, 12, 23  127:18
unduly  9:10  10:24
16:14  19:19  30:4,
13  31:2, 18  38:9
96:22  128:21
unintelligible
15:14  16:14  18:21
19:7  21:16  23:12

24:5  25:23  28:8
29:2  33:12  34:17
35:14  36:3, 14
37:21  38:16  39:13
40:19  41:2  42:17
46:1, 23  50:22
51:16  54:3  57:19
58:14, 22  59:24
65:9  66:6  67:11
68:6, 21  70:5  71:7
76:1  77:7  79:13
80:16  81:24  82:6
83:7, 14  84:9
86:11  88:2, 15
89:21  91:3  92:5,
21  93:10  94:12
96:21  100:8
103:15, 23  106:15
109:3  110:2, 20
113:10, 24  122:7,
19  123:2, 25
125:21  129:12
130:6
UNITED  1:1
unmuted  101:19
unreasonable  18:22
untrue  55:8
upper  61:4  97:25
USC  14:10
use  16:2, 3  34:11
35:10, 12, 18, 20, 25
36:5, 8, 24  39:19
48:22  59:4  60:7, 9,
16  63:16, 17, 18, 19,
21, 22, 23  72:6
75:24  76:2  83:23
84:3  86:16  109:18
110:9  111:8

< V >

vague  7:23  8:23,
25  9:9, 15  11:8
12:15  13:2, 8, 17
15:13  17:10  18:1,
20  19:5, 6, 17, 23
20:25  21:13, 15
22:14, 24  23:11
24:2, 4  25:22  26:5,
13, 22  27:13, 14, 24
28:7  29:1  30:4, 12
34:15  35:13  36:4,
14  37:1, 5, 20
38:10, 15  39:5, 12,
25  40:7, 17  41:1,
11, 18  42:17  43:15
45:15  46:2, 21, 23
47:10  50:9, 21
51:9, 17, 25  52:16
53:3, 13, 20  54:2,
11  55:10  56:17, 24
57:18  58:13, 21

59:23, 24  61:6, 19
64:23  65:20  66:5,
16, 25  67:10, 18
68:6, 20  70:5, 13
71:6, 8, 19  72:14
73:11  75:5, 25
76:12, 17, 23  77:8,
16  79:5, 14, 20
80:4, 5, 15  81:23
82:5  83:7, 13, 22
84:7  85:1, 21
86:12, 22, 23  88:1,
14  89:10, 21  90:18,
19  91:2, 4  92:1, 4,
17, 20  93:20  94:11
95:13  97:10  98:4,
6, 12, 21  99:14
103:7, 15, 22  105:2
106:15  109:2, 7, 23,
25  110:19  111:20
113:8, 23  114:16
118:21, 22  122:7,
17, 25  123:10
124:19  125:20
126:4, 11, 19
127:14  128:18
129:12  130:5
vehicle  16:11
37:19  38:3, 6, 21,
25  39:1, 3, 11  75:1
78:8  102:17  112:9,
16, 21  113:3, 16, 19
114:10, 13
versus  3:10, 11, 19,
23  4:7  14:11
24:16  25:7  34:3
48:5  49:23  122:1
Video  4:8, 10, 12,
13, 14, 15, 16, 17
16:25  57:9, 17, 24
61:3  62:7, 11, 17
63:5  64:2  69:11
74:22  75:8, 9, 13,
16  77:24  84:19
91:22, 25  92:15
93:5, 18  94:3, 7, 8,
10  96:10  99:7, 8,
10, 12  101:25
102:2, 6, 12, 13, 21
103:2, 20  104:5, 16
105:4
videos  94:5
view  102:14
Vine  2:6
violates  12:24
violations  30:11
visit  47:7, 19  52:8
53:1, 19  119:11
120:13  122:2
visited  54:23  55:1,
6, 14  56:2  59:18

105:15  111:5
129:18
visiting  53:11, 14,
25  54:3  64:12
visits  120:15, 21
121:24
Volkswagen  39:2,
11
vs  1:6

< W >

wait  6:19  14:2, 5
49:15  71:10
108:14  129:1
waited  15:25
waiting  115:4
waive  18:13
waiving  18:18
walk  34:12, 14
35:2  48:23  59:20,
25  72:6  95:11
walked  70:1, 8
96:11  97:2
walker  35:10, 12,
18, 20  36:1, 5, 9, 12,
24  72:6, 7  106:1
110:9  111:8
walking  58:10
103:11  104:1
want  11:15  15:5
82:19  83:24  87:13
131:7
wanted  5:21  8:3
15:6  17:18  68:9
88:5
waste  20:13
watch  87:5, 8
watching  91:24
105:5
way  15:11  132:12
wean  73:8
weaned  73:16  74:9
wear  86:20
wearing  78:6  87:4
well  35:11  60:6
62:14  99:22
127:17  129:23
went  31:17  81:13
106:9, 10, 21  110:7
116:12  130:4
we're  7:1  46:4
91:24  93:5  94:3
98:25  101:15
102:21  105:4
115:3
West  15:3
Westwood  9:5
10:6, 10
we've  31:22  45:21
48:20  81:22  99:10

WHEREOF  132:14
wire  77:23, 25
withdrawing  18:4
WITNESS  3:2
6:23  13:3, 24  14:3
15:24  17:14  18:11,
18, 24  22:7, 15
23:7, 22  26:9  27:1,
19  31:9  32:4
33:15, 21  34:21
35:5, 17  36:5  37:9,
13  38:12  39:7, 15
40:14, 20  41:4, 15,
21  42:19  43:23
44:6, 14, 18, 20, 25
45:18  46:10, 25
47:13  50:10  51:2,
10, 20  52:3, 17
53:8, 16, 23  54:7,
15, 20  55:12, 20
56:19  57:1, 20
58:16, 23  60:1
61:8, 25  63:2  64:9,
25  65:11, 21  66:8,
17  67:1, 23  68:8,
23  70:8, 22  71:1, 9,
24  72:16  73:14
74:6  75:6, 22  76:5,
14, 19  77:1, 12, 18
78:11, 19  79:7, 16
80:7, 19  82:1  83:9,
16, 23  84:12  85:2
86:15  87:1, 7, 17
88:3, 20  89:12
90:2, 21  91:6, 17
92:3, 7, 23  93:13,
25  94:16  95:16
96:23  97:14  98:7,
15  99:1, 5, 19
100:10, 18  103:8,
17  104:1, 11, 20
105:6  106:19
108:12, 16  109:13
110:4, 23  111:22
112:2, 7, 13  113:11
114:17  117:4, 20
118:25  122:12, 20
123:6, 14  124:13,
22  125:9, 25  126:7,
14, 23  128:4, 8, 23
130:15  132:6, 9, 14
word  26:16, 19
27:25
worded  55:12
words  17:3  27:5,
8  28:5  100:5
work  9:8, 10
16:21  29:11  40:6,
8, 16  65:6  68:10
94:5  107:5, 14, 17,

Trustpoint.One    Alderson®

www.trustpoint.one
www.aldersonreporting.com

155

800.FOR.DEPO
(800.367.3376)

*23* 108:*4* 127:*1, 2, 6*

**worked** 9:*19* 41:*8* 126:2 127:*3, 19, 21*
**working** 83:*19*
**works** 65:*11, 15*
**worries** 7:*1*
**Wright** 52:*18, 22* 53:*19, 25* 54:*18*
**W-r-i-g-h-t** 52:*25*
**write** 106:*23* 107:*2, 3*
**wrong** 16:*3* 55:*13* 64:*17* 68:*10* 85:*20* 89:*24*
**wrongly** 51:*14*
**wrote** 106:*20*

**< X >**
**Xray** 68:*13*
**Xrays** 68:*9, 16*

**< Y >**
**Yacoub** 3:*24* 48:*5*
**Y-a-c-o-u-b** 48:*5*
**yard** 16:*18, 19*
**Yashar** 43:*7, 10, 12*
**Y-a-s-h-a-r** 43:*12*
**yeah** 47:*13*
**year** 5:*18* 16:*1* 21:*23* 33:2 40:*1* 66:*10* 72:*1* 73:*19* 90:*24* 106:*13* 116:*6, 7*
**years** 7:*13* 13:*4, 24* 19:*3* 21:*24* 22:*7, 9, 10, 19* 23:*9, 22* 39:*21, 23* 40:*14* 41:*25* 66:*11* 73:*15* 98:*15, 16, 17, 20* 99:*5* 127:*5, 7, 16, 19*

**< Z >**
**Zoom** 7:*3*

Trustpoint.One | Alderson.

www.trustpoint.one
www.aldersonreporting.com

800.FOR.DEPO
(800.367.3376)

# Exhibit 34

FULL NAME:

James Shayler

COMMITTED NAME (if different)

Same

FULL ADDRESS INCLUDING NAME OF INSTITUTION
California men's Colony-West
P.O. Box 8103
San Luis Obispo, Ca. 93403

PRISON NUMBER (if applicable)

T-85844

EXHIBIT

SHAYLER 2

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

James Shayler

PLAINTIFF ,

v.

Dr. Onglao, Chief medical Officer
Dr. Greenman, mar hcv sub-committee
, Dr. Perry,

DEFENDANT(S).

CASE No. CV **06- 8047**

(To be supplied by the Clerk)

CIVIL RIGHTS COMPLAINT
PURSUANT TO (check one)

☒ 42 U.S.C. § 1983
or
☐ Bivens v. Six Unknown Agents
403 U.S. 388 (1971);

## A. PREVIOUS LAWSUITS

1)   Have you brought any other lawsuits in a federal court while a prisoner:  ☐ Yes   ☒ No

2)   If your answer to 1 is yes, how many? _____ Describe the lawsuit in the space below.   (If there
     is more than one lawsuit, describe the additional lawsuits on an attached piece of paper using the
     same outline:)

RECEIVED AND
CLERK U.S. DISTRICT COURT
JAN 25 2007
CENTRAL DISTRICT OF CALIFORNIA
BY

10:17AM
RECEIVED
CLERK, U.S. DISTRICT COURT
DEC 7
CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

CLERK, U.S. DISTRICT COURT
DEC 18 2006
CENTRAL DISTRICT OF CALIFORNIA
BY

DOCKETED ON CM
JAN 3 1 2007
BY:                067

Page 1 of 6

a.    Parties to this previous lawsuit:

Plaintiff _____

_____

Defendants _____

_____

b.    Court _____

c.    Docket or case number _____

d.    Name of judge to whom case was assigned _____

e.    Disposition (For example: Was the case dismissed? If so, what was the basis for dismissal? Was it appealed? Is it still pending?)

_____

f.    Issues raised: _____

_____

_____

g.    Approximate date of filing lawsuit _____

h.    Approximate date of disposition _____

## B. EXHAUSTION OF ADMINISTRATIVE REMEDIES

1)    Is there a grievance procedure available at the institution where the events relating to your current complaint occurred?    ☒ Yes    ☐ No

2)    Have you filed a grievance concerning the facts relating to your current complaint?

☒ Yes    ☐ No

If your answer is no, explain why not _____

_____

_____

3)    Is the grievance procedure completed?    ☒ Yes    ☐ No

Page 2 of 6

If your answer is no, explain why not _____

_____    _____

4) Please attach copies of papers related to the grievance procedure. Log # CMC-W-06-1573

## C. JURISDICTION

This complaint alleges that the civil rights of plaintiff __James Shayler__
                                                          (print plaintiff's name)

who presently resides at __California men's Colony-West_____, were violated
                          (mailing address or place of confinement)

by the actions of the defendant(s) named below, which actions were directed against plaintiff at_____
California men's Colony-West
_____
                    (institution/city where violation occurred)

on (date or dates) __April to Aug. 2006__, _____, _____.
                          (Claim I)              (Claim II)        (Claim III)

(You need not name more than one defendant or allege more than one claim; however, make a copy of this page to provide the information below
if you are naming more than five (5) defendants.)

1) Defendant __Doctor Onglao_____ resides or works at
              (full name of first defendant)

West medical Clinic at California men's Colony-West P.O. Box 8103, San Luis Obispo,
_____
              (full address of first defendant)
                                                      Ca. 93403
Doctor Onglao is the Plaintiff's primary care provider (CPC)
              (defendant's position and title, if any)

The defendant is sued in his/her:    ☑ individual   ☒ official capacity. (Check one or both).

Explain how this defendant was acting under color of law:

Doctor Onglao was acting under the color of law, in the course of and scope of his
_____

employment with California Dept. of Corrections as a doctor.
_____

2) Defendant __Chief medical Officer Doctor Greenman_____ resides or works at
              (full name of second defendant)

East medical Hospital at California men's Colony P.O. Box 8101
_____, and is employed as
              (full address of second defendant)     San Luis Obispo, Ca. 93403

Chief medical Officer for California men's Colony Hospital_____.
              (defendant's position and title, if any)

The defendant is sued in his/her:   ☒ individual   ☒ official capacity. (Check one or both.)

Explain how this defendant was acting under color of law:

Doctor Greenman was acting under the color of law, in the course of and scope of
_____

her employment with California Dept. of Corrections as Chief medical Officer
_____

Page 3 of 6

3) Defendant __MAR HCV Sub-C__ ttee (Dr. mission) _____ resides or works at
   (full name of third defendant)

__East medical Hospital at California men's Colony_____, and is employed as
   (full address of third defendant)

__Dr. mission is on mar hcv sub-Committee, and is in charge of treatment of Hepatitis C with__
                                                                                                    Interferon
   (defendant's position and title, if any)


The defendant is sued in his/her:  ☒ individual   ☒ official capacity. (Check one or both.)

Explain how this defendant was acting under color of law:

   __Dr. mission was acting under the color of law, in the course of and scope of his__

   __employment with California Dept. of Corrections as a Doctor__


4) Defendant __Doctor Perry_____ resides or works at
   (full name of fourth defendant)

__Doctor Perry is a Doctor at West Medical Clinic_____, and is employed as
   (full address of fourth defendant)

__Doctor Perry is the Doctor who heard the Appeal_____.
   (defendant's position and title, if any)


The defendant is sued in his/her:  ☒ individual   ☒ official capacity. (Check one or both.)

Explain how this defendant was acting under color of law:

   __Dr. Perry was acting under the color of law, in the course of and scope of his__

   __employment with california Dept. of Corrections as a Doctor__


5) Defendant _____ resides or works at
   (full name of fifth defendant)

_____, and is employed as
   (full address of fifth defendant)

_____.
   (defendant's position and title, if any)


The defendant is sued in his/her:  ☐ individual   ☐ official capacity. (Check one or both.)

Explain how this defendant was acting under color of law:

_____


Page 4 of 6

## E. CLAIMS*

### CLAIM I

The following civil right has been violated:

Civil Right Violation amendment 8

" Deliberate Differenence " to a serious medical need

( see Complaint and Claim for relief )

Supporting Facts: [Include all facts you consider important. State the facts clearly, in your own words, and without citing legal authority or argument. Be certain you describe, in separately numbered paragraphs, exactly what each DEFENDANT (by name) did to violate your right.]

*If there is more than one claim, describe the additional claim(s) on another attached piece of paper using the same outline.

( see Complaint and Claim for relief )

PAGE 5 OF 6

CIVIL RIGHTS COMPLAINT FORM

438

## F. REQUEST FOR RELIEF

I believe that I am entitled to the following specific relief:

( see Complaint and claim for relief )

_____

12/01/06
(Date)

James Shayh
(Signature of Plaintiff)

Page 6 of 6

```
1   James Shayler
    T-85844    31-02 Low
2   California Men's Colony-West
    P.O. Box 8103
3   San Luis Obispo, Ca. 93403

4   In Pro Per

5

6                    UNITED STATES DISTRICT COURT
                     CENTRAL DISTRICT, EASTERN DIVISION
7

8   JAMES SHAYLER,              )        CASE NO.
              Plaintiff,        )
9                               )        COMPLAINT AND CLAIM FOR RELIEF
                                )
    -vs-                        )
10                              )
                                )
11  DR. ONGLAO, DR. PERRY       )
    DR. MISSION, DR. GREENMAN,  )
12            defendants,       )
                                )
13  _____  )

14

15                        GENERAL   ALLEGATIONS

16

17  1.  This is a complaint for damages for defendants's " deliberate indifference to a

18      serious medical need of plaintiff, James Shayler during his confinement by the

19      California Department of Corrections (CDC) at California Men's Colony-West (CMC).

20      This is a claim for damages and injunctive relief brough under 42 U.S.C. § 1983

21      against prison Physicians  officals for violations of plaintiff rights to be free

22      from cruel and unusual punishment as protected by the Eight Amendment of the United

23      States Consitution.

24  2.  This action arises under 42 U.S.C. § 1983, and jurisdiction is based upon 28 U.S.C.

25      § 1331 and 1343.

26  3.  All of the conduct giving rise to the claims alleged herein arose in San Luis Obispo

27      County. California. Therfore, venue is proper under 28 U.S.C. § 1391(b)(2).

28
```

4.  Plaintiff is and at all relevant times mentioned herein an inmate in the custody,
    control, and care of CDC employees at California Men's Colony. Plaintiff has been
    an inmate at California Men's Colony since 2003. At all times during his incarceration
    plaintiff has relied on the medical care providers at CDC prisons to provide him
    with the necessary medical care.

5.  Plaintiff is informed and believes, and thereon alleges, that defendant Doctor
    Greenman, M.D. was during the time relevant herein employed by CDC as the Chief
    Medical Officer (CMO) at California Men's Colony. Plaintiff is further informed
    and believes, and thereon alleges, that defendant Dr. Greenman is a properly trained
    and licensed medical doctor who was responsible for the medical care of all inmates
    at California Men's Colony . This included, but was not limited to, the supervision,
    direction, and/or proper training of the medical staff at CMC in the delivery of health
    care services and the management of health care programs; involvement in the determination
    of proper medical care for inmates, including, but not limited to, having authority to
    order and approve medical treatments to be done; having authority to assure that
    inmates receive continuing proper medical care; having authority and responsibility
    for assuring the proper ordering and stocking of medical supplies; communication
    of medical needs to the correctional custody staff, and, generally, making sure
    that proper medical treatment is provided to all inmates. Plaintiff is further
    informed and believes, and theron alleges, that defendant. Dr. Greenman, was
    responsible for assuring that CMC medical staff, and all other medical providers
    whom CDC contracted in providing medical care to inmates at CMC, provided proper
    medical care to the inmates, and that all such individuals knew and understood,
    and acted pursuant to CDC policy. At all times mentioned defendant, Dr. Greenman,
    was acting under color of state law,in the course and scope of his employment, and
    is sued herein in his offcial and individual capacities.

6.  Defendant, Dr. Onglao, is and at all times relevant herein was employed by the CDC
    as a licensed medical doctor at CMC. Plaintiff is informed and believes, and thereon

1   Dr. Onglao sent to plaintiff, the request back, along with a copy of his liver biopsy

2   and a inmate request for interview. The request stated ( your liver biopsy showed a

3   2/4 stage that MEAN NO TREATMENT at this time. Also, once paroled CDC is not responsible

4   for your health care anymore, only when you are inside ) (see exhibit A ) ( liver biopsy )

5   and (see exhibit B) ( Inmate request from Dr. Onglao stating NO TREATMENT at stage 2 ,

6   and EXCLUSION CRITERIA checklist dated 2003 ).

7   Under "Deliberate Indifference" to a serious medical need, Dr. Onglao, REFUSAL of treatment

8   for Hepatitis C at stage 2, shows a level of culpability equal to criminal law definition

9   of Recklessness, that is, Dr. Ongalo was aware that the reasons he gave for refusal of

10  treatment, were against California Department of Corrections own policies of treatment

11  in CDC Hepatitis C Clinical Management Program. In CDC Hepatitis C Clinical Management

12  Program on page 4 under C. Phase III: ( Staging by Liver Biopsy and Combination Therapy)

13  (number 9) states as follow: inmate-patients whose liver biopsy results are consistent

14  with stage 2-3 fibrosis, or greater and who otherwise meet inclusion criteria will be

15  offered Combination Therapy. Dr. Onglao, refusal of treatment at stage 2, is against

16  CDC own policy of treating Hepatitis C. (see exhibit C) copy of CDC Hepatitis C Clinical

17  Management Program. The Plaintiff wrote the Division of Correctional Health Care Services

18  in Sacramento regarding the meaning of stage 2-3. The plaintiff got back a letter dated

19  Nov. 15, 2006, from the Division of Correctional Health Care Services. In the letter

20  they stated that stage 2-3, means that stage 2 through stage 3 or greater should be

21  offered combination therapy. (see exhibit D ) copy of letter from Division of Correctional

22  Health Care Services in Sacramento. This shows that the plaintiff should recieved treatment

23  at stage 2, and that Dr. Onglao did know that serious harm exists and did draw the inference

24  by refusing treatment and was recklesness in his judgement to hold treatmnet.

25  10. First, when plaintiff asked to be refered to MAR HCV sub-committee, Dr. Onglao should

26  of refered the plaintiff's medical case to the Sub-committee, under CDC's own policy.

27  Under CDC Hepatitis C Clinical Management Program, Page 3. Phase III (number 12) states

28  as follow: If there are questions of eligibility regarding liver biopsy or combination

1   therapy, the PCP, or doctor, working through the MAR HCV Sub-committee, may submit

2   a request for consideration for review and decision to the Health Care Review Sub-

3   committee. Dr. Onglao, did know that serious harm existed and did draw the inference

4   by refusing the plaintiff a request to the MAR HCV Sub-committee, Dr. Ongalo showed

5   recklessness in his judgement to refuse a request.

6   11. Plaintiff, sent another inmate request telling Dr. Onglao that he believes he meets

7   all guidelines for treatment form California State Department of Health Serivces, Dr.

8   Onglao sent back the request along with CDC Hepatitis C Clinical Management Program

9   EXCLUSION CRITERIA checklist (Dated 2003), this was a outdated exclusion criteria

10  checklist, and had been updated and changed in 2004 . Dr. Ongalo refused treatment

11  under a OLD criteria (serially normal ALT or ALT less than twice normal on 3 consecutive

12  tests at least one month apart) Dr. Onglao had to known that this Exclusion criteria was

13  old criteria (dated 2003) and had been revised both in 2004 and 2005. Being that Dr. Onglao

14  was treating inmate-patients for hepatitis C. Under the revised Hepatitis C Clinical

15  Management Program, Dated 2004, and 2005, Page 2 Phase II (number 8) states as follow:

16  Inmates-patients 45 years old or younger with ALT levels elevated to less than two (2)

17  times normal laboratory values for all three (3) consecutive ALT tests performed as

18  reqired in Phase II, are not elegible for combination therapy. (see exhibit B ) outdated

19  exclusion criteria checklist see date. The plaintiff is 51 years old, not 45 years old.

20  12.  In the plaintiff's medical records dated 1/30/06, the plaintiff medical files regarding

21  Hepatitis C treatment was reviewed by Department Head at east Medical Hosital, Dr. Araya

22  is also on MAR HCV Sub-committee. In his review of the plaintiff case, Dr. Araya O.K.ed

23  liver biopsy, and states in medical records that if liver biopsy come back equal to

24  or greater then ( ≥ ) stage 2 , he recommends treatment. Yet Dr. Onglao refused me

25  treatment against his own Department Head, and a supervising Doctor on the MAR HCV

27  sub-committee. This shows a level of culpability equal to the criminal law definition

28  of recklessness, that is Dr. Onglao, was aware of the facts from which the inflerence

1    could be drawn that a substantial risk of serious harm exists, and he also

2    cause the inference. ( U.S.C. A. Counst. Amend 8 )  Sentencing and Punishment 1533

3    West Fed. Practice Digest 4th. ( Beander v. Regier) 385 F. 3d. 1133 ( Farmer v. Brennan)

4    128 L. Ed. 2d. 811 (1994) .  (see exhibit E ) copy of medical records from Dr. Araya

5    recommending treatment at equal to or greater then stage 2.

6   13. The plaintiff, went to see Dr. Onglao and showed him a letter from Cedar-Sinal Medical

7    Center, from the Chairman of the Pathology and laboratory Department. The plaintiff had

8    sent a copy of liver biopsy and medical records to the Pathology Department. In the

9    letter from Dr. Geller M.D. ,he states that the perference is to use whole numbers

10    wherever possible in a liver biopsy, he states that occasionally a score of 2-3 will

11    be used ONLY when a liver biopsy finding is not entirely clear. In the letter the

12    Chairman, Dr. Geller M.D. states that a individual with a stage 2 should get treatment

13    to try and control the progression of the heaptitis C . Dr. Onglao had tryed to state

14    that stage 2-3 in CDC hepatitis C Clinical Management progam, means a patient has to

15    be at a stage in between 2 and 3. I shows him, were Dr. Geller, had stated that a

16    score of 2-3, is ONLY use when a liver biopsy finding is not entirely clear, and  would

17    be used a guideline. Dr. Onglao, still refused me treatment against the recommendation

18    of a liver specialist. (see exhibit F ) Letters from Liver Specialists recommended

19   Treatment at stage 2, and with the amount of scarring on liver biopsy.

20   14. The Plaintiff, sent his medical records, along with his liver biopsy to a number

21    Medical Liver Centers in the Country. The plaintiff recieved two letters from two

22    of the Country Top Liver Centers.  The first one was from Yale University Liver Center

23    from the Director James Boyer, M.D. The letter states in general most medical opiniions

24    would indicate that patients with stage 2 disease should be treated, particularty if

25    they have genotpye 2 since there is an 80% chance of eradicating the virus and preventing

26    progression of disease. I would certainly recommend that you undergo twenty-four weeks

27    of therapy with Pegylated interferon and ribavirin.

28   The second letter was from Johns Hopkins University, Division of Infectious Diseases.

1　" Division Chief Mr. David Thomas M.D. states that with the <u>amount of scarring</u>

2　<u>on liver biopsy is enough to seriously consider treatment</u>. I sent both letters

3　to all defendants, Dr. Onglao, Dr. Perry, Dr. Mission, Dr. Greenman who is the CMO.

4　Yet all the defendants still refused to treatment me against three (3) of the Country

5　Top Liver Specialist recommendations for treatment at stage 2 and with amount of scarring

6　on liver biopsy. In the United States District Court for the Northern District of

7　California in(Marciano Plata v. Arnold Schwarzenegger) Judge Thelton Henderson in the

8　( Finding of Fact and Conclusion of Law REAPPOINTMENT OF RECEIVER) on page 24 under

9　(13) Specialty Services that <u>even when patients do see a specialty consultant, medcial</u>

10　<u>staff often do not follow-up on the specialist's recommendations</u>.

11　A state prisoner who tested postive for hepatitis C has a serious medical need for

12　prompt interferon treatment, as would support prisoners Eight Amendment claim, where

13　the physician opined that he would give interferon treatment to a patient in the

14　same hepatitis C stage as the prisoner. (U.S.C.A. Const. Ament. 8) Sentencing and

15　Punishment 1546 West Fed. Practice Digest 4th. ( Bender v. Regier) 385 F. 3d 1133.

16　In ( Hunt, 199 F. 3d at 1224) states that when a patient is diagnosed by a phyician

17　mandating treatment, and NO treatment is given, amounts to " deliberate indifference".

18　The plaintiff had the Department Head, and a Phyician on the MAR HCV Sub-committee,

19　Dr. Araya recommending treatment equeal to or greater then stage 2. The plaintiff

20　had three (3) liver specialist recommend treatment at stage 2, Yet all the defendants

21　refused to treat the plaintiff.

22　15. The plaintiff went to see Dr. Onglao on three different times complaining about

23　symptoms of hepatitis C, the plaintiff stated he had fatigue,exhaustion, and pain

24　in right upper adbomen. The plaintiff, showed Dr. Ongalo , that in the California

25　Health and safety Code 122410, were it states that California Department of Health

26　Services (Available protocols and guidelines) under (a) The State Department of Health

27　Services shall make available protocols and guidelines developed by the <u>National</u>

28　<u>Institutes of Health</u> for educating physicians, and health professionals and training

1  community service provider on the most recent medical information on hepatitis C

2  treatment and therapeutic decisionmaking. Under (3) it states protocols within the

3  Department of Corrections to enable the department to provide treatment to prisoners

4  with hepatitis C. ( see exhibit G ) Health and Safety Code 122410

5  The palintiff showed Dr. Onglao that California Department of Corrections MUST follow

6  guidelines from the State Department of Health. The guidelines were developed by the

7  National Institutes of Health.

8  The plaintiff, showed Dr. Onglao a copy of guidelines from National Institutes of Health,

9  under (who should be treated) The Panel recommends that all patients with Fibrois and

10  and evidence of chronic hepatitis C on liver biopsy should be treated.

11  I showed Dr. Onglao, on my liver biopsy that I had chronic hepatitis C and that I had

12  Portal Fibrosis, Yet Dr. Onglao still refused me treatment.

13  A copy of both Health and Safety Code 122410 and a copy of National Institutes of Health

14  guidelines recommended treatment was put in my appeal that was denied by Dr. Greenman

15  who is Chief Medical Officer (CMO). (see exhibit G ) and (see exhibit H) both Health

16  and  Safety Code 122410, and guidelines from National Institutes of Health.

17  16. The plaintiff, found out that Dr. Onglao had offered treatment to other inmates at

18  same stage that he refused treatment to the plaintiff. Dr. Onglao refused treatment to

19  the plaintiff at stage 2, stating that he needed to be at stage 3 for treatment. At the

20  same time Dr. Ongalo offered treatment to inmate John Pfeifer V-69439, inmate Pfeifer,

21  liver biopsy show him at stage 2, Dr. Ongalo put in his medical records he was a stage

22  3, and offered inmate Pfeifer treatment. (see exhibit I ) medical records and liver biopsy

23  of inmate John Pfeifer V-69439. This is unconstitution medical care, offering treatment

24  to one inmate at stage 2, while refusing treatment to another inmate at same stage.

25  This shows conduct that is more than mere negligence.

26  17. The plaintiff was given Ibuprofen and Tylenol for over 18 months, while Dr. Onglao

27  were a ware that the plaintiff had Hepatitis C, Dr. Onglao never gave me a copy of

28  general Instructions for hepatitis C patients and did not follow its guidelines.

1    Under General Instructions for Hepatitis C , it states that Ibuprofen SHOULD BE USED

2    WITH EXTREME CAUSTION, and that Tylenol chronic use should be avioded. (see exhibit J )

3    Dr. Onglao gave me the Tylenol for over 18 months shows Chronic use, and was aware of

4    other doctor including him self giving me Ibuprofen. This shows that Dr. Onglao had

5    knowledge of the risk of serious harm, disregarded the risk, and that this conduct

6    was more than mere negligence.

7    18.  The Plaintiff wrote to Dr. Mission at East medical Hospital, Dr. Mission is on the

8    MAR HCV Sub-committee, and also give the Interferon treatment. The plaintiff recieved

9    a phone call, in the Lt. office from Dr, Mission about the letter. The plaintiff told

10   that Dr. Onglao was refusing treatment for hepatitis C. The plaintiff told Dr. Mission

11   he had a liver biopsy done it came at Stage 2 and grade 2. The plaintiff also told Dr.

12   Mission that in CDC'S own Hepatitis C Clinical Management Program  that a inmate patient

13   who liver biopsy come back at stage 2-3 or greater should be offered combination therapy.

14   Dr. Mission , stated that it was CMC policy that a inmate patient need to be at stage 3,

15   in order to get treatment. I informed Dr. Mission, that he was raising the guidelines from

16   what CDC Hepatitis C Clinical Management Progarm states. I told Dr.  Mission, that he

17   should be using guidelines from California Dpartment of Health Services , which were

18   developed by the National Instatuste of Health. I informed Dr. Mission, that the guidelines

19   recommend treatment to any patient with Portal Fibrosis and evidence of Chronic Hepatitis C

20   on liver biopsy. I inform him I had both on my liver biopsy. I also told Dr. Mission,

21   that Dr. Araya, who is on the MAR HCV Sub-committee had recommeded treatment at equeal

22   to or greater then stage 2. Dr. Mission said that is highly unlikly. I also informed

23   Dr. Mission that I had a letter from Cedar-Sinal Medical Center, from a liver specialist

24   Dr. Geller, M.D. from the Pathology Department and he recommends treatment at stage 2.

25   Dr. Mission stated that the plaintiff was not at Cedar-Sinal, but in prison, and that

26   he was not going to talk about it any more. The plaintiff sent to Dr. Mission 2 more

27   letters from liver specialist recommending treatment at stage 2, along with all of the

28   other documents showing he should get treatment, still Dr. Mission refused treatment.

19. The plaintiff wrote to the Chief medical Officer, Dr. Greenman, complainting
about Dr. Onglao refusing treatment for Hepatitis C. The plaintiff stated to
Dr. Greenman in letter that his liver biopsy came back at Stage 2 and Grade
2. The plaintiff stated under CDC's own hepatitis C Clinical Management Program
states that a inmate patient should be offered combination therapy when the
liver biopsy come back at stage 2-3, or greater. Dr. Greenman wrote back saying
that he would need to be at stage 3 for treatment. (see exhibit C ) and (see exhibt D )
shows CDC guidelines and letter from CDC Division of Correctional Health Care .
In the letter, plaintiff explained to Dr. Greenman, that Dr. Araya, a Department
Head and on the MAR HCV Sub-committee, had recommeding treatment in medical records
if liver biopsy came back equal to greater then stage 2. (see exhibit D). Yet Dr.
Greenman refused to treat the plaintiff. The palintiff also explained to Dr. Greenamn
in letter, that under Health and Safety Code 122410, that CDC should use guidelines
for treatment from California State Department of Health Services developed by the
National Institutes of Health. The guidelines recommend treatment if liver biopsy
show chronic hepatitis C and evidence of Portal fibrosis. I stated that I had both.
I also stated in letter that from Cedar-Sinal Medical Center, from a liver specialist
Chairman Dr. Geller, M.D. from the Pathology Department, who states I should get
treatment at stage 2. Dr. Greenman still refused treatment. I sent two (2) more
Letters from Yale University Liver Center, and from John Hopkins Unversity, Division
of Infectious Diseases, both letter from top Liver specialist recommended treatment
at stage 2 and with the amount of scarring on liver biopsy. Still Chief Medical Officer
Dr. Greenman refused treatment. The plaintiff sent all documents that supported treatment
to Dr. Greenman. The Plaintiff appealed the refusal of treatment, in the second level
appeal response health care manager states after reviewing your liver biopsy, we
find you at 2+ on liver biospy, but that does not qualify you for treatment you must
be a stage 3 for treatment. This is against CDC own guidelines in Hepatitis C Clinical
Management Program, it states treatment at stage 2-3. Not at stage 3 only. Dr. Greenman

1   in affect raised the guidelines from stage 2-3, to stage 3 against the guidelines

2   from CDC own hepatitis C Clinical Management Program. A 2+ would be the same

3   a score of 2-3, and would support I should of been offer treatment.

4   A State Constitutional violation against Chief Medical Officer (a supervisor) may be

5   liable under section 1983 upon showing: 1) personal involvement in the constitutional

6   deprivation. 2) a sufficient causel connection between the supervior's wrongful

7   conducts and the consitutional violation. (Redman v. County of San Diego) 942 f. 2d 1435

8   1446 (9th Cir. 1991).

9 20.   The plaintiff appealed (602) Dr. Onglao refusal of treatment of Hepatitis C with

10   Interferon, at hearing Dr. Perry denied my appeal, stating that at stage 2, I do not get

11   treatmnet with Interferon. I informed Dr. Perry that the California Department of Corrections

12   Hepatitis C Clinical Management Program states a patient will be offered combination therapy

13   if the liver biopsy come back consistent with stage 2-3 fibrosis. ( see exhibit C ) and

14   (see exhibit D) Dr. Perry stated I needed to be at stage 3 to get treatment. I showed Dr.

15   Perry a copy of my medical records were Dr. Araya, a Department Head, and on the MAR HCV

16   Sub-committee had O.K.ed liver biopsy and recommended treatment equeal to greater then

17   stage 2. I showed Dr. Perry a letter from Cedar-Sinal Medical Center, Dr. Geller, M.D.

18   who is chairman of the Pathology Department and a liver specialist had recommended treatment

19   at stage 2. Dr. Perry stated I am not entitled to the same treatment as a patient on the

20   out side. I informed Dr. Perry that under the Inmate-patient Orientation Handbook to Health

21   Care Services that CDC medical should follow established medical standards, and that the

22   National Institues of Health who developed guidelines for California State Department of

23   Health, recommendes treatment if a patient has chronic Hepatitis C and if Portal Fibrosis

24   is present on liver biopsy. Dr. Perry said that he had spent to much time with this matter

25   and told me to leave. I sent to Dr. Perry, two (2) more letters from liver specialists,

26   one from Yale Universtiy Liver center, and from John Hopkins Unversity, Division of Infectiou

27   Diseases, both letters from top Liver specialist recommended treatment at stage 2, and with

28   the amount of scarring on liver biopsy. Still Dr. Perry refused to treat me.

1  21. Under the California Department of Corrections Inmate-patient Orienation

2  Handbook to Health Care services. (January 2006) Page 7 states as follow: If you

3  are idedenified as having a chronic health condition and you qualify for the Chronic

4  Care Program (CCP) you will recieve medically necessary health care services in accordance

5  with established procedures and medical standards. (see exhibit K).

6  California Department of Corrections and all the defendants ω Dr. Onglao, Dr. Perry,

7  Dr. Mission, and Chief Medical Officer Dr. Greenman health care does not meet medical

8  standards.. The guidelines or policy for treatment Hepatitis C with Interferon at stage

9  3 is constitutionally inadequate medical care, and I challenge the Constitutionality

10  of the guidelines CDC is using for treatment of Hepatitis C.

11  California Department of Corrections and all the defendants, are NOT using the guidelines

12  under Health and Safety Code  122410, California Department of Health Services make

13  available guidelines developed by the National Institutes of Health. Which are mandated

14  for California Department of Corrections to use. (see exhibit G )

15  The National Institutes of Health recommends treatment to ALL patient with Portal Fibrosis

16  and evidence of Chronic hepatitis C on liver biopsy. (see exhibit H )

17  To show a standard of care , the plaintiff had in is medical records, from Dr. Araya,

18  a Department Head, and on the MAR HCV Sub-committee. Dr. Araya recommends treatment if

19  liver biospy coame back equal to or greater then stage 2.

20  The plaintiff had three (3) letters from the Country Top liver Centers , ( Cedar-Sinal

21  Medical Center ) ( John Hopkins Division of Infectious Diseases ) and (Yale Unversity

22  Liver Center ) all the liver specialist recommended treatment at stage 2, and with the

23  amount of scarring on liver biopsy.

24  The Center for Disease Control and Prevention (CDC) recommendation is combination therapy

25  if Fibrosis or other signs that cirrhosis of the liver will occur. (Rigrigez v. Bakke)

26  84 Fed Appx. 688 . Also look up (CDC) recommendation on website www. cdc.gov/ncidod/

27  disease/hepatitis C.

28  In ( Bender v. Regier ) 385 F. 3d 1133, page 1136 ( the Department of Health develops

1   a protocol) It states that the Department of health developed a protocol for

2   treatment of Hepatitis C virus with Interferon, the protocol eligibility criteria

3   is for the Department of Corrections to use as a guideline. The California State

4   Department of Health under Health and Safety Code 122410 has the same guidelines

5   for the Department of Correction to use as well.

6 **21.** The palintiff recieved the appeal from Director's level appeal decision, in the

7 appeal at director's level the findings and decision was made by Appeals Examiner

8 J. G. Arceo, Facility Captain. He has <u>NO medical experience at all</u>, yet he is reviewing

9 a medical appeal. He states the plaintiff was examined by licensed physicians for his health

10 concerns and request for treatment. He has been treated in accordance with the professional

11 judgement of the physicians. The only physician that was trained to review treatment for

12 Hepatitis C, did recommend treatment equal to or greater then stage 2. The plaintiff had

13 three (3) letters from liver specialists recommending treatment at stage 2, and with the

14 amount of scarring on liver biopsy, Yet the appeals examiner refused to grant the appeal

15 The appeals examiner states the plaintiff has received medical treatment in accordance

16 with departmental regulations. Under CDC's own guidelines in Hepatitis C Clinical Management

17 Progam on page 4 under C. Phase III ) staging by liver biopsy and combination therapy

18 (number 9) states as follow: <u>inmate-patients whose liver biopsy results are consistent with</u>

19 <u>stage 2-3 fibrosis , or greater and who otherwise meet inclusion criteria will be offered</u>

20 <u>Combination Therapy.</u> (see exhibit C ).

21 The palintiff has a letter from the Division of Correctonal Health Care Services in

22 Sacramento regarding the meaning of <u>stage 2-3.</u> In the letter they stated that stage 2-3,

23 means that stage 2 through stage 3 or greater should be offered combination therapy.

24 ( see exhibit D ).

25 Yet the <u>appeals 2 level</u> states stage 2, does not qualify him for treatment, and the

26 appellant would only qualify for treatment if he had a communicable infectious diease.

27 Hepatitis C is A COMMUNICABLE INFECTIOUS DIEASE, not only that the plaintiff has been

28 exsposeed to TB and had to take medical treatment for it for over 6 months.

## DISCUSSION

1

2 (Eighth Amendment Violation-Deliberate Indifference to serious Medical Need)

3 In order for " deliberate indifference"to be established, there must ne a  purposeful

4 act or failure to act on the part of the defendants and resulting harm. ( McGuckin v.

5 Nevada Bd. of State Prison ) 766 F 2d. 404, 407. ( 9th Cir. 1985).

6 Eight Amendment protection against deliberate indifference to prison health  problems

7 extends to conditions that threaten to cause health problem in future, as well as current

8 serious health problems. (Helling v. McKinney) U.S. Nev. 19931 113 S. Ct. 2475, 509

9 US 25, 125 L. Ed. 2d 22.

10 In case (Mckenna v. Wright) 386 F. 3d 432 states 7. Prison 17 (2) under sentencing

11 and punishment 1546 ( that prison officials alleged failure to provide prisoner with medical

12 treatment for his Hepatitis C virus would amount to deliberate indifference  to prisoners

13 serious medical need, as would support claim for denial of adequate medical care in violatio

14 of the eight Amendment). U.S. C.A. Const. Amend. 8, Fed Rules Civ. Proc. rules 12 (b) (6),

15 28 U.S. C.A.

16 Failure to provide treatment because of a tight budget states a claim for relief.

17 ( Jones v. Johnson ) 781 F. 2d. 769, 771 ( 9th Cir. 1986)

18 To show a serious medical need is considered " one that been diagosed by a physician as

19 mandating treatment or one that is so obvious that even a lay person would easily recognize

20 the necessity for a doctor's attention (Hill v. Dekalb Reg'l Youth Dept. ) Ctr 40 F 3d

21 1176, 1187 (11th Cir.(1994) In either case, " the medical need must be one that, if left

22 unattended a substanfial risk of serious harm". HIV and Hepatitis C meet either of these

23 definitions.

24 To establish the second element, deliberate inderence to a serious medical need, the

25 prisoner must prove three facts: 1) subjective knowledge of a risk of serious harm. 2)

26 Disregard of the risk. 3) By conduct that is more than mere negligence.

27 To prove all three facts:  1) All the defendants were aware of the plaintiff's Hepatitis C,

28 and was aware that he was at stage 2, and if not treated would get worse, with a risk of

1 futher serious harm, from chronic liver disease, with development of cirrhosis, and

2 or liver Cancer. With out treatment the plaintiff will advance to stage 4, and damage

3 to the plaintiff's liver will become greater to the piont the plaintiff would need a

4 liver transplant.

5 2) To show disregard of that risk, by the defendants refusing treatment against the

6 recommendation of the National Institues of Health, recommendation of Dr. Araya,

7 who is on the MAR HCV Sub-committee, and the recommendation of three (3) liver Specialists

8 who reviewed my liver biospy and medical records and recommended treatment at stage 2,

9 and with the amount of scarring on liver biopsy. This shows a disregard of risk. 3)

10 To show conduct that is more than mere negligence: All the defendants intentionally

11 interfered with medical treatment by refusing treatment against CDC's own policy,

12 against the recommendation of the National Institutes of Health, against California State

13 Department of Health guidelines, against CDC's own Doctor, Dr. Araya, who is in charge of

14 reviewing patients for treatment for Hepatitis C. Against three (3) liver specialists who

15 recommended treatment at stage 2. This conduct shows more than mere negligence.

16 Deliberate indifference MAY be established by showing a grossly indequate medical care

17 as well as by a decision to take an easier but less effective couse of treatment. All

18 the defendants were aware of the risk of serious harm, all of the defendants disregarded

19 the risk, and all the defendants conduct was more than mere negligence.

20 The plaintiff has established " Deliberate Indifference" to a serious medical need, by the

21 facts shown in this complaint and the exhibits. The plaintiff, has suffered from this

22 deliberate indifference in the treatment of the plaintiff's Hepatitis C. Because the failure

23 to treat the plaintiff has sustained the follwong injuries and damages. Pain, suffering,

24 emtional distress, inpairment of enjoyment of life, shorting of life, and futher medical

25 expense and loss of earning and futher earning capacity.

26                                      CLAIM FOR RELIEF

27        ( Eight Amendment Violation- Deliberate Indifference to Serious Medical need )

28

1 The plaintiff refers to and incorporates by reference herein the allegations of all
2 paragraphs, inclusive.

3 Plaintiff's medical condition, as desribed herein, constitutes a serious  medical need
4 in that failure to treat the condition has resulted in further significant injury, and
5 the ongoing failure to treat it is likly to cause more serious injury. Said injury has
6 included, but not necessarily been limited to, fatigue and exhaustion, with joint pains,
7 and right upper adbomal pain. Plaintiff's medical condition also significantly affects
8 his activities in prison each and every day. Plaintiff will suffer from the failure to
9 treat his Hepatitis C, with further significant injury and failure to treat it is likly
10 to cause more serious injury. Patients with Chronic Hepatitis C, if not treated will
11 progress to Cirrhosis of the liver, the plaintiff is at stage 2 and grade 2, and is half
12 way to Cirrhosis. Cirrhosis is at stage 4. Also patients with Hepatitis C, if not treated
13 could cause cancer of the liver, and almost all liver tranplants are caused by hepatitis C.
14 Plaintiff is informed and believes, and thereon alleges, that defendants  have acted
15 intentionly in the manner desribed above and with knowledge of plaintiff's suffering
16 and the risk of further serious harm that could result from their actions or the refusal
17 to act.

18 Defendants conduct violates 42 U.S.C. § 1983, because that conduct constitutes deliberate
19 indifference to plaintiff's serious medical needs in violation of this Eight amendment
20 Right to be free from cruel and unusal punishment.

21 As a further proximate result of the defendant's conduct, plaintiff is informed and
22 believes, and thereon alleges, that he will suffer special damages in the futher in the
23 form of medical expenses for treatment of his condition, Chronic hepatitis C with
24 Interferon, and will have a loss of income.

25 In acting as described herein above, defendants acted despicably, knowingly, willfully,
26 and maliciously, or with reckless or callous disregard for plaintiff's federally protected
27 rights, entitling plaintiff to an award of exemplary and punitive damages.

28 WHEREFORE, plaintiff , James Shayler prays for judgement against defendants as follows:

1.   For injunctive relief in thew form of proper medical treatment according to proof;

2.   For special damages, according to proof;

3.   For general damages, accoding to proof;

4.   For punitive damages, according to proof;

5.   For resonable attorney fees puruant to 42 U.S.C. § 1988;

6.   For the cost of the suit; and

7.   For such other and further relief as the Court may deem just and proper.


Dtaed:  11/28/06                BY: _James Shayler_

James Shayler

# EXHIBIT A

MAR-09-2006 THU 10:20 AM    H-CARE SYS              FAX No. 8055477513                    P. 001
Sent By: HP LaserJet 3100;              4343259;          Mar-9-06  11:37AM;          Page 1/2

# CENTRAL COAST PATHOLOGY CONSULTANTS, Inc.
### A Medical Group

C. L. Douglas, M.D., Director | S. B. Jobst, M.D. | J. B. Hannah, M.D. | D. M. Lawrence, M.D.
B. D. Ragsdale, M.D. | R. E. Rocha, M.D. | K. F. Lundquist, M.D.

Tel #: (805) 434-4504   Fax #: (805) 434-3259
Test Performed at: 3701 S. Higuera Street Ste. 200 San Luis Obispo, CA 93401

## Patient: SHAYLER, JAMES CDC# T85844

### Accession #: TWS-06-10590

Date Coll/Rec'd: 2/23/2006 - 2/23/2006

Sex: M
DOB: 9/20/1955
MRN:

**Physician:**   **RUSSELL, WILLIAM M.D. - RADIOLOGY DIAGNOSTIC CENTER**
**VIGGIANELLI, MICHAEL  - CALIFORNIA MENS COLONY**

**SPECIMEN RECEIVED:**   A) Liver Biopsy

**CLINICAL HISTORY:**   50-year old male California Men's Colony inmate with history of hepatitis C.

**GROSS DESCRIPTION:**   In formalin, designated "liver ultrasound biopsy" are four needle-shaped portions of soft, light-brown tissue, 6- to 20 x 1-mm in greatest dimension each. This also includes a 3-mm aggregate of apparently yellow-tan fatty tissue. One (1) cassette entirely. PAS, trichrome, iron and reticulin stains are requested.

SBJ/sw:la
2/23/06

**MICROSCOPIC DESCRIPTION:**   Sections show several needle biopsies of liver with adequate numbers of portal areas for examination. A small amount of accompanying fibroadipose tissue is present. The overall architecture is intact as seen by reticulin stain. The trichrome stain shows patchy portal fibrosis with focal periportal extension but with no bridging fibrosis identified. No bile duct proliferation is seen. However, portal areas contain patchy aggregates of chronic inflammatory cells with focal piecemeal necrosis. Mild fatty change is appreciated. No PAS-positive diastase-resistant globules are seen within the cytoplasm of hepatocytes. No granulomas are present. Prussian blue stain is negative for stainable iron. There is no malignancy.

**MICROSCOPIC DIAGNOSIS:**

Liver (core needle biopsies):
- **CHRONIC HEPATITIS C**
- **GRADE 2 / 4 INFLAMMATION (PATCHY PORTAL INFLAMMATION WITH MILD PIECEMEAL NECROSIS)**
- **STAGE 2 / 4 FIBROSIS (PATCHY PORTAL FIBROSIS WITH FOCAL PERIPORTAL EXTENSION BUT WITH NO BRIDGING FIBROSIS)**
- **MILD FATTY CHANGE**
- **NO STAINABLE IRON**

SBJ/la

# EXHIBIT B

STATE OF CALIFORNIA
GA-22 (9/92)

## INMATE REQUEST FOR INTERVIEW

DEPARTMENT OF CORRECTIONS

| DATE 3/9/06 | TO Shay ler | | FROM (LAST NAME) ONG LAU | | CDC NUMBER |
|---|---|---|---|---|---|

| HOUSING U 3-31-02L | BED NUMBER | WORK ASSIGNMENT | | JOB NUMBER FROM | TO |
|---|---|---|---|---|---|

| OTHER ASSIGNMENT (SCHOOL, THERAPY, ETC.) | ASSIGNMENT HOURS FROM | TO |
|---|---|---|

### Clearly state your reason for requesting this interview.

You will be called in for interview in the near future if the matter cannot be handled by correspondence.

Your biopsy showed stage 2/4 . that means no treatment at this time. Also, once paroled, CDC is not responsible for your health care any more. Only while you're inside.

Do NOT write below this line. If more space is required, write on back.

INTERVIEWED BY

DATE

DISPOSITION

**CALIFORNIA MEN'S COLONY**
**MEDICAL DEPARTMENT**

# CDC HEPATITIS C
# CLINICAL MANAGEMENT PROGRAM
# EXCLUSION CRITERIA CHECKLIST

DATE: _____

Exclusion Criteria for Consideration of Combination Therapy per CDC Protocol
(See Attachment C of HCSD Draft Protocol of November 2003)

| Factor is present (NOT a treatment candidate) | Factor is not present (May be a treatment candidate) | CIRCLE YES IF ANY OF THE FOLLOWING APPLY: |
|---|---|---|
| **YES** | NO | Release within 12 months (genotype 2 or 3), within 18 months for other genotypes |
| **YES** | NO | Age > 60 years |
| **YES** | NO | History of Nonresponse or Relapse to Combination Therapy |
| **YES** | NO | Liver Biopsy within past 4 years with fibrosis ≤ 2/4 (non HIV patient) OR < 2 /4 (HIV patient) |
| **YES** | NO | Poorly controlled cardiopulmonary disease |
| **YES** | NO | Diabetic with Hemoglobin A1c > 8.5% |
| **YES** | NO | Creatinine > 2.0 |
| **YES** | NO | Serially normal ALT or ALT less than twice normal on 3 consecutive tests at least one month apart |
| **YES** | NO | Ischemic cardiovascular or cerebrovascular disease |
| **YES** | NO | Uncontrolled hyperthyroidism or hypothyroidism* |
| **YES** | NO | Decompensated cirrhosis: albumin < 3.0, jaundice, ascites, varices, coagulopathy |
| **YES** | NO | Autoimmune disease |
| **YES** | NO | Neutrophils < 1500/cu mm, platelets < 75,000/cu mm |
| **YES** | NO | Hemoglobinopathy, hemolytic anemia |
| **YES** | NO | Hemoglobin < 11 gm/dl or Hematocrit < 33% |
| **YES** | NO | Solid organ transplant recipient |
| **YES** | NO | HIV infection with CD4 Count < 300 |
| **YES** | NO | Active Cancer |
| **YES** | NO | Seizure disorder with any seizure activity |
| **YES** | NO | Inability to cooperate with medical treatment |
| **YES** | NO | Refuses contraceptive use during and 6 months after treatment |
| **YES** | NO | A documented history of alcohol or substance abuse or other high risk behavior within the past 6-12 months |

* Refer to drug manufacturer's warnings in addition to above.

_____
Physician signature

INMATE NAME, CDC #, DOB

CMC - 1

# EXHIBIT C



CALIFORNIA DEPARTMENT OF CORRECTIONS



# HEPATITIS C
## CLINICAL
### MANAGEMENT
#### PROGRAM

March 2004

**Hepatitis C Clinical Management Program**        **Health Care Services**

6. Inmate-patients approved for liver biopsy shall have a medical hold placed on them to prevent transfer until the liver biopsy has been completed and the decision to begin combination therapy has been made based on the biopsy results.

7. In general, the liver biopsy should be completed within three (3) months from the time the PCP requests that a liver biopsy be performed by completing the *Request for Services* form CDC 7243.

8. Inmate-patients who have had a liver biopsy shall have their cases reviewed by the MAR HCV Sub-committee prior to initiation of combination therapy.

9. Inmate-patients whose liver biopsy results are consistent with stage 2-3 fibrosis or greater, and who otherwise meet inclusion criteria will be offered combination therapy as shown in Attachment J.

10. Patients that are HIV-infected, whose liver biopsy results are consistent with stage 2 fibrosis or greater, and who otherwise meet inclusion criteria are also eligible for combination therapy.

11. Inmate-patients whose liver biopsy results are consistent with stage 2 fibrosis or less, and inmate-patients who are HIV infected and whose liver biopsy results are consistent with less than stage 2 fibrosis, are currently not eligible for combination therapy, but shall be followed every six (6) to twelve (12) months in the HCV Clinical Management Program and reconsidered for liver biopsy every four (4) years.

12. If there are questions of eligibility regarding liver biopsy or combination therapy, the PCP working through the MAR HCV Sub-committee may submit a request for consideration for review and decision to the Health Care Review Sub-committee.

13. The anticipated time period from the HCV screening request made by the inmate-patient to the initiation of combination therapy is nine (9) months, except for patients 45 years old or younger with ALT levels elevated to less than two (2) times normal during testing required in phase II section 8.

14. Inmate-patients receiving combination therapy shall be seen by the PCP weekly for the first two weeks and monthly thereafter beginning with the fourth (4) week.

15. Inmate-patients receiving combination therapy shall have appropriate evaluations and laboratory tests as outlined in Attachments I, J, K1 or K2.

16. Inmate-patients in the Mental Health program who are receiving interferon may be seen on a more frequent basis as determined by the interdisciplinary treatment team.

March 2004          5

**CALIFORNIA DEPARTMENT OF CORRECTIONS**　　　**HEPATITIS C CLINICAL MANAGEMENT PROGRAM**

# Exclusion Criteria for Combination Therapy*

*No biopsy or treatment* if an early release date: generally less than ten [10] months from the time the primary care provider refers the inmate-patient for a liver biopsy by completing the *Request for Services* form CDC 7243 for genotypes 2 and 3, or less than sixteen [16] months from the time the primary care provider refers the inmate-patient for a liver biopsy by completing the *Request for Services* form CDC 7243 for other genotypes.

---

- An early release date: generally less than ten [10] months from the time the primary care provider refers the inmate-patient for a liver biopsy by completing the *Request for Services* form CDC 7243 for genotypes 2 and 3, or less than sixteen [16] months from the time the primary care provider refers the inmate-patient for a liver biopsy by completing the *Request for Services* form CDC 7243 for other genotypes

- Poorly controlled cardiopulmonary, cerebrovascular or thyroid disease, blood dyscrasias, seizures, cancer, diabetes mellitus (hemoglobin $A_{1c}$ >8.5%), or renal insufficiency (creatinine >2 mg/dL)

- Inmate-patients 45 years old or younger with ALT levels elevated to less than two (2) times normal laboratory values on three consecutive tests, at least one month apart, are not eligible for treatment

- Decompensated cirrhosis – e.g. albumin <3, jaundice, ascites, varices, coagulopathy

- Autoimmune disease

- WBC <1,500/mm³, platelets <75,000/mm³

- Hemolytic anemias, or hemoglobin <11gm/dL or hematocrit <33%

- Solid organ transplantation

- HIV infection w/CD4 Count <300

- Poorly controlled psychiatric/psychological condition

- Serious suicidal behavior in the past 12 months

- History of illicit drug use, alcohol or other substance abuse, or other high risk behaviors currently active or within the past 6-12 months

- Inability to cooperate with treatment

- Inability to give informed consent

- Age >60 years

- Pregnancy – a pregnancy test is required prior to initiating therapy

**\*Refer to drug manufacturer's warnings in addition to highlighted contraindications**

# EXHIBIT D

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION

ARNOLD SCHWARZENEGGER, GOVERNOR

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P.O. Box 942883
Sacramento, CA 94283-0001



15 November, 2006

Mr. James Shayler, T-85844
California Men's Colony
P.O. Box 8101
San Luis Obispo, Calif. 93409

Dear Mr. Shayler:

This is in response to your letter of correspondence to the Division of Correctional Health Care Services (DCHCS) regarding the meaning of Stage 2-3 in the Hepatitis C Clinic Management Program, In your letter you state you are trying to find the meaning of Stage 2-3 regarding treatment for Hepatitis in the Hepatitis C Clinic Management Program. Number (9), it is our understanding that Stage 2-3, means that if a patient is at Stage 2 through Stage 3 or greater and meets all inclusive criteria, will be afforded Combination Therapy.

I hope this answers any question you have regarding this issue,

VICKI O' SHAUGHNESSY
Staff Services Management II
Clinical operations Support Section
Division Of Correctional Health Care Service

# EXHIBIT E

| DATE | TIME | |
|---|---|---|
| 1/12/06 | | **CMC ORTHO CLINIC** Flu from 11/14/05 VE |
| | S | 2½ mos $\bar{p}$ ulnar nerve transposition. No real improvement yet. |
| | | $\sim$ - $\cancel{\uparrow}$ = OJD but little chan pre op |
| | O | ROM 28° - 105° mild contracture R V finger PIP |
| | $\cancel{R}$ | RTC 1 mo |
| | | [signature] |
| 1/30/06 | 1600 | HCV TRC Records reviewed. Meets CDCR criteria for Liver Bx Recommend Bx, consider Tx for HCV if Bx shows ≥ Stage 2 fibrosis and no contraindications exist [signature] / Arage mo |

| INSTITUTION | HOUSING UNIT | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|---|---|---|
| | | Shaylir, James ₮ 85844 |

**INTERDISCIPLINARY PROGRESS NOTES**

09/20/55

CDC 7230 (Rev 04/03)

468

**Algebra    659**

Check: Choose any number greater than 7. Let's choose 9.

$$x + 3 > 10$$
$$9 + 3 > 10$$
$$12 > 10$$

There is one major rule that you must keep in mind when solving an inequality.

> When you multiply or divide both sides of an inequality by a negative number, it changes the direction of the inequality sign.

For example we know that $8 < 12$.

$$8 < 12$$

If we multiply both sides by $-2$, we get $8(-2)$, which is $-16$, and $12(-2)$, which is $-24$. You know that $-16$ is greater than $-24$. So the answer is

$$8(-2) > 12(-2)$$

$$-16 > -24$$

Notice that the arrow changed direction from less than to greater than.

**Example 2:** $-4x < 12$

$$-4x < 12$$

Divide both sides by $-4$. *Notice that you are dividing by a negative number,* so change the direction of the inequality sign.

$$\frac{-4x}{-4} < \frac{12}{-4}$$

$$x > -3$$

Check: Choose any number greater than $-3$. Let's choose 0.

$$-4x < 12$$

$$-4(0) < 12$$

$$0 < 12$$

Sometimes you may see the signs $\leq$ or $\geq$. These mean "less than or equal to" or "more than or equal to." So, if an answer is $x \geq 3$, this means that the answer is 3 or a number larger than 3.

## EXERCISE 17: ONE-STEP INEQUALITIES

*Directions:* Solve for $x$. Check your answers.

**1.** $x - 3 > -5$     **4.** $\frac{x}{-3} < 12$     **7.** $x - 7 \leq 0$

**2.** $5 + x < 7$     **5.** $x - 5 \geq -1$     **8.** $70 > 5x$

**3.** $-3 + x < -10$     **6.** $-4x > 8$     **9.** $-4x > -16$

**Answers and solutions start on page 695.**

# Factoring

Some problems require factoring algebraic expressions. To *factor* means to find and separate numbers that have been multiplied. An example from arithmetic helps to explain factoring. There are two ways to multiply to get the number 15. For instance, $3 \times 5 = 15$ and $15 \times 1 = 15$. We can say that 3 and 5 are factors of 15 and that 1 and 15 are also factors of 15. The factors are the numbers that were multiplied.

# EXHIBIT F



## CEDARS-SINAI MEDICAL CENTER.
**Pathology and Laboratory Medicine**

Stephen A. Geller, MD
Chairman

June 19, 2006

James Shayler
T-85844, #1-021
California Men's Colony – West
P.O. Box 8103
San Luis Obispo, CA 93404

Dear Mr. Shayler-

Thank you for your recent letter inquiring about staging of hepatitis C liver biopsies. Unfortunately, your question requires a complicated answer.

Liver biopsies from patients with hepatitis C are evaluated and scored for both grade and stage. The grade refers to the degree of inflammation in the liver and the stage refers to the amount of fibrosis (scarring). There are, however, a variety of grading and staging systems currently in use. Although the preference is to use a whole number wherever possible, some pathologists will occasionally use a range when the liver biopsy findings are not entirely clear and you may get a "2-3" score. To be absolutely sure of the meaning of your staging of "2/4" it would be best to find out the system that was used by the examining pathologist. In most of the systems, the "2/4" stage would mean significant fibrosis but not to cirrhosis. Cirrhosis is the most severe form of liver fibrosis, associated with a variety of symptoms and physical manifestations. Often, depending on the clinical circumstances, individuals with a "2/4" will be treated to try and control the progression of the hepatitis C.

Enclosed for your interest is an outline of the system that we use ("Scheuer") as well as a system widely used in Europe ("Metavir"). As you can see, they are similar.

I hope this is helpful for you.

Sincerely,

Stephen A. Geller, M.D.

8700 Beverly Blvd. ■ Room 8725 ■ Los Angeles, CA 90048
Office (310) 423-6611 ■ Fax (310) 423-0122 ■ www.cedars-sinai.edu

Form No. 4509 (Rev. 3/02)

471



**JOHNS HOPKINS**
U N I V E R S I T Y

**Division of Infectious Diseases**
1830 East Monument Street / Suite 452
Baltimore MD 21205-2100 USA
(410) 502-7134 / FAX (410) 614-8488
http://www.hopkins-aids.edu
http://www.hopkins-id.edu

David L. Thomas, MD, MPH
Division Chief

October 16, 2006


Mr. James Shayler
T-85844 31-02 Low
California Men's Colony-West
P.O. Box 8103
San Luis Obispo, CA  93403


Dear Mr Shayler,

I am sorry to hear about your hepatitis C infection.  I cannot comment on your case in particular because you aren't my patient.  What I can tell you is that the result of a liver biopsy is one of the most important things that we use to decide if treatment is a good idea.  The amount of scarring on your biopsy is enough to seriously consider treatment.  The other things have to be decided by a patient and their doctor and include the chances of getting cured and the chances of having side effects from the drugs.

Best of wishes as you work through this.


Sincerely,

David L. Thomas, MD, MPH
*Professor of Medicine*
*Chief, Division of Infectious Diseases*

# Yale University

James L. Boyer, M.D.
Ensign Professor of Medicine
Director, Liver Center
School of Medicine
333 Cedar Street, 1080 LMP
P.O. Box 208019
New Haven, Connecticut 06520-8019

Campus address:
TAC, ROOM S241C
Telephone: 203 785-5279
Fax: 203 785-7273
Email: james.boyer@yale.edu
Fed Ex address:
One Gilbert Street
New Haven, Connecticut 06519

October 12, 2006

James Shayler
T-85844   31-02 Low
California Men's Colony-West
P.O. Box 8103
San Luis Obispo, CA  93403

Dear Mr. Shayler:

I am responding to your letter for information as to the stage that liver biopsy patients should
receive treatment for hepatitis C.  In general most medical opinions would indicate that patients
with stage 2 disease should be treated, particularly if they have genotype type 2 since there is an
80% chance of eradicating the virus and preventing progression of disease.  I would certainly
recommend that you undergo twenty-four weeks of therapy with pegylated interferon and
ribavirin providing there are no other contraindications.  Good luck with the treatment.

Sincerely yours,

James L. Boyer, M.D.
Ensign Professor of Medicine
Director, Liver Center

JLB:amt

# EXHIBIT G

### § 122406. Report to Legislature by Secretary of Veterans Affairs

The Secretary of Veterans Affairs shall report to the Legislature on or before March 1, 2001, regarding the use of funds earmarked by the federal Veteran's Administration to regional offices in California to educate, screen, and treat veterans with the hepatitis C virus.

Added Stats 2000 ch 754 § 2 (SB 1256).

### § 122410. Available protocols and guidelines

(a) The State Department of Health Services shall make available protocols and guidelines developed by the National Institutes of Health, *the University of California at San Francisco,* and California legislative advisory committees on hepatitis C for educating physicians and health professionals and training community service providers on the most recent scientific and medical information on hepatitis C detection, *transmission,* diagnosis, treatment, and therapeutic decisionmaking.

(b) The guidelines referenced in subdivision (a) may include, but not be limited to, all of the following:

(1) Tracking and reporting of both acute and chronic cases of hepatitis C by public health officials.

(2) A cost-efficient plan to screen the prison population and the medically indigent population in California.

(3) Protocols within the Department of Corrections to enable that department to provide appropriate *prevention and* treatment to prisoners with hepatitis C.

(4) Protocols for the education of correctional peace officers and other correctional workers who work with prisoners with hepatitis C.

(5) Protocols for public safety and health care workers who come in contact with hepatitis C patients.

(6) Surveillance programs to determine the prevalence of hepatitis C in ethnic and other high-risk populations.

(7) Education *and outreach* programs for high-risk individuals, including, but not limited to, individuals who received blood transfusions prior to 1992, hemophiliacs, veterans, *women who underwent a caesarian section or premature delivery prior to 1990, persons who received an organ transplant prior to 1990, persons who receive invasive cosmetic procedures, including body piercing and tattooing,* students, * * * minority communities, *and any other categories of persons at high risk for hepatitis C infection as determined by the director.* Education and outreach programs shall be targeted to high-risk individuals as determined by the director. Education programs may provide information and referral on hepatitis C including, but not limited to, education materials developed by health-related companies, community-based or national advocacy organizations, counseling, patient support groups, and existing hotlines for consumers.

(c) Nothing in this section shall be construed to require the department to develop or produce any protocol, guideline, or proposal.

Added Stats 1998 ch 867 § 1 (SB 694). Amended Stats 2000 ch 754 § 3 (SB 1256).

**Amendments:**

**2000 Amendment: (1)** Amended subd (a) by adding **(a)** '', the University of California at San Francisco,''; and **(b)** ''transmission,'' after ''C detection,''; **(2)** added ''prevention and'' in subd (b)(3); and **(3)** amended subd (b)(7) by **(a)** adding ''and outreach'' after ''Education'' at the beginning of the first sentence; and **(b)** substituting ''women who underwent a caesarian section or premature delivery prior to 1990, persons who

# EXHIBIT H

# Chronic Hepatitis C:

## Current Disease Management

**National Digestive Diseases Information Clearinghouse**



**National
Institute of
Diabetes and
Digestive
and Kidney
Diseases**

**NATIONAL
INSTITUTES
OF HEALTH**

The hepatitis C virus (HCV) is one of the most important causes of chronic liver disease in the United States. It accounts for about 15 percent of acute viral hepatitis, 60 to 70 percent of chronic hepatitis, and up to 50 percent of cirrhosis, end-stage liver disease, and liver cancer. Almost 4 million Americans, or 1.8 percent of the U.S. population, have antibody to HCV (anti-HCV), indicating ongoing or previous infection with the virus. Hepatitis C causes an estimated 10,000 to 12,000 deaths annually in the United States.

A distinct and major characteristic of hepatitis C is its tendency to cause chronic liver disease. At least 75 percent of patients with acute hepatitis C ultimately develop chronic infection, and most of these patients have accompanying chronic liver disease.

Chronic hepatitis C varies greatly in its course and outcome. At one end of the spectrum are patients who have no signs or symptoms of liver disease and completely normal levels of serum liver enzymes. Liver biopsy usually shows some degree of chronic hepatitis, but the degree of injury is usually mild, and the overall prognosis may be good. At the other end of the spectrum are patients with severe hepatitis C who have symptoms, HCV RNA in serum, and elevated serum liver enzymes, and who ultimately develop cirrhosis and end-stage liver disease. In the middle of the spectrum are many patients who have few or no symptoms, mild to moderate elevations in liver enzymes, and an uncertain prognosis.

Chronic hepatitis C can cause cirrhosis, liver failure, and liver cancer. Researchers estimate that at least 20 percent of patients with chronic hepatitis C develop cirrhosis, a process that takes at least 10 to 20 years. After 20 to 40 years, a smaller percentage of patients with chronic disease develop liver cancer. Liver failure from chronic hepatitis C is one of the most common reasons for liver transplants in the United States. Hepatitis C is the cause of about half of cases of primary liver cancer in the developed world. Men, alcoholics, patients with cirrhosis, people over age 40, and those infected for 20 to 40 years are more likely to develop HCV-related liver cancer.

## Risk Factors and Transmission

HCV is spread primarily by contact with blood and blood products. Blood transfusions and the use of shared, unsterilized, or poorly sterilized needles and syringes have been the main causes of the spread of HCV in the United States. With the introduction in 1991 of routine blood screening for HCV antibody and improvements in the test in the mid-1992, transfusion-related hepatitis C has virtually disappeared. At present, injection drug use is the most common risk factor for contracting the disease. However, many patients acquire hepatitis C without any known exposure to blood or to drug use.



**U.S. Department
of Health and
Human Services**

patients who weigh less than 75 kilograms (165 pounds) and 1,200 mg for those who weigh more than 75 kilograms. In certain situations, an 800-mg dose (400 mg twice daily) is recommended (see below).

Combination therapy leads to rapid improvements in serum ALT levels and disappearance of detectable HCV RNA in up to 70 percent of patients. However, long-term improvement in hepatitis C occurs only if HCV RNA disappears during therapy and stays undetectable once therapy is stopped. Among patients who become HCV RNA negative during treatment, a proportion relapse when therapy is stopped. The relapse rate is lower in patients treated with combination therapy compared with monotherapy. Thus, a 48-week course of combination therapy using peginterferon and ribavirin yields a sustained response rate of approximately 55 percent. A similar course of peginterferon monotherapy yields a sustained response rate of only 35 percent. A response is considered "sustained" if HCV RNA remains undetectable for 6 months or more after stopping therapy.

The optimal duration of treatment varies depending on whether interferon monotherapy or combination therapy is used, as well as by HCV genotype. For patients treated with peginterferon monotherapy, a 48-week course is recommended, regardless of genotype. For patients treated with combination therapy, the optimal duration of treatment depends on viral genotype. Patients with genotypes 2 and 3 have a high rate of response to combination treatment (70 to 80 percent), and a 24-week course of combination therapy yields results equivalent to those of a 48-week course. In contrast, patients with genotype 1 have a lower rate of response to combination therapy (40 to 45 percent), and a 48-week course yields a significantly better sustained

response rate. Again, because of the variable responses to treatment, testing for HCV genotype is clinically useful when using combination therapy.

In addition, the optimal dose of ribavirin appears to vary depending on genotype. For patients with genotypes 2 or 3, a dose of 800 mg daily appears adequate. For patients with genotype 1, the full dose of ribavirin (1,000 or 1,200 mg daily depending on body weight) appears to be needed for an optimal response.

## Who Should Be Treated?

Patients with anti-HCV, HCV RNA, elevated serum aminotransferase levels, and evidence of chronic hepatitis on liver biopsy, and with no contraindications, should be offered therapy with the combination of alpha interferon and ribavirin. The National Institutes of Health Consensus Development Conference Panel recommended that therapy for hepatitis C be limited to those patients who have histological evidence of progressive disease. Thus, the panel recommended that all patients with fibrosis or moderate to severe degrees of inflammation and necrosis on liver biopsy should be treated and that patients with less severe histological disease be managed on an individual basis. Patient selection should not be based on the presence or absence of symptoms, the mode of acquisition, the genotype of HCV RNA, or serum HCV RNA levels.

Patients with cirrhosis found through liver biopsy can be offered therapy if they do not have signs of decompensation, such as ascites, persistent jaundice, wasting, variceal hemorrhage, or hepatic encephalopathy. However, interferon and combination therapy have not been shown to improve survival or the ultimate outcome in patients with preexisting cirrhosis.

Case 2:06-cv-01047-FJM-GBS Document 649 Filed 11/21/09 Page 46 of 98 Page ID
#:1317



# NIH Consensus Development Program

Home | About Us | Previous Conference Statements | CME | FAQs

## Management of Hepatitis C: 2002

National Institutes of Health
Consensus Conference Statement
June 10-12, 2002



**NIH Consensus and State-of-the-Science statements are prepared by independent panels of health professionals and public representatives on the basis of (1) the results of a systematic literature review prepared under contract with the Agency for Healthcare Research and Quality (AHRQ), (2) presentations by investigators working in areas relevant to the conference questions during a 2-day public session, (3) questions and statements from conference attendees during open discussion periods that are part of the public session, and (4) closed deliberations by the panel during the remainder of the second day and morning of the third. This statement is an independent report of the panel and is not a policy statement of the NIH or the Federal Government.**

**The statement reflects the panel's assessment of medical knowledge available at the time the statement was written. Thus, it provides a "snapshot in time" of the state of knowledge on the conference topic. When reading the statement, keep in mind that new knowledge is inevitably accumulating through medical research.**

## Introduction

The hepatitis C virus (HCV) is one of the leading known causes of liver disease in the United States. It is a common cause of cirrhosis and hepatocellular carcinoma (HCC) as well as the most common reason for liver transplantation. At least 4 million people in this country are believed to have been infected with HCV. Following the identification of hepatitis A and hepatitis B, this disorder was categorized in 1974 as "non-A, non-B hepatitis." In 1989, the hepatitis C virus was identified and found to account for the majority of those patients with non-A, non-B hepatitis. In March 1997, the National Institutes of Health (NIH) held a Consensus Development Conference regarding management and treatment of HCV infection. This led to an important, widely distributed NIH Consensus Statement that, for several years, defined the standard of care.

479

patients with renal insufficiency, and trials of pegylated monotherapy may be indicated in these patients. Lactic acidosis may be a rare complication of combination therapy in patients undergoing therapy for HIV and HCV.

## 4. Which patients with hepatitis C should be treated?

All patients with chronic hepatitis C are potential candidates for antiviral therapy. Treatment is recommended for patients with an increased risk of developing cirrhosis. These patients are characterized by detectable HCV RNA levels higher than 50 IU/mL, a liver biopsy with portal or bridging fibrosis, and at least moderate inflammation and necrosis. The majority also have persistently elevated ALT values. In some patient populations, the risks and benefits of therapy are less clear and should be determined on an individual basis or in the context of clinical trials.

Many patients with chronic hepatitis C have been ineligible for trials because of injection drug use, significant alcohol use, age, and a number of comorbid medical and neuropsychiatric conditions. Efforts should be made to increase the availability of the best current treatments to these patients. Because a large number of HCV-infected persons in the United States are incarcerated, programs should be implemented to prevent, diagnose, and treat HCV infection in these individuals. Based on the NHANES III data that demonstrate high prevalence of HCV in African American and Hispanic populations, individuals who are uninsured or have publicly funded healthcare are more likely to be infected with HCV. Efforts should also be initiated to diagnose and treat infection in these individuals.

All patients with chronic hepatitis C should be vaccinated against hepatitis A, and seronegative persons with risk factors for hepatitis B virus (HBV) should be vaccinated against hepatitis B.

### Normal ALT Levels

Approximately 30 percent of patients with chronic HCV infection have normal ALT levels, and another 40 percent have ALT levels less than two times the upper limit of normal. Although most of these patients have mild disease, histologically, some may progress to advanced fibrosis and cirrhosis. Experts differ on whether to biopsy and treat these patients.

Numerous factors must be considered in recommending treatment, including favorable genotype, presence of hepatic fibrosis, patient motivation, symptoms, severity of comorbid illness, and the patient's age. When patients with normal or minimally elevated ALT levels are treated with monotherapy, their SVR rates are similar to those of patients with higher ALT levels. Studies of pegylated interferon with ribavirin have not been completed in patients with normal ALT levels.

### Mild Liver Disease

Progression to cirrhosis is likely to be slow in patients who have persistent ALT elevations but no fibrosis and minimal necroinflammatory changes. These patients may not need treatment and should be monitored periodically. However, decisions to treat such patients should be individualized and may be based on the patient's desire to eliminate the HCV infection or unwillingness to undergo subsequent liver biopsies to assess disease progression.

become negative for HCV RNA by PCR. However, many of these patients relapse once interferon is discontinued. In patients who relapse, the reappearance of HCV RNA and rise of serum ALT levels usually occurs within 1 to 3 months after treatment; only rarely does it occur later. A sustained, long-term response (defined as no relapse at least 6 months after stopping interferon) occurs in 10 to 15 percent of patients who are treated for 6 months and 20 to 25 percent of those treated for 1 year.

Characteristics that predict a good response to interferon are absence of cirrhosis, a short duration of infection, low levels of HCV RNA in serum, and viral genotypes 2 and 3. None of these features are perfect predictors, but they can help in evaluating the chances of success.

### Who Should Be Treated?

Patients with anti-HCV, HCV RNA, elevated aminotransferase levels, and evidence of chronic hepatitis on liver biopsy should be offered therapy with alpha interferon. A recent NIH Consensus Development Conference recommended that all patients with fibrosis on liver biopsy or at least moderate degrees of inflammation and necrosis should be treated, and that patients with milder histological disease be managed on an individual basis. Patient selection should not be based on symptoms, mode of acquisition, genotype of HCV, or serum HCV RNA levels.

Patients found to have cirrhosis through liver biopsy can be offered therapy if they do not have signs of decompensation, such as ascites, persistent jaundice, wasting, variceal hemorrhage, or hepatic encephalopathy. However, interferon therapy is less likely to be successful in patients with cirrhosis than those without, and therapy has not been proven to improve survival or ultimate outcome.

Children and patients older than 60 years also should be managed on an individual basis, as the benefit in these patients has not been well documented. In these indefinite situations, the indications for therapy should be reassessed at regular intervals. In view of the rapid developments in hepatitis C today, better therapies may soon be available, at which point expanded indications for therapy would be appropriate.

In patients with clinically significant extra-hepatic manifestations, such as cryoglobulinemia and glomerulonephritis, long-term maintenance therapy with alpha interferon aimed at suppression of the disease may be needed rather than a 12-month course aimed at eradication of HCV RNA. In these patients, continuous therapy can be given

265

# EXHIBIT I

UNITED STATES DISTRICT COURT FOR THE CENTRAL
DISTRICT, EASTERN DIVISION


JAMES SHAYLER, )
        Plaintiff, )
                 )
                 )
-vs- )
                 )
DR. ONGLAO, DR. PERRY, )
DR. GREENMAN, DR. MISSION, )
        Defendants, )

CASE NO.

DECLARATION OF JOHN PEFEIFER
V-69439


John Pfeifer declares as follow:

I am a inmate at california men's Colony-West, I have been diagnosed with
hepatitis C by the West medical Clinic. My doctor, at Jamestown had ordered a
liver biopsy. My liver biospy came back as Stage 2 and Grade.2 Dr Onglao
offered me treatment with Interferon. I turn down the treatment, do to having
to be moved to east CMC, which is a level 3, and would of put me in danager.
I signed a refusal of treatment on April of 2006.

Executed in California Men's colony-West at San Luis Obispo, Oct. 10th 2006.
I declare under penalty of perjury the foregoing to be true and correct

*John Pfeifer*
John Pfeifer
V-69439

FAX:209-532-5713        Oct 26        10:08        P.01

William A. Knapp, M.D.
Robert W. Purvis, Jr., M.D.
Gary M. Dolan, M.D.
John E. Baker, M.D.
Michael E. Fitzpatrick, M.D.
Phillip H. Deos, M.D.
Rick R. Baier, M.D.

## YOSEMITE PATHOLOGY MEDICAL GROUP, INC.

2625 Coffee Road, Suite S * Modesto, California 95355
(209) 577-1200
27 South Shepherd Street, Suite C * Sonora, California 95370
(209) 532-8153 / (209) 532-5713 FAX

Avtarinder K. Nijjar, M.D.
Robert L. Merriam, M.D.
Harvey C. Chang, M.D.
Marigold J. Ardron, M.D.
Noel L. Libuit, M.D.
Shijun "John" Cui, M.D.
Hong Li, M.D.
Robert Colletti, M.H.A.

**NAME:** PFEIFER, John                    **DOB:** 9/4/1966        **PATHOLOGY NO:** 05 T 4008

**DOCTOR:** Sierra Conservation Center      **DATE COLLECTED:** 9/21/2005       **HOSPITAL:** Tuolumne General
Dr. Parkinson                                                                M000114476
B. Teegarden, MD.                         **DATE RECEIVED:** 9/21/2005

**SPECIMEN:** Liver biopsy

Clinical Data:      Hepatitis C

## GROSS:

The specimen is received in formalin labeled "Pfeifer, John". It consists of a slender core biopsy of light tan tissue approximately 0.1 cm in diameter and 2.2 cm in length. Filtered through and embedded in lens paper with request for special stains.
RRB;eh        09-21-05

## MICROSCOPIC DESCRIPTION:

Sections of percutaneous needle biopsy of liver tissue are examined in serial section in levels on three slides stained with H&E, trichrome, and Prussian blue stains. They show a single intact core of hepatocellular tissue averaging 0.7 cm in width. The specimen includes portions of approximately 8 portal tracts which show moderate to marked chronic inflammation consisting of lymphocytes. There is abundant evidence of abridgement of the lumina plate with piecemeal necrosis. Bile ducts are readily identified and are morphologically normal without evidence of inflammation. Lobular architecture is distorted due to aggregates of lymphocytes with rare acidophilic bodies. The Prussian blue stain is negative for stainable iron and the trichrome stain shows expansion of the portal tracts with periportal fibrosis and a suggestion of septae formation with architectural distortion but without clear cut cirrhosis.

## DIAGNOSIS:

**Liver, needle core biopsy:**
   -Chronic hepatitis C
   -Moderately limiting plate necrosis, grade 3
   -Lobular inflammation with acidophilic bodies, grade 2
   -Fibrosis with septae formation and architectural distortion, fibrosis stage 2

R. Baier, M.D.
RB:fm

Codes:   1 - H / E      2 - Special     0 - IPOX
9/26/2005

Original read and signed.

| DATE | TIME | |
|---|---|---|
| | | NEW ARRIVAL FROM: C T F          G.P. CLEARED? YES / NO |
| 4/13/06 | | |
| | | RPR: NR.                    T.B. CODE: 22 |
| | | CHICKEN POX? YES / NO     parole 7/07 |
| | | MEDICAL PROBLEMS: |
| | | Hep C(+) |
| | | Liver biopsy 2005 — Interferon was |
| | | Decided against the treatment. |
| 4/20/06 | | UNSCHEDULED |
| | | VS. 98.1   p. 77 |
| age: 39 | | R: 20  BP: 119/69 |
| WT 189 | | ↔ new to N/W I'm labs done at CTF. has |
| | 3:40 | HCV + Hep B, liver biopsy okay? + w/c qual for |
| | pm | him for Tx. But I'm decided to refuse |
| | | Tx after learning he w'd be transfered |
| | | to Soul for Tx. they w'd want to go to Salinas. |
| | | ?? ... when ... when ...  the ... ... |
| | | well, supple ... ... RR ... ... |
| | | abd: soft, NT, ⊖ ... eph: ⊖ edema |
| | | A/P ⊕ HCV, okay ? ⊖ refused Tx by I'm |

| INSTITUTION | HOUSING UNIT | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|---|---|---|
| CMC-WEST | | |

Arrived From: DVI on 4/13/06

**V69439**
**PFEIFER, JOHN**

**INTERDISCIPLINARY PROGRESS NOTES**

DC-7230(Rev 04/02)

# EXHIBIT J

**California Department of Corrections**

**Hepatitis C Clinical Management Program**

# GENERAL INSTRUCTIONS
# FOR HEPATITIS C PATIENTS



- AVOID USE OF ALCOHOL

- DO NOT USE INTRAVENOUS DRUGS

- DO NOT "SNORT" COCAINE

- DO NOT GET A TATTOO

- DO NOT SHARE YOUR TOOTHBRUSH, RAZOR, OR OTHER PERSONAL CARE ITEMS

- REDUCE WEIGHT IF OVERWEIGHT

- EAT A WELL-BALANCED HEART HEALTHY DIET

- DRINK PLENTY OF FLUIDS

- GET ADEQUATE REST AND REGULAR EXERCISE

- STOP SMOKING

- *ASPIRIN* AND *IBUPROFEN (MOTRIN, ADVIL)* SHOULD BE USED WITH EXTREME CAUTION AND ONLY AFTER DISCUSSION WITH YOUR PHYSICIAN

- YOU MAY USE *ACETAMINOPHEN (TYLENOL)* FOR PAIN OR OTHER *ACETAMINOPHEN* CONTAINING MEDICATIONS, BUT THE DOSE SHOULD NOT EXCEED 4 GRAMS PER DAY. CHRONIC USE SHOULD BE AVOIDED

- AVOID TAKING SUPPLEMENTAL IRON

- DO NOT DONATE BLOOD, TISSUE, OR ORGANS

- MINIMIZE USE OF PAIN MEDICATIONS, ESPECIALLY

CMC Pharmacy  Department of Corrections
Hwy. 1  San Luis Obispo, CA 93409  ●  (805) 547-7900 Ext. 7955
CAUTION: Federal law prohibits transfer of this drug to any person other than patient for whom prescribed.

SHAYLER, JAMES    T-85844
RX: 302816- 5 DR: ONGLAO,
11/20/06    RM: W3-31-02L
TAKE 3 TABS 3 TIMES A DAY
ONLY IF NEEDED
ACETAMINOPHEN 325MG
MFG:MC #60 STOP:03/20/07

CMC Pharmacy  Department of Corrections
Hwy. 1  San Luis Obispo, CA 93409  ●  (805) 547-7900 Ext. 7955
CAUTION: Federal law prohibits transfer of this drug to any person other than patient for whom prescribed.

SHAYLER, JAMES    T-85844
RX: 233854- 7 DR: PERRIN
05/04/06    RM: W3-31-02L
TAKE 1 TAB 3 TIMES A DAY
ONLY IF NEEDED(WITH FOOD)
IBUPROFEN TAB 400MG
MFG:LC #30 STOP:05/22/06

CMC Pharmacy  Department of Corrections
Hwy. 1  San Luis Obispo, CA 93409  ●  (805) 547-7900 Ext. 7955
CAUTION: Federal law prohibits transfer of this drug to any person other than patient for whom prescribed.

SHAYLER, JAMES    T-85844
RX: 204221- 1 DR: PERRIN
11/30/05    RM: W3-31-02L
TAKE 1 TABLET 3 TIMES A
DAY (TAKE WITH FOOD)
IBUPROFEN TAB 400MG
MFG:LC #45 STOP:12/13/05

CMC Pharmacy  Department of Corrections
Hwy. 1  San Luis Obispo, CA 93409  ●  (805) 547-7900 Ext. 7955
CAUTION: Federal law prohibits transfer of this drug to any person other than patient for whom prescribed.

SHAYLER, JAMES    T-85844
RX: 275546- 6 DR: PERRY,
09/19/06    RM: W3-31-02L
TAKE 3 TABS 3 TIMES A DAY
ONLY IF NEEDED
ACETAMINOPHEN 325MG
MFG:MC #30 STOP:09/24/06

# EXHIBIT K





Division of Correctional Health Care Services

# Inmate-Patient

# Orientation Handbook

# to

# Health Care Services

January 2006

reasons why a medication may not be refilled so please be respectful. Health care staff does their best to get medications to you quickly.

## MEDCIATION RENEWALS

When you are taking self-administered medications, and the medication packaging indicates the prescription is about to expire (run out), **YOU** must request a medication *renewal.* Do this when you have two (2) to four (4) days of medication remaining by filling out and submitting a CDCR Form 7362 asking for a medication *renewal*. In order to renew the medication, your primary care provider must order it, and to determine if you need the medication renewed, you may be scheduled for a health care appointment. After you have submitted the Form 7362 asking for a medication renewal, check periodically (but no more than once a day) with nursing staff to see if your medication is available or if you have been scheduled for an appointment with your primary care provider. If you do not receive a medication renewal within 48 hours of your original request, ask the nursing staff to check with the pharmacy. There are many reasons why a medication may not be renewed so please be respectful. Health care staff does their best to get medications to you quickly.

## CHRONIC CARE PROGRAM (CCP)

Chronic illness is any health problem lasting at least six months that has the potential to, or actually does affect your functioning and long-term prognosis. High blood pressure, diabetes mellitus, certain gynecological disorders or diseases, chronic infectious diseases such as Hepatitis C Virus (HCV), Human Immunodeficiency Virus (HIV), chronic pulmonary diseases such as asthma or emphysema, and seizure disorders are considered chronic health conditions.

If you are identified as having a chronic health condition and you qualify for the Chronic Care Program (CCP) you will receive medically necessary health care services in accordance with established procedures and medical standards.

The purpose of the CCP is to:

- Screen, identify and monitor your chronic health conditions in order to initiate appropriate therapeutic regimens that will promote health and reduce complication rates.

- Reduce your risk of morbidity (disease related conditions) and mortality (death) and improve your quality of life.

- Provide you with education and counseling to encourage you to practice healthy behaviors.

If you are enrolled in the CCP:

- You will have routine appointments scheduled with a health care provider to treat and monitor your chronic health condition(s).

- Chronic care visits DO NOT require any co-pay fee.

---

January 2006                                                                                                    7

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

## DIRECTOR'S LEVEL APPEAL DECISION

Date:  NOV 2 1 2006

In re:   Shayler, T-85844
California Men's Colony
P.O. Box 8101
San Luis Obispo, CA 93409-8101

IAB Case No.: 0602335          Local Log No.: CMC 06-1573

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner J. G. Arceo, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

**I    APPELLANT'S ARGUMENT:** It is the appellant's position that according to a liver biopsy he meets the criteria for treatment of his hepatitis "C". The appellant requests that the Department provide him with Combination Therapy treatment.

**II   SECOND LEVEL'S DECISION:** The reviewer found that the appellant has been appropriately evaluated and Stage "2/4" does not qualify him for treatment. The appellant would only qualify for treatment if he had a communicable infectious disease. Fortunately, this is not the appellant's situation. The appellant's request for Combination Therapy for hepatitis "C" is denied at this point.

**III  DIRECTOR'S LEVEL DECISION:** Appeal is denied.

A. **FINDINGS:** The appellant has been examined by licensed physicians for his health concerns and requested treatment. He has been treated in accordance with the professional judgment of the physicians. The institution has taken the appropriate steps to ensure the appellant's medical concerns have been reviewed and evaluated. According to medical staff familiar with the appellant's health care and history, he has received medical treatment in accordance with departmental regulations. The appellant has presented no evidence to warrant modification of the decision reached by the institution.

B. **BASIS FOR THE DECISION:**
California Code of Regulations, Title 15, Section: 3350, 3350.1, 3354, 3355

C. **ORDER:** No changes or modifications are required by the institution.

This decision exhausts the administrative remedy available to the appellant within CDCR.

N. GRANNIS, Chief
Inmate Appeals Branch

cc:    Warden, CMC
Health Care Manager, CMC
Appeals Coordinator, CMC
Medical Appeals Analyst, CMC

James Shayler                                    Dated:  11/10/06
T-85844   31-02 Low
California Men's Colony-West
P.O. Box 8103
San Luis Obispo, Ca. 93403


Re: Letters from Liver specialist supporting treatment on
    Appeal Log No. CMC-06-1573



Dear Appeal Examiner,

I have sent to you letters from 2 liver specialist that recommend treatment
at stage 2, and with amount of scarring on my liver biopsy. I sent copies
of medical records and my liver biopsy to this liver Centers. This shows
a Standard of medical care , that CDC should be using. Please review the
letters.



Sincerely,

James Shayler

James Shayler



**CEDARS-SINAI MEDICAL CENTER.**
**Pathology and Laboratory Medicine**

Stephen A. Geller, MD
Chairman

June 19, 2006

James Shayler
T-85844, #1-021
California Men's Colony – West
P.O. Box 8103
San Luis Obispo, CA 93404

Dear Mr. Shayler-

Thank you for your recent letter inquiring about staging of hepatitis C liver biopsies. Unfortunately, your question requires a complicated answer.

Liver biopsies from patients with hepatitis C are evaluated and scored for both grade and stage. The grade refers to the degree of inflammation in the liver and the stage refers to the amount of fibrosis (scarring). There are, however, a variety of grading and staging systems currently in use. Although the preference is to use a whole number wherever possible, some pathologists will occasionally use a range when the liver biopsy findings are not entirely clear and you may get a "2-3" score. To be absolutely sure of the meaning of your staging of "2/4" it would be best to find out the system that was used by the examining pathologist. In most of the systems, the "2/4" stage would mean significant fibrosis but not to cirrhosis. Cirrhosis is the most severe form of liver fibrosis, associated with a variety of symptoms and physical manifestations. Often, depending on the clinical circumstances, individuals with a "2/4" will be treated to try and control the progression of the hepatitis C.

Enclosed for your interest is an outline of the system that we use ("Scheuer") as well as a system widely used in Europe ("Metavir"). As you can see, they are similar.

I hope this is helpful for you.

Sincerely,

Stephen A. Geller, M.D.

8700 Beverly Blvd. ■ Room 8725 ■ Los Angeles, CA 90048
Office (310) 423-6611 ■ Fax (310) 423-0122 ■ www.cedars-sinai.edu

Form No. 4509 (Rev. 3/02)



JOHNS HOPKINS
U N I V E R S I T Y

**Division of Infectious Diseases**
1830 East Monument Street / Suite 452
Baltimore MD 21205-2100 USA
(410) 502-7134 / FAX (410) 614-8488
http://www.hopkins-aids.edu
http://www.hopkins-id.edu

David L. Thomas, MD, MPH
Division Chief

October 16, 2006

Mr. James Shayler
T-85844 31-02 Low
California Men's Colony-West
P.O. Box 8103
San Luis Obispo, CA  93403

Dear Mr Shayler,

I am sorry to hear about your hepatitis C infection.  I cannot comment on your case in particular because you aren't my patient.  What I can tell you is that the result of a liver biopsy is one of the most important things that we use to decide if treatment is a good idea.  The amount of scarring on your biopsy is enough to seriously consider treatment.  The other things have to be decided by a patient and their doctor and include the chances of getting cured and the chances of having side effects from the drugs.

Best of wishes as you work through this.

Sincerely,

David L. Thomas, MD, MPH
*Professor of Medicine*
*Chief, Division of Infectious Diseases*

# Yale University

James L. Boyer, M.D.
Ensign Professor of Medicine
Director, Liver Center
School of Medicine
333 Cedar Street, 1080 LMP
P.O. Box 208019
New Haven, Connecticut 06520-8019

Campus address:
TAC, ROOM S241C
Telephone: 203 785-5279
Fax: 203 785-7273
Email: james.boyer@yale.edu
Fed Ex address:
One Gilbert Street
New Haven, Connecticut 06519

October 12, 2006

James Shayler
T-85844   31-02 Low
California Men's Colony-West
P.O. Box 8103
San Luis Obispo, CA  93403

Dear Mr. Shayler:

I am responding to your letter for information as to the stage that liver biopsy patients should
receive treatment for hepatitis C.  In general most medical opinions would indicate that patients
with stage 2 disease should be treated, particularly if they have genotype type 2 since there is an
80% chance of eradicating the virus and preventing progression of disease.  I would certainly
recommend that you undergo twenty-four weeks of therapy with pegylated interferon and
ribavirin providing there are no other contraindications.  Good luck with the treatment.

Sincerely yours,

James L. Boyer, M.D.
Ensign Professor of Medicine
Director, Liver Center

JLB:amt

495

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

**INMATE/PAROLEE APPEAL FORM**
CDC 602 (12/87)

Location: Institution/Parole Region
1. CMC-W
2.

Log No.
1. 06-1573
2.

Category
Medical (8)

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|------|--------|-----------|------------------|
| James Shayler | T-85844 | Yard Crew | 3-31-02L |

A. Describe Problem: I have Hepatitis C, I had a liver biopsy done. The liver biopsy shows that I am at Stage 2/4 and grade 2/4.(see Exhibit A ) The liver biopsy states that I have chronic Hepatitis C, protal areas contain aggregates of chronic inflammatory cells, portal fibrosis with focal preiportal extension. This micorosopic description means it is progressing to stage 3. It will only get worse, with out treatment (Interferon). My primary Care provider Dr. Onglao Has refused to treat me, stating that there is no treatment at stage 2. When I question Dr. Onglao refusal, he then stated in writing that my ALT levels were not Doubled or two times the normal levels, stating that I could not have treatment. (attach page)

If you need more space, attach one additional sheet.

B. Action Requested: That California Dept. of Corrections provide treatment with Combination Therapy.

Inmate/Parolee Signature: _James W. Shayler_    Date Submitted: 6/25/06

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: BYPASS

Staff Signature: _____    Date Returned to Inmate: _____

RECEIVED INMATE APPEALS BRANCH AUG 24 2006

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

BYPASS

Signature: _____    Date Submitted: _____
Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

CDC Appeal Number:

CMC APPEALS OFFICE JUN 29 2006

496

**First Level** ☐ Granted ☐ P. Granted ☐ Denied ☐ Other _____

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: _____ Due Date: _____

Interviewed by: _____

_BYPASS_

Staff Signature: _____ Title: _____ Date Completed: _____

Division Head Approved:                                                                    Returned

Signature: _____ Title: _____ Date to Inmate: _____

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

_BYPASS_

Signature: _____ Date Submitted: _____

**Second Level** ☐ Granted ☐ P. Granted ☒ Denied ☐ Other    JUN 29 2006    AUG 11 2006

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: _____ Due Date: _____

☐ See Attached Letter                                AUG 15 2006

Signature: M. Vggnale                    CMC APPEALS OFFICE    Date Completed: 8/15/06

Warden/Superintendent Signature:    E. GREENMAN, MD, HCM    Date Returned to Inmate: AUG 16 2006

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

IN THE Appeal RESPONSE, The Health Care MANAGE, DR. GREENMAN
States that I am STAGE 2+. UNDER (CDC's) Hepatitis C Clinical
MANgement PROgram States, stage 2-3 fibrosis
will be offered combination Therapie. I should
guality at Stage 2. (See ATTACh Director's level Review)

Signature: James Shayler                    Date Submitted: 8/17/06

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION: ☐ Granted ☐ P. Granted ☒ Denied ☐ Other _____

☒ See Attached Letter                                Date: NOV 21 2006

CDC 602 (12/87)

497

STATE OF CALIFORNIA                                                    DEPARTMENT OF CORRECTIONS

*California Men's Colony*

# *MEMORANDUM*

APPEAL RESPONSE LEVEL:          SECOND

DATE:                          Monday, August 14, 2006

TO:                            SHAYLER, JAMES

CDC #:                         T85844

APPEAL LOG #:                  CMC-W-06-01573

ISSUE APPEALED:                Public Health Issues

INTERVIEW:

You were interviewed on 8/10/06, and given the opportunity to clarify the issue of this appeal before two panel physicians and the medical appeals analyst.

PROBLEM DESCRIPTION / ACTION REQUESTED:

Shayler, James  T-85844:  In your written appeal, signed 6/25/06, you state that you have hepatitis C and you have had a liver biopsy which shows you are at Stage 2/4.  You state the microscopic description indicates that your disease is progressing to Stage 3, and you state it will only get worse without treatment with interferon.  You state that your primary care physician, Dr. Onglao has refused to order interferon treatment for your hepatitis condition, and you believe his decision to decline treatment is in conflict with the CDCR Hepatitis C Clinical  Treatment Program guidelines.  You request that CDCR provide treatment for your hepatitis C with Combination Therapy.

APPEAL RESPONSE:

During interview and in your written appeal you point out that confusion surrounds the term Stage 2-3, and Stage 2+, as it relates to qualifying the patient to receive treatment for his condition.  Your unit health record records your biopsy as 2+, which is the equivalent of Stage 2/4.  Stage 2/4 does not qualify you for treatment.  Stage 2+ is not the same as Stage 3/4.  Stage 2/4 would only qualify a patient for treatment, if that patient also has a communicable infectious disease.  Fortunately, this is not your situation.

Your request for Combination Therapy for hepatitis C is denied at this point in time.

APPEAL DECISION: Denied

M. U~~~~ll. ~                                      8/15/06
_____                    _____
E. GREENMAN, M.D.                                   Date
Health Care Manager

EG:bv

Page 1 of 1

**Attach Additional Page**

A few days ago, while in the law library, I found a copy of **HEPATITIS C CLINICAL MANAGEMENT PROGRAM** dated 2004 and 2005. Under the revised Hepatitis C Clinical Management Program I **meet all criteria for treatment with comination Therapy.**
On page 4. under C. phase III ( staging by liver biopsy and Combination Therapy) it staes in number (9) That inmate-patients whose liver biopsy results are consistent with **stage 2-3 fibrosis** or greater, and who meet all inclusion criteria **will be offered combination Therapy.** I am at stage 2 and progressing to stage 3, Yet doctor Onglao has refused treatment to me.

The second reason Doctor Onglao gave me (my ALT levels not being two times normal)
It states in the revised Hepatitis C Clinical Management Program on page 2. B phase II ( Inital Management after diagnosis of HCV) under number (8) that inmate-patie..ts **who are 45 years or younger** with ALT levels elvated to, less then two times normal values will not be offered combination therapy. **I am 51 years old, my ALT levels do not have to be two times normal values.**

I wrote the Pathology consultants and they stated to me that there is not a stage 2-3/4 only stages 1/4 , 2/4 , 3/4, and 4/4. In the Hepatits C Clinical Management Program, under number (9) were it states stage  2-3 , that means stages 2-3 should get treatment, not that stage 2-3/4 get treatment, there is NO stage 2-3/4.

I meet all criteria for treatment, I don't have a high risk behavior, and I had 11 months and 29 days left on sentence, when Doctor Onglao refused me treatment ( a number of times) I only needed 10 months, to able to get teratment, do to the fact I am type 2, and only require 6 months of treatment.

Because of the medical Dept. refual to treat me, my Hepatitis C is only going to get worse, and cause me more damage. This refusal of treatment is professional negligence by staff doctors at CMC, who are trying to save money at the inmate expence.

By the staff Doctors refusing to treat me with Interferon against CDC own guild-lines is a violation of my Civil Rights, under 8th amendment, " deliderate indifference" to a serious medical need.

Under Plata **v.** Davis and Plata **v.** Schwarzenegger, I am entitled to medical care treatment for Hepatitis C at stage 2.

## DIRECTOR'S LEVEL REVIEW

The appeal was denied at second level for treatment foe Hepatitis C with Comination Therapy,
the appeal response was dinied by the Health Care manager. If you would look at the response
the Health Care Manager states that my unit health record put my liver biopsy at 2+ , that saying
that greater than stage 2 and progressing to stage 3. The Health Care Manager states I do not
qualify because it not the same as stage 3/4. Under CDC'S own guidelines offer treatment at
stage 2-3, not stage 3 only. If you would look at (exhibit B) CDC'S Hepatitis C Clinical
Managment Program B. Phase III (Staging by Liver Biopsy and Combination therapy) (9) states as
follow: Inmate-patients whose liver biopsy results are consistent with Stage 2-3 or greater will
be offered combination therapy. This states that stages 2 through 3 will be offered treatment,
not just stage 3/4. My stage of 2+ should qualify me for treatmnet under CDC'S own policy. If
you look at my liver biopsy it shows that I have CHRONIC Hepatitis C and stage 2 and grade 2
damage to my liver. (see exhibit A)

In my medical records (see exhibit C) Doctor Araya, a Department head and on MAR HCV Sub-Committee
reviewed my medical records, he states that if liver biopsy come back equal to or greater than
($\geq$) stage 2 that he recommends treatment. Dr. Araya uses the sign ($\geq$) which
means equal to or greater than. Dr. Araya is on MAR HCV Sub-Committe and he
recommended treatment at equal to or greater than stage 2 . In the appeal response
the Health Care Manager states my liver biopsy at stage 2+ that would put me
at equal to or greater than stage 2.

Under CDC'S Inmate-patient Orientaion Handbook to health Care Services states on Page 7
CHONIC CARE PROGRAM (CCP) that if you are identified as having a chronic health condition and you
quaily for the Chronic Care program (CCP) you will receive medically necessary health care services
in accordance with established procedures and medical standards. This states health care services
in accordance to MEDICAL STANDARDS.

To show medical standards, under Health and Safety Code § 122410. ( Available protocols and
guidelines) (see exhibit D ) The State Department of Health Services shall make available protocols
and guidelines developed by the National Institutes of Health for treatment. Under (3) states
protocols within the department of Corrections to enable that department to provide treatment
to prisoner with hepatitis C. This states California Department of Corrections protocols MUST
follow the recommendation from the National Institutes of Health.

Under U.S. Department of Health and Human Services Chronic Hepatitis C Current Disease Management
Program, which was developed by the National Institutes of Health, on page 10 (Who should get treated)
The panel recommends that ALL Patients with Fibrosis or evidence of Choronic Hepatitis C should
be treatdd. Iy you look at my liver biopsy it shows chronic hepatitis C and at stage 2, I have
moderate Fibrosis.

To show medical standard, under the Center for Disease Control and Prevention (CDC) it
recommendation is that if liver biopsy shows fibrosis or other signs that cirrhosis of the

DIRECTOR'S LEVEL REVIEW

PAGE 2

Liver will occur. Look up Center for disease Control on its Website at www. cdc.
gov/ncido/disease/hepatitis C.

To show medical stardard., The American Association for the Study of Liver Diseases
Practice Guideline: Diagnosis, Management, and Treatment of Hepatitis C at www.aasld.
org/ewed/docs/hepatitisc.pdf. The American Association, which is liver specalists
remmond treatment to patients with chronic hepatitis C and patients with fibrosis.
If you look at my liver biospy it shows chronic hepatitis C and at stage 2 and grade
2,I have moderate fibrosis.

To show medical standard, (see exhibit F) I sent a copy of my liver biopsy to Cedar-Sinal
Medical Center, to the Pathology and Labortatory Department. A leter was sent back from the
Chairman of the Pathogoly and Labortaory Department. Dr. Geller states in letter that the
perference is to use whole numbers whenever posssible in a liver biopsy. He states that
occasionally a score of 2-3 will be used only when a liver biopsy is not entirely clear.
Also Dr. Geller, who is the Chairman of Cedar-Sinal Medical center states in letter that
a individual with a stage 2 should get treatment to try and control the progression of
the Hepatitis C.

The letter from Dr. Geller points out that a score of 2-3 is only use when a liver biopsy
is not entirely clear, and the perference is to use whole numbers whenever possible.
This would go to show that California Dept. of Corrections Hepatitis C Clinical Management
Program wording that inmate-patients whose liver biopsy results are consistent with stage
2-3 fibrosis or greater, would mean stage 2 though stage 3 should get treatment.
Also, Dr. Geller states that a individual with a stage 2 should get treatment.
To show medical standard, (see exhibit G) this page is from a medical Book on Hepatitis
C and you can see that states under (who should get treated) that all patient with chronic
Hepatitis C and patients that show fibrosis damage to liver should get treatment.
I have both chonic hepatitis C and show signs of fibrosis damage to liver. (see exhibit B)

CONCLUSION

I would like to state one more time that in my medical records on 1/30/06, Dr. Araya,
a Department Head, and on the MAR HCV Sub-committe reviewed my medical records, he states
that if liver biopsy come back at ( equal to or greater than stage 2 ) that he recommends
treatment. Dr. Araya used the sign $\geq$ which means equal to or greater than.(see Exhibit C)

## DIRECTOR'S LEVEL REVIEW

### PAGE 3

If you contact the Division of Correctional Health Care Services, regarding
California Department of Corrections Hepatitis C Clinical Management Program
B. Phase III: ( Staging by liver Biopsy and Combination Therapy)
(9) Inmate-patients whose liver biopsy results are consistent with Stage 2-3 fibrosis
will be offered combination therapy.

The Doctors will state that stage 2-3 fibrosis means stages 2 though 3 should get treatment.
To support this (see exhibit D) the U.S. Department of Health and Human Services
Chronic Hepatitis C Current Disease Management Program, which was developed by
the National Institutes of Health , On page 10 ( who should get treated) The panel
recommends that ALL patients with fibrosis or evidence of Chronic Hepatitis C should
be treated .

I have shown from a number of top medical experts that at Stage 2 fibrosis I should
be offerd Combination Therapy. I have shown a medical standard that California Department
of Corrections is refusing me and is my right concering my health care. I have contacted
the Prison Law Office ( Attorney  Donald Specter ) and they have stated I should be
offered treatment at stage 2, from the evidence I sent them, and are willing to litigate
this issue for me in court.

Also I sent a letter  to Judge Henderson, who put CDC medical health care in Receivership
and Judge Henderson referred my letter to Californ prison Health Care receivership
Mr. Robert Sillen, who is the Receiver, they will be looking in to this matter, and
and recommended me to 602 appeal the treatment of my Heapatitis C.

I ask that the Director's Level review offer me treatment for Hepatitis C, and that
at stage 2 and grade 2, I should get combination Therapy.

Dated: 8.10.06

By: _James Shayler_
James Shayler

# EXHIBIT

# A

State of California
**CDC FORM 695**
**Screening For:**
CDC 602 Inmate/Parolee Appeals
CDC 1824 Reasonable Modification or Accommodation Request

RE: Screening at the INFORMAL Level

*June 20, 2006*

**SHAYLER, T85844**
*WFU3310000000002L*

Log Number: CMC-W-
(Note: Log numbers are not assigned to screen out appeals, or informal level appeals)

The enclosed documents are being returned to you for the following reasons:

*You are appealing an action or decision that has not yet occurred. Such issues are not appealable until they happen. (CCR 3084.3(c)(3)).*

*When you parole you can request make this request. If you are denied, then you may file an appeal based on the denial. You cannot appeal an issue that is in the future, i.e. treatment when you parole, therefore, this appeal cannot be accepted.*

D. Engler/M. Vela
CC-II Specialist
California Men's Colony

To: M. Vela, I have followed CCR 3084.3 (c) (3) I am asking
to be treated NOW.

James Shyler

**NOTE:** Failure to follow instruction(s) will be viewed as non-cooperation and your appeal will be automatically dismissed pursuant to CCR 3084.4(d). This screening decision may not be appealed. If you believe this screen out is in error, please return this form to the Appeals Coordinator with an explanation of why you believe it to be in error, and supporting documents. You have only 15 days to comply with the above directives.

---

## PERMANENT APPEAL ATTACHMENT – DO NOT REMOVE

## CENTRAL COAST PATHOLOGY CONSULTANTS, Inc.
### A Medical Group

| | | | |
|---|---|---|---|
| C. L. Douglas, M.D., Director | S. B. Jobst, M.D. | J. B. Hannah, M.D. | D. M. Lawrence, M.D. |
| B. D. Ragsdale, M.D. | R. E. Rocha, M.D. | | K. F. Lundquist, M.D. |

Tel #: (805) 434-4504   Fax #: (805) 434-3259
Test Performed at: 3701 S. Higuera Street Ste. 200 San Luis Obispo, CA 93401

### Patient: SHAYLER, JAMES CDC# T85844

### Accession #: TWS-06-10590

Date Coll/Rec'd: 2/23/2006 - 2/23/2006

Sex: M
DOB: 9/20/1955
MRN:

**Physician:   RUSSELL, WILLIAM M.D. - RADIOLOGY DIAGNOSTIC CENTER**
**VIGGIANELLI, MICHAEL - CALIFORNIA MENS COLONY**

**SPECIMEN RECEIVED:**   A) Liver Biopsy

**CLINICAL HISTORY:**   50-year old male California Men's Colony inmate with history of hepatitis C.

**GROSS DESCRIPTION:**   In formalin, designated "liver ultrasound biopsy" are four needle-shaped portions of soft, light-brown tissue, 6- to 20 x 1-mm in greatest dimension each. This also includes a 3-mm aggregate of apparently yellow-tan fatty tissue. One (1) cassette entirely. PAS, trichrome, iron and reticulin stains are requested.

SBJ/sw:la
2/23/06

**MICROSCOPIC DESCRIPTION:**   Sections show several needle biopsies of liver with adequate numbers of portal areas for examination. A small amount of accompanying fibroadipose tissue is present. The overall architecture is intact as seen by reticulin stain. The trichrome stain shows patchy portal fibrosis with focal periportal extension but with no bridging fibrosis identified. No bile duct proliferation is seen. However, portal areas contain patchy aggregates of chronic inflammatory cells with focal piecemeal necrosis. Mild fatty change is appreciated. No PAS-positive diastase-resistant globules are seen within the cytoplasm of hepatocytes. No granulomas are present. Prussian blue stain is negative for stainable iron. There is no malignancy.

**MICROSCOPIC DIAGNOSIS:**

Liver (core needle biopsies):
- **CHRONIC HEPATITIS C**
- **GRADE 2 / 4 INFLAMMATION (PATCHY PORTAL INFLAMMATION WITH MILD PIECEMEAL NECROSIS)**
- **STAGE 2 / 4 FIBROSIS (PATCHY PORTAL FIBROSIS WITH FOCAL PERIPORTAL EXTENSION BUT WITH NO BRIDGING FIBROSIS)**
- **MILD FATTY CHANGE**
- **NO STAINABLE IRON**

SBJ/la

# EXHIBIT

# B

Attachment J



CALIFORNIA DEPARTMENT OF CORRECTIONS



# HEPATITIS C
## CLINICAL
### MANAGEMENT
#### PROGRAM

March 2004

6. Inmate-patients approved for liver biopsy shall have a medical hold placed on them to prevent transfer until the liver biopsy has been completed and the decision to begin combination therapy has been made based on the biopsy results.

7. In general, the liver biopsy should be completed within three (3) months from the time the PCP requests that a liver biopsy be performed by completing the *Request for Services* form CDC 7243.

8. Inmate-patients who have had a liver biopsy shall have their cases reviewed by the MAR HCV Sub-committee prior to initiation of combination therapy.

Read →

9. Inmate-patients whose liver biopsy results are consistent with stage 2-3 fibrosis or greater, and who otherwise meet inclusion criteria will be offered combination therapy as shown in Attachment J.

10. Patients that are HIV-infected, whose liver biopsy results are consistent with stage 2 fibrosis or greater, and who otherwise meet inclusion criteria are also eligible for combination therapy.

11. Inmate-patients whose liver biopsy results are consistent with stage 2 fibrosis or less, and inmate-patients who are HIV infected and whose liver biopsy results are consistent with less than stage 2 fibrosis, are currently not eligible for combination therapy, but shall be followed every six (6) to twelve (12) months in the HCV Clinical Management Program and reconsidered for liver biopsy every four (4) years.

12. If there are questions of eligibility regarding liver biopsy or combination therapy, the PCP working through the MAR HCV Sub-committee may submit a request for consideration for review and decision to the Health Care Review Sub-committee.

13. The anticipated time period from the HCV screening request made by the inmate-patient to the initiation of combination therapy is nine (9) months, except for patients 45 years old or younger with ALT levels elevated to less than two (2) times normal during testing required in phase II section 8.

14. Inmate-patients receiving combination therapy shall be seen by the PCP weekly for the first two weeks and monthly thereafter beginning with the fourth (4) week.

15. Inmate-patients receiving combination therapy shall have appropriate evaluations and laboratory tests as outlined in Attachments I, J, K1 or K2.

16. Inmate-patients in the Mental Health program who are receiving interferon may be seen on a more frequent basis as determined by the interdisciplinary treatment team.

CALIFORNIA DEPARTMENT OF CORRECTIONS          HEPATITIS C CLINICAL MANAGEMENT PROGRAM

# Exclusion Criteria for Combination Therapy*

*No biopsy or treatment* if an early release date: generally less than ten [10] months from the time the primary care provider refers the inmate-patient for a liver biopsy by completing the *Request for Services* form CDC 7243 for genotypes 2 and 3, or less than sixteen [16] months from the time the primary care provider refers the inmate-patient for a liver biopsy by completing the *Request for Services* form CDC 7243 for other genotypes.

---

- An early release date: generally less than ten [10] months from the time the primary care provider refers the inmate-patient for a liver biopsy by completing the *Request for Services* form CDC 7243 for genotypes 2 and 3, or less than sixteen [16] months from the time the primary care provider refers the inmate-patient for a liver biopsy by completing the *Request for Services* form CDC 7243 for other genotypes

- Poorly controlled cardiopulmonary, cerebrovascular or thyroid disease, blood dyscrasias, seizures, cancer, diabetes mellitus (hemoglobin $A_{1c}$ >8.5%), or renal insufficiency (creatinine >2 mg/dL)

- Inmate-patients 45 years old or younger with ALT levels elevated to less than two (2) times normal laboratory values on three consecutive tests, at least one month apart, are not eligible for treatment

- Decompensated cirrhosis – e.g. albumin <3, jaundice, ascites, varices, coagulopathy

- Autoimmune disease

- WBC <1,500/mm³, platelets <75,000/mm³

- Hemolytic anemias, or hemoglobin <11gm/dL or hematocrit <33%

- Solid organ transplantation

- HIV infection w/CD4 Count <300

- Poorly controlled psychiatric/psychological condition

- Serious suicidal behavior in the past 12 months

- History of illicit drug use, alcohol or other substance abuse, or other high risk behaviors currently active or within the past 6-12 months

- Inability to cooperate with treatment

- Inability to give informed consent

- Age >60 years

- Pregnancy – a pregnancy test is required prior to initiating therapy

**\*Refer to drug manufacturer's warnings in addition to highlighted contraindications**

EXHIBIT

C

| DATE | TIME | |
|------|------|---|
| 1/12/06 | | CMC ORTHO CLINIC   Flu from 11/14/05 V̄ |
| | S | 2½ mos p̄ ulnar nerve transposition |
| | | No real improvements yet - |
| | | ↙ - x̄ = DJD [?] |
| | | tell the pre op |
| | O | Rom 28° - 105° |
| | | mild contracture R̄ Ē finger PIP |
| | R | RTC 1 mo |
| 1/30/06 | 1600 | HCV TRC |
| | | Records reviewed. |
| | | Meets CDCR criteria for liver Bx |
| | | Recommend Bx & consider Tx for HCV if Bx shows ≥ Stage 2 |
| | | fibrosis and no contraindications exist |
| | | ( Arayer mo |

| INSTITUTION | HOUSING UNIT | CDC NUMBER, NAME (LAST, FIRST, MI) AND DATE OF BIRTH |
|-------------|--------------|------------------------------------------------------|
| | | Shayler, James |
| | | P 85844 |

**INTERDISCIPLINARY PROGRESS NOTES**

CDC 7230 (Rev 04/03)
STATE OF CALIFORNIA

09/20/55

511

# EXHIBIT

# D

HEALTH AND SAFETY CODE                                    § 122410

### § 122406. Report to Legislature by Secretary of Veterans Affairs

The Secretary of Veterans Affairs shall report to the Legislature on or before March 1, 2001, regarding the use of funds earmarked by the federal Veteran's Administration to regional offices in California to educate, screen, and treat veterans with the hepatitis C virus.

Added Stats 2000 ch 754 § 2 (SB 1256).

### § 122410. Available protocols and guidelines

(a) The State Department of Health Services shall make available protocols and guidelines developed by the National Institutes of Health, *the University of California at San Francisco,* and California legislative advisory committees on hepatitis C for educating physicians and health professionals and training community service providers on the most recent scientific and medical information on hepatitis C detection, *transmission,* diagnosis, treatment, and therapeutic decisionmaking.

(b) The guidelines referenced in subdivision (a) may include, but not be limited to, all of the following:

(1) Tracking and reporting of both acute and chronic cases of hepatitis C by public health officials.

(2) A cost-efficient plan to screen the prison population and the medically indigent population in California.

(3) Protocols within the Department of Corrections to enable that department to provide appropriate *prevention and* treatment to prisoners with hepatitis C.

(4) Protocols for the education of correctional peace officers and other correctional workers who work with prisoners with hepatitis C.

(5) Protocols for public safety and health care workers who come in contact ith hepatitis C patients.

(6) Surveillance programs to determine the prevalence of hepatitis C in ethnic i other high-risk populations.

7) Education *and outreach* programs for high-risk individuals, including, but limited to, individuals who received blood transfusions prior to 1992, iophiliacs, veterans, *women who underwent a caesarian section or prema- e delivery prior to 1990, persons who received an organ transplant prior to 30, persons who receive invasive cosmetic procedures, including body pierc- and tattooing,* students, * * * minority communities, *and any other catego- 's of persons at high risk for hepatitis C infection as determined by the direc- r.* Education and outreach programs shall be targeted to high-risk individuals ; determined by the director. Education programs may provide information and eferral on hepatitis C including, but not limited to, education materials devel- ped by health-related companies, community-based or national advocacy orga- aizations, counseling, patient support groups, and existing hotlines for consum- rs.

(c) Nothing in this section shall be construed to require the department to develop or produce any protocol, guideline, or proposal.

Added Stats 1998 ch 867 § 1 (SB 694). Amended Stats 2000 ch 754 § 3 (SB 1256).

**Amendments:**

**2000 Amendment: (1)** Amended subd (a) by adding **(a)** '', the University of California at San Francisco,''; and **(b)** ''transmission,'' after ''C detection,''; **(2)** added ''prevention and'' in subd (b)(3); and **(3)** amended subd (b)(7) by **(a)** adding ''and outreach'' after ''Education'' at the beginning of the first sentence; and **(b)** substituting ''women who underwent a caesarian section or premature delivery prior to 1990, persons who

# EXHIBIT

# E

# Chronic Hepatitis C:
## Current Disease Management

*National Digestive Diseases Information Clearinghouse*



**National Institute of Diabetes and Digestive and Kidney Diseases**

**NATIONAL INSTITUTES OF HEALTH**

The hepatitis C virus (HCV) is one of the most important causes of chronic liver disease in the United States. It accounts for about 15 percent of acute viral hepatitis, 60 to 70 percent of chronic hepatitis, and up to 50 percent of cirrhosis, end-stage liver disease, and liver cancer. Almost 4 million Americans, or 1.8 percent of the U.S. population, have antibody to HCV (anti-HCV), indicating ongoing or previous infection with the virus. Hepatitis C causes an estimated 10,000 to 12,000 deaths annually in the United States.

A distinct and major characteristic of hepatitis C is its tendency to cause chronic liver disease. At least 75 percent of patients with acute hepatitis C ultimately develop chronic infection, and most of these patients have accompanying chronic liver disease.

Chronic hepatitis C varies greatly in its course and outcome. At one end of the spectrum are patients who have no signs or symptoms of liver disease and completely normal levels of serum liver enzymes. Liver biopsy usually shows some degree of chronic hepatitis, but the degree of injury is usually mild, and the overall prognosis may be good. At the other end of the spectrum are patients with severe hepatitis C who have symptoms, HCV RNA in serum, and elevated serum liver enzymes, and who ultimately develop cirrhosis and end-stage liver disease. In the middle of the spectrum are many patients who have few or no symptoms, mild to moderate elevations in liver enzymes, and an uncertain prognosis.

Chronic hepatitis C can cause cirrhosis, liver failure, and liver cancer. Researchers estimate that at least 20 percent of patients with chronic hepatitis C develop cirrhosis, a process that takes at least 10 to 20 years. After 20 to 40 years, a smaller percentage of patients with chronic disease develop liver cancer. Liver failure from chronic hepatitis C is one of the most common reasons for liver transplants in the United States. Hepatitis C is the cause of about half of cases of primary liver cancer in the developed world. Men, alcoholics, patients with cirrhosis, people over age 40, and those infected for 20 to 40 years are more likely to develop HCV-related liver cancer.

## Risk Factors and Transmission

HCV is spread primarily by contact with blood and blood products. Blood transfusions and the use of shared, unsterilized, or poorly sterilized needles and syringes have been the main causes of the spread of HCV in the United States. With the introduction in 1991 of routine blood screening for HCV antibody and improvements in the test in the mid-1992, transfusion-related hepatitis C has virtually disappeared. At present, injection drug use is the most common risk factor for contracting the disease. However, many patients acquire hepatitis C without any known exposure to blood or to drug use.



**U.S. Department of Health and Human Services**

patients who weigh less than 75 kilograms (165 pounds) and 1,200 mg for those who weigh more than 75 kilograms. In certain situations, an 800-mg dose (400 mg twice daily) is recommended (see below).

Combination therapy leads to rapid improvements in serum ALT levels and disappearance of detectable HCV RNA in up to 70 percent of patients. However, long-term improvement in hepatitis C occurs only if HCV RNA disappears during therapy and stays undetectable once therapy is stopped. Among patients who become HCV RNA negative during treatment, a proportion relapse when therapy is stopped. The relapse rate is lower in patients treated with combination therapy compared with monotherapy. Thus, a 48-week course of combination therapy using peginterferon and ribavirin yields a sustained response rate of approximately 55 percent. A similar course of peginterferon monotherapy yields a sustained response rate of only 35 percent. A response is considered "sustained" if HCV RNA remains undetectable for 6 months or more after stopping therapy.

The optimal duration of treatment varies depending on whether interferon mono-therapy or combination therapy is used, as well as by HCV genotype. For patients treated with peginterferon monotherapy, a 48-week course is recommended, regardless of genotype. For patients treated with combination therapy, the optimal duration of treatment depends on viral genotype. Patients with genotypes 2 and 3 have a high rate of response to combination treatment (70 to 80 percent), and a 24-week course of combination therapy yields results equivalent to those of a 48-week course. In contrast, patients with genotype 1 have a lower rate of response to combination therapy (40 to 45 percent), and a 48-week course yields a significantly better sustained

response rate. Again, because of the variable responses to treatment, testing for HCV genotype is clinically useful when using combination therapy.

In addition, the optimal dose of ribavirin appears to vary depending on genotype. For patients with genotypes 2 or 3, a dose of 800 mg daily appears adequate. For patients with genotype 1, the full dose of ribavirin (1,000 or 1,200 mg daily depending on body weight) appears to be needed for an optimal response.

## Who Should Be Treated?

Patients with anti-HCV, HCV RNA, elevated serum aminotransferase levels, and evidence of chronic hepatitis on liver biopsy, and with no contraindications, should be offered therapy with the combination of alpha interferon and ribavirin. The National Institutes of Health Consensus Development Conference Panel recommended that therapy for hepatitis C be limited to those patients who have histological evidence of progressive disease. Thus, the panel recommended that all patients with fibrosis or moderate to severe degrees of inflammation and necrosis on liver biopsy should be treated and that patients with less severe histological disease be managed on an individual basis. Patient selection should not be based on the presence or absence of symptoms, the mode of acquisition, the genotype of HCV RNA, or serum HCV RNA levels.

Patients with cirrhosis found through liver biopsy can be offered therapy if they do not have signs of decompensation, such as ascites, persistent jaundice, wasting, variceal hemorrhage, or hepatic encephalopathy. However, interferon and combination therapy have not been shown to improve survival or the ultimate outcome in patients with preexisting cirrhosis.

10   Chronic Hepatitis C:  Current Disease Management

EXHIBIT

F



**CEDARS-SINAI MEDICAL CENTER.**
**Pathology and Laboratory Medicine**

Stephen A. Geller, MD
Chairman

June 19, 2006

James Shayler
T-85844, #1-021
California Men's Colony – West
P.O. Box 8103
San Luis Obispo, CA 93404

Dear Mr. Shayler-

Thank you for your recent letter inquiring about staging of hepatitis C liver biopsies. Unfortunately, your question requires a complicated answer.

Liver biopsies from patients with hepatitis C are evaluated and scored for both grade and stage. The grade refers to the degree of inflammation in the liver and the stage refers to the amount of fibrosis (scarring). There are, however, a variety of grading and staging systems currently in use. Although the preference is to use a whole number wherever possible, some pathologists will occasionally use a range when the liver biopsy findings are not entirely clear and you may get a "2-3" score. To be absolutely sure of the meaning of your staging of "2/4" it would be best to find out the system that was used by the examining pathologist. In most of the systems, the "2/4" stage would mean significant fibrosis but not to cirrhosis. Cirrhosis is the most severe form of liver fibrosis, associated with a variety of symptoms and physical manifestations. Often, depending on the clinical circumstances, individuals with a "2/4" will be treated to try and control the progression of the hepatitis C.

Enclosed for your interest is an outline of the system that we use ("Scheuer") as well as a system widely used in Europe ("Metavir"). As you can see, they are similar.

I hope this is helpful for you.

Sincerely,

Stephen A. Geller, M.D.

8700 Beverly Blvd. ■ Room 8725 ■ Los Angeles, CA 90048
Office (310) 423-6611 ■ Fax (310) 423-0122 ■ www.cedars-sinai.edu

Form No. 4509 (Rev. 3/02)

# EXHIBIT

# G

## *Hepatitis C*

become negative for HCV RNA by PCR. However, many of these patients relapse once interferon is discontinued. In patients who relapse, the reappearance of HCV RNA and rise of serum ALT levels usually occurs within 1 to 3 months after treatment; only rarely does it occur later. A sustained, long-term response (defined as no relapse at least 6 months after stopping interferon) occurs in 10 to 15 percent of patients who are treated for 6 months and 20 to 25 percent of those treated for 1 year.

Characteristics that predict a good response to interferon are absence of cirrhosis, a short duration of infection, low levels of HCV RNA in serum, and viral genotypes 2 and 3. None of these features are perfect predictors, but they can help in evaluating the chances of success.

### *Who Should Be Treated?*

Patients with anti-HCV, HCV RNA, elevated aminotransferase levels, and evidence of chronic hepatitis on liver biopsy should be offered therapy with alpha interferon. A recent NIH Consensus Development Conference recommended that all patients with fibrosis on liver biopsy or at least moderate degrees of inflammation and necrosis should be treated, and that patients with milder histological disease be managed on an individual basis. Patient selection should not be based on symptoms, mode of acquisition, genotype of HCV, or serum HCV RNA levels.

Patients found to have cirrhosis through liver biopsy can be offered therapy if they do not have signs of decompensation, such as ascites, persistent jaundice, wasting, variceal hemorrhage, or hepatic encephalopathy. However, interferon therapy is less likely to be successful in patients with cirrhosis than those without, and therapy has not been proven to improve survival or ultimate outcome.

Children and patients older than 60 years also should be managed on an individual basis, as the benefit in these patients has not been well documented. In these indefinite situations, the indications for therapy should be reassessed at regular intervals. In view of the rapid developments in hepatitis C today, better therapies may soon be available, at which point expanded indications for therapy would be appropriate.

In patients with clinically significant extra-hepatic manifestations, such as cryoglobulinemia and glomerulonephritis, long-term maintenance therapy with alpha interferon aimed at suppression of the disease may be needed rather than a 12-month course aimed at eradication of HCV RNA. In these patients, continuous therapy can be given

265

Case 2:06-cv-08042-UA-RNB Document 6 Filed 12/18/06 Page 88 of 90 Page ID #:182

James Shayler
T-85844    31-02 LOW
California Men's Colony - West
P.O. Box 8103
San Luis Obispo, Ca. 93403





$00.60
02 1A
0004632145    DEC 06 2006
MAILED FROM ZIP CODE 93401



United States District Court
Central District of California
312 North Spring Street Room G-8
Los Angeles, Ca. 90012

ATTN: PRO SE CLERK

Thos costle cu  12/11/06

TKoscosh c4    12/1/06

# Exhibit 35

# *LUMBAR SPINE MEDICAL SOURCE STATEMENT*

From. BEVERLY HOSPITAL

Re: JAMES Shayler (Name of Patient)

_____ (Social Security No.)

**EXHIBIT**

**SHAYLER 4**

Please answer the following questions concerning your patient's impairments. *Attach relevant treatment notes, radiologist reports, laboratory and test results as appropriate.*

1. Frequency and length of contact: 8 days

2. Diagnoses: multiple levels of Diffued Disc Bulgue with impsugement of the L5 nerve Root.

3. Prognosis: _____

4. Identify the *clinical findings*, laboratory and test results that show your patient's medical impairments:

   MRI

5. Have your patient's impairments lasted or can they be expected to last at least twelve months? ☒ Yes ☐ No

6. Identify all of your patient's *symptoms*, including pain, insomnia, fatigue, etc.:

   unable to stand an walk over 15 minutes pain at 10 leool.

7. If your patient has pain:

   a. Characterize the nature, location, radiation, frequency, precipitating factors, and severity of your patient's pain:

      pain Runs down Right leg, and lower spine.

   b. Does your patient have neuro-anatomic distribution of pain? ☐ Yes ☒ No

From Social Security Disability Practice by Thomas E. Bush, copyright James Publishing. Used with permission. For information 800-440-4780 or www.JamesPublishing.com.

c. Identify any positive objective signs:

☐ Reduced range of motion: Description _____

☑ Positive supine straight leg raising test:    ☐ Swelling
    Left at _15_ ° Right at _20_ °    ☑ Muscle spasm
☑ Positive seated straight leg raising test    ☐ Motor loss
☐ Abnormal gait    ☐ Muscle atrophy
☑ Sensory loss    ☑ Muscle weakness
☐ Reflex loss    ☐ Impaired appetite
☑ Tenderness    ☐ Weight change
☐ Crepitus    ☐ Impaired sleep

Other signs: _____

8. Do emotional factors contribute to the severity of your patient's symptoms and functional
   limitations?                                ☐ Yes        ☑ No

9. Identify the side effects of any medication that may have implications for working, e.g.,
   dizziness, drowsiness, stomach upset, etc.:

   _____

   _____

10. As a result of your patient's impairments, estimate your patient's functional limitations if
    your patient were placed in a ***competitive work situation:***

    a. How many city blocks can your patient walk without rest or severe pain? _no walking_

    b. Please circle the hours and/or minutes that your patient can sit *at one time*, e.g., before
       needing to get up, etc.

       **Sit:**        0  5  10  15  20  (30)  45         1   2   More than 2
                              Minutes                              Hours

    c. Please circle the hours and/or minutes that your patient can stand *at one time*, e.g.,
       before needing to sit down, walk around, etc.

       **Stand:**      0  5  10  (15)  20  30  45         1   2   More than 2
                              Minutes                              Hours

    d. Please indicate how long your patient can sit and stand/walk ***total in an 8-hour
       working day*** (with normal breaks):

       **Sit**        **Stand/walk**
       ☑              ☑              less than 2 hours
       ☐              ☐              about 2 hours
       ☐              ☐              about 4 hours
       ☐              ☐              at least 6 hours

    e. Does your patient need a job that permits shifting positions *at will* from sitting, standing
       or walking?                              ☑ Yes       ☐ No

5263

f. Does your patient need to include periods of walking around during an 8-hour working day?  ☑ Yes   ☐ No

If yes, how *often* must your patient walk?   How *long* must your patient walk each time?
1  5 ⑩ 15  20  30  45  60  90          1  2  3  4 ⑤ 6  7  8  9  10  11  12  13  14  15
Minutes                              Minutes

g. Will your patient sometimes need to take unscheduled breaks during a working day?  ☑ Yes   ☐ No

If yes,  1) how *often* do you think this will happen?        5 times per day

2) how *long* (on average) will your patient have to rest before returning to work?     15 mins

h. With prolonged sitting, should your patient's leg(s) be elevated?  ☑ Yes   ☐ No

If yes,  1) how *high* should the leg(s) be elevated?        _____

2) if your patient had a sedentary job, *what percentage of time* during an 8-hour working day should the leg(s) be elevated?        60 %

i. While engaging in occasional standing/walking, must your patient use a cane or other assistive device?  ☑ Yes   ☐ No

*For this and other questions on this form, "rarely" means 1% to 5% of an 8-hour working day; "occasionally" means 6% to 33% of an 8-hour working day; "frequently" means 34% to 66% of an 8-hour working day.*

j. How many pounds can your patient lift and carry in a competitive work situation?

|                    | Never | Rarely | Occasionally | Frequently |
|--------------------|-------|--------|--------------|------------|
| Less than 10 lbs.  | ☐     | ☑      | ☐            | ☐          |
| 10 lbs.            | ☐     | ☐      | ☐            | ☐          |
| 20 lbs.            | ☑     | ☐      | ☐            | ☐          |
| 50 lbs.            | ☑     | ☐      | ☐            | ☐          |

k. How often can your patient perform the following activities?

|                | Never | Rarely | Occasionally | Frequently |
|----------------|-------|--------|--------------|------------|
| Twist          | ☑     | ☐      | ☐            | ☐          |
| Stoop (bend)   | ☑     | ☐      | ☐            | ☐          |
| Crouch/ squat  | ☑     | ☐      | ☐            | ☐          |
| Climb ladders  | ☑     | ☐      | ☐            | ☐          |
| Climb stairs   | ☑     | ☐      | ☐            | ☐          |

l. If your patient has significant limitations with reaching, handling or fingering, please indicate the percentage of time during an 8-hour working day that your patient can use hands/fingers/arms for the following activities:

|        | HANDS: Grasp, Turn Twist Objects | FINGERS: Fine Manipulations | ARMS: Reaching In Front of Body | ARMS: Reaching Overhead |
|--------|----------------------------------|-----------------------------|----------------------------------|-------------------------|
| **Right:** | %                            | %                           | %                                | %                       |
| **Left:**  | %                            | %                           | %                                | %                       |

m. How much is your patient likely to be "*off task*"? That is, what percentage of a typical workday would your patient's symptoms likely be severe enough to interfere with *attention and concentration* needed to perform even simple work tasks?

☐ 0%   ☐ 5%   ☐ 10%   ☐ 15%   ☐ 20%   ☑ 25% or more

n. To what degree can your patient tolerate work stress?

☑ Incapable of even "low stress" work         ☐ Capable of low stress work
☐ Capable of moderate stress - normal work    ☐ Capable of high stress work

Please explain the reasons for your conclusion: _____

o. Are your patient's impairments likely to produce "good days" and "bad days"?
☑ Yes        ☐ No

If yes, assuming you patient was trying to work full time, please estimate, on the average, how many days per month your patient is likely to be absent from work as a result of the impairments or treatment:

☑ Never                          ☐ About three days per month
☐ About one day per month        ☐ About four days per month
☐ About two days per month       ☐ More than four days per month

11. Are your patient's impairments (physical impairments plus any emotional impairments) *reasonably consistent* with the symptoms and functional limitations described in this evaluation?                                ☑ Yes        ☐ No

If no, please explain: _____

12. Please add an additional page to describe any other limitations (such as psychological limitations, limited vision, difficulty hearing, need to avoid temperature extremes, wetness, humidity, noise, dust, fumes, gases or hazards, etc.) that would affect your patient's ability to work at a regular job on a sustained basis.

2/11/2020
*Date*

*Signature*   BEVERLY ⚕ HOSPITAL

*Printed/Typed Name:* _____

7-35                  *Address:*         Charles E. Ananian, D.P.M.
11/09
§231.2
_____
_____

# Exhibit 36



EXHIBIT

10 SHAYLER

# Exhibit 37

EXHIBIT

SHAYLER 16













































































# Exhibit 38

Anoush Hakimi (SBN 228858)
anoush@handslawgroup.com
Peter Shahriari (SBN 237074)
peter@handslawgroup.com
Laura Steven (SBN 332168)
laura@handslawgroup.com
**THE LAW OFFICE OF HAKIMI & SHAHRIARI**
1800 Vine Street
Los Angeles, CA 90028
Telephone: (888) 635-2250
Facsimile: (213) 402-2170

Attorneys for Plaintiff,
**JAMES SHAYLER**

| EXHIBIT |
| --- |
| **SHAYLER 5** |

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
| --- | --- |
| James Shayler, an individual,<br><br>          Plaintiff,<br><br>     v.<br><br>1310 PCH LLC, a California limited liability company; and Does 1-10,<br><br>          Defendants. | Case No.: 2:20-cv-10751-GW-GJS<br><br>Hon. George H. Wu<br><br>**DECLARATION OF JAMES SHAYLER IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: August 16, 2021<br>Time: 8:30 a.m.<br>Courtroom: 9D |

# DECLARATION OF JAMES SHAYLER

I, James Shayler, declare as follows:

1.      I am over the age of eighteen, of sound mind, and capable of making this declaration.  I am the Plaintiff in this action, wherein I have filed a First Amended Complaint (FAC) for violations of the Americans with Disabilities Act (ADA) and the Unruh Civil Rights Act (UCRA).  I make this declaration in support of Plaintiff's Motion for Summary Judgment.

2.      I have knowledge of the matters contained herein, and they are true and correct of my own personal knowledge, except for those matters stated upon information and belief, and as to those matters, I believe them to be true and correct.  If called and sworn as a witness, I could and would testify competently hereto.

## I.      My Disabilities

3.      I am a disabled senior citizen.  I have various physical conditions that impact my health and mobility.  I had two knee replacement surgeries which did not go well.  The surgeries resulted in severe pain in my knees and caused my legs to become very weak.  I have a pinched sciatic nerve that causes my left leg to give out sporadically.  I occasionally lose balance when my left leg gives out. I have neuropathy affecting the bottom of my feet, which causes a burning sensation.  I have spinal arthritis, spinal stenosis, spondylosis, and a herniated

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

disk.  I experience severe back pain on a regular basis.  I feel sciatica nerve pain in my left hip, which also causes me to limp.

4.      I use a cane daily to help me walk.  When my pain is especially bad, I use a walker instead.  Sometimes my pain is so severe that I cannot be mobile, i.e., I cannot walk around at all.  Filed concurrently herewith as Exhibit 10 are true and correct copies of photos I took of my walker and cane.

5.      I have very limited use of one arm and hand as a result of an injury on the job as a firefighter years ago.  I cannot put much pressure on my left arm or hand.  I was also in a car accident recently, which caused my back condition to further deteriorate.

6.      Considering my permanent disabilities, the State of California has issued me a permanent disabled person parking placard.  Filed concurrently herewith as Exhibit 11 is a true and correct copy of a photo I took of my disabled person parking placard, with identification number redacted.

7.      A true and correct copy of the "Lumbar Spine Medical Source Statement" I received from Beverly Hospital, in connection with my evaluation by Dr. Charles Ananian on February 11, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as Exhibit 1.  The information in the Lumbar Spine Medical Source Statement is accurate and reflects Dr. Ananian's observations and notes during the visit.  As reflected in the Lumbar

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

Spine Medical Source Statement, there are multiple levels of diffuse disc bulges in my spine with impingement at the L5 nerve root. *See* Exh. 1 (2/11/20 Lumbar Spine Medical Source Statement). I have sciatica, and experience pain in my lower spine and right leg. *Id.* at 1-2. I have difficulty walking and standing for longer than fifteen (15) minutes. *Id.* at 1-2.

8. A true and correct copy of the "Orthopedic Follow-Up Evaluation" record I received from Dr. Thomas McCloy's office, in connection with an evaluation I had with orthopedic surgeon John D. Plut, M.D. on December 8, 2016, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 2</u>. The information in the evaluation is accurate and reflects Dr. Plut's observations, examination, and notes during our visit. During this visit, Dr. Plut diagnosed me with bilateral osteoarthritis of the knees. *See* Exh. 2 (12/8/16 Orthopedic Follow-Up Evaluation) at 2.

9. A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my visit with Dr. McCloy on January 15, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 3</u>. The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit. As noted in the document, I have a history of: fracture to the right ulnar bone that caused nerve damage and hand atrophy, spinal stenosis and chronic sciatic nerve

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

pain, bilateral knee replacements, and elbow fracture surgery. Exh. 3 (1/15/20 Progress Note) at 2-3. Dr. McCloy diagnosed me with chronic pain syndrome and sciatica. *Id.* at 4.

10. A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my visit with Dr. McCloy on March 2, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 4</u>. The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit. During that visit, I discussed with Dr. McCloy that I had a deep hole in the callus at the middle of the metatarsal heads of my foot, but because I have neuropathy, I could not feel it at that time. *See* Exh. 4 (3/2/20 Progress Note) at 2. Dr. McCloy referred me to a podiatrist. *Id.* at 3.

11. A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my evaluation with Dr. McCloy on April 14, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 5</u>. The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit. During this visit, I discussed with Dr. McCloy that I was continuing to see a podiatrist every week. *See* Exh. 5 (4/14/20 Progress Note) at 2. We again discussed my ongoing right arm and hand pain from an old ulnar nerve injury,

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

my chronic sciatic nerve pain, and my need for medications due to my chronic pain. *Id.*

12. A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my evaluation with Dr. McCloy on May 18, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 6</u>. The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit. During this visit, I discussed with Dr. McCloy that I was hospitalized for osteomyelitis in my foot. *See* Exh. 6 (5/18/20 Progress Note). *Id.* at 2.

13. A true and correct copy of the record I received from Dr. Thomas McCloy's office, in connection with my visit with Dr. Henry Su on July 2, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 7</u>. The information in the document is accurate and reflects Dr. Su's observations and notes during our visit. I had a follow up visit with Dr. Su regarding my foot infection and osteomyelitis. *See* Exh. 7 (7/2/20 Progress Note) at 2.

14. A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my evaluation with Dr. McCloy on July 14, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 8</u>. The information in the progress note is

Case No. 2:20-cv-10751-GW-GJS

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

accurate and reflects Dr. McCloy's observations and notes during our visit. During this visit, I discussed with Dr. McCloy that I required a walking boot. *See* Exh. 8 (7/14/20 Progress Note). *Id.* at 2.

15.     A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my visit with Dr. McCloy on September 9, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as Exhibit 9. The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit. During this visit, I discussed with Dr. McCloy that I had ongoing neuropathy pain and required medications. *See* Exh. 9 (9/9/20 Progress Note). *Id.* at 2.

16.     Because I have severely impaired mobility, and rely on a walker or cane, I need ADA compliant routes of travel, parking, signage, business interiors, and restroom facilities for full and equal access to public accommodations.

## II.     Barriers at the Property

17.     In February 2019, November 2019, and January 2020, I visited the property located at 1312 Pacific Coast Hwy, Hermosa Beach, California 90254 (the "Property"). During my visits, I encountered the access barriers, conditions, and/or violations identified in my FAC. *See* ECF Doc. 17, First Amended Complaint (FAC) at ¶ 20.

18.     On the Property, there is a business called Beach Cities Cleaners, which is a laundry/dry cleaning facility ("the business").  I visited the business on three occasions, in February 2019, November 2019, and January 2020.

19.     During my visits, I could not easily access the Property and/or the business.  I had difficulty parking, disembarking from the car, and walking to and entering the business given the hazards at the Property.  *See* ECF Doc. 17, FAC at ¶¶ 19-23.  I experienced difficulty, humiliation, and frustration.  *See* ECF Doc. 17, FAC at ¶ 22.

20.     I need to walk on a smooth surface without excess slopes or changes in level because I am at risk of tripping when I use my cane or walker.  During my visits, there were changes in level and excess slopes in the route connecting the designated disabled parking space (and/or access aisle) to the business entrance and on the landing in front of the exterior doors.  I have been advised by my investigator that these conditions (issues) remain.

21.     Because it is difficult for me to walk and stand for longer than fifteen (15) minutes, I need directional signage pointing me to an accessible entrance, so that I can quickly figure out where to go. The business also lacked directional signage indicating an accessible entrance, making it difficult for me to determine where to travel safely. I have been advised by my investigator that these conditions (issues) remain.

22.     I need adequate space to disembark from the car, and to unload my mobility device(s).  The designated disabled parking space was not long enough, and there was not adjacent access aisle to allow me to unload my mobility device(s).  I have been advised by my investigator that these conditions (issues) remain. Additionally, the designated disabled parking space was excessively sloped, making it difficult for me to safely disembark.

23.     I need to park in the designated disabled parking space, and it is difficult for me to determine where to park when the designated disabled parking space is not clearly marked.  Also, other people who are not disabled tend to park in the designated disabled parking space, and/or access aisle, which lack adequate signage warning against unauthorized parking.  It is exceedingly difficult for me to disembark from the car when I have to use a non-disabled parking space (without an adjacent access aisle), instead of a designated disabled parking space (with an adjacent access aisle).  The proper signs were not posted when I visited the Property.  I have been advised by my investigator that these conditions (issues) remain.

24.     I intend and plan to visit the Property again once the existing barriers to access are removed (i.e., once the existing ADA violations are remediated).

Case No. 2:20-cv-10751-GW-GJS
DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

25. I presently remain deterred from visiting the Property because I am aware that access barriers (i.e., conditions in violation of the ADA and UCRA) still exist.

26. I have reviewed the Declaration of John Battista, filed concurrently herewith, and am aware of the access barriers (i.e., non-compliant conditions) he found during his inspection on June 29, 2021.

27. The non-compliant conditions Mr. Battista observed included: excess slopes in the designated disabled parking space; no marked adjacent access aisle for the designated disabled parking space; non-compliant signage for the designated disabled parking space; no directional sign indicating an accessible route of travel; and excessive slopes on the accessible route of travel and in the landing for the exterior doors. These conditions constitute barriers to access for disabled persons such as myself as described above.

28. Once the remaining violations have been remediated, making the Property safe for me, I plan to visit again and patronize Beach Cities Cleaners because it is close to my friend's house and offers lower prices than other cleaners.

1      I declare under the penalty of perjury under the laws of the State of

2

3    California and the United States of America that the foregoing is true and correct.

4    Dated: July 13, 2021

5

6                                    _James Shayler_____

7                                         James Shayler

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                  **11**                    Case No. 2:20-cv-10751-GW-GJS
                 **DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ**

# Exhibit 38

Anoush Hakimi (SBN 228858)
anoush@handslawgroup.com
Peter Shahriari (SBN 237074)
peter@handslawgroup.com
Laura Steven (SBN 332168)
laura@handslawgroup.com
**THE LAW OFFICE OF HAKIMI & SHAHRIARI**
1800 Vine Street
Los Angeles, CA 90028
Telephone: (888) 635-2250
Facsimile: (213) 402-2170

Attorneys for Plaintiff,
**JAMES SHAYLER**

```
┌─────────────────────┐
│      EXHIBIT         │
│                      │
│    SHAYLER 5         │
└─────────────────────┘
```
exhibitsticker.com

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| James Shayler, an individual,<br><br>      Plaintiff,<br><br>  v.<br><br>1310 PCH LLC, a California limited liability company; and Does 1-10,<br><br>      Defendants. | Case No.: 2:20-cv-10751-GW-GJS<br><br>Hon. George H. Wu<br><br>**DECLARATION OF JAMES SHAYLER IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: August 16, 2021<br>Time: 8:30 a.m.<br>Courtroom: 9D |

# DECLARATION OF JAMES SHAYLER

I, James Shayler, declare as follows:

1.      I am over the age of eighteen, of sound mind, and capable of making this declaration.  I am the Plaintiff in this action, wherein I have filed a First Amended Complaint (FAC) for violations of the Americans with Disabilities Act (ADA) and the Unruh Civil Rights Act (UCRA).  I make this declaration in support of Plaintiff's Motion for Summary Judgment.

2.      I have knowledge of the matters contained herein, and they are true and correct of my own personal knowledge, except for those matters stated upon information and belief, and as to those matters, I believe them to be true and correct.  If called and sworn as a witness, I could and would testify competently hereto.

## I.      My Disabilities

3.      I am a disabled senior citizen.  I have various physical conditions that impact my health and mobility.  I had two knee replacement surgeries which did not go well.  The surgeries resulted in severe pain in my knees and caused my legs to become very weak.  I have a pinched sciatic nerve that causes my left leg to give out sporadically.  I occasionally lose balance when my left leg gives out. I have neuropathy affecting the bottom of my feet, which causes a burning sensation.  I have spinal arthritis, spinal stenosis, spondylosis, and a herniated

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

disk.  I experience severe back pain on a regular basis.  I feel sciatica nerve pain in my left hip, which also causes me to limp.

4.    I use a cane daily to help me walk.  When my pain is especially bad, I use a walker instead.  Sometimes my pain is so severe that I cannot be mobile, i.e., I cannot walk around at all.  Filed concurrently herewith as Exhibit 10 are true and correct copies of photos I took of my walker and cane.

5.    I have very limited use of one arm and hand as a result of an injury on the job as a firefighter years ago.  I cannot put much pressure on my left arm or hand.  I was also in a car accident recently, which caused my back condition to further deteriorate.

6.    Considering my permanent disabilities, the State of California has issued me a permanent disabled person parking placard.  Filed concurrently herewith as Exhibit 11 is a true and correct copy of a photo I took of my disabled person parking placard, with identification number redacted.

7.    A true and correct copy of the "Lumbar Spine Medical Source Statement" I received from Beverly Hospital, in connection with my evaluation by Dr. Charles Ananian on February 11, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as Exhibit 1.  The information in the Lumbar Spine Medical Source Statement is accurate and reflects Dr. Ananian's observations and notes during the visit.  As reflected in the Lumbar

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

Spine Medical Source Statement, there are multiple levels of diffuse disc bulges in my spine with impingement at the L5 nerve root. *See* Exh. 1 (2/11/20 Lumbar Spine Medical Source Statement). I have sciatica, and experience pain in my lower spine and right leg. *Id.* at 1-2. I have difficulty walking and standing for longer than fifteen (15) minutes. *Id.* at 1-2.

8. A true and correct copy of the "Orthopedic Follow-Up Evaluation" record I received from Dr. Thomas McCloy's office, in connection with an evaluation I had with orthopedic surgeon John D. Plut, M.D. on December 8, 2016, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 2</u>. The information in the evaluation is accurate and reflects Dr. Plut's observations, examination, and notes during our visit. During this visit, Dr. Plut diagnosed me with bilateral osteoarthritis of the knees. *See* Exh. 2 (12/8/16 Orthopedic Follow-Up Evaluation) at 2.

9. A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my visit with Dr. McCloy on January 15, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 3</u>. The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit. As noted in the document, I have a history of: fracture to the right ulnar bone that caused nerve damage and hand atrophy, spinal stenosis and chronic sciatic nerve

Case No. 2:20-cv-10751-GW-GJS
DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

pain, bilateral knee replacements, and elbow fracture surgery.  Exh. 3 (1/15/20 Progress Note) at 2-3.  Dr. McCloy diagnosed me with chronic pain syndrome and sciatica.  *Id.* at 4.

10.    A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my visit with Dr. McCloy on March 2, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 4</u>.  The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit.  During that visit, I discussed with Dr. McCloy that I had a deep hole in the callus at the middle of the metatarsal heads of my foot, but because I have neuropathy, I could not feel it at that time.  *See* Exh. 4 (3/2/20 Progress Note) at 2.  Dr. McCloy referred me to a podiatrist.  *Id.* at 3.

11.    A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my evaluation with Dr. McCloy on April 14, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 5</u>.  The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit.  During this visit, I discussed with Dr. McCloy that I was continuing to see a podiatrist every week.  *See* Exh. 5 (4/14/20 Progress Note) at 2.  We again discussed my ongoing right arm and hand pain from an old ulnar nerve injury,

Case No. 2:20-cv-10751-GW-GJS

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

my chronic sciatic nerve pain, and my need for medications due to my chronic pain. *Id.*

12.     A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my evaluation with Dr. McCloy on May 18, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 6</u>.  The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit. During this visit, I discussed with Dr. McCloy that I was hospitalized for osteomyelitis in my foot.  *See* Exh. 6 (5/18/20 Progress Note).  *Id.* at 2.

13.     A true and correct copy of the record I received from Dr. Thomas McCloy's office, in connection with my visit with Dr. Henry Su on July 2, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 7</u>.  The information in the document is accurate and reflects Dr. Su's observations and notes during our visit.  I had a follow up visit with Dr. Su regarding my foot infection and osteomyelitis.  *See* Exh. 7 (7/2/20 Progress Note) at 2.

14.     A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my evaluation with Dr. McCloy on July 14, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 8</u>.  The information in the progress note is

accurate and reflects Dr. McCloy's observations and notes during our visit.

During this visit, I discussed with Dr. McCloy that I required a walking boot. *See*

Exh. 8 (7/14/20 Progress Note). *Id.* at 2.

15. A true and correct copy of a progress note I received from Dr.

Thomas McCloy's office, in connection with my visit with Dr. McCloy on

September 9, 2020, and redacted to remove irrelevant private information, is filed

concurrently herewith as <u>Exhibit 9</u>. The information in the progress note is

accurate and reflects Dr. McCloy's observations and notes during our visit.

During this visit, I discussed with Dr. McCloy that I had ongoing neuropathy

pain and required medications. *See* Exh. 9 (9/9/20 Progress Note). *Id.* at 2.

16. Because I have severely impaired mobility, and rely on a walker or

cane, I need ADA compliant routes of travel, parking, signage, business interiors,

and restroom facilities for full and equal access to public accommodations.

## II. Barriers at the Property

17. In February 2019, November 2019, and January 2020, I visited the

property located at 1312 Pacific Coast Hwy, Hermosa Beach, California 90254

(the "Property"). During my visits, I encountered the access barriers, conditions,

and/or violations identified in my FAC. *See* ECF Doc. 17, First Amended

Complaint (FAC) at ¶ 20.

18.     On the Property, there is a business called Beach Cities Cleaners, which is a laundry/dry cleaning facility ("the business"). I visited the business on three occasions, in February 2019, November 2019, and January 2020.

19.     During my visits, I could not easily access the Property and/or the business. I had difficulty parking, disembarking from the car, and walking to and entering the business given the hazards at the Property. *See* ECF Doc. 17, FAC at ¶¶ 19-23. I experienced difficulty, humiliation, and frustration. *See* ECF Doc. 17, FAC at ¶ 22.

20.     I need to walk on a smooth surface without excess slopes or changes in level because I am at risk of tripping when I use my cane or walker. During my visits, there were changes in level and excess slopes in the route connecting the designated disabled parking space (and/or access aisle) to the business entrance and on the landing in front of the exterior doors. I have been advised by my investigator that these conditions (issues) remain.

21.     Because it is difficult for me to walk and stand for longer than fifteen (15) minutes, I need directional signage pointing me to an accessible entrance, so that I can quickly figure out where to go. The business also lacked directional signage indicating an accessible entrance, making it difficult for me to determine where to travel safely. I have been advised by my investigator that these conditions (issues) remain.

22.     I need adequate space to disembark from the car, and to unload my mobility device(s).  The designated disabled parking space was not long enough, and there was not adjacent access aisle to allow me to unload my mobility device(s).  I have been advised by my investigator that these conditions (issues) remain. Additionally, the designated disabled parking space was excessively sloped, making it difficult for me to safely disembark.

23.     I need to park in the designated disabled parking space, and it is difficult for me to determine where to park when the designated disabled parking space is not clearly marked.  Also, other people who are not disabled tend to park in the designated disabled parking space, and/or access aisle, which lack adequate signage warning against unauthorized parking.  It is exceedingly difficult for me to disembark from the car when I have to use a non-disabled parking space (without an adjacent access aisle), instead of a designated disabled parking space (with an adjacent access aisle).  The proper signs were not posted when I visited the Property.  I have been advised by my investigator that these conditions (issues) remain.

24.     I intend and plan to visit the Property again once the existing barriers to access are removed (i.e., once the existing ADA violations are remediated).

25.     I presently remain deterred from visiting the Property because I am aware that access barriers (i.e., conditions in violation of the ADA and UCRA) still exist.

26.     I have reviewed the Declaration of John Battista, filed concurrently herewith, and am aware of the access barriers (i.e., non-compliant conditions) he found during his inspection on June 29, 2021.

27.     The non-compliant conditions Mr. Battista observed included: excess slopes in the designated disabled parking space; no marked adjacent access aisle for the designated disabled parking space; non-compliant signage for the designated disabled parking space; no directional sign indicating an accessible route of travel; and excessive slopes on the accessible route of travel and in the landing for the exterior doors.  These conditions constitute barriers to access for disabled persons such as myself as described above.

28.     Once the remaining violations have been remediated, making the Property safe for me, I plan to visit again and patronize Beach Cities Cleaners because it is close to my friend's house and offers lower prices than other cleaners.

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

1    I declare under the penalty of perjury under the laws of the State of

2

3    California and the United States of America that the foregoing is true and correct.

4    Dated: July 13, 2021

5

6                                    _James Shayler_

7                                    James Shayler

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 39

Case 2:20-cv-11107-FMO-GJS   Document 32-2   Filed 06/17/21   Page 1 of 1   Page ID #:477



EXHIBIT

8 SHAYLER

1:16:42 PM April 2 2021

Exhibit 6

# Exhibit 40



EXHIBIT

SHAYLER 9

Exhibit 9

1:17:41 PM April 2 2021

597

# Exhibit 41

EXHIBIT

11 SHAYLER



**Exhibit 18**

# Exhibit 42

EXHIBIT

SHAYLER 14



**Exhibit 17**

# Exhibit 43

DocuSign Envelope ID: BE62B6D0-1CCE-4B7B-910B-E80B7430E665

Anoush Hakimi (SBN 228858)
anoush@handslawgroup.com
Peter Shahriari (SBN 237074)
peter@handslawgroup.com
Ani Avetisyan (SBN 266679)
ani@handslawgroup.com
Laura Steven (SBN 332168)
laura@handslawgroup.com
**THE LAW OFFICE OF HAKIMI & SHAHRIARI**
1800 Vine Street
Los Angeles, CA 90028
Telephone: (888) 635-2250
Facsimile: (213) 402-2170

Attorneys for Plaintiff,
**JAMES SHAYLER**

|   |   |
|---|---|
| **EXHIBIT** | |
| **SHAYLER 6** | |

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| James Shayler, an individual, | Case No.: 2:20-cv-01882-RAO |
|      Plaintiff, | Hon. Rozella A. Oliver |
|      v. | |
| Ehab S. Yacoub, an individual; Lorine A. Mikhaeil, an individual; and Does 1-10, | **DECLARATION OF JAMES SHAYLER IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
|      Defendants. | Date: April 14, 2021<br>Time: 10:00 a.m.<br>Courtroom: 590 |

DocuSign Envelope ID: BE62B6D0-1CCE-4B7B-910B-E80B7430E665

## DECLARATION OF JAMES SHAYLER

I, James Shayler, declare as follows:

1.      I am over the age of eighteen, of sound mind, and capable of making this declaration.  I am the Plaintiff in this action, wherein I have filed a First Amended Complaint (FAC) for violations of the Americans with Disabilities Act (ADA) and the Unruh Civil Rights Act (UCRA).  I make this declaration in support of Plaintiff's Motion for Summary Judgment.

2.      I have knowledge of the matters contained herein, and they are true and correct of my own personal knowledge, except for those matters stated upon information and belief, and as to those matters, I believe them to be true and correct.  If called and sworn as a witness, I could and would testify competently hereto.

### I.      My Disabilities

3.      I am a disabled senior citizen.  I have various physical conditions that impact my health and mobility.  I had two knee replacement surgeries which did not go well.  The surgeries resulted in severe pain in my knees and caused my legs to become very weak.  I have a pinched sciatic nerve that causes my left leg to give out sporadically.  I occasionally lose balance when my left leg gives out. I have neuropathy affecting the bottom of my feet, which causes a burning sensation.  I have spinal arthritis, spinal stenosis, spondylosis, and a herniated

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

DocuSign Envelope ID: BE62B6D0-1CCE-4B7B-910B-E80B7430E665

disk.  I experience severe back pain on a regular basis.  I feel sciatica nerve pain in my left hip, which also causes me to limp.

4.    <u>I use a cane daily to help me walk.  When my pain is especially bad, I use a walker instead.</u>  Sometimes my pain is so severe that I cannot be mobile, i.e., I cannot walk around at all.  Filed concurrently herewith as <u>Exhibit 10</u> are true and correct copies of photos I took of my walker and cane.

5.    I have very limited use of my left arm and hand as a result of an injury on the job as a firefighter years ago.  I cannot put much pressure on my left arm or hand, and my left hand has atrophied.  I was also in a car accident recently, which caused my back condition to further deteriorate.

6.    Considering my permanent disabilities, the State of California has issued me a permanent disabled person parking placard.  Filed concurrently herewith as <u>Exhibit 11</u> is a true and correct copy of a photo I took of my disabled person parking placard, with identification number redacted.

7.    A true and correct copy of the "Lumbar Spine Medical Source Statement" I received from Beverly Hospital, in connection with my evaluation by Dr. Charles Ananian on February 11, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 1</u>.  The information in the Lumbar Spine Medical Source Statement is accurate and reflects Dr. Ananian's observations and notes during the visit.  As reflected in the Lumbar

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

DocuSign Envelope ID: BE62B6D0-1CCE-4B7B-910B-E80B7430E665

Spine Medical Source Statement, there are multiple levels of diffuse disc bulges in my spine with impingement at the L5 nerve root. *See* Exh. 1 (2/11/20 Lumbar Spine Medical Source Statement). I have sciatica, and experience pain in my lower spine and right leg. *Id.* at 1-2. I have difficulty walking and standing for longer than fifteen (15) minutes. *Id.* at 1-2.

8.     A true and correct copy of the "Orthopedic Follow-Up Evaluation" record I received from Dr. Thomas McCloy's office, in connection with an evaluation I had with orthopedic surgeon John D. Plut, M.D. on December 8, 2016, and redacted to remove irrelevant private information, is filed concurrently herewith as Exhibit 2. The information in the evaluation is accurate and reflects Dr. Plut's observations, examination, and notes during our visit. During this visit, Dr. Plut diagnosed me with bilateral osteoarthritis of the knees. *See* Exh. 2 (12/8/16 Orthopedic Follow-Up Evaluation) at 2.

9.     A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my visit with Dr. McCloy on January 15, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as Exhibit 3. The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit. As noted in the document, I have a history of: fracture to the right ulnar bone that caused nerve damage and hand atrophy, spinal stenosis and chronic sciatic nerve

DocuSign Envelope ID: BE62B6D0-1CCE-4B7B-910B-E80B7430E665

pain, bilateral knee replacements, and elbow fracture surgery.  Exh. 3 (1/15/20 Progress Note) at 2-3.  Dr. McCloy diagnosed me with chronic pain syndrome and sciatica.  *Id.* at 4.

10.  A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my visit with Dr. McCloy on March 2, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 4</u>.  The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit.  During that visit, I discussed with Dr. McCloy that I had a deep hole in the callus at the middle of the metatarsal heads of my foot, but because I have neuropathy, I could not feel it at that time.  *See* Exh. 4 (3/2/20 Progress Note) at 2.  Dr. McCloy referred me to a podiatrist.  *Id.* at 3.

11.  A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my evaluation with Dr. McCloy on April 14, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 5</u>.  The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit.  During this visit, I discussed with Dr. McCloy that I was continuing to see a podiatrist every week.  *See* Exh. 5 (4/14/20 Progress Note) at 2.  We again discussed my ongoing right arm and hand pain from an old ulnar nerve injury,

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

DocuSign Envelope ID: BE62B6D0-1CCE-4B7B-910B-E80B7430E665

my chronic sciatic nerve pain, and my need for medications due to my chronic

pain. *Id.*

12.    A true and correct copy of a progress note I received from Dr.

Thomas McCloy's office, in connection with my evaluation with Dr. McCloy on

May 18, 2020, and redacted to remove irrelevant private information, is filed

concurrently herewith as Exhibit 6.  The information in the progress note is

accurate and reflects Dr. McCloy's observations and notes during our visit.

During this visit, I discussed with Dr. McCloy that I was hospitalized for

osteomyelitis in my foot.  *See* Exh. 6 (5/18/20 Progress Note).  *Id.* at 2.

13.    A true and correct copy of the record I received from Dr. Thomas

McCloy's office, in connection with my visit with Dr. Henry Su on July 2, 2020,

and redacted to remove irrelevant private information, is filed concurrently

herewith as Exhibit 7.  The information in the document is accurate and reflects

Dr. Su's observations and notes during our visit.  I had a follow up visit with Dr.

Su regarding my foot infection and osteomyelitis.  *See* Exh. 7 (7/2/20 Progress

Note) at 2.

14.    A true and correct copy of a progress note I received from Dr.

Thomas McCloy's office, in connection with my evaluation with Dr. McCloy on

July 14, 2020, and redacted to remove irrelevant private information, is filed

concurrently herewith as Exhibit 8.  The information in the progress note is

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

DocuSign Envelope ID: BE62B6D0-1CCE-4B7B-910B-E80B7430E665

accurate and reflects Dr. McCloy's observations and notes during our visit. During this visit, I discussed with Dr. McCloy that I required a walking boot. *See* Exh. 8 (7/14/20 Progress Note). *Id.* at 2.

15. A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my visit with Dr. McCloy on September 9, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as Exhibit 9. The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit. During this visit, I discussed with Dr. McCloy that I had ongoing neuropathy pain and required medications. *See* Exh. 9 (9/9/20 Progress Note). *Id.* at 2.

16. Because I have severely impaired mobility, and rely on a walker or cane, I need ADA compliant routes of travel, parking, signage, business interiors, and restroom facilities for full and equal access to public accommodations.

## II. Barriers at the Property

17. In February 2019, April 2019, November 2019, and December 2019, I went the property located at 4315 Sepulveda Boulevard, Culver City, California 90016 (the "Property"). During my visits, I encountered the access barriers, conditions, and/or violations identified in my FAC. *See* ECF Doc. 44, First Amended Complaint (FAC) at ¶ 20.

Case No. 2:20-cv-01882-RAO

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

DocuSign Envelope ID: BE62B6D0-1CCE-4B7B-910B-E80B7430E665

18.     On the Property, there is a business called Fresh Pita Organic Express, which is a restaurant/eatery ("the business").  I visited the business on four occasions, in February 2019, April 2019, November 2019, and December 2019.

19.     During my visits, I could not easily access the Property and/or the business.  I had difficulty parking, disembarking from the car, and walking to and entering the business given the hazards at the Property.  *See* ECF Doc. 44, FAC at ¶¶ 20-23.  I experienced difficulty, humiliation, and frustration.  *See* ECF Doc. 44, FAC at ¶ 22.

20.     I need to walk on a smooth surface without excess slopes or changes in level because I am at risk of tripping when I use my cane or walker.  During my visits, the pavement was not smooth, and there were changes in level and excess slopes in the route connecting the designated disabled parking space (and/or access aisle) to the business entrance.  I have been advised by my investigator that these conditions (issues) remain.

21.     I need adequate space to disembark from the car, and to unload my mobility device(s).  The designated disabled parking space, and adjacent access aisle for loading and unloading, were not long enough and did not provide me with sufficient space.  The designated disabled parking space also was not wide

Case No. 2:20-cv-01882-RAO

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

DocuSign Envelope ID: BE62B6D0-1CCE-4B7B-910B-E80B7430E665

enough.  I have been advised by my investigator that these conditions (issues) remain.

22.    I need to park in the designated disabled parking space, and it is difficult for me to determine where to park when the designated disabled parking space is not clearly marked.  Also, other people who are not disabled tend to park in the designated disabled parking space, and/or access aisle, which lack adequate signage warning against unauthorized parking.  It is exceedingly difficult for me to disembark from the car when I have to use a non-disabled parking space (without an adjacent access aisle), instead of a designated disabled parking space (with an adjacent access aisle).  The proper signs were not posted when I visited the Property.  I have been advised by my investigator that these conditions (issues) remain.

23.    I also had difficulty using the restroom because the toilet tissue dispenser was located too far from the toilet, and the mirror was placed too high off the floor.  I have been advised by my investigator that these conditions (issues) remain.

24.    I intend and plan to visit the Property again once the existing barriers to access are removed (i.e., once the existing ADA violations are remediated).  The Property is conveniently located about ten (10) minutes from

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

DocuSign Envelope ID: BE62B6D0-1CCE-4B7B-910B-E80B7430E665

my home by car, and I enjoy the shawarma prepared by Fresh Pita Organic Express.

25.    I presently remain deterred from visiting the Property because I am aware that access barriers (i.e., conditions in violation of the ADA and UCRA) still exist.

26.    I have reviewed the Declaration of Marc Friedlander, filed concurrently herewith, and am aware of the access barriers (i.e., non-compliant conditions) he found during his inspection on August 18, 2020.

27.    The non-compliant conditions Mr. Friedlander observed included: excess slopes in the designated disabled parking space; damaged pavement in the parking lot; no marked route of travel; unsecured mats in and around the business; changes in level at the business entrance; insufficient door clearance space at the business entrance; and improperly positioned toilet rear grab bar. These conditions constitute barriers to access for disabled persons such as myself.

28.    Because I use a walker, it is difficult for me to get out of the car, unload my walker, and ambulate with the assistance of my walker when I am on a sloped surface.  It is difficult for me to traverse excess slopes in the designated disabled parking space.

29.    It would be difficult for me to traverse the parking lot given the broken and extremely damaged condition of the pavement.  I could trip if my

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

DocuSign Envelope ID: BE62B6D0-1CCE-4B7B-910B-E80B7430E665

cane, walker, and/or feet catch on the uneven ground.

30.     Due to my difficulty ambulating, it is dangerous for me to traverse an area where there is no designated path, or marked route of travel, out of the way of vehicle traffic.

31.     I am also at risk of tripping on the unsecured mats outside and inside the business, and the change in level at the doorway/ entrance to the business.

32.     Furthermore, my walker cannot comfortably fit through the doorway entrance to the business since the entrance is too narrow.

33.     Moreover, the higher toilet rear grab bar makes it more difficult for me to use the restroom inside the business.

34.     Once the remaining violations have been remediated, making the Property safe for me, I plan to visit again and patronize the Fresh Pita Organic Express restaurant/eatery.

I declare under the penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Dated:  March 17, 2021

_____
James Shayler

DECLARATION OF JAMES SHAYLER ISO PLAINTIFF'S MSJ

# Exhibit 44

EXHIBIT

SHAYLER 13



**Exhibit 22**

# Exhibit 45

Anoush Hakimi (SBN 228858)
anoush@handslawgroup.com
Peter Shahriari (SBN 237074)
peter@handslawgroup.com
Laura Steven (SBN 332168)
laura@handslawgroup.com
**THE LAW OFFICE OF HAKIMI & SHAHRIARI**
1800 Vine Street
Los Angeles, CA 90028
Telephone: (888) 635-2250
Facsimile: (213) 402-2170

Attorneys for Plaintiff,
**JAMES SHAYLER**

EXHIBIT

SHAYLER 7

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SHAYLER, an individual,<br><br>              Plaintiff,<br><br>     v.<br><br>HB MAT PROPERTIES, a California limited liability company; FUSION SUSHI, a business of unknown form; and DOES 1-10,<br><br>              Defendants. | Case No.:  2:20-cv-11107-FMO-GJS<br><br>Hon. Fernando M. Olguin<br><br>**DECLARATION OF JAMES SHAYLER IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION PURSUANT TO FRCP RULE 12(B)(1) AND (H)(3)**<br><br>Date:  July 1, 2021<br>Time:  10:00 a.m.<br>Courtroom:  6D |

1

# DECLARATION OF JAMES SHAYLER

I, James Shayler, declare as follows:

1.      I am over the age of eighteen, of sound mind, and capable of making this declaration. I am the Plaintiff in this action, wherein I have filed a First Amended Complaint (FAC) for violations of the Americans with Disabilities Act (ADA).  I make this declaration in support of Plaintiff's Opposition to Defendant's Motion to Dismiss for Lack of Jurisdiction Pursuant to FRCP Rule 12(b)(1) and (h)(3).

2.      I have knowledge of the matters contained herein, and they are true and correct of my own personal knowledge, except for those matters stated upon information and belief, and as to those matters, I believe them to be true and correct. If called and sworn as a witness, I could and would testify competently hereto.

3.      I am a disabled senior citizen.  I have various physical conditions that impact my health and mobility.  I had two knee replacement surgeries which did not go well.  The surgeries resulted in severe pain in my knees and caused my legs to become very weak.  I have a pinched sciatic nerve that causes my left leg to give out sporadically.  I occasionally lose balance when my left leg gives out.  I have neuropathy affecting the bottom of my feet, which causes a burning sensation.  I have spinal arthritis, spinal stenosis, spondylosis, and a herniated

2

disk.  I experience severe back pain on a regular basis.  I feel sciatica nerve pain in my left hip, which also causes me to limp.

4.      I use a cane to help me walk, or when my pain is especially bad, I use a walker instead. Sometimes my pain is so severe that I cannot be mobile, i.e., I cannot walk around at all.  Filed concurrently herewith as <u>Exhibit 1</u> are true and correct copies of photos I took of my walker and cane.

5.      <u>I have very limited use of my right arm and hand as a result of an injury on the job as a firefighter years ago.  I cannot put much pressure on my right arm or hand, and my right hand has atrophied.</u>  I was also in a car accident recently, which caused my back condition to further deteriorate.

6.      A true and correct copy of a progress note I received from Dr. Thomas McCloy's office, in connection with my visit with Dr. McCloy on January 15, 2020, and redacted to remove irrelevant private information, is filed concurrently herewith as <u>Exhibit 2</u>.  The information in the progress note is accurate and reflects Dr. McCloy's observations and notes during our visit.  As noted in the document, I have a history of:  fracture to the right ulnar bone that caused nerve damage and hand atrophy, spinal stenosis and chronic sciatic nerve pain, bilateral knee replacements, and elbow fracture surgery. Exh. 2 (1/15/20 Progress Note) at 2-3.  Dr. McCloy diagnosed me with chronic pain syndrome and sciatica. *Id.* at 4.

DECLARATION OF JAMES SHAYLER ISO OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

7.     I have two friends who live in Hermosa Beach near Fusion Sushi, and I enjoy traveling to visit them, spending time with them at the beach, and going out to eat in the neighborhood.

8.     I visited Fusion Sushi with one of my friends who especially enjoys sushi, but I had trouble accessing the property as I describe below.

9.     It is difficult for me to walk and stand due to the pain and weakness in my back and legs. It is far easier for me to visit a property with the accessible entrance clearly marked with the International Symbol of Accessibility ("ISA"), so that I am not walking or backtracking unnecessarily to try to find the accessible entrance. Here, there was no directional signage on the entrance from the public sidewalk at the steps (which is not accessible) directing me to an accessible entrance. I am also aware that my CASp inspector identified a similar lack of directional signage to the restroom, and signage on the strike side of the restroom, which poses the same risks to me, and thus I am deterred from visiting the Property.

10.     I need to use the designated disabled parking space and adjacent access aisle, so that I can easily access the business entrance and do not spend extra time on my feet, given my foot, leg, and back issues. There is a heightened risk that these areas will be unavailable for use if they are not clearly marked due

4

DECLARATION OF JAMES SHAYLER ISO OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

to faded paint, illegible surface signage, or if the proper signage deterring others without disabilities from parking there is not posted.

11.     I need adequate space to park in the designated disabled parking space and unload my mobility device(s) in the adjacent access aisle. If the parking space and access aisle are not long enough or wide enough, it is difficult for me to safely and comfortably disembark from my vehicle, unload my mobility device(s), and maneuver with my mobility device(s).

12.     When there are excess changes in level, such as those I encountered next to the walk adjacent to the designated disabled parking space, I am at risk of tripping and falling, because my cane or walker may become trapped in an uneven surface. I am also aware that my CASp inspector identified similar uneven ground and changes in level at the front door entrance threshold/weather strip, which poses the same risks to me, and thus I am deterred from visiting the Property. My walker has wheels on the front of it, which make it difficult to push on uneven surfaces. *See* Exh. 1. Further, such uneven surfaces caused (and would cause) me difficulty and additional pain because I suffer from neuropathy affecting the bottom of my feet.

13.     I have difficulty walking on slopes, because I use a walker and a cane, I have limited range of movement in my legs, and I suffer from a pinched sciatic nerve. Also, in cases of severe slopes (such as one slope here, in between

5

the designated disabled parking space and marked path of travel), I am at risk of catching my foot, cane, or walker on the sloped ground. When I encounter such significant slopes, I need require the safety features of a ramp.

14.     I am aware that my investigator found hatch lines in the access aisle that are not a maximum of thirty-six inches (36") on center. I need to use the adjacent access aisle (to unload my mobility device(s)) due to my mobility issues. When the hatch lines on the access aisle are not properly marked, others tend to park there.

15.     I am aware that my investigator found that the handrails on the stairs were not in the proper position. Because of my leg issues (i.e., pain and weakness), I rely on handrails to guide myself up and down stairs.

16.     I am aware that my investigator found that there are concrete expansion joints in the walkway spaced greater than one-half inch (1/2"), and measuring up to one inch (1"). It is very dangerous for me to push my walker when the ground is not smooth, because the wheels on my walker may become trapped and cause me to fall. Even when I am not using my walker, my cane or foot may become stuck in the uneven ground, again posing a fall risk for me.

17.     I am aware that my investigator found unsecured floor mats. I have difficulty walking on carpets or mats that are not secured, because I am at a heightened risk of tripping if my cane, walker, and/or foot catches on the

DECLARATION OF JAMES SHAYLER ISO OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

unsecured carpet or mat, causing me to lose my balance (exacerbating my balance issues), trip, and/or fall.

18.    I am aware that my investigator found that the front door's opening force measures twelve pounds (12 lbs.). It is difficult for me to open heavy doors due to my balance issues, back issues, and because I have limited use of one of my hands.

19.    I am aware that my investigator found door locking (twist lock) and opening hardware (door knob) on the restroom door that requires tight grasping, pinching, and/or twisting of the wrist. I have limited use of my right hand, which makes it difficult for me to operate these types of door knobs and locks, particularly when I need to use my other hand to hold my cane or walker.

20.    I am aware that my investigator found limited maneuvering clearance on the pull side of the men's restroom door, and a narrow opening to the restroom stall, which makes it difficult for me to pass through both with my walker.

21.    I am aware that my investigator found that the restroom stall door is not self-closing, the toilet flush valve is on the wall side, and toilet seat cover dispenser is not on an accessible route. Given my balance issues, while I am also trying to hold on to my cane or walker, it is difficult for me to reach out and close the door, flush the toilet, or retrieve a toilet seat cover.

7

22.    Given that I am aware of the numerous findings by my investigator, I
am deterred from visiting the property because of the dangers the conditions pose
to me, as I have explained above.

23.    I hope to visit my friends in Hermosa Beach in the very near future,
and I would like to visit Fusion Sushi again with my friend who enjoys sushi once
it is safe to do so.

I declare under the penalty of perjury under the laws of the State of
California and the United States of America that the foregoing is true and correct.

Dated:  June 9, 2021

_____
James Shayler

8

DECLARATION OF JAMES SHAYLER ISO OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS

# EXHIBITS 46-49 VIDEOS